**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------------------x
                                          )
In re                                     )       Chapter 11
                                          )
QIMONDA RICHMOND, LLC, et al.,¹           )       Case No. 09-10589 (MFW)
                                          )
                        Debtors.          )       Jointly Administered
                                          )
-------------------------------------------------------------x
```

**NOTICE OF ENTRY INTO PURCHASE AND SALE AGREEMENT WITH
RICHMOND SEMICONDUCTOR LLC AND PROPOSED BIDDING PROTECTIONS
AND BIDDING PROCEDURES WITH RESPECT THERETO**

PLEASE TAKE NOTICE that pursuant to the *Order Granting Debtors' Motion, Pursuant to Sections 105(a), 105(d) and 363(b) of the Bankruptcy Code, for Entry of an Order Approving Bidding Protection Procedures and Bidding Procedures in Connection with the Sale of Certain Property of the Debtors*, dated as of July 21, 2009 [Docket No. 561] (the "Sales Procedures Order"), Qimonda Richmond, LLC ("QR"), after consultation with the professionals for the Official Committee of Unsecured Creditors, submits this notice and related exhibits (collectively, the "RS Stalking Horse Notice") identifying Richmond Semiconductor LLC ("RS") as the "stalking horse bidder," pursuant to the Purchase and Sale Agreement between QR and RS, dated as of February 11, 2010 (the "RS PSA") for the Property.² The following exhibits are annexed hereto:

- Exhibit A: A copy of the RS PSA.

- Exhibit B: The RS Bidding Procedures (the "RS Bidding Procedures") governing the sale of the Property under the RS PSA.

- Exhibit C: The *Declaration of Douglas O. Barrett in Support of the Richmond Semiconductor LLC Stalking Horse Notice* (the "Barrett Declaration").

---

¹ The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Qimonda Richmond, LLC (7867) and Qimonda North America Corp. (4654).

² Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the RS PSA.

1

- Exhibit D: The proposed order, entitled *Order (I) Authorizing Qimonda Richmond, LLC to Award Bidding Protections to Richmond Semiconductor LLC; (II) Affording the Payment of the Bidding Protections Administrative Expense Treatment under Sections 503 and 507 of the Bankruptcy Code; and (III) Approving Bidding Protections in Connection With the Sale of Certain Assets of Qimonda Richmond, LLC* (the "RS Stalking Horse Order").

- Exhibit E: The proposed *Notice of Auction*.[3]

PLEASE TAKE FURTHER NOTICE that the key financial terms of the RS Bidding Protections (as defined below) granted to RS and the RS Bidding Procedures governing the sale of the Property under the RS PSA are summarized below:[4]

- Pursuant to the RS PSA, QR proposes to sell the Property to RS for an aggregate purchase price of $**12,000,000.00**.

- If QR closes a transaction with a party other than the RS involving all or a portion of the Property subject to the terms of the RS PSA, (i) a break up fee of $**240,000.00** shall be payable by QR to RS (the "Break Up Fee"), and (ii) an expense reimbursement for reasonable, out-of-pocket, documented costs and expenses of RS related to the transaction of up to $**125,000.00** (the "Expense Reimbursement" and together with the Break Up Fee, the "RS Bidding Protections").

- If QR receives a Qualified Bid (defined in the RS Bidding Procedures) for the Property prior to the bid deadline of March 10, 2010 at 4:00 p.m. (prevailing New York City time), QR will conduct an auction for the Property on March 12, 2010 at 9:00 a.m. (prevailing New York City time) time at the offices of Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (the "Auction").

PLEASE TAKE FURTHER NOTICE that any response or objection to the RS Stalking Horse Notice must be in writing, filed with the Clerk of the Bankruptcy Court, 824 Market Street, 3rd Floor, Wilmington, Delaware, 19801 (an "Objection"), and served upon the undersigned counsel (with a copy to counsel for RS, Hogan & Hartson LLP, 555 Thirteenth Street, NW, Washington, DC 20004, Attn: Edward Dolan, Esq.) on or before **February 26, 2010 at 4:00 p.m. (prevailing New York City time)** (the "Objection Deadline").

---

[3]     QR has filed two additional stalking horse notices concurrently herewith for separate assets.  To save publication and mailing costs, QR will mail and publish one consolidated auction notice.

[4]     The specific RS Bidding Protections granted to RS and the RS Bidding Procedures governing the sale of the Property under the RS PSA are attached hereto and should be reviewed in their entirety as they contain the specific terms and conditions agreed to by the parties relating to the sale of the Property.  If there are any inconsistencies the summary in this notice, the RS Bidding Procedures and the RS PSA, the terms of the RS PSA and the RS Bidding Procedures shall govern.

PLEASE TAKE FURTHER NOTICE that if any response or objection is received before the Objection Deadline, QR will seek to have a hearing scheduled before the Bankruptcy Court on no less than three (3) business days notice.

PLEASE TAKE FURTHER NOTICE THAT IF NO RESPONSE OR OBJECTION IS TIMELY FILED, SERVED AND RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY ENTER THE BIDDING PROTECTION ORDER WITHOUT FURTHER NOTICE OR HEARING.

Dated:  February 11, 2010
          Wilmington, Delaware

Respectfully submitted,

_____/s/ Lee E. Kaufman_____
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Email:  collins@rlf.com
          merchant@rlf.com
          kaufman@rlf.com

 – and –

Mark Thompson (admitted *pro hac vice*)
Morris J. Massel (admitted *pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York  10017
Telephone:  (212) 455-2000
Facsimile:  (212) 455-2502

*Attorneys for the Debtors and*
*Debtors in Possession*

# EXHIBIT A

**[RS PSA]**

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement") is made effective as of February 11, 2010 (the "Effective Date"), by and between QIMONDA RICHMOND, LLC, a Delaware limited liability company ("Seller"), and RICHMOND SEMICONDUCTOR, LLC, a Delaware limited liability company ("Buyer").

WHEREAS, on February 20, 2009 (the "Petition Date"), Seller filed a voluntary petition for relief (the "Bankruptcy Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 09-10589 (MFW), jointly administered;

WHEREAS, Seller continues to operate as debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, on July 21, 2009, the Bankruptcy Court entered its Order Granting Debtors' Motion, Pursuant to Sections 105(a), 105(d) and 363(b) of the Bankruptcy Code, for Entry of an Order Approving Bidding Protection Procedures and Bidding Procedures in Connection with the Sale of Certain Assets of the Debtors (the "Sales Procedures Process Order");

WHEREAS, subject to the terms and conditions of this Agreement and the Stalking Horse Order (as defined below), Seller desires to sell and transfer, and Buyer desires to purchase and acquire, the Property (as defined below);

### ARTICLE I.

### PURCHASE AND SALE

Section 1.1    Agreement of Purchase and Sale.  Subject to the terms and conditions hereinafter set forth, Seller agrees to sell and convey to Buyer, and Buyer agrees to purchase from Seller, the following (collectively, the "Property"):

(a)    that certain real property located in Sandston, Virginia and more particularly described in Exhibit A attached hereto and made a part hereof (the "Land");

(b)    (i) the buildings and any and all other structures, fixtures, cabling, wirings, heating and cooling systems (including all computer, hardware and software used to operate such systems and all other components thereof), building system computers, data processing and transmitting equipment and other improvements affixed to or located on the Land (the "Improvements") and (ii) all furniture, carpeting, draperies, curtains, and other items of personal property (including all software and other intellectual property that is embedded in such personal property) owned by Seller and located on the Land and Improvements, other than those assets set forth on Schedule 1.2(a) (the "Personal Property").

(c)    all of Seller's right, title and interest, if any, in and to any air space, subterrain, roads, streets, alleys and ways, public and private, serving any of said Land or

1

Improvements; all of Seller's right, title and interest, if any, in and to any land lying in the bed of any street, road, avenue or alley, open or closed, or proposed to be opened or closed, in front of or adjoining any of said Land or Improvements, and all other appurtenances, rights, easements, rights-of-way, tenements and hereditaments incident thereto, and all right, title and interest, if any, of Seller in and to any award made or to be made in lieu thereof and in and to any award for damages to the Land or the Improvements by reason of any casualty or condemnation (collectively, the "Appurtenant Rights"); and

(d)    all assignable existing warranties and guaranties (express or implied) issued to Seller in connection with the Improvements or the Personal Property, all assignable existing permits, licenses and other approvals, and authorizations, certificates of occupancy and entitlements issued by any governmental authority in connection with the Property (the "Intangibles").

Section 1.2    Excluded Property.    Notwithstanding anything to the contrary in this Agreement or otherwise, the Property shall not include and Seller is not selling to Buyer any right, title or interest of Seller in, to or under any of the following assets (collectively, the "Excluded Assets"):

(a)    the assets listed on attached Schedule 1.2(a), including, without limitation, (i) all semiconductor equipment and tools; (ii) all assets owned by and/or previously sold to third parties, including without limitation, Seller, Air Products and Chemicals, Inc., General Electric Capital Corporation, Nextel Communications of the Mid-Atlantic, Inc., Macquarie Electronics USA Inc., Overland Capital Group, Inc., Royal Bank of Scotland and Texas Instruments Incorporated (collectively, the "Excluded Asset Owners"); (iii) all assets reasonably required by the Seller for the administration of the Bankruptcy Case, or any other assets not owned by Seller;

(b)    cash and cash equivalents on hand and in banks;

(c)    accounts, notes and other receivables;

(d)    utility service prepayments and deposits;

(e)    insurance policies;

(f)    the Seller's corporate books and records and any software, hardware or intellectual property related to such books and records;

(g)    manuals relating to the Excluded Assets;

(h)    all commitments, contracts, leases, licenses, agreements and understandings, written or oral, relating to the Business to which Seller is a party or by which it or any of the Property is bound (collectively, the "Contracts");

(i)    any and all claims and causes of action which Seller may assert whether under the Bankruptcy Code or otherwise, including without limitation Seller's rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are

defined by the non-bankruptcy law of any relevant jurisdiction) and any other direct or indirect claim of any kind whatsoever, whenever and wherever arising or asserted;

(j) Seller's name, Seller's trademarks associated with Seller's name, the domain name and Seller's website;

(k) all software and other intellectual property other than such software and other intellectual property that is legally transferable and embedded in any of the Improvements or Personal Property; and

(l) substation, transmission lines and distribution infrastructure located within the Land that is owned by Dominion Resources.

Section 1.3    Purchase Price.  Seller shall sell and Buyer shall purchase the Property for the amount of Twelve Million Dollars ($12,000,000) (the "Purchase Price").

Section 1.4    Payment of Purchase Price.  The Purchase Price, as increased or decreased by prorations and adjustments as herein provided, shall be payable in full at Closing in cash by wire transfer of immediately available funds to a bank account designated by Seller in writing to Buyer prior to the Closing (as defined below).

Section 1.5    Deposit.  Within one (1) business day after  the execution and delivery of this Agreement, Buyer will deposit with Chicago Title Insurance Company (the "Title Company"), having its office at 830 East Main Street, Richmond, Virginia 23219, the sum of One Million Two Hundred Thousand Dollars ($1,200,000) (the "Deposit") in good funds either by certified bank or cashier's check or by federal wire transfer.  The Deposit shall be applied to the Purchase Price at Closing or treated as liquidated damages pursuant to Section 9.2 in the event of Buyer's failure to close in accordance with the terms of an escrow agreement to be entered into between Buyer, Seller and the Title Company in the form attached hereto as Exhibit D (the "Escrow Agreement").  Subject to Section 9.2, all interest earned on the Deposit shall be credited to the Purchase Price upon the Closing.  The failure of Buyer to timely deliver the Deposit hereunder shall be a material default, and shall entitle Seller, at Seller's sole option and as its sole remedy to terminate this Agreement upon two (2) business days' written notice to Buyer.

Section 1.6    Assumption of Liabilities.  (a) (i) From and after the Closing Date, Buyer shall be solely responsible for, and shall indemnify, defend and hold harmless, Seller and its Representatives (as defined below) from and against any obligations or material liabilities first arising from or relating to facts, circumstances or conditions at or relating to the Property first existing, initiated or occurring from and after the Closing Date related to activities of the Buyer, including, without limitation obligations or liabilities under or relating to Environmental Laws (as defined below) relating to facts, circumstances or conditions at or relating to the Property first existing, initiated or occurring from and after the Closing Date.

(ii) From and after the Termination Date (as defined in the Lease), Buyer shall be solely responsible for, and shall indemnify, defend and hold harmless, Seller and its Representatives (as defined below) from and against  any obligations or liabilities (x) first arising from or relating to facts, circumstances or conditions at or relating to the Property first existing, initiated or occurring from and after the Termination Date,  including, without limitation, obligations or liabilities under

or relating to Environmental Laws (as defined below) relating to facts, circumstances or conditions at or relating to the Property first existing, initiated or occurring from and after the Termination Date and (y) relating to (A) the preservation, maintenance, upkeep, decommissioning, decontamination, remediation, cleaning, modification or removal of or (B) the failure to preserve, maintain, upkeep, decommission, decontaminate, remediate, clean, modify or remove any structure, building, building component, improvement, infrastructure, vessel, container, piping, tubing, conduit, duct, equipment, tool, device, chattel or fixture included or contained in the Property from and after the Termination Date except to the extent resulting from the maintenance or removal of Excluded Equipment from the Property prior to the Termination Date (the obligations and liabilities assumed by Buyer pursuant to 1.6(a)(i) and (ii), the "Assumed Liabilities"); provided, that the Assumed Liabilities shall not include and Seller shall remain obligated for (a) any obligations or liabilities under any Contracts, and (b) any obligations or liabilities arising directly from the removal of any Excluded Equipment or the action of any Excluded Asset Owner in connection therewith (whether arising prior to or subsequent to the Termination Date). Except for the Assumed Liabilities, Buyer shall not assume any duties, debts, liabilities or obligations (absolute or contingent) of any kind of Seller or otherwise relating to the Property of any nature whatsoever, whether due and payable or not yet due and payable, known or unknown, asserted or unasserted, direct or indirect, liquidated or unliquidated, or arising out of, based upon or relating to any event, condition, circumstance, act or omission occurring or existing before, on or after the Closing Date.

(b)     If a claim is made against Seller that Seller believes to be covered by Buyer's indemnification obligations in Section 1.6(a) above, Seller shall promptly notify Buyer of the claim and, in such notice shall offer to Buyer the opportunity to assume the defense of the claim within fifteen (15) business days after receipt of the notice. If Buyer timely elects to assume the defense of the claim, Buyer shall have the right, in its sole discretion, to settle the claim on any terms it considers reasonable and without Seller's prior written consent, as long as the settlement shall not require Seller to render any performance or pay any consideration, and does not include or involve the admission or plea of no contest to any alleged illegal or immoral act of Seller. If Buyer fails timely to elect to assume the defense of the claim or thereafter fails to defend diligently after notice and an opportunity to cure as is reasonable under the circumstances, then Seller shall have the right to take over the defense of the claim at the sole expense of Buyer, provided that such expenses shall be reasonable. Seller shall have the right, in its sole discretion, to settle the claim on any terms it considers reasonable and without Buyer's prior written consent, as long as the settlement shall not require Buyer to render any performance or pay any consideration, and does not include or involve the admission or plea of no contest to any alleged illegal or immoral act of Buyer. If Buyer assumes the defense of a claim, Seller may employ its own counsel but such employment shall be at the sole expense of Seller; in addition, in the event that counsel selected by Buyer at any time determines that such counsel cannot represent the interests of both Buyer and Seller, Seller shall retain its own counsel at Buyer's expense, provided that such expenses shall be reasonable.

Section 1.7     No Successor Liability.  The parties intend that, except where expressly prohibited under any applicable federal, state, local, national or supranational or foreign law (including common law), statute, ordinance, rule, regulation, order, code ruling, decree, arbitration award, agency requirement, license or permit of any governmental or regulatory authority, agency,

4

commission, body or other governmental entity (each, a "<u>Law</u>"), upon the Closing, Buyer shall not be deemed to: (i) be the successor of Seller, (ii) have, *de facto* or otherwise, merged with or into Seller, (iii) be a mere continuation or substantial continuation of Seller or the enterprise(s) of Seller or (iv) be liable for any acts or omissions of Seller in the conduct of Seller's business or arising under or related to the Property. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the parties intend that Buyer shall not be liable for any bankruptcy claims, other claims, written notices, causes of action, proceedings, complaints, investigations or other proceedings against Seller or any of its predecessors or affiliates, and Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Property, the operations conducted thereon or any obligations of Seller arising prior to or subsequent to the Closing Date, including, without limitation, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Property prior to the Closing, except as expressly provided in this Agreement. The parties agree that the provisions substantially in the form of this <u>Section 1.7</u> shall be reflected in the Sale Order (as defined below).

## ARTICLE II.

## TITLE AND SURVEY

Section 2.1    <u>Title Examination</u>.  Buyer acknowledges that Buyer has received (i) a preliminary title commitment for the Property, including all documents referenced therein (the "<u>Title Commitment</u>"), by the terms of which the Title Company has agreed to issue to Buyer at Closing an owner's policy of title insurance (the "<u>Title Policy</u>") in accordance with the Title Commitment and in the amount of the Purchase Price on the 1992 or 2006 form of ALTA owner's title insurance policy, insuring Buyer's fee simple title to the Property subject only to Permitted Exceptions (as defined below) and (ii) an ALTA Survey (the "<u>Survey</u>") of the Property which accurately (x) depicts the Improvements and boundary lines of the Property and (y) plots all plottable matters set forth in the Title Commitment.

Section 2.2    <u>Title Defects</u>.  Prior to the Closing, Buyer may order an update to the Title Commitment and may order an update to the Survey (as applicable, a "<u>Title Commitment Update</u>" or a "<u>Survey Update</u>").  In the event that either the Title Commitment Update or the Survey Update shows any matter that is not a Permitted Exception that was caused (whether by action or omission) or consented to by Seller or adversely affects Buyer's intended use of the Property (a "<u>Title Defect</u>"), Buyer shall notify Seller within ten (10) days of the receipt of the Title Commitment Update or the Survey Update that shows the Title Defect.  Seller shall, prior to or at Closing, cure or remove the Title Defect to the satisfaction of Buyer, which may, at Seller's sole option, include a cure or removal through the Sale Order.  In the event that Seller is unwilling or unable to cure the Title Defect, then Buyer at its option may (i) in the event the Title Defect may be cured by the payment of a liquidated amount proceed to Closing, in which case the Purchase Price shall be reduced by such liquidated amount or (ii) terminate this Agreement and the provisions of <u>Section 9.2</u> below shall apply. If Buyer and Seller do not agree on such liquidated amount pursuant to Section 2.2(i), the matter shall be addressed by the Bankruptcy Court or the applicable court with jurisdiction pursuant to <u>Section 11.14</u>.

Section 2.3   <u>Permitted Exceptions</u>.  The Property shall be conveyed subject only to the following matters, which are hereinafter referred to as the "<u>Permitted Exceptions</u>":

(a)    those matters that are listed on <u>Exhibit E</u> hereto;

(b)    all matters shown on the Survey;

(c)    the lien of all ad valorem real estate taxes and assessments not delinquent as of the date of Closing, subject to proration as herein provided;

(d)    all applicable Laws (including, without limitation, those relative to building, zoning and land use) affecting the development, use, occupancy or enjoyment of the Property;

(e)    title exceptions resulting from any act of Buyer or its affiliates, officers, directors, managers, employees, attorneys, investment bankers, accountants and other agents and representatives (collectively, "<u>Representatives</u>"); and

(f)    any Title Defects which are  insured over by Title Company in a manner reasonably acceptable to Buyer or accepted by Buyer with a reduction in the Purchase Price pursuant to Section 2.2 above.

## ARTICLE III.

## CLOSING

Section 3.1   <u>Time and Place</u>.  The closing of the purchase and sale of the Property contemplated by this Agreement (the "<u>Closing</u>") shall take place at the offices of Hogan & Hartson, LLP, 555 Thirteenth Street, N.W., Washington, D.C. 20004 at 10:00 a.m., local time, on the second (2nd) business day after the conditions to Closing set forth in Article IV (excluding conditions that, by their terms, cannot be satisfied until the Closing) have been satisfied (or waived by the party entitled to waive such condition), or at such other place, date and time as the parties may agree in writing (the "<u>Closing Date</u>").

Section 3.2   <u>Deliveries by Seller at Closing</u>.  At Closing, Seller shall deliver the following documents to Buyer and take the following actions set forth below:

(a)    deliver to Buyer a special warranty deed  conveying the Property subject only to Permitted Exceptions in the form attached hereto as <u>Exhibit F</u> (the "<u>Deed</u>") duly executed and acknowledged by Seller;

(b)    deliver to Buyer a bill of sale for the Personal Property in the form attached hereto as <u>Exhibit G</u> (the "<u>Bill of Sale</u>") duly executed by Seller;

(c)    deliver to Buyer an assignment and assumption agreement (the "<u>Assignment of Intangibles</u>") in the form attached hereto as <u>Exhibit H</u> assigning to Buyer Seller's interest in the Intangibles duly executed by Seller;

6

(d)　　deliver to Buyer a certificate, dated as of the date of Closing and executed on behalf of Seller by a duly authorized officer thereof, certifying that the closing conditions set forth in Section 4.2(b) and Section 4.2(c) have been satisfied;

(e)　　deliver to Buyer such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Seller;

(f)　　deliver to Buyer a FIRPTA certificate in the form attached hereto as Exhibit I duly executed by Seller;

(g)　　deliver to Buyer a certified copy of the Sale Order;

(h)　　deliver to Buyer a so-called seller's affidavit as may be customarily and reasonably required by the Title Company;

(i)　　execute and deliver to  Buyer a settlement statement (the "Settlement Statement") in the form agreed between Buyer and Seller;

(j)　　deliver to Buyer exclusive possession and, except as provided pursuant to Section 7.2,  occupancy of the Property;

(k)　　execute and deliver to Buyer the Lease (as hereinafter defined);

(l)　　deliver to Buyer such additional documents as shall be reasonably required to consummate the transaction contemplated by this Agreement, including documents that may be required to satisfy any requirements to the issuance of the  Title Policy.

Section 3.3　　Deliveries by Buyer at Closing.　At Closing, Buyer shall deliver the following or take the following actions:

(a)　　pay to Seller the Purchase Price, as increased or decreased by prorations and adjustments as herein provided, in immediately available wire transferred funds pursuant to Section 1.4 hereof;

(b)　　deliver to Seller an executed counterpart of the Assignment of Intangibles executed by Buyer;

(c)　　deliver to Seller a certificate, dated as of the date of Closing and executed on behalf of Buyer by a duly authorized officer thereof, certifying that the closing conditions set forth in Section 4.3(c) and Section 4.3(d) have been satisfied;

(d)　　execute and deliver to Seller a counterpart original of the Settlement Statement;

(e)　　deliver to Seller such evidence as to the authority of the person or persons executing documents on behalf of Buyer; and

(f)     deliver to Seller a guaranty executed by the sole member of Buyer in the form attached hereto as <u>Exhibit N</u>;

(g)     execute and deliver to Seller the Lease;

(h)     deliver to Seller such additional documents as shall be reasonably required to consummate the transaction contemplated by this Agreement.

Section 3.4     <u>Credits and Prorations</u>.

(a)     All taxes and utility expenses of the Property shall be prorated as of 12:01 a.m. on the day of Closing as if Buyer were vested with title to the Property during the entire day upon which Closing occurs.  Such prorated items include, without limitation, the following:

(i)     subject to Article 4 of the Lease (as defined in Section 7.2 below), taxes and assessments (including personal property taxes on the Personal Property) levied against the Property shall be prorated to periods before and after Closing (as provided in <u>Section 3.4(b)</u> below) and Seller shall be responsible for all taxes relating to taxable periods or portions thereof prior to the Closing Date and Buyer shall be responsible for all taxes relating to taxable periods or portions thereof on and after the Closing Date; and

(ii)     utility charges for which Seller is liable, if any, such charges to be apportioned at Closing on the basis of the most recently received bill for each such utility.

(iii)     in the case of any taxable period starting before and ending after the Closing Date, with respect to the Property (a "<u>Straddle Period</u>"), the amount of taxes allocable to the portion of such Straddle Period prior to the Closing Date shall be deemed to be (x) in the case of taxes imposed on a periodic basis (such as real or personal property taxes), the amount of such taxes for the entire period (or, in the case of such taxes payable on an arrears basis, the amount of such taxes for the immediately preceding taxable period) multiplied by a fraction, the numerator of which is the number of calendar days in such taxable period ending on the day prior to the Closing Date, and the denominator of which is the number of calendar days in the entire relevant taxable period, and (y) in the case of taxes not described in (x), the amount of any such taxes determined as if such taxable period ended as of the close of business on the day prior to the Closing Date,

(iv)     at Closing, Seller shall, pursuant to the Sale Order, pay an amount of taxes and assessments equal to that portion of such taxes and assessments which relates to the period ending before the Closing Date; provided that, if any taxes or assessments which relate to the period ending before the Closing Date are not paid at or prior to Closing, Seller shall be charged at Closing an amount equal to that portion of such unpaid taxes or assessments which relates to the period

8

before Closing and Buyer shall pay such taxes or assessments along with any taxes or assessments which relate to the period ending on or after the Closing Date prior to their becoming delinquent. Any such apportionment made with respect to a tax year for which the tax rate or assessed valuation, or both, have not yet been fixed shall be based upon the tax rate and/or assessed valuation fixed. To the extent that the actual taxes and assessments for the current year differ from the amount apportioned at Closing, the parties shall make all necessary adjustments by appropriate payments between themselves within ninety (90) days after such amounts are determined following Closing (or thirty (30) days after the assessment, whichever occurs later), subject to the provisions of Section 3.4(c) hereof. Buyer shall pay all supplemental taxes resulting from the change in ownership and reassessment occurring as the result of the Closing pursuant to this Agreement;

(v)     subject to Article 4 of the Lease (as defined in Section 7.2 below), any and all refunds, credits, claims, or rights to appeal respecting the amount of any taxes or assessments charged in connection with the Property (collectively "Tax Refunds") (including any interest related thereto) received by Buyer with respect to the Property for periods prior to the time of the Closing Date (or portions thereof) shall be for the account of Seller, and any Tax Refunds received by Seller relating to the Property for periods including, and after the time of, the Closing Date, (or portions thereof) shall be for the account of Buyer. Buyer shall pay over to Seller, and Seller shall pay over to Buyer, any such Tax Refunds received by the other party (net of any taxes payable by such other party as a result of receiving such Tax Refunds) within five (5) business days of receipt thereof. Seller shall be entitled to request that Buyer, at Seller's expense, file for and obtain any Tax Refunds with respect to the Property for tax periods or portions thereof ending before the Closing Date, and Buyer shall be entitled to request that Seller, at Buyer's expense, file for and obtain any Tax Refunds with respect to the Property for periods including, and after the time of, the Closing Date. Neither Buyer's nor Seller's consent to such request from the other party shall be unreasonably withheld; and

(vi)     as to utility charges referred to in Section 3.4(a)(ii) hereof, Seller may upon notice to Buyer elect to pay one or more of all of said items accrued to the date hereinabove fixed for apportionment directly to the person or entity entitled thereto, and to the extent Seller so elects, such item shall not be apportioned hereunder, and Seller's obligation to pay such item directly in such case shall survive the Closing or any termination of this Agreement.

(b)     Except as otherwise provided herein, any utility expense amount which cannot be ascertained with certainty as of Closing shall be the subject of a final proration ninety (90) days after Closing, or as soon thereafter as the precise amounts can be ascertained. Buyer shall promptly notify Seller when it becomes aware that any such estimated amount has been ascertained. Once such utility expense amounts have been ascertained, Buyer shall prepare, and certify as correct, a final proration statement which shall be subject to Seller's

\\\DC - 032778/000004 - 3026778 v2

approval, which approval shall not be unreasonably withheld, conditioned or delayed.  Upon Seller's acceptance and approval of any final proration statement submitted by Buyer, such statement shall be conclusively deemed to be accurate and final; and

(c)     Buyer and Seller will cooperate fully, as and to the extent reasonably requested by the other party, in connection with any tax matters relating to the Property (including by the provision of reasonably relevant records or information, and cooperation in the filing of any tax returns).

(d)     The provisions of this <u>Section 3.4</u> shall survive Closing.

Section 3.5     <u>Transaction Taxes and Closing Costs</u>.

(a)     Seller and Buyer shall execute such returns, questionnaires and other documents as shall be required with regard to all applicable real property transaction taxes imposed by applicable federal, state or local law or ordinance;

(b)     Seller shall pay the fees of any counsel representing Seller in connection with this transaction.  Seller shall also pay the following costs and expenses:

(i)     one-half (½) of the escrow fee, if any, which is charged by the Title Company;

(ii)     the premium for the ALTA Standard Coverage Owner's Policy of Title Insurance to be issued to Buyer by the Title Company at Closing; and

(iii)     the fees for recording the Deed and any additional recording fees incurred in connection with the satisfaction of Seller's obligations hereunder (if any).

(c)     Buyer shall pay the fees of any counsel representing Buyer in connection with this transaction.  Buyer shall also pay the following costs and expenses:

(i)     one-half (½) of the escrow fee, if any, which is charged by the Title Company;

(ii)     the cost of the Title Commitment, any Title Commitment Update and any Survey Update; and

(iii)     the premium for the ALTA Extended Coverage Owner's Policy of Title Insurance to be issued to Buyer by the Title Company at Closing, and all endorsements thereto, but only to the extent that those costs exceed the cost of an ALTA Standard Coverage Owner's policy.

(d)     All costs and expenses incident to this transaction and the Closing thereof, and not specifically described above, shall be paid by the party incurring same;

(e)     Seller shall bear and be responsible for paying any and all sales, use, transfer, filing, recordation, registration, documentary, stamp and similar taxes and fees, including related penalties, additions to tax, and interest imposed by any governmental authority with respect to the transfer of the Property (collectively, "Transfer Taxes"), regardless of whether the tax authority seeks to collect such taxes from Seller or Buyer.  The parties will cooperate in the preparation, execution and filing of all tax returns and other documentation with respect to all such Transfer Taxes.  The parties will take all reasonable steps to minimize any Transfer Taxes; and

(f)     The provisions of this Section 3.5 shall survive the Closing.

## ARTICLE IV.

## CONDITIONS TO CLOSING

Section 4.1     Conditions to Each Party's Obligation to Effect the Closing.   The respective obligations of each party to effect the Closing hereunder shall be subject to the fulfillment at or prior to the Closing of the following conditions:

(a)     there shall not be in effect any preliminary or permanent injunction or other order or decree by any federal or state court or administrative agency having competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated in this Agreement;

(b)     the Bankruptcy Court shall have entered (i) the Sale Procedures Order, substantially in the form attached to this Agreement and (ii) the Sale Order approving this Agreement, substantially in the form attached to this Agreement, and such Sale Order, among other things: (A) shall include a determination that Buyer is a purchaser in good faith within the meaning of section 363(m) of the Bankruptcy Code and, therefore, entitled to the protections of such section, (B) shall include a waiver of the ten (10) day stay set forth in Federal Rule of Bankruptcy Procedure 6004(h) and (C) shall not have been stayed or otherwise limited as to its terms or effectiveness; and the Sale Order (i) shall not have been reversed or stayed at the time of Closing and (ii) shall not be the subject of an appeal or motion for rehearing or new trial, provided however, that Buyer, in its sole and absolute discretion, may elect to proceed with the Closing even if an appeal from or a motion for rehearing or new trial on the Sale Order is pending; and

(c)     all filings, consents and approvals necessary to permit the parties hereto to perform the transactions contemplated hereby shall have been duly obtained, made or given, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect.

Section 4.2     Conditions Precedent to Buyer's Obligation to Effect the Closing.   In addition to the conditions set forth in Section 4.1 above, the obligation of Buyer to consummate the transactions contemplated hereunder shall be subject to the fulfillment on or before the date of Closing of all of the conditions set forth in this Section 4.2 below, any or all of which may be waived by Buyer in writing in its sole and absolute discretion.

11

(a)    Seller shall have delivered to Buyer all of the items required to be delivered to Buyer pursuant to Section 3.2;

(b)    the representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects (and those representations and warranties that are qualified as to materiality shall be true and correct in all respects) as of the Closing Date as though made at and as of the Closing (except to the extent that such representations and warranties are stated to be made as of a date other than the date they were made, in which case they shall have been true and correct in all material respects, and those representations and warranties that are qualified as to materiality shall be true and correct in all respects as of such other date);

(c)    Seller shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Seller as of the date of Closing;

(d)    The Title Company shall have issued or irrevocably committed to issue to Buyer the Title Policy which shall contain no exceptions other than Permitted Exceptions; and

(e)    The Bankruptcy Court shall have issued an order rejecting the Air Products Lease (as defined below) or the Air Products Lease shall have been terminated by mutual consent or pursuant to its terms.

Section 4.3    Conditions Precedent to Obligation of Seller.  In addition to the conditions set forth in Section 4.1 above, the obligation of Seller to consummate the transaction contemplated hereunder shall be subject to the fulfillment on or before the date of Closing of all of the following conditions, any or all of which may be waived by Seller in its sole and absolute discretion.

(a)    Seller shall have received the Purchase Price as adjusted as provided herein, and payable in the manner provided for in this Agreement;

(b)    Buyer shall have delivered to Seller all of the items required to be delivered to Seller pursuant to Section 3.3;

(c)    The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects (and those representations and warranties that are qualified as to materiality shall be true and correct in all respects) as of the Closing Date as though made at and as of the Closing (except to the extent that such representations and warranties are stated to be made as of a date other than the date they were made, in which case they shall have been true and correct in all material respects as of such other date); and

(d)    Buyer shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Buyer as of the date of Closing.

\\\DC - 032778/000004 - 3026778 v2

# ARTICLE V.

## REPRESENTATIONS AND WARRANTIES

Section 5.1    <u>Representations and Warranties of Sellers</u>.  Seller represents and warrants to Buyer as follows:

(a)    <u>Organization and Good Standing</u>.  Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Subject to the limitations imposed on Seller as a result of having filed a petition for relief under the Bankruptcy Code, or pursuant to any order entered by the Bankruptcy Court, Seller has full entity power and authority to own, operate and lease its properties including the Property. Seller is duly qualified to do business, and is in good standing, in each jurisdiction in which the character or location of the property owned, leased or operated or the nature of the business conducted makes such qualification necessary, except where the failure to be qualified or in good standing will not have a material adverse effect on the Property or the Seller's ability to consummate the transactions contemplated hereunder.

(b)    <u>Authorization</u>.  Subject to the entry of the Sale Order, Seller has the requisite power and authority to execute this Agreement and the other agreements, instruments and certificates to be executed and delivered by it in connection with the transactions contemplated by this Agreement (collectively, the "<u>Seller Ancillary Documents</u>"), to perform its obligations under such agreements, and to consummate the transactions contemplated hereby and thereby. Subject to the entry of the Sale Order, the execution and delivery by Seller of this Agreement and the Seller Ancillary Documents and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate and other organizational action on the part of Seller. This Agreement and the Seller Ancillary Documents have been duly executed and delivered by Seller and, assuming the execution and delivery by Buyer and the entry of the Sale Order, constitute valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except the availability of the remedy of specific performance or injunctive or other forms of equitable relief may be subject to equitable defenses and would be subject to the discretion of the court before which any proceedings therefor may be brought.

(c)    <u>No Violation; Consents</u>.  Upon or after the entry and effectiveness of the Sale Order, the execution and delivery of this Agreement and the Seller Ancillary Documents and the performance of Seller's obligations herein or therein will not (i) conflict with or result in any breach of any provision of the organizational documents of Seller, (ii) violate any applicable foreign, federal, state or local law (including common law), statute, code, ordinance, rule, regulation or other requirement enacted, promulgated, issued or entered by a governmental authority (collectively, "<u>Law</u>"), (iii) require any consent, approval, authorization or permit of, or filing with or notification to, any governmental authority or other Person which has not otherwise been obtained or made or (iv) result in the imposition of any liens, charges, pledges, mortgages, security interests, deeds of trust, restrictions, easements, claims, licenses, leases and other rights of usage and all encumbrances of every type and description (all of the foregoing, "<u>Encumbrances</u>", which term shall include Liens (as defined in Section 101(37) of the Bankruptcy Code) and Claims (as defined in Section 101(5) of the Bankruptcy Code)) upon the

13

Property, except as (x) are excused by or unenforceable as a result of the filing of the Bankruptcy Case or the applicability of any provision of, or any Law under, the Bankruptcy Code or (y) set forth in this Agreement.

(d)     <u>Title to Properties; Absence of Liens</u>.

(i)     Seller is the sole and lawful owner of, and holds good and marketable title to, the Property subject to the Permitted Exceptions and Encumbrances that will be addressed in the Sale Order. At the Closing, Seller shall transfer and convey to Buyer good and marketable title to all of the Property, free and clear of all Encumbrances, except for Permitted Exceptions;

(ii)     To the actual knowledge, after due inquiry, of Miriam Martinez, Scott Ryan or David Robey ("<u>Knowledge</u>"), no portion of the Land or any Improvement is the subject of, or affected by, any condemnation or eminent domain proceedings currently instituted or pending, and to the Knowledge of Seller, no such proceedings are threatened; and

(iii)     Neither the Land, the Improvements nor the other Property are subject to any Encumbrances (other than Permitted Exceptions or any Encumbrances that shall be released or cured on or prior to Closing).

(e)     <u>Permits</u>. Set forth on <u>Schedule 5.1(e)</u> is a list of each material license, permit, consent, approval, variance, exemption and other authorizations (collectively, "<u>Permits</u>") relating to the Property issued by any governmental authority to Seller, and Seller has not received any notice of any proceeding relating to the revocation or modification of any such Permit. To Seller's Knowledge, no condition exists and no event has occurred which might reasonably be expected to cause the revocation of any material Permit. Except for the Permits listed in <u>Schedule 5.1(e)</u>, to Seller's Knowledge, no material Permit is required from any governmental authority for Seller to own and operate the Property as it was operated immediately before the filing of the Bankruptcy Case.

(f)     <u>Compliance with Law</u>. Seller is, to the extent related to the Property, in compliance in all material respects with all applicable Laws and, to Seller's Knowledge, no condition exists which, with or without notice or passage of time or both, shall cause Seller not to remain in compliance. Seller has received no notification and has no Knowledge that any notification could be forthcoming from any governmental authority relating to the Property: (i) asserting that Seller is not in compliance with any applicable Laws, (ii) threatening to revoke any material Permit relating to the Property or (iii) notifying Seller of any investigation by any such governmental authority.

(g)     <u>Litigation</u>. Subject to entry of the Sale Order, there are no private or governmental actions, suits, proceedings, claims, arbitrations, judgments or decrees or, to Seller's Knowledge, investigations pending against Seller or affecting Seller or the Property, which (i) contest or challenge Seller's authority, right or ability to perform its obligations under this Agreement or any of the Seller Ancillary Documents, as applicable, (ii) challenge Seller's right, title or ownership in any of the Property or (iii) would impair or have an adverse effect on

14

Buyer's right or ability to own, use, commercialize or otherwise exploit any of the Property, or impair or have an adverse effect on the value of any of the Property following the Closing. To Seller's Knowledge, there are no proceedings threatened that assert any claim described in clauses (i), (ii) or (iii) of the preceding sentence; provided, however, that if after the date hereof, any action, suit, proceeding, claim, arbitration, judgment decree or investigation described in clauses (i), (ii) or (iii) is asserted, instituted or entered, then the representation contained in the first sentence of this Section 5.1(g) shall be deemed accurate as of the Closing Date so long as an order has been issued by the Bankruptcy Court rejecting, disallowing or dismissing such action, suit, proceeding, claim, arbitration, judgment decree or investigation, no appeal or motion for reconsideration of that order has been filed and the time for filing such motion and an appeal has expired. Except for orders entered in the Bankruptcy Case that do not have an adverse effect on the Property or on Seller's ability to consummate the transactions contemplated hereunder, there are no judgments, decrees, injunctions or orders of any court, governmental authority, arbitrator or mediator pending or binding against Seller or the Property.

(h)     Insurance.  Schedule 5.1(h) lists all insurance policies insuring the Property, including the policy numbers, expiration dates, premium payment schedules, and the coverage limitations and amounts of any deductibles with respect to such insurance policies. Such insurance policies are in full force and effect for such amounts and are sufficient for material compliance with all legal requirements and of all agreements to which Seller is a party or by which it is bound. No event has occurred which limits or impairs the rights of Seller under any such insurance policies. Schedule 5.1(h) sets forth all claims Seller has made under the insurance policies referred to herein within the last twelve (12) months.

(i)     Taxes.  Except as set forth in Schedule 5.1(i), there are no liens for taxes (other than for taxes not yet due and payable) upon the Property.

(j)     Environmental.  To the Knowledge of Seller, except as disclosed on Schedule 5.1(j), as of the date hereof:

(i)     there are no pending or threatened material actions, suits, claims or legal proceedings (in each case in writing) based on the release of Hazardous Substances (as defined below) or the violation of applicable Environmental Laws (as defined below) at the Property or otherwise arising from Seller's activities at the Property involving the release of Hazardous Substances;

(ii)     other than relating to the structures, buildings, building components, improvements, infrastructure, vessels, containers, piping, tubing, conduits, ducts, equipment, tools, devices, chattels or fixtures included or contained in the Property, there are no conditions, facilities, procedures or any other facts or circumstances which could reasonably be expected to give rise to material claims, expenses, losses, liabilities or governmental action against Buyer in connection with any Hazardous Substances present at or disposed from the Property, from any Environmental Laws, or otherwise arising from Seller's activities at the Property involving Hazardous Substances;

15

(iii)    neither polychlorinated biphenyls nor asbestos-containing materials are present on or in the Property;

(iv)    there are no underground improvements intended for the storage of Hazardous Substances and excluding piping or similar structures presently or formerly used for the storage of Hazardous Substances on or below the surface of the Property;

(v)    Seller is currently in material compliance with applicable Environmental Laws;

(vi)    there has been no material release of Hazardous Substances at, on, under or from the Property, such that Seller is or would reasonably be expected to be liable for remediation with respect to such Hazardous Substances; and

(vii)    Seller has furnished to Buyer copies of all material environmental assessments or audits in its possession or under its control that relate to Seller's compliance with applicable Environmental Laws or the environmental condition at the Property (the "Environmental Reports").

For purposes of this Agreement, "Environmental Law" shall mean any federal, state or local statute, law, rule, regulation, ordinance, code or rule of common law in effect and in each case as amended, and any legally binding judicial or administrative interpretation thereof, to the extent relating to protection of the environment or human exposure to Hazardous Substances, including the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. 11001 *et seq.*; the Resource Conservation and Recovery Act, 42 U.S.C. 6901 *et seq.*; the Federal Water Pollution Control Act, 33 U.S.C. 1251 *et seq.*; the Clean Air Act, 42 U.S.C. 7401 *et seq.*; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. 136 *et seq.*; the Safe Drinking Water Act, 42 U.S.C. 300f *et seq.*; the Toxic Substance Control Act, 15 U.S.C. 2601 *et seq.*; the Oil Pollution Act of 1990, 33 U.S.C. 2701 *et seq.*; the Hazardous Materials Transportation Act, 49 U.S.C. 5101 *et seq.*; the Atomic Energy Act, 42 U.S.C. 2011 *et seq.*; any laws regulating the use of biological agents or substances including medical or infectious wastes; and any corresponding or analogous foreign, state or local laws, regulations or ordinances.

For purposes of this Agreement, "Hazardous Substances" shall mean any wastes, substances, radiation or materials (whether solids, liquids or gases):(a) which are defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "restricted hazardous wastes," "toxic substances," "toxic pollutants," "hazardous air pollutants," "pollutants," "contaminants," "toxic chemicals," "toxics," "hazardous chemicals," "extremely hazardous substances," "regulated substances" or "pesticides" as defined as such in any applicable Environmental Law, (b) which are or contain any radioactive materials, asbestos, asbestos-containing materials, urea formaldehyde foam insulation, radon, polychlorinated biphenyls (PCBs), toxic mold, methyl-tertiary butyl ether (MTBE), lead-based paints or petroleum or petroleum products (including, without limitation, crude oil or any fraction thereof), (c) which pose a hazard to human health, safety, natural resources, employees or the

16

environment and (d) exposure to which is prohibited, limited or regulated by Environmental Law.

The representations and warranties included in Section 5.1(c), Section 5.1(h), and this Section 5.1(l) are the sole and exclusive representations and warranties of Seller relating to Environmental Laws, Hazardous Substances or environmental matters.

(j) <u>Financial Advisors</u>. Except as set forth on <u>Schedule 5.1(m)</u> and in <u>Section 11.19</u>, no individual, corporation, general or limited partnership, limited liability company or other entity has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the transactions contemplated hereunder. Buyer is not and will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the transactions contemplated hereunder based upon any arrangement made by or on behalf of Seller.

(k) INTENTIONALLY DELETED

(l) <u>Excluded Asset Owners</u>. <u>Schedule 1.2(a)</u> sets forth (i) any material equipment or any other material personal property that is owned by an Excluded Asset Owner (the "<u>Excluded Equipment</u>"), (ii) any agreements, contracts, orders or decrees to which Seller is a party or by which Seller is bound that provides an Excluded Asset Owner a right to enter the Property to remove any Excluded Equipment or that requires Seller to maintain any of the Excluded Equipment and (iii) the date by which each Excluded Asset Owner must remove from the Property the Excluded Equipment owned by such Excluded Asset Owner. Except for (i) pursuant to applicable Law, (ii) the Excluded Asset Owners and (iii) any third parties who acquire Excluded Assets after the Effective Date (whose rights to enter upon or otherwise use or possess the Land or any portion thereof shall be substantially similar to the Excluded Asset Owner's rights), no individual, partnership, corporation, limited liability company, association, joint stock company, trust, joint venture or unincorporated organization (any of the foregoing, or any governmental entity, a "<u>Person</u>") has any rights to enter upon or otherwise use or possess the Land or any portion thereof.

(m) <u>No Inducement or Reliance; Independent Assessment</u>. With respect to the Property, Seller acknowledges it has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by Buyer or any of its Representatives that are not expressly set forth herein (including the exhibits hereto), whether or not any such representations, warranties or statements were made in writing or orally, and Seller acknowledges that none of Buyer, nor any of its Representatives or other Person will have or be subject to any liability to Seller or any other Person resulting from the distribution to Seller, or Seller's use of, any such information, including any information, documents or material made available to Seller in expectation of the transactions contemplated by this Agreement.

(n) <u>No Other Representations or Warranties</u>. Except as expressly set forth in this Agreement and the Seller Ancillary Documents, none of Seller or any agent, employee, attorney or other representative of Seller or purporting to represent Seller, makes any representation or warranties, express or implied, of any kind whatsoever to Buyer with

respect to the Property or otherwise, including, without limitation, the maintenance, repair, condition, quality, design, marketability, accuracy, utility or completeness of the Land and Improvements, and Seller expressly disclaims as it pertains to Buyer (1) any implied or express warranty of merchantability, (2) any implied or express warranty of fitness for a particular purpose or (3) any implied or express warranty of conforming to models or samples with respect to any of the foregoing. For the avoidance of doubt, except as set forth in this Agreement or the Seller Ancillary Documents, no warranty or representation is given on the contents of the documents provided in due diligence, on any other documents or other information not contained in this Agreement, all of which were produced only for information purposes.

Section 5.2    Representations and Warranties of Buyer.  Buyer represents and warrants to Seller as follows:

(a)    Organization of Buyer.  Buyer is duly organized, validly existing and in good standing under the laws of the jurisdiction of the State of Delaware and has the requisite power and authority to own, lease and operate its properties, to conduct its business as it is presently being conducted, and to enter into and perform its obligations under this Agreement and the other documents to be entered into by Buyer pursuant hereto (the "Buyer Ancillary Documents");    Buyer is a single member limited liability company and the membership of Buyer shall not change between the date hereof and the Closing.

(b)    Authority; Validity and Binding Effect.  (i)  Buyer has the limited partnership power and authority to execute and deliver this Agreement and the Buyer Ancillary Documents and to perform its obligations hereunder and thereunder and (ii) the execution, delivery and performance of this Agreement and the Buyer Ancillary Documents by Buyer has been duly authorized by all necessary limited partnership actions of Buyer, and no further action is necessary on the part of Buyer for Buyer to execute and deliver this Agreement and to consummate and perform such Buyer's obligations hereunder.  This Agreement has been duly executed and delivered on behalf of Buyer and the Buyer Ancillary Documents shall have been duly and validly executed and delivered by Buyer at or prior to the Closing.  This Agreement constitutes a legal, valid and binding agreement of Buyer, and each of the Buyer Ancillary Documents when executed and delivered prior to the Closing by Buyer shall constitute legal, valid and binding agreements of Buyer, in each case, enforceable against Buyer in accordance with their respective terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and general equitable principles, regardless of whether enforceability is considered in a proceeding at law or in equity;

(c)    Non-contravention.  Neither the execution and delivery by Buyer of this Agreement or the Buyer Ancillary Documents, nor the consummation or performance by Buyer of any of the transactions to be consummated or performed by it under this Agreement or the Buyer Ancillary Documents, shall, directly or indirectly (with or without notice or lapse of time),  (i) violate or constitute a breach of any provision of Buyer's organizational documents; (ii) violate any Laws applicable to Buyer; (iii) conflict with, give rise to a right of acceleration or termination under, result in any payment or benefit becoming due under, or result in a breach of or constitute (with due notice or lapse of time or both) a default under, any note, indenture,

agreement, lease or other instrument to which Buyer is a party or (iv) result in the creation or imposition of any Lien upon any property or Property of Buyer, except with respect to clauses (ii), (iii) and (iv) for such violations, breaches, defaults, conflicts and Encumbrances that would not reasonably be expected to have a material adverse effect on the ability of Buyer to pay the Purchase Price, to perform its other obligations under this Agreement or to perform its obligations under the Buyer Ancillary Documents; and

(d)     Consents and Approvals. The execution, delivery and performance by Buyer of this Agreement do not and shall not require any action by or in respect of, consent or approval of, or filing with, any governmental body, agency, official or authority.  No consent, waiver, agreement, approval or authorization of any Person (other than a governmental body, agency, official or authority) is required for the execution, delivery and performance of this Agreement by the Buyer.

(e)     Financial Advisors.  Except for Colliers Spectrum Cauble, Inc., no person has acted, directly or indirectly, as a broker, finder or financial advisor for Buyer in connection with the transactions contemplated hereunder and Seller is not and will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the transactions contemplated hereunder based upon any arrangement made by or on behalf of Buyer.

(f)     No Projections.  Buyer acknowledges that neither Seller nor any of its Representatives, have made any warranty, express or implied, as to the performance, utility or prospects, financial or otherwise, or the profitability of the Property for Buyer, or with respect to any expense estimates, forecasts, projections or business plans prepared by or on behalf of Seller and delivered to Buyer in connection with Buyer's review of the Property and the negotiation and the execution of this Agreement.

(g)     Financing.  Buyer has and will have on the Closing Date sufficient cash and cash equivalents and/or existing credit facilities with sufficient borrowing capacity thereunder (and has provided Seller with satisfactory evidence thereof) to purchase the Property and to consummate the transactions contemplated by this Agreement.

(h)     Buyer's Investigation. Buyer represents that it is a sophisticated entity that was advised by knowledgeable counsel and other advisors and hereby acknowledges that it has conducted an investigation of the Property.  Notwithstanding the foregoing, this Section 5.2 does not limit any representation or warranty made by Seller in this Agreement or any document or instrument delivered to Buyer pursuant to this Agreement.

## ARTICLE VI.

## ACTIONS PRIOR TO CLOSING

Section 6.1     Conduct and Preservation of Property.     During the period from the Effective Date to the Closing Date, except as provided in Section 6.2, Seller shall conduct its

operations with respect to the Property according to its ordinary course of business consistent with past practice since the Petition Date and in compliance with all applicable Laws and shall take all actions reasonably necessary to preserve, maintain and protect the Property and shall maintain all required Permits in effect. Seller agrees to keep the Property insured under policies that are substantially equivalent to the policies maintained as of the Effective Date through Closing and that it will not cancel nor permit the cancellation of any of the Seller's insurance policies without the prior written consent of the Buyer.

Section 6.2    Restrictions on Certain Actions. Without limiting the generality of Section 6.1, prior to the Closing Date Seller shall not without the prior written consent of Buyer:

(a)    mortgage or pledge any of the Property, tangible or intangible, or create or suffer to exist any Encumbrance thereupon;

(b)    sell, lease, transfer or otherwise dispose of any of the Property;

(c)    settle or resolve any pending or threatened proceeding, action, claim, action, suit, investigation or inquiry by or before any court or governmental authority relating to the Property, unless such settlement or resolution creates no current or future obligation or Encumbrance with respect to the Property;

(d)    enter into any agreement or other commitment that would be binding on Buyer or the Property after Closing;

(e)    commence or join in any proceeding for the rezoning of all or any portion of the Property; or

(f)    agree to any of the foregoing.

Section 6.3    Environmental. Upon learning of the occurrence subsequent to the date hereof and prior to the Closing Date of the release or threatened release of Hazardous Substances on, under, from, or about the Leased Premises caused by Seller, its agents, employees, customers, contractors or invitees, including the owner or purchaser of any Third Party Equipment, Seller shall (i) promptly notify Buyer of the release or threatened release of Hazardous Substances, (ii) promptly commence to remediate such Hazardous Substances in accordance with relevant cleanup criteria and applicable Environmental Laws and (iii) keep Buyer informed of Seller's progress with respect to such remediation.

**ARTICLE VII.**

**ADDITIONAL AGREEMENTS**

Section 7.1    Access to Information; Cooperation; Communication; Press Releases.

(a)    Access. From and after the date hereof, the Seller (a) shall give the Buyer and its Representatives reasonable access, during regular business hours and upon reasonable advance notice, to the Property, including for the purpose of conducting surveys, architectural, engineering, geotechnical inspections and tests, and Phase I environmental inspections as Buyer shall reasonably desire, at Buyer's expense (the cost of which, to the extent

consistent with the provisions of Section 10.1(a)(i)(B), shall be part of the Reimbursement Amount) and (b) shall cause managers or officers of the Seller to furnish the Buyer and its Representatives with information with respect to the Property as the Buyer may from time to time reasonably request. Notwithstanding the foregoing, no invasive or destructive environmental sampling or testing of the Property shall be performed. Buyer agrees (at its expense) to restore the Land and Improvements as soon as reasonably possible to the same condition as existed prior to any such inspection or test, and Buyer agrees to indemnify, defend and hold harmless, Seller and its Representatives from and against any and all loss, liability, cost, damage and expense arising from or in connection with any such inspection or test.

(b) <u>Cooperation Toward Closing</u>. From the date hereof until the Closing Date, subject to the terms and conditions of this Agreement, each of the parties hereto shall use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Law to consummate and make effective the sale of the Property in accordance with this Agreement, the Stalking Horse Order and the Sale Order (as defined below), including using commercially reasonable efforts to ensure timely satisfaction of the conditions precedent to such party's obligations hereunder.

Section 7.2 <u>Post-Closing Lease.</u> Buyer shall lease the Property to Seller pursuant to the lease attached hereto as <u>Exhibit M</u> (the "<u>Lease</u>").

<b>ARTICLE VIII.</b>

<b>RISK OF LOSS</b>

Section 8.1 <u>Minor Damage.</u>. In the event of loss or damage to the Property or any portion thereof prior to the Closing whether by fire or other casualty or condemnation or otherwise which is not "Major" (as defined in <u>Section 8.3</u>), this Agreement shall remain in full force and effect provided that Seller shall, at Seller's option, either (a) perform any necessary repairs or (b) elect not to perform the necessary repairs in which case the Purchase Price shall be reduced by an amount equal to the cost of such repairs as stated in a Damage Opinion (as defined below) (such cost, the "<u>Cost of Repairs</u>"). If Seller elects to perform repairs upon the Property, Seller shall use reasonable efforts to complete such repairs promptly, and the date of Closing shall be extended for a reasonable time to allow for the completion of such repairs.

Section 8.2 <u>Major Damage</u>. Seller shall promptly notify Buyer of the occurrence of any "Major" loss or damage to the Property or any portion thereof whether by fire or other casualty or condemnation or otherwise prior to the Closing, which notice shall state the cost of repair or restoration thereof in a Damage Opinion. Buyer shall have the right, exercisable by giving written notice to Seller within twenty (20) days after receipt of Seller's written notice, to continue this Agreement in effect, or terminate this Agreement in which event the provisions of <u>Section 9.2</u> shall apply. If Buyer does not elect to continue this Agreement within said twenty (20) day period, then Buyer shall be deemed to have terminated this Agreement. In the event Buyer elects to continue this Agreement in effect, Seller shall at Seller's option either (a) perform any necessary repairs or (b) elect not to perform any necessary repairs. If Seller elects to perform repairs upon the Property, Seller shall use reasonable efforts to complete such repairs promptly, and the date of Closing shall

be extended for a reasonable time in order to allow for the completion of such repairs. If Seller elects not to perform repairs and the Cost of Repairs is less than or equal to $10,000,000, the Purchase Price shall be reduced by an amount equal to the Cost of Repairs. If Seller elects not to perform repairs and the Cost of Repairs exceeds $10,000,000, (i) Seller agrees to assign to Buyer at Closing all of Seller's right, title and interest in and to any claims and proceeds Seller may have with respect to all insurance policies relating to the Property, including, without limitation, rent loss insurance or condemnation awards relating to the premises in question and (ii) the Purchase Price shall be reduced by an amount equal to (x) the Cost of Repairs less (y) the net amount of insurance proceeds available to Buyer

Section 8.3    Definition of "Major" Loss or Damage.  For purposes of Sections 8.1 and 8.2, "Major" loss or damage refers to the following:  loss or damage to the Property hereof such that the cost of repairing or restoring the premises in question to substantially the same condition which existed prior to the event of damage would be, in a written opinion of an architect or other qualified expert selected by Seller and reasonably approved by Buyer (a "Damage Opinion"), equal to or greater than One Million Dollars ($1,000,000.00).  If Buyer does not give written notice to Seller of Buyer's reasons for disapproving an architect or other qualified expert within fifteen (15) business days after receipt of notice of the proposed architect or other qualified expert, then Buyer shall be deemed to have approved the architect or other qualified expert selected by Seller.

Section 8.4    Risk of Loss.  Prior to Closing, Seller shall have the full risk of loss with respect to the Property, and upon Closing, the full risk of loss with respect to the Property shall pass to Buyer.

## ARTICLE IX.

## TERMINATION; SURVIVAL

Section 9.1    Termination Rights.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of Buyer and Seller;

(b)    by either Buyer or Seller, by written notice of termination to the other, if the Closing has not occurred by April 15, 2010 (as may be extended by written agreement of the parties); provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(b) shall not be available to any party if it is in breach of its obligations under this Agreement in any material respect after giving effect to any applicable cure period;

(c)    by either party, upon written notice to the other party, if (i) there shall be any Law or regulation that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited or (ii) consummation of the transactions contemplated hereby would violate any nonappealable final order, decree or judgment of (A) the Bankruptcy Court or (B) any other court or governmental authority having competent jurisdiction;

(d)    by Buyer, upon written notice to Seller, if Seller shall consummate a sale of all or any portion of the Property pursuant to a competing bid;

(e) by Buyer, upon written notice to Seller, if the Bankruptcy Court does not enter (i) the Stalking Horse Order (as defined below) on or before March 5, 2010, or (ii) the Sale Order on or before March 26, 2010, unless extended to a later date by mutual consent of Seller and Buyer;

(f) by Seller, upon written notice to Buyer, if, on or prior to the Closing Date, Buyer fails to close when obligated to do so hereunder or is in material breach of Section 7.1(b) or any representation or warranty made by Buyer herein (ignoring any materiality qualifier contained therein) and such breach shall not be cured within thirty (30) days of the date of notice of breach served by Seller claiming such material breach; provided, that the right to terminate this Agreement pursuant to this Section 9.1(f) shall not be available to Seller if it is in material breach of this Agreement at the time notice of termination is delivered;

(g) by Buyer, upon written notice to Seller, if, on or prior to the Closing Date, Seller is in material breach of any representation, warranty, covenant or agreement herein contained (ignoring any materiality qualifier contained therein) and such breach shall not be cured within thirty (30) days of the date of notice of breach served by Buyer claiming such material breach; provided, that the right to terminate this Agreement pursuant to this Section 9.1(g) shall not be available to Buyer if it is in material breach of this Agreement at the time notice of termination is delivered;

(h) by Buyer pursuant to Section 2.2 above;

(i) by Buyer pursuant to Section 8.2(b) above; or

(j) by Seller, if Buyer does not deliver the Deposit to the Title Company in accordance with the terms of the Escrow Agreement within one (1) business day of the Effective Date.
.

Section 9.2    Effect of Termination.   No termination of this Agreement pursuant to Section 9.1 shall be effective until written notice thereof is given to the non-terminating party specifying the provision hereof pursuant to which such termination is made.  If this Agreement is validly terminated by either Buyer or Seller pursuant to Section 9.1, this Agreement shall be void and of no effect, and there shall be no further obligation under this Agreement on the part of any Party or its respective Affiliates, directors, officers or stockholders to any other Party; provided that the provisions of the Stalking Horse Order and Confidentiality Agreement, Section 1.5 (Deposit), Section 10.1(a)(i) (as it relates to the Break-up Fee), this Section 9.2 (Effect of Termination), Section 9.3 (Survival of Representations and Warranties), Section 11.2 (Public Disclosure) and Article XI (Miscellaneous) shall remain in full force and effect in accordance with their terms; provided, further, that nothing contained in this Section 9.2 shall relieve any party from liability for any breach of this Agreement.  In the event this Agreement is terminated pursuant to Section 9.1(a), (b), (c), (d), (e), or (i), Buyer shall be entitled to receive the Deposit from the Title Company (including all interest earned from the investment thereof and Buyer and Seller agree to instruct the Title Company accordingly pursuant to the Escrow Agreement).  In addition thereto, (i) if this Agreement is terminated by Buyer pursuant to Section 9.1(d), Seller shall pay to Buyer the Break-Up Fee (as defined below) and the Reimbursement Amount (as

defined below) pursuant to Section 10.1(a) below, (ii) if this Agreement is terminated by Buyer pursuant to Section 9.1(g) or (h), in addition to receipt of the Deposit, Seller shall pay to Buyer reimbursement of all reasonable, documented, out of pocket costs and expenses (including due diligences expenses), including attorneys fees and fees of investment bankers or other financial advisors, incurred by Buyer in connection with this Agreement up to a maximum of the Reimbursement Amount (as defined below), which payment shall be made to Buyer by wire transfer of immediately available funds to an account designated by Buyer promptly after termination of this Agreement by Buyer and (iii) in the event of breach by Seller of its obligation to convey to the Property to Buyer when obligated to do so hereunder, in lieu of terminating this Agreement, Buyer shall be entitled to seek specific performance of Seller's obligation to convey the Property to Buyer in accordance with the terms of this Agreement.

In the event that Agreement is terminated by Seller pursuant to Section 9.1(f), Seller shall be entitled to receive the Deposit from the Title Company (including all interest earned from the investment thereof and Buyer and Seller agree to instruct the Title Company accordingly pursuant to the Escrow Agreement) as liquidated damages. Seller's actual damages in the event the sale is not consummated are extremely difficult or impracticable to determine at the Effective Date. Seller agrees that the receipt of the Deposit shall be Sellers' sole and exclusive remedy in the event Buyer fails to close when obligated to do so hereunder and waives all other rights for damages and specific performance.

Section 9.3    Survival of Representations and Warranties.

(a)    The representations and warranties of Seller in this Agreement other than Section 5.1(b), Section 5.1(c) and Section 5.1(k) of this Agreement shall not survive the Closing.

(b)    The representations and warranties of Buyer in this Agreement other than Section 5.2(b), Section 5.2(c) and Section 5.2(e) of this Agreement shall not survive the Closing.

(c)    The parties hereby agree that the limitations set forth above in this Section 9.3 on the survival of the representations and warranties of the parties shall not apply to a representation or warranty in the event that a party has committed fraud or made an intentional misrepresentation with respect to such representation or warranty.

# ARTICLE X.

# BANKRUPTCY MATTERS

Section 10.1   Bankruptcy Matters.

(a)    Within two (2) business days of the execution of this Agreement, Seller will file and serve:

(i)    the Sale Procedures Notice (as defined in the Sale Procedures Process Order) in accordance with the Sale Procedures Process Order requesting the entry of the Stalking Horse Order substantially in the form annexed hereto as

Exhibit J (the "<u>Stalking Horse Order</u>") approving the bidding procedures and the bidding protections in substantially in the form annexed hereto as <u>Exhibit K</u> (the "<u>Bidding Procedures</u>"); subject to such approval by the Bankruptcy Court of the Stalking Horse Order, if Seller receives from a third party a higher and better offer to purchase all or any portion of the Property at the Auction (as defined in the Bidding Procedures), and such third party offer is subsequently approved by the Bankruptcy Court and closes as provided by the terms of such offer and Buyer is not then in material breach under this Agreement after giving effect to any applicable cure period, then Seller will pay Buyer from the proceeds of such offer (A) compensation in the fixed amount of Two Hundred Forty Thousand Dollars ($240,000), for the time and expense associated with initial due diligence and negotiation of this Agreement and the value of serving as the "stalking horse" for Seller's marketing of the Property (the "<u>Break-Up Fee</u>") and (B) reimbursement of all reasonable, documented, out of pocket costs and expenses, including attorneys fees and fees of investment bankers or other financial advisors, incurred by Buyer in connection with this Agreement up to a maximum of One Hundred and Twenty Five Thousand Dollars ($125,000) (the "<u>Reimbursement Amount</u>"), which payment shall be made to Buyer by wire transfer of immediately available funds to an account designated by Buyer concurrently with the consummation of such sale of all or any portion of the Property to a third party; and

(ii)    a motion with the Bankruptcy Court (the "<u>Sale Motion</u>") requesting entry of an order substantially in the form annexed hereto as <u>Exhibit L</u> (the "<u>Sale Order</u>") that (i) approves the sale of the Property to Buyer on the terms and conditions set forth in this Agreement and authorizes Seller to proceed with the Closing, (ii) includes a specific finding and conclusion of law that Buyer is a good faith purchaser of the Property within the meaning of Section 363(m) of the Bankruptcy Code, (iii) states that the sale of the Property shall be free and clear of all Encumbrances whatsoever (except Permitted Exceptions) and (iv) such other provisions as reasonably requested by Buyer.

(b)    <u>Service of Sale Motion</u>.  Seller will serve a copy of the Sale Motion in accordance with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and such other Persons as the Buyer reasonably requests. Seller will provide Buyer a list of such Persons identified in Paragraph D of the Sale Order.

(c)    <u>Copies of Pleadings</u>.  Seller shall provide Buyer with drafts of all documents, motions, orders, filings or pleadings that it proposes to file with the Bankruptcy Court that relate to the approval of this Agreement and the consummation of the transactions contemplated hereby, and will provide Buyer with reasonable opportunity to review and approve such filings. Seller shall also promptly (within one (1) business day) provide Buyer with copies of all pleadings received by or served by or upon Seller in connection with the Bankruptcy Case that relate to or may reasonably be expected to affect the transactions provided for in this Agreement and which have not otherwise been served on Buyer.

(d)    <u>Rejection of Air Product Lease</u>.  Seller will prior to Closing either (i) obtain an order from the Bankruptcy Court rejecting the Lease between Seller and

Air Products and Chemicals, Inc. (the "<u>Air Products Lease</u>") or (ii) terminate the Air Products Lease by mutual consent or pursuant to its terms.

(e)      <u>Affidavits and Declarations</u>. Buyer shall promptly provide Seller with any affidavits or declarations reasonably requested by the Seller in support of obtaining any Bankruptcy Court order, including without limitation the Stalking Horse Order and Sale Order.

**ARTICLE XI.**

**MISCELLANEOUS**

Section 11.1 <u>"AS IS" TRANSACTION</u>. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PROPERTY. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY (EXPRESS OR IMPLIED) OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PROPERTY. IF THE CLOSING OCCURS, BUYER WILL ACCEPT THE PROPERTY, AT THE CLOSING DATE "AS IS," "WHERE IS," SUBJECT TO THE PROVISIONS OF THIS AGREEMENT AND THE SALE ORDER PROVIDING, AMONG OTHER THINGS, THAT THE SALE OF THE PROPERTY IS FREE AND CLEAR OF ALL LIENS (OTHER THAN THE APPROVED TITLE EXCEPTIONS).

Section 11.2 <u>NO CONSEQUENTIAL OR PUNITIVE DAMAGES</u>. NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO ANY OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL, OR PUNITIVE DAMAGES CLAIMS BY SUCH PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

Section 11.3 <u>Confidentiality</u>. Buyer and its Representatives shall hold in confidence all data and information obtained with respect to Seller or its business obtained after the execution and delivery of this Agreement, and shall not disclose the same to others; provided, however, that Buyer may disclose such data and information to the Representatives of Buyer if such persons agree to treat such data and information confidentially. Seller and its Representatives shall hold in confidence all data and information obtained with respect to Buyer or its business, obtained after the execution and delivery of this Agreement, and shall not disclose the same to others; provided, however, that Seller may disclose any such data and information to the Bankruptcy Court, the Official Committee of Unsecured Creditors or other parties in interest in the Bankruptcy Cases and to the Representatives of Seller if such persons agree to treat such data and information confidentially. Seller also agrees to keep confidential the identity of Buyer. In the event of a breach or threatened breach by this <u>Section 11.3</u>, either party shall be entitled to an injunction

restraining the other party or its agents or representatives from disclosing, in whole or in part, such confidential information. Nothing herein shall be construed as prohibiting either party from pursuing any other available remedy at law or in equity for such breach or threatened breach. The provisions of this <u>Section 11.3</u> shall survive Closing or any termination of this Agreement.

Section 11.4 <u>Public Disclosure</u>. Prior to and after the Closing, any release to the public of information with respect to the sale contemplated herein or any matters set forth in this Agreement will be made only in the form approved by Buyer and Seller, except for disclosures required by law or made with the Bankruptcy Court.

Section 11.5 <u>Assignment</u>. The terms and provisions of this Agreement are to apply to and bind the permitted successors and assigns of the parties hereto, provided, (i) Seller may not assign this Agreement or any of its rights or obligations hereunder without the prior written consent of Buyer, which may be granted or withheld in Buyer's sole discretion, and (ii) Buyer may assign this Agreement or any of its rights hereunder without the consent of Seller, <u>provided,</u> (i) the assignee controls, is controlled by or is under common control with Buyer or (ii) such assignee is at least as credit worthy as Buyer and has access to cash reserves in an amount at least equal to the Purchase Price Buyer; <u>provided</u> further in no event shall any assignment of this Agreement release or discharge Buyer from any liability or obligation hereunder unless expressly agreed otherwise by Seller in writing. Any such assignment by Buyer of its rights or delegation by Buyer of its duties hereunder, Buyer shall remain fully liable (as primary obligor and not as a guarantor) for performance of the obligations of Buyer under this Agreement and the various agreements to be entered into pursuant to this Agreement.

Section 11.6 <u>Notices</u>. Any notice or other communication required or permitted hereunder shall be given in writing by (a) personal delivery, (b) reputable overnight delivery service with proof of delivery, (c) United States Mail, postage prepaid, certified mail, return receipt requested, or (d) legible facsimile transmission, sent to the intended addressee at the address (or facsimile number) set forth below, or to such other address (or facsimile number) or to the attention of such other person as the addressee shall have designated by written notice sent in accordance herewith. Any notice so given shall be deemed to have been given upon receipt or refusal to accept delivery, or, in the case of (i) certified mail, the date of deposit in the United States Mail; or (ii) facsimile transmission, as of the date of the facsimile transmission provided that an original of such facsimile is also sent to the intended addressee by means described in clauses (a), (b) or (c) above. Unless changed in accordance with the preceding sentence, the addresses for notices given pursuant to this Agreement shall be as follows:

|  |  |
|---|---|
| If to Buyer: | Richmond Semiconductor, LLC |
|  | 12851 Foster Street, Suite 205 |
|  | Overland Park, KS 66213 |
|  | Attn: Chad L. Williams |
|  | Telephone: (913) 814-9988 |
|  | Facsimile: (913) 814-7766 |
|  |  |
| With a copy to: | Hogan & Hartson LLP |
|  | 555 Thirteen Street, N.W. |
|  | Washington, D.C. 20004 |

\\\DC - 032778/000004 - 3026778 v2

<table>
<tr><td></td><td></td><td>Attn:  Edward R. Dolan, Esq.</td></tr>
</table>

Attn:  Edward R. Dolan, Esq.
Attn:  Lee E. Berner, Esq.
Telephone:  (202) 637-5600
Facsimile:  (202) 637-5910

If to Seller:                       Qimonda Richmond, LLC
                                    6000 Technology Boulevard
                                    Sandston, VA 23150
                                    Facsimile: (919) 474-6888
                                    Attention: Legal Department

With copies to (for information purposes only):

                                    Simpson Thacher & Bartlett LLP
                                    425 Lexington Avenue
                                    New York, NY 10017-3954
                                    Facsimile: (212) 455-2502
                                    Attention: D. Rhett Brandon and Morris J. Massel

                                    The Official Committee of Unsecured Creditors of
                                    Qimonda North America and Qimonda
                                    Richmond, LLC
                                    c/o Jones Day
                                    2727 North Harwood
                                    Dallas, Texas 75201
                                    Facsimile: (214) 969-5100
                                    Attention: Troy B. Lewis and Daniel P. Winikka

Whenever notice must be given, or funds or documents delivered, or any other action must be taken pursuant to this Agreement and the last day for such notice, delivery or action is a day other than a business day, then such notice may be given, or such funds or documents may be delivered, or such other action may be taken, on the next succeeding business day.  Saturdays, Sundays and any day on which banks in New York City are permitted or required to be close are not considered business days.

Section 11.7  <u>Modifications</u>.  This Agreement cannot be changed orally, and no executory agreement shall be effective to waive, change, modify or discharge it in whole or in part unless such executory agreement is in writing and is signed by the parties against whom enforcement of any waiver, change, modification or discharge is sought.

Section 11.8  <u>Entire Agreement</u>.  This Agreement, including the exhibits and schedules hereto, contains the entire agreement between the parties hereto pertaining to the subject matter hereof and fully supersedes all prior written or oral agreements and understandings between the parties pertaining to such subject matter.  The parties further intend that this Agreement constitutes the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever may be introduced in any judicial or arbitration proceeding involving this agreement.

28

Section 11.9   Further Assurances.  Each party agrees that it will execute and deliver such other documents, instruments or conveyances of any kind and take such other action, whether prior or subsequent to Closing, as may be reasonably requested by the other party to consummate the transaction contemplated by this Agreement.  The provisions of this Section 11.9 shall survive Closing.

Section 11.10  Counterparts.  This Agreement may be executed in counterparts, all such executed counterparts shall constitute the same agreement, and the signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

Section 11.11  Facsimile Signatures.  In order to expedite the transaction contemplated herein, signatures sent by facsimile transmission or scanned and sent by email may be used in place of original signatures on this Agreement or any document delivered pursuant hereto (other than the Deed the notarized original of which shall be required prior to Closing).  Seller and Buyer intend to be bound by the signatures on the faxed or emailed document, are aware that the other party will rely on the faxed or emailed signatures, and hereby waive any defenses to the enforcement of the terms of this Agreement based on the form of signature.

Section 11.12  Severability.  If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect; provided that the invalidity or unenforceability of such provision does not materially adversely affect the benefits accruing to any party hereunder.

Section 11.13  Applicable Law.   THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE BANKRUPTCY CODE AND THE LAWS OF THE COMMONWEALTH OF VIRGINIA.

Section 11.14  Submission to Jurisdiction.  Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and if the Bankruptcy Case has been closed, such litigation may  be heard by the United States District Court or the courts of the State of Delaware having subject matter jurisdiction thereof and sitting in New Castle County, Delaware, and the parties hereby consent to the jurisdiction of such courts for such purposes, and waive any objection they may have thereto based on venue, *forum non coveniens* or other similar doctrines.

Section 11.15  No Third-Party Beneficiary.  The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Buyer only and are not for the benefit of any third party; and, accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

\\\DC - 032778/000004 - 3026778 v2

Section 11.16 <u>Captions</u>.  The section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent and for any purpose, to limit or define the text of any section or any subsection hereof.

Section 11.17 <u>Construction</u>.  The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and that the normal rule of construction to take effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

Section 11.18 <u>Recordation</u>.  This Agreement many not be recorded by any party hereto without the prior written consent of the other party hereto.  The provisions of this <u>Section 11.18</u> shall survive the Closing or any termination of this Agreement.

Section 11.19 <u>Time of the Essence</u>.  Time is of the essence of each and every provision of this Agreement.

*REMAINDER OF PAGE INTENTIONALLY BLANK*
*SIGNATURE PAGE(S) TO FOLLOW*

\\\DC - 032778/000004 - 3026778 v2

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

SELLER:               QIMONDA RICHMOND, LLC,
a Delaware limited liability company

By: _____

Name: _Scott T. Ryan_

Title: _VP and General Counsel_

BUYER:                    RICHMOND SEMICONDUCTOR, LLC
                          a Delaware limited liability company

                          By: _____

                              Name: Chad L. Williams
                              Title: Chief Executive Officer


                              **[End of Signatures]**

**EXHIBIT A**

**THE LAND**

**(attached hereto)**

ALL that certain tract or parcel of land, with all improvements thereon and appurtenances thereunto belonging, lying and being in Varina District, Henrico County, Virginia, containing 210.000 acres, as shown on a plat consisting of 2 sheets made by Timmons, dated September 4, 1996, entitled "ALTA/ACSM LAND TITLE SURVEY SHOWING 210.000 ACRES OF LAND BEING A PART OF THE ELKO TRACT, a copy of which is recorded in in the Clerk's Office, Circuit Court of Henrico County, Virginia in Plat Book 102, pages 215-218, (the "Survey") and being more particularly bounded and described in accordance with the Survey as follows:

Beginning at a point on the western right-of-way line of Route 380 (Elko Tract Road), said point being 4087 feet, more or less, south of the southern right-of-way line of Route 156 (Elko Road), thence along a survey tie line S 70° 08' 19" W 509.28 feet to a point on the southern right-of-way line of proposed Memorial Drive, said point being on the true and actual point of beginning; thence along the southern right-of-way line of proposed Memorial Drive N 83° 15' 21" E 288.38 feet to a point; thence continuing along said right-of-way line N 82° 06' 36" E 135.86 feet to a point; thence continuing along said right-of-way line along a curve to the right having a radius of 943.00 feet, an arc length of 874.89 feet, an included angle of 53° 09' 27", a chord bearing of S 71° 18' 40" E and a chord distance of 843.85 feet to a point; thence continuing along said right-of-way line S 44 0 43" 57" E 2063.43 feet to a point; thence continuing along said right-of-way line along a curve to the left having a radius of 1057.00 feet, an arc length of 364.15 feet, an included angle of 19° 44' 21", a chord bearing of S 54° 36' 07" E and a chord distance of 362.35 feet to a point; thence continuing along said right-of-way line along a curve to the right having a radius of 2743.00 feet, an arc length of 100.94 feet, an included angle of 02° 06' 30", a chord bearing of S 63°25' 03" E and a chord distance of 100.93 feet to a point; thence leaving said right-of-way line S 35° 00' 00" W 2376.79 feet to a rod set; thence N 55° 00' 00" W 3758.54 feet to a rod set; thence N 37° 41' 49" E 38.17 feet to a point (said point being S 00° 29' 50" E 0.39 feet from a rod found); thence N 17° 07' 28" E 293.63 feet to a point (said point being N 27° 36' 03" W 0.23 feet from a rod found); thence N 32° 04' 28" E 209.63 feet to a point (said point being S 57° 27' 06" W 0.17 feet from a rod found); thence S 60° 27' 32"E 385.19 feet to a rod found; thence N 40° 39' 28" E 203.30 feet to a rod found; thence N 62° 16' 28" E 112.20 feet to a rod set; thence N 55° 54' 28" E 141.20 feet to a rod set; thence N 31° 54' 28" E 112.20 feet to a rod found; thence N 15° 24' 28" E 238.40 feet to a rod found; thence N 08° 42' 28" E 213.20 feet to a point (said point being N 18° 25' 53" E 0.16 feet from a rod found); thence N 04° 43' 28" E 570.24 feet to a point on the southern right-of-way line of proposed Memorial Drive; thence along said right-of-way line along a curve to the left having a radius of 2062.00 feet, an arc length of 128.47 feet, an included angle of 03° 34'11", a chord bearing of N 85° 12' 22" E and a chord distance of 128.45 feet, to a point; thence continuing along said right-of-way N 78° 15' 26" E152.25 feet to a point, said point being the true and actual point of beginning.

BEING the same real estate conveyed to Qimonda Richmond, LLC, a Delaware limited liability company, by deed from Qimonda North America Corp., a Delware corporation, dated May 1, 2006, recorded October 26, 2007, in the Clerk's Office, Circuit Court, County of Henrico, Virginia, in Deed Book 4427, page 1866.

**EXHIBIT B**

**[INTENTIONALLY OMITTED]**

\\\DC - 032778/000004 - 3026778 v2

**EXHIBIT C**

**[INTENTIONALLY OMITTED]**

\\\DC - 032778/000004 - 3026778 v2

**EXHIBIT D**

**ESCROW AGREEMENT**

**(attached hereto)**

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement") is made this 11th day of February, 2010, by and among QIMONDA RICHMOND, LLC, a Delaware limited liability company ("Seller"), RICHMOND SEMICONDUCTOR, LLC, a Delaware limited liability company ("Buyer") and Chicago Title Insurance Company ( "Escrow Agent").

### Preliminary Statement

Under that certain Purchase and Sale Agreement dated February 11, 2010, between Buyer and Seller (the "Purchase Agreement"), Seller has agreed to sell or cause to be sold to Buyer and Buyer has agreed to purchase from Seller the Property (as defined therein), which includes certain real and personal property, on the terms and conditions set forth therein. Buyer is delivering to Escrow Agent a deposit of One Million Two Hundred and 00/100 Dollars ($1,200,000) (together with any interest, investment income or other proceeds accrued thereon pursuant to investments hereunder the "Deposit") in good funds by federal wire transfer. Escrow Agent shall hold the Deposit pursuant to the terms hereof.

Escrow Agent agrees to act as such upon the terms and conditions set forth in this Agreement. All capitalized terms used herein and not defined herein shall have the meanings set forth in the Purchase Agreement.

NOW, THEREFORE, the parties hereto agree as follows:

1. <u>Escrow Agent</u>. Seller and Buyer hereby engage Chicago Title Insurance Company to serve as Escrow Agent under the terms hereof pursuant to the Purchase Agreement. Escrow Agent hereby accepts such engagement and agrees to hold and release the Deposit in accordance with the terms hereof. Any Deposit shall be deposited with Escrow Agent by wire transfer. Wire transfer instructions are attached hereto as <u>Schedule 1</u>. All interest, investment income or other proceeds will accrue to and be reported to applicable taxing authorities, including the Internal Revenue Service, for the account of Buyer. Simultaneously with the execution and delivery hereof, Buyer agrees to deliver to Escrow Agent a properly completed W-9 form and an executed "Investment of Escrow Funds" form.

2. <u>Deposit</u>. Buyer shall deposit the Deposit with Escrow Agent within one (1) business day after the execution and delivery of the Purchase Agreement. The Deposit shall be held by Escrow Agent and invested in one or more separate FDIC insured interest-bearing money market accounts at Bank of America, N.A. (the "Bank") doing business nationally and internationally. Escrow Agent shall not commingle the Deposit with any funds of Escrow Agent or others except when funds are wired into Escrow Agent's general escrow account. Funds will be in the general escrow account until they are moved into an investment account and Escrow Agent agrees to move said funds as soon as practically possible. Escrow Agent shall, as soon as reasonably practical after it receives the Deposit from Buyer, invest the Deposit, and provide Seller and Buyer written confirmation thereof. Escrow Agent shall not be responsible for any loss suffered from any investment, including, without limitation, any market loss on any investment liquidated prior to maturity in order

to make a payment required hereunder, except any loss resulting from its gross negligence or willful misconduct.

3.    <u>Release of Deposit</u>.

(a)    Three (3) business days prior to the anticipated Closing Date, the Escrow Agent shall be notified of such anticipated date.  In the event the Closing occurs under the Purchase Agreement, Buyer and Seller shall jointly deliver written instructions to the Escrow Agent instructing the Escrow Agent to release the Deposit to Seller, whereupon Escrow Agent shall deliver the Deposit to Seller on the same business day after receiving such instruction by wire transfer or immediately available funds to an account designated by Seller, and the Deposit shall be applied to the Purchase Price at Closing.

(b)    If the Purchase Agreement is terminated pursuant to Section 9.1(a) of the Purchase Agreement, then Buyer and Seller shall jointly deliver written instructions to Escrow Agent for the closing of the investment account and instructions for the release of the Deposit to Buyer, whereupon Escrow Agent shall deliver the Deposit to Buyer within three (3) business days after receiving such notice by wire transfer of immediately available funds to an account designated by Buyer.

(c)    If Buyer terminates the Purchase Agreement pursuant to Section 9.1(b), (c)  (d), (e), (g), (h) or (i) of the Purchase Agreement or if Seller terminates the Purchase Agreement pursuant to Section 9.1(c) of the Purchase Agreement, then Buyer shall deliver a written claim notice (a "<u>Buyer Claim Notice</u>") to Seller and Escrow Agent that (i) identify such section by which the Purchase Agreement is being terminated and (ii) instruct Escrow Agent to release the Deposit to Buyer.  If Seller disputes the validity of such Buyer Claim Notice, Seller shall give written notice of such dispute to Buyer, with a copy to Escrow Agent, within ten (10) business days after delivery of such Buyer Claim Notice by Buyer to Seller.  If Seller fails to dispute the validity of such Buyer Claim Notice within such ten (10) business day period or if Seller notifies Escrow Agent in writing that there is no dispute with respect to such Buyer Claim Notice, then Escrow Agent shall deliver the Deposit to Buyer within three (3) business days of the earlier of (x) the notification that there is no dispute and (y) the expiration of such ten (10) business day period, to an account designated by Buyer.  To the extent there is a dispute with a Buyer Claim Notice, such dispute shall be settled in accordance with <u>Section 3(e)</u> below

(d)    If Seller terminates the Purchase Agreement pursuant to Section 9.1(b) or (f) of the Purchase Agreement, then Seller shall deliver a written claim notice (a "<u>Seller Claim Notice</u>") to Buyer and Escrow Agent for the release of the Deposit, together with any interest accrued thereon, to Seller.  Such Seller Claim Notice shall reference that Seller is terminating the Purchase Agreement pursuant to Section 9.1(f) of the Purchase Agreement.  If Buyer disputes the validity of such Seller Claim Notice, Buyer shall give written notice of such dispute to Seller, with a copy to Escrow Agent, within ten (10) business days after delivery of such Seller Claim Notice by Seller to Buyer.  If Buyer fails to dispute the validity of such Seller Claim Notice within such ten (10) business day period or if Buyer notifies Escrow Agent in writing that there is no dispute with respect to such Seller Claim Notice, then Escrow Agent shall deliver the Deposit to Seller within three (3) business days of the earlier of (x) the notification that there is no dispute and (y) the expiration of such ten (10) business day period, by wire transfer of immediately available

\\\DC - 032778/000004 - 3013156 v7

funds to an account designated by Seller. To the extent there is a dispute with a Seller Claim Notice, such dispute shall be settled in accordance with <u>Section 3(e)</u> below.

(e)     If there is a dispute with respect to a Buyer Claim Notice or Seller Claim Notice, Seller and Buyer shall use their reasonable efforts to resolve such dispute within ten (10) business days after delivery of the applicable Buyer Claim Notice or Seller Claim Notice. If Seller and Buyer are able to resolve such dispute within the ten (10) business day period, Buyer and Seller shall deliver joint written instructions to Escrow Agent requesting the release of the Deposit to Buyer or Seller, as the case may be. Promptly following the receipt of such instructions (and in any event within three (3) business days after the receipt of such instructions), Escrow Agent shall release the Deposit, to Buyer or Seller, as the case may be, by wire transfer in immediately available funds to an account designated by Buyer or Seller, as the case may be. If no such instructions are given to Escrow Agent within the ten (10) business day period, Escrow Agent shall not take any action with respect to the Deposit, and Seller and Buyer agree that the matter shall be addressed by the Bankruptcy Court or the applicable court with jurisdiction pursuant to <u>Section 11.14</u> of the Purchase Agreement. Escrow Agent shall have the right to interplead all the parties hereto with such a court or may continue to hold the Deposit until receipt of joint written instructions from Seller and Buyer. Seller or Buyer, whichever loses in any such action, shall be solely obligated to pay such costs and fees to Escrow Agent, as well as the reasonable attorneys' fees of the prevailing party in accordance with the other provisions of this Agreement.

4.     <u>Notices</u>.

All notices, request, demands or other communications required or permitted under this Agreement shall be in writing and delivered personally or by certified mail, return receipt requested, postage prepaid, or by United Parcel Service, Federal Express or Airborne Express or by fax or email, as follows:

|  |  |
|---|---|
| If to Buyer: | Richmond Semiconductor, LLC<br>12851 Foster Street, Suite 205<br>Overland Park, KS 66213<br>Attn: Chad L. Williams<br>Telephone: (913) 814-9988<br>Facsimile: (913) 814-7766 |
| With a copy to: | Hogan & Hartson LLP<br>555 Thirteenth Street, N.W.<br>Washington, D.C. 20004<br>Attn: Edward R. Dolan, Esq.<br>Attn: Lee E. Berner, Esq.<br>Telephone: (202) 637-5600<br>Facsimile: (202) 637-5910 |
| If to Seller: | Qimonda Richmond, LLC<br>6000 Technology Boulevard<br>Sandston, VA 23150 |

\\\DC - 032778/000004 - 3013156 v7

Facsimile: (919) 474-6888
Attention: Legal Department

| | |
|---|---|
| With a copy to: | Simpson Thacher & Bartlett LLP |
| | 425 Lexington Avenue |
| | New York, NY 10017-3954 |
| | Attn: D. Rhett Brandon, Esq. |
| | Attn: Morris J. Massel, Esq. |
| | Telephone: (212) 455-2000 |
| | Facsimile: (212) 455-2502 |

| | |
|---|---|
| If to Escrow Agent: | Chicago Title Insurance Company |
| | 830 East Main Street, Suite 1600 |
| | Richmond, VA 23219 |
| | Attn:  Douglas M. Atkins, Esq. |
| | Attn:  Lenore Barron, Esq. |
| | Facsimile:  (804) 521-5756 |

Notices shall be deemed served three (3) days after mailing, and in the case of overnight courier or hand delivery or electronic mail, on the date actually delivered to or rejected by the intended recipient; *provided* in the case of electronic mail, a copy of said notice is sent by overnight courier for next day delivery properly addressed and paid for to the intended recipient and in the case of facsimile, upon the sender's receipt of confirmation of transmission of such facsimile notice produced by the sender's facsimile machine, provided a copy of such transmission and the confirmation receipt thereof is deposited with an overnight courier for next day delivery to the intended recipient properly addressed and paid for. Either party hereto may change the address for receiving notices, requests, demands or other communication by notice sent in accordance with the terms of this Section 4. Notwithstanding the foregoing provisions of this Section 4, (a) notices served by hand delivery shall be deemed served on the date of delivery if delivered at or prior to 5:00 P.M. Eastern Time on a business day and on the next business day if delivered after 5:00 P.M. Eastern Time on a business day or at any time on a non-business day and (b) notices served by facsimile transmission or electronic mail shall be deemed served on the date of transmission if the sender receives confirmation of transmission in the manner set forth above at or prior to 5:00 P.M. Eastern Time on a business day and on the next business day if the sender receives confirmation of transmission in the manner set forth above after 5:00 P.M. Eastern Time on a business day or at any time on a non-business day.  Saturdays, Sundays and any day on which banks in New York City are permitted or required to be close are not considered business days.

5.    Liability and Duties of Escrow Agent.  Acceptance by Escrow Agent of its duties under this Agreement is subject to the following terms and conditions:

(a)    The parties acknowledge that Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that Escrow Agent shall not be deemed to be the agent of either of the parties, and that Escrow Agent shall not be liable to either of the parties for any act or omission on its part taken or made in good faith, and not

\\\DC - 032778/000004 - 3013156 v7

in disregard of this Agreement and/or the Purchase Agreement, but shall be liable for its negligent acts and willful misconduct;

(b)     Seller and Buyer shall jointly and severally indemnify Escrow Agent for, and hold it harmless against all costs, claims and expenses, including but not limited to reasonable attorneys' fees, incurred in connection with the performance of Escrow Agent's duties hereunder, except with respect to actions or omissions taken or made by Escrow Agent in bad faith, in disregard of this Agreement or involving negligence on the part of Escrow Agent;

(c)     Escrow Agent shall be fully protected in acting on and relying upon any written notice, instruction, direction or other document which Escrow Agent in good faith believes to be genuine and to have been signed or presented by the proper party or parties;

(d)     Escrow Agent may seek the advice of legal counsel in the event of any dispute or question as to the construction of any of the provisions of this Agreement or its duties hereunder, and it shall incur no liability and shall be fully protected in respect of any action taken or suffered by it in good faith in accordance with the opinion of such counsel; and

(e)     Escrow Agent may resign and be discharged from its duties hereunder at any time by giving written notice of such resignation to each of Seller and Buyer specifying a date, not less than thirty (30) days after the date of such notice, when such resignation will take effect.  Upon the effective date of such resignation, Escrow Agent shall deliver the funds held in escrow to such person or persons as Seller and Buyer shall in writing jointly direct, and upon such delivery Escrow Agent shall be relieved of all duties and liabilities thereafter accruing under this Agreement.  Seller and Buyer shall have the right at any time upon joint action to substitute a new Escrow Agent by giving notice thereof to Escrow Agent then acting.  If, however, Seller and Buyer shall fail to name such a successor escrow agent within twenty (20) days after the notice of resignation from Escrow Agent, Escrow Agent may apply to a court of competent jurisdiction for appointment of a successor escrow agent.

6.     <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia (but not the choice of law rules thereof).

7.     <u>Dispute Resolution</u>.  It is understood and agreed that, should any dispute arise with respect to the delivery, ownership, right of possession, and/or disposition of the Deposit, or should any claim be made upon Escrow Agent or the Deposit by a third party, Escrow Agent upon receipt of notice of such dispute or claim is authorized and shall retain in its possession without liability to anyone, all or any of said Deposit until such dispute shall have been settled either by the mutual written agreement of the parties involved by a final order, decree or judgment of the Bankruptcy Court or the applicable court with jurisdiction pursuant to Section 11.14 of the Purchase Agreement, the time for perfection of an appeal of such order, decree or judgment having expired.  Escrow Agent may, but shall be under no duty whatsoever to, institute or defend any legal proceedings which relate to the Deposit.

\\\DC - 032778/000004 - 3013156 v7

8.     Consent to Jurisdiction and Service.   Buyer and Seller (the "Interested Parties") hereby absolutely and irrevocably consents and submits to the jurisdiction of the Bankruptcy Court in connection with any actions or proceedings brought against the Interested Parties (or any of them) by the Escrow Agent arising out of or relating to this Agreement.  In any such action or proceeding, the Interested Parties each hereby absolutely and irrevocably (i) waives any objection to jurisdiction or venue, (ii) waives personal service of any summons, complaint, declaration or other process, and (iii) agrees that the service thereof may be made by certified or registered first-class mail directed to such party, as the case may be, at their respective addresses in accordance with Section 4.  Notwithstanding the preceding sentence, with respect to any actions or proceedings brought by one of the Interested Parties against the other Interested Party arising out of or relating to this Agreement (including the distribution of funds held in escrow in accordance with the Purchase Agreement), each of the Interested Parties agrees that such dispute shall be settled in the manner provided in the Purchase Agreement.

9.     Waiver of Jury Trial.  EACH OF SELLER, BUYER AND ESCROW AGENT HEREBY WAIVE A TRIAL BY JURY OF ANY AND ALL ISSUES ARISING IN ANY ACTION OR PROCEEDING BETWEEN ESCROW AGENT, BUYER AND SELLER OR THEIR RESPECTIVE SUCCESSORS OR ASSIGNS, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF ITS PROVISIONS OR ANY NEGOTIATIONS IN CONNECTION HEREWITH.

10.     Counterparts.  This Agreement may be executed in one or more counterparts, each of which when so executed and delivered shall be deemed an original, all of which taken together shall constitute one and the same original.

11.     Attorney's Fees.  Should any party employ attorneys to enforce any of the provisions hereof, the party or parties losing in any final judgment agrees to pay the prevailing party or parties all reasonable costs, charges and expenses, including reasonable attorneys' fees, expended or incurred in connection therewith.

12.     Entirety; Modifications.   This Agreement and the Purchase Agreement together embody the entire agreement between the parties with respect to the Deposit and supercedes all prior agreements and understandings related to the Deposit.   This Agreement may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.  No course of conduct shall constitute a waiver of any of the terms and conditions of this Agreement, unless such waiver is specified in writing, and then only to the extent so specified.  A waiver of any of the terms and conditions of this Agreement on one occasion shall not constitute a waiver of the other terms of this Agreement, or of such terms and conditions on any other occasion. Notwithstanding any other provision hereof, consent to an alteration or modification of this Agreement may not be signed by means of an e-mail address.

13.     Binding Effect; Successors.   This Agreement shall be binding upon the respective parties hereto and their heirs, executors, successors and assigns.  If Escrow Agent consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another entity authorized to exercise fiduciary powers, the successor entity without any further act shall be the successor Escrow Agent.

\\\DC - 032778/000004 - 3013156 v7

14. <u>Termination of Escrow</u>.  This Agreement shall terminate upon the release by Escrow Agent the Deposit in accordance with this Agreement.

*REMAINDER OF PAGE INTENTIONALLY BLANK*
*SIGNATURE PAGE FOLLOWS*

\\\DC - 032778/000004 - 3013156 v7

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be executed as of the day and year first above written.

**SELLER**:

QIMONDA RICHMOND, LLC, a Delaware limited liability company

By: _____
      Name:
      Title:

**BUYER**:

RICHMOND SEMICONDUCTOR, LLC, a Delaware limited liability company

By: _____
      Name:
      Title:

**ESCROW AGENT**:

CHICAGO TITLE INSURANCE COMPANY

By: _____
      Name:
      Title:

## SCHEDULE 1

## WIRING INSTRUCTIONS

Bank of America, N.A.
100 West 33rd Street
New York, NY 10001

ABA Routing No.     0260-0959-3

Escrow Account Name:    Chicago Title Insurance Company
                      Custodial Escrow Account
                      One Capitol Square, 16th Floor
                      830 East Main Street
                      Richmond, Virginia 23219

Escrow Account No.  1233919966

Reference:              Qimonda Richmond 297300016C

Notify:                 Douglas Atkins at [Douglas.atkins@fnf.com](mailto:Douglas.atkins@fnf.com)

**EXHIBIT E**

**PERMITTED EXCEPTIONS**

(attached hereto)

# PERMITTED EXCEPTIONS

1.  Taxes subsequent to those for the second half of 2010, not yet due and payable.

2.  Easement granted to Virginia Electric and Power Company, dated April 13, 1975, recorded May 30, 1975, in Deed Book 1641, page 350, to construct, operate and maintain a pole line for the transmission and distribution of electricity together with appurtenances and rights as detailed therein.

3.  Restrictions, easements, conditions, assessments, etc., recorded as set forth in Declaration of Covenants, Restrictions and Easements for White Oak Technology Park, dated September 26, 1996, recorded September 26, 1996, in Deed Book 2675, page 1344,

4.  Terms, agreements and conditions as set forth in Water and Sewer Service Agreement, by and between White Oak Semiconductor Partnership, Industrial Development Authority of the County of Henrico, Virginia and the County of Henrico, Virginia, dated September 26, 1996, recorded September 26, 1996, in Deed Book 2677, page 286.

5.  Easement granted to the County of Henrico, Virginia, dated March 25, 1997, recorded April 23, 1997, in Deed Book 2715, page 345, to construct, operate and maintain utility lines together with appurtenances and rights as detailed therein.

6.  Easement granted to Bell Atlantic-Virginia, Inc., dated July 24, 1997, recorded August 15, 1997, in Deed Book 2741, page 1343, to construct, operate and maintain a communication system of buried wires and cables together with appurtenances and rights as detailed therein.

7.  Easement granted to Virginia Electric and Power Company, dated October 8, 1997, recorded November 4, 1997, in Deed Book 2759, page 1305, to construct, operate, inspect, improve, rebuild, maintain, repair, replace and remove: (1) overhead electric transmission and/or distribution lines and communications lines, and (2) an electric substation, together with appurtenances and rights as detailed therein.

8.  Plat of survey prepared by Timmons, dated September 4, 1996, entitled "ALTA/ACSM LAND TITLE SURVEY SHOWING 210.000 ACRES OF LAND BEING A PART OF THE ELKO TRACT, a copy of which is recorded in Plat Book 102, pages 215-218, shows the following adverse matters:
    a.  Fence surrounding water tower located in northeastern portion of premises extends onto adjoining premises, the location of which is depicted on the Survey as encroaching 22.6'.
    b.  Power pole with meter and utility pole outside of easement area located in the mid-portion of the premises connected by line to pole within Virginia Electric and Power Company easement at Deed Book 1641, page 350. (Pole shown on the Survey and referenced as this exception is not in the same location as this exception.)
    c.  Confirmed cemetery area in mid-portion of the premises, the approximate location of which is depicted on the Survey. This policy takes exception to the use

of aforesaid areas as a cemetery and to unlocated easement for ingress and egress with respect thereto.

d. Ditch located in the southeastern portion of the premises extends in an easterly direction onto adjoining property.

Note: Wetlands areas and 100' RPA Buffer Line by Williamsburg Environmental Group are subject to Paragraph 1 (a) of the Exclusions from Coverage of this Policy.

9. In addition to the above referenced matters, the Survey shows the following adverse matters:
   a. 25' Front Setback along Technology Boulevard.
   b. 30' Rear Setback along the southwestern property line.
   c. Swampy Area located in the western portion of property.
   d. Intentionally Deleted.
   e. Overhead Powerline runs over the central portion of property.
   f. 2 Electric Houses and a Transformer located in the central portion of property, and a Transformer located in the western portion of property.
   g. Cell Tower Site located in the western portion of property
   h. Water Valves and Fire Hydrants located throughout the property
   i. Valves, Storm Drains, Drains and GVs located throughout the property. (GV needs to be added to the legend; probably stands for Gas Valve)
   j. Undesignated Symbols (which may be Fire Hydrants) located throughout the property. These symbols do not match the legend.


**NOTE**: Permitted Exception No. 8 and No. 9 above will not be included as Permitted Encumbrances on Exhibit B to the Special Warranty Deed.

**EXHIBIT F**

**DEED**

**(attached hereto)**

Tax Map No:

_____

Prepared by:
Lee E. Berner, Esq.,
 Hogan & Hartson L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004

### Special Warranty Deed

This SPECIAL WARRANTY DEED is made as of _____ __ 2010 by and between QIMONDA RICHMOND, LLC, a Delaware limited liability company, having a principal address of _____ (the "**Grantor**") and _____, a _____ [corporation/limited liability company/limited partnership], having a principal address of [12851 Foster Street, Suite 205, Overland Park, Kansas, 66213] (the "**Grantee**").

### W I T N E S S E T H:

That for and in consideration of the sum of Ten Dollars ($10.00), the receipt of which is hereby acknowledged, Grantor does hereby grant unto Grantee, in fee simple, the following described parcel of land and premises, situated in the County of Henrico, Virginia and more particularly described in <u>Exhibit A</u> attached hereto and made a part hereof.

TOGETHER WITH all and singular the ways, easements, rights, privileges and appurtenances to the same belonging or in any way appertaining, and all the estate, right, title, interest and claim, either at law or in equity, or otherwise however of Grantor, of in, to, or out of said land and premises.

AND Grantor covenants that it will warrant specially the property hereby conveyed, and that it will execute such further assurances of said land as may be requisite.

SUBJECT ONLY to the Permitted Encumbrances set forth on <u>Schedule B</u> attached hereto.

*[Signature page follows on the next page]*

1

IN TESTIMONY WHEREOF, Grantor, on the day and year first hereinabove written, has caused these presents to be executed on its behalf.

**GRANTOR**:

QIMONDA RICHMOND, LLC, a Delaware limited liability company

By:_____
Name:
Title:

STATE OF _____)
                                                    ) ss:
COUNTY OF _____)

The foregoing Special Warranty Deed was acknowledged before me this ___ day of _____ ___, 2010 by _____, the _____ of Qimonda Richmond, LLC.

In testimony whereof I have affixed my official seal, this __ day of _____, A.D. 2010.

_____
Notary Public

[Notarial Seal]

Date of Expiration: _____

**Exhibit A to Special Warranty Deed**

Description of Land

**Exhibit B to Special Warranty Deed**

<u>Permitted Encumbrances</u>

1.      The lien of real estate taxes not yet due and payable


2.      List of Permitted Encumbrances

## EXHIBIT G

## BILL OF SALE

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, QIMONDA RICHMOND, LLC, a Delaware limited liability company (collectively, "<u>Seller</u>"), does hereby sell and convey to RICHMOND SEMICONDUCTOR, LLC, a Delaware limited liability company ("<u>Buyer</u>"), any and all of Seller's right, title and interest in and to the Personal Property (as defined Purchase and Sale Agreement, dated February 11, 2010, by and between Seller and Buyer), AS IS, WHERE IS, AND WITHOUT WARRANTY of title or use, and without warranty, express or implied, of merchantability or fitness for a particular purpose.

TO HAVE AND TO HOLD all of said personal property unto Buyer, its successors and assigns, to its own use forever.

IN WITNESS WHEREOF, Seller has duly executed this Bill of Sale as of the ____ day of _____, 2010.

SELLER:        QIMONDA RICHMOND, LLC,
a Delaware limited liability company

By:    _____

Name:  _____

Title:   _____

\\\DC - 032778/000004 - 3026778 v2

## ASSIGNMENT OF INTANGIBLES

THIS ASSIGNMENT AND ASSUMPTION OF INTANGIBLES ("Assignment") is made as of the _____ day of _____, 2010, between QIMONDA RICHMOND, LLC, ("Assignor"), and RICHMOND SEMICONDUCTO, LLC, a Delaware limited liability company ("Assignee"). Capitalized terms used herein and not otherwise defined herein shall have the meanings given to such terms in that certain Purchase and Sale Agreement dated effective as of February 11, 2010, between Assignor, as Seller, and Assignee, as Buyer (the "Purchase Agreement").

1. Assignment. Pursuant to the Purchase Agreement, Assignor is concurrently herewith transferring and conveying to assignee all right, title and interest of Assignor in and to the Land described on Schedule 1 attached hereto and incorporated herein by reference. As part of such transaction, Assignor hereby assigns, transfers, sets over and conveys to Assignee all of Assignor's right, title and interest, to the extent assignable, in, to and under any Intangibles relating to the Land and Improvements.

2. Assumption. Subject to the terms of the Purchase Agreement and the express obligations and responsibilities of the parties thereunder, Assignee does hereby assume and agree to perform all of Assignor's obligations and liabilities under the Intangibles accruing from and after the date hereof.

3. Successors and Assigns. This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and their respective heirs, executors, administrators, successors and assigns. Each entity constituting Assignee shall be jointly and severally liable for all obligations of Assignee hereunder.

This Assignment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

### *SIGNATURE PAGE TO FOLLOW*

IN WITNESS WHEREOF, Assignor and Assignee have each executed this Assignment as of the date first written above.

ASSIGNOR:                                  QIMONDA RICHMOND, LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

ASSIGNEE:                                 RICHMOND SEMICONDUCTOR, LLC
a Delaware limited liability company

By: _____
Name: _____
Title: _____

## EXHIBIT I

**FIRPTA CERTIFICATE**

**(attached hereto)**

# CERTIFICATE OF NON-FOREIGN STATUS FOR AN ENTITY

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by Qimonda Richmond, LLC ("**Qimonda Richmond**"), the undersigned hereby certifies the following on behalf of Qimonda Richmond:

1. Qimonda Richmond is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2. Qimonda Richmond is not a disregarded entity as defined in § 1.1445-2(b)(2)(iii);

3. Qimonda Richmond's U.S. employer identification number is 51-0567867; and

4. Qimonda Richmond's office address is

Qimonda Richmond, LLC
6000 Technology Boulevard
Sandston, VA 23150

Qimonda Richmond understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Qimonda Richmond.

Transferor:

QIMONDA RICHMOND, LLC, a Delaware limited liability company.

By: _____

    Name:
    Title:

Date: _____ ___, 2010

\\\DC - 032778/000004 - 3013403 v1

**EXHIBIT J**

**STALKING HORSE ORDER**

**(attached hereto)**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------

)

In re                                            )

                                                 )

QIMONDA RICHMOND, LLC, et al.,[1]                )          Case No. 09-10589 (MFW)

                                                 )

                            Debtors,             )          Jointly Administered

-----------------------------------------------------------------

## ORDER (I) AUTHORIZING QIMONDA RICHMOND, LLC TO AWARD BIDDING PROTECTIONS TO RICHMOND SEMICONDUCTOR LLC; (II) AFFORDING THE PAYMENT OF THE BIDDING PROTECTIONS ADMINISTRATIVE EXPENSE TREATMENT UNDER SECTIONS 503 AND 507 OF THE BANKRUPTCY CODE; AND (III) APPROVING BIDDING PROCEDURES IN CONNECTION WITH <u>THE SALE OF CERTAIN ASSETS OF QIMONDA RICHMOND, LLC</u>

Upon consideration of the *Notice of Entry Into Asset Purchase Agreement with Richmond Semiconductor LLC and Proposed Bidding Protections and Bidding Procedures with Respect Thereto* [Docket No. <u>     </u>] (the "<u>RS Stalking Horse Notice</u>") filed herein by Qimonda Richmond, LLC ("<u>QR</u>"); the Court finding that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a core proceeding pursuant to 28 U.S.C. § 157, and (iii) notice of the RS Stalking Horse Notice was sufficient under the circumstances and that no other or further notice need be provided; and upon the Declaration of Douglas O. Barrett (the "<u>Barrett Declaration</u>") in

support of the RS Bidding Protections;[2] and upon the legal and factual bases set forth in the RS Stalking Horse Notice, the Barrett Declaration and the record of these cases which establish just cause for the relief granted herein; and the Court having determined that the relief sought in the RS Stalking Horse Notice is in the best interests of the above captioned debtors and debtors in possession (collectively, the "Debtors") and their estates, as well as stakeholders thereof, and after due deliberation and sufficient cause appearing therefore, it is hereby:

ORDERED, the RS Bidding Procedures annexed hereto as Exhibit 1 are hereby approved and such RS Bidding Procedures shall govern the sale of the Property; and it is further

ORDERED, that the RS Bidding Protections, including the Break Up Fee and the Expense Reimbursement, the provisions related to the Deposit (as defined in the RS PSA) and to termination as set forth in the RS PSA and the Escrow Agreement (as defined in the RS PSA), as applicable, are hereby authorized and approved; and it is further

---

[Footnote continued]

[1]     The Debtors in these chapter 11 cases, along with the last four (4) digits of each debtor's federal tax identification number, are: Qimonda Richmond, LLC (7867) and Qimonda North America Corp. (4654).

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the RS Stalking Horse Notice.

ORDERED, that the Break Up Fee and the Expense Reimbursement shall be treated as administrative expenses under sections 503(b)(1) and 507(a)(2) of title 11 of the United States Code (the "Bankruptcy Code") and paid as specified by this Order and the RS PSA; and it is further

ORDERED, that if QR receives a Qualified Bid (as defined in the RS Bidding Procedures) for the Property prior to the bid deadline of March 10, 2010 at 4:00 p.m. (prevailing New York City time), the Debtors will conduct an auction for the Property on March 12, 2010 at 9:00 a.m. (prevailing New York City time) at Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (the "Auction"); and it is further

ORDERED, that the Debtors shall provide notice of the Bid Deadline (as defined in the RS Bidding Procedures) in the form annexed hereto as Exhibit 2 (the "Bid Deadline Notice") by (a) serving the Bid Deadline Notice on all parties whom the Debtors, their advisors and the Committee's professionals have indicated as parties who have previously shown interest in or may be interested in purchasing the Property, (b) publishing the Bid Deadline Notice in the national edition of *The Wall Street Journal* within seven (7) calendar days after entry of this Order; and it is further

ORDERED, that, payment of the Break Up Fee, the Expense Reimbursement and the Deposit shall be made in accordance with the RS PSA and the Escrow Agreement, as applicable; and it is further

ORDERED, that to the extent there is any inconsistency between the terms of this Order and the RS PSA, the terms of this Order and the exhibits hereto shall control; and it is further

ORDERED, that this Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

Dated: _____, 2010
Wilmington, Delaware


_____
THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT K**

**[attached hereto]**

# THE BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale (the "Proposed Sale") of certain Property of Qimonda Richmond, LLC (the "Debtor"). The Debtor will seek entry of an order from the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") authorizing and approving the Proposed Sale to the Proposed Purchaser (defined below) or to another Qualified Bidder (defined below) that is determined to have made the offer that provides the highest or best aggregate value to the Debtor (the "Sale Transaction"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the RS PSA (defined below).

## RS PSA

On February 11, 2010, the Debtor entered into a purchase and sale agreement (the "RS PSA") with Richmond Semiconductor LLC (the "Buyer" or "Proposed Purchaser"). Pursuant to the RS PSA, the Buyer proposes to acquire the Property (as defined in the RS PSA) free and clear of all Encumbrances (as defined in the RS PSA).

Recognizing the Buyer's expenditure of time, energy, and resources, the Debtor has agreed to provide certain bidding protections to the Buyer. Specifically, the Debtor has determined that the RS PSA furthers the goals of the Bidding Procedures by setting a floor which all other Qualified Bids (defined below) must exceed. As a result, the Debtor has agreed that under certain circumstances, as set forth in the RS PSA, the Debtor will reimburse the Buyer for certain of its expenses of up to $125,000 (the "Expense Reimbursement") and pay to the Buyer a breakup fee of $240,000 (the "Breakup Fee"). The Buyer will have an opportunity to "credit bid" such Breakup Fee and Expense Reimbursement in any subsequent bids it elects to make in the Auction (defined below).

The Proposed Purchaser is a Qualified Bidder (defined below), and the RS PSA is a Qualified Bid (defined below).

The Buyer's offer to purchase the Property as set forth in the RS PSA may be terminated by the Buyer pursuant to the terms and conditions set forth in Section 9 of the RS PSA.

## The Bidding Process

On February ___, 2010, the Court entered an Order Approving Debtor's Motion, Pursuant to Sections 105(a), 105(d) and 363(b) of the Bankruptcy Code, for Entry of an Order Approving Bidding Procedures And Bidding Protections in Connection with the Sale of Certain Property of the Debtor [Docket No. _____] (the "RS Stalking Horse Order").

Subject to the Bidding Procedures Order, the Debtor and its advisors shall (i) determine whether any bid for the Property is a Qualified Bid, (ii) coordinate the efforts of Qualified Bidders in conducting their due diligence investigations, (iii) receive offers from Qualified Bidders, and (iv) negotiate in good faith any offers made to purchase the Property (collectively, the "Bidding Process"). The Buyer is a Qualified Bidder and the RS PSA is a

Qualified Bid. The Debtor shall consult with certain restricted members of the Official Committee of Unsecured Creditors (the "Committee") and its professionals regarding the Debtor's determination as to whether bids are Qualified Bids and bidders are Qualified Bidders. Only Qualified Bidders may participate in the Bidding Process and bid at the Auction. Neither the Debtor nor its representatives shall be obligated to furnish information of any kind whatsoever to any person that is not a Qualified Bidder, and the Debtor and its professionals shall use good faith efforts to provide all Qualified Bidders with substantially similar information. The Debtor, after consultation with the Committee's professionals, shall have the right to adopt such other rules for the Bidding Process that will better promote the goals of the Bidding Process and that are not materially inconsistent with any of the other provisions hereof, the RS PSA, the Bidding Procedures Order or any Bankruptcy Court order.

## Participation Requirements

Any person that wishes to participate in the Bidding Process (a "Potential Bidder") must become a "Qualified Bidder". As a prerequisite to becoming a Qualified Bidder (and thus, among other things, prior to being able to conduct due diligence), a Potential Bidder must deliver (unless previously delivered) to the Debtor, not later than March 8, 2010 at 4:00 p.m. (prevailing New York City time):

(i)     An executed confidentiality agreement in form and substance acceptable to the Debtor; and

(ii)     Sufficient information, as requested by the Debtor, to allow the Debtor to determine that the Potential Bidder has the financial wherewithal and any required authorizations to close the Sale Transaction, including, but not limited to, current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Debtor) of the Potential Bidder or of those entities that will guarantee the obligations of the Potential Bidder.

A Qualified Bidder is a Potential Bidder that delivers the documents described in subparagraphs (i) and (ii) above, and that the Debtor determines is reasonably likely (based on financial information submitted by the Potential Bidder, experience and other considerations deemed relevant by the Debtor) to submit a *bona fide* offer and to be able to consummate a sale if selected as a Successful Bidder.

Notwithstanding anything herein to the contrary, any creditor of the Debtor that has a valid lien on all or some portion of the Property not subject to a bona fide dispute or any pending challenge or litigation that secures a valid claim (each a "Secured Creditor") shall be deemed to be a Qualified Bidder to the extent of its valid secured claim; however such Secured Creditor must satisfy the Debtor that the Secured Creditor has the financial wherewithal and any required authorizations to close the Sale Transaction, including, but not limited to, current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Debtor) of the Secured Creditor or of those entities that will guarantee the obligations of the Secured Creditor to the extent of its offer in excess of its valid secured claim. If such Secured Creditor submits all Required Bid Documents in accordance with the terms of the Bidding Procedures, such bid submitted by such Secured Creditor shall be

deemed a Qualified Bid. Any such Secured Creditor shall have the right to submit a credit bid to the extent of its valid secured claim pursuant to section 363(k) of the Bankruptcy Code for the portion of the Property on which such Secured Creditor has a lien.

The Debtor shall consult with the Committee's professionals and restricted members in connection with the Debtor's determinations as to whether a Potential Bidder is a Qualified Bidder. No later than seven (7) business days after a Potential Bidder delivers all of the materials required by subparagraphs (i) and (ii) above, the Debtor shall determine, and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.

## Due Diligence

The Debtor may continue to afford any Qualified Bidder the time and opportunity to conduct reasonable due diligence; provided, however, that the Debtor shall not be obligated to furnish any due diligence information after the Bid Deadline (defined below). The Debtor will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from such Qualified Bidders. Neither the Debtor nor any of its representatives are obligated to furnish any information to any person other than a Qualified Bidder.

## Bid Deadline

A Qualified Bidder that desires to make a bid shall deliver written copies of its bid to (i) Qimonda Richmond, LLC, c/o Qimonda North America Corp., 3608 Shannon Rd., Suite 100, Durham, NC 27707 (Attn: Miriam Martinez and Scott Ryan); (ii) Advanced Technology Resource Group of CMN Inc. &b/a Collier International, 601 Union Street, Suite 5300, Seattle, Washington 98101 (Attn: Nick Papa); and (iii) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Attn: Morris J. Massel, Esq. and Rhett Brandon, Esq.), not later than 4:00 p.m. (prevailing New York City time) on March 10, 2010 (the "Bid Deadline").

## Bid Requirements

All bids must include (unless such requirement is waived by the Debtor, after consultation with the Committee's professionals and only if not materially inconsistent with any of the other provisions hereof, the RS PSA, the Bidding Procedures Order or any Bankruptcy Court order) the following documents (the "Required Bid Documents"):

- The identity of the bidder and the officer(s) or authorized agent(s) who will appear on behalf of such bidder;

- A purchase price, the value of which is determined by the Debtor (after consultation with the Committee's professionals and restricted members) to be at least equal to or greater than the purchase price in the RS PSA for the applicable Property bid on plus $500,000 (the "Initial Incremental Bid Amount");

- A letter stating that the bidder's offer is irrevocable until April 15, 2010 (as may be extended by written agreement of the Debtor and such bidder) (the "Termination Date");

- An executed copy of a purchase agreement pursuant to which the Qualified Bidder proposes to acquire the applicable Property, which purchase agreement shall include (i) the Termination Date, and (ii) a representation that the Qualified Bidder will make all necessary regulatory or other filings and pay the fees associated with such filings;

- A good-faith cash deposit, which shall be made with the Debtor's escrow agent upon the submission of a Qualified Bid in an amount equal to at least 10% of the purchase price set forth in the applicable purchase agreement for such Qualified Bidder (the "Good Faith Deposit"); provided that for a Secured Creditor's credit bid pursuant to section 363(k) of the Bankruptcy Code solely for the Property subject to the liens of such Secured Creditor, the Good Faith Deposit requirement may be satisfied to the extent of such Secured Creditor's valid secured claim and such Secured Creditor will agree to forfeit its allowed secured claim to the extent used as some or all of its Good Faith Deposit; if a Secured Creditor's valid secured claim is less than the required Good Faith Deposit, such Secured Creditor shall post the remainder of the Good Faith Deposit in cash;

- Written evidence of a commitment for financing or other evidence of the ability to consummate the sale satisfactory to the Debtor, with appropriate contact information for such financing sources; provided that for any bid that is entirely financed as a credit bid of a Secured Creditor to the extent of its valid secured claim pursuant to section 363(k) of the Bankruptcy Code, no such evidence shall be required;

- A redline of bidder's proposed purchase agreement over that of the RS PSA;

- A redline of bidder's proposed "Deed of Lease" over that attached as an exhibit to the RS PSA; and

- A redline of bidder's proposed form of sale order over the form of order attached to the RS PSA.

A bid received from a Qualified Bidder that includes all of the Required Bid Documents and meets all of the above requirements is a "Qualified Bid".

The Debtor reserves the right to determine, after consultation with the Committee's professionals and restricted members, the value of any Qualified Bid(s) for the Property, and which Qualified Bid(s) provide the highest or best aggregate value to the Debtor. Proposals will be evaluated on numerous grounds; however, proposals that are unconditional and contemplate sales of the Property that may be consummated on or soon after the Sale Hearing are preferred.

## "As Is, Where Is"

The sale of the Property shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtor, its agents or its estate except to the extent set forth in the RS PSA or the purchase agreement of another Successful Bidder. By submitting a bid, each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Property prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Property in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Property, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures or, (i) as to the Proposed Purchaser, as expressly stated in the terms of the sale of the Property set forth in the RS PSA and ancillary documents, or (ii) as to another Successful Bidder, as expressly stated in the terms of the sale of the Property set forth in the applicable agreement and ancillary documents.

## Free Of Any And All Encumbrances

Except as otherwise provided in the RS PSA or another Successful Bidder's purchase agreement, all of Debtor's right, title and interest in and to the Property subject thereto shall be sold free and clear of Encumbrances to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Encumbrances to attach to the net proceeds of the sale of the Property with the same validity and priority as such Encumbrances applied against the Property.

## Auction

If a Qualified Bid other than that submitted by the Proposed Purchaser has been received by the Debtor, the Debtor shall conduct an auction (the "Auction") with respect to the Property. The Auction shall commence on March 12, 2010 at 9:00 a.m. (prevailing New York City time). The Debtor shall notify all Qualified Bidders that have submitted Qualified Bids of the time and place of the Auction.

Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. During the Auction, bidding shall begin initially with the Qualified Bid(s) that provide the highest or best aggregate value to the Debtor, as determined by the Debtor (after consultation with the Committee's professionals and restricted members) and subsequently continue in minimum increments of at least $250,000. Other than otherwise set forth herein, the Debtor may conduct the Auction in the manner it determines (after consultation with the Committee's professionals) will result in the highest, best or otherwise financially superior offer(s) for the Property that is not materially inconsistent with any of the other provisions hereof, the RS PSA, the Bidding Procedures Order or any Bankruptcy Court order.

At the conclusion of the Auction, the Debtor (after consultation with the Committee's professionals and restricted members) shall identify the offer for the Property that provides the highest or best aggregate value to the Debtor (the "Successful Bid", and the entity or entities submitting such Successful Bid, the "Successful Bidder(s)") and advise the Qualified

Bidders of such determination. The Qualified Bidder whose final bid is deemed to be highest and best following the conclusion of the Auction will be the "Successful Bidder", and such bid, the "Successful Bid". Immediately after the announcement of the Successful Bid, the Successful Bidder shall execute and deliver a purchase agreement incorporating the price and terms offered in the Successful Bid (the "Final Sale Agreement"). Upon submission of the Final Sale Agreement by the Successful Bidder, the Debtor will execute the Final Sale Agreement and shall seek Bankruptcy Court approval of the Final Sale Agreement at a hearing before the Bankruptcy Court to be held not more than two business days after conclusion of the Auction.

## Acceptance of Qualified Bids

The Debtor shall sell the Property to the Successful Bidder(s) upon the approval of the Successful Bid(s) by the Bankruptcy Court after a hearing (the "Sale Hearing"). The Debtor's presentation of the Successful Bid(s) to the Bankruptcy Court for approval does not constitute the Debtor's acceptance of the bid(s). The Debtor will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing. All parties in interest in the chapter 11 cases reserve their right to object to the Debtor's selection of the Successful Bidder(s), and the Bankruptcy Court's approval of the respective purchase agreements.

## Sale Hearing

The Sale Hearing shall be conducted by the Bankruptcy Court on March 16, 2010 at 11:30 a.m. (prevailing New York City time). Following the approval of the sale of the Property to the Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate an approved sale within ten (10) business days after entry of an Order approving the Sale, the Debtor shall be authorized (after consultation with the Committee's professionals), but not required, to deem the next highest or otherwise best Qualified Bid, as disclosed at the Sale Hearing, the Successful Bid, and the Debtor (after consultation with the Committee's professionals) shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such bid without further order of the Bankruptcy Court.

## Combination Bidding

Qualified Bidders may form joint ventures or partnerships to submit bids with respect to the Sale Transaction, with the prior written consent of the Debtor. For the avoidance of doubt, separate bidders on any Sale Transaction may, but are not required to, combine their bids with the prior written approval of the Debtor.

## Return of Good Faith Deposit

As noted above, all Qualified Bidders will be required to submit the Good Faith Deposit with the Debtor on or before the Bid Deadline in the amount of set forth in the RS PSA. Good Faith Deposits of all Qualified Bidders shall be held in a separate non-interest-bearing account until a proposal is no longer irrevocable as provided herein, at which time they will be returned to the Qualified Bidder; provided, however, that if a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such

Successful Bidder, the Debtor will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become the property of the Debtor. To the extent that any defaulting Successful Bidder is a Secured Creditor, such creditor's allowed secured claim will be reduced by an amount equal to ten (10) percent of such creditor's Credit Bid.

## The Committee

The Debtor shall provide to the Committee's professionals information, which information may be shared with restricted members of the Committee, regarding the qualification of bidders, the valuation of bids and such other information related to the sale process as may be reasonably requested by the Committee. Throughout the process, the Debtor shall consult with the Committee's restricted members and its professionals as provided herein.

## Additional Requirements

All persons who submit a bid to purchase (i) the Property or (ii) any other assets of Debtor that are governed by a stalking horse order entered by the Bankruptcy Court that will be sold concurrently with the Property (each, an "Asset Lot"), must in such bid itemize the purchase price set forth in such bid among the assets sought to be purchased by the third party offeror in a manner consistent with the methodology used by Buyer and, as applicable, the stalking horse bidder for the Asset Lot. Furthermore, the Bidding Procedures shall provide that all persons who submit a bid for an Asset Lot, must bid on all of the assets in such Asset Lot, and such bid cannot select only portions of the assets in an Asset Lot; provided, however, that such bids may include (i) one or more Asset Lots and/or (ii) other assets of Seller other than assets in an Asset Lot.

## Bankruptcy Court Oversight

The Bankruptcy Court shall decide any controversy regarding the qualification of bidders and the valuation of bids.

## Reservation of Rights

The Debtor reserves the right to (i) determine in its reasonable discretion (after consultation with the Committee's professionals and restricted members) which offer provides the highest or best aggregate value to the Debtor, and (ii) reject at any time prior to entry of a Bankruptcy Court order approving an offer, without liability, any offer other than the RS PSA that the Debtor in its reasonable discretion (after consultation with the Committee's professionals and restricted members) deem to be (x) inadequate or insufficient, (y) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or procedures set forth therein or herein, or (z) contrary to the best interests of the Debtor and its estate.

The selection of a Successful Bidder(s) shall be within the reasonable business judgment of the Debtor (after consultation with the Committee's professionals and restricted members) and subject to the approval of the Bankruptcy Court, and economic considerations may not be the sole criteria upon which the Debtor may base its decision. In assessing whether

an offer provides the highest or best aggregate value to the Debtor, the Debtor may consider, among other things, the net economic effect upon the Debtor's estate. The presentation of a particular offer to the Bankruptcy Court for approval does not constitute the Debtor's acceptance of the offer. The Debtor will be deemed to have accepted an offer only when the offer has been approved by the Bankruptcy Court at the Sale Hearing. At or before the Sale Hearing, the Debtor (after consultation with the Committee's professionals) may impose such other terms and conditions on the Qualified Bidders the Debtor may determine to be in the best interests of the Debtor, its estate, its creditors, and other parties in interest that are not materially inconsistent with any of the other provisions hereof, the RS PSA, the RS Stalking Horse Order or any Bankruptcy Court order.

**EXHIBIT L**

**SALE ORDER**

**(attached hereto)**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------x
                                    )
In re:                              )       Chapter 11
                                    )
QIMONDA RICHMOND, LLC et. al.       )       Case No. 09-10589 (MFW)
                                    )
              Debtors.              )       Jointly Administered
                                    )
-----------------------------------------------------x

**ORDER (I) AUTHORIZING THE SALE BY QIMONDA RICHMOND, LLC
TO RICHMOND SEMICONDUCTOR LLC OF CERTAIN PROPERTY
FREE AND CLEAR OF ENCUMBRANCES, AND
(II) APPROVING PURCHASE AND SALE AGREEMENT**

Upon the motion [Docket No. _____], dated February __, 2010 (the "Motion"), of

Qimonda Richmond, LLC, as debtor and debtor-in-possession (the "Seller" or "Debtor") in the

above captioned bankruptcy case (the "Bankruptcy Case"), for the entry of an order (i)

authorizing the Debtor's sale (the "Sale") to Richmond Semiconductor LLC ("Purchaser"),

pursuant to a Purchase and Sale Agreement between the Debtor and Purchaser, dated as of

February 11, 2010 (the "Purchase Agreement"), a copy of which is annexed hereto as Exhibit A,

of the Property,[1] free and clear of Encumbrances, with such Encumbrances to transfer, affix, and

attach to the proceeds of the Sale, with the same order, priority, validity, force, and effect which

such Encumbrances now have against the Property (with certain of such Encumbrances satisfied

at Closing as set forth herein), subject to any claims and defenses the Debtor or its estate may

possess with respect thereto, and (ii) approving the Purchase Agreement and the transactions set

forth therein; and upon this Court's order dated February ___, 2010, approving, *inter alia,* certain

bidding procedures and an auction (the "Auction") in connection with the Debtors' sale of the

Property; and upon the *Order Approving Bidding Procedures And Bidding Protections in*

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
Purchase Agreement.

*Connection with the Sale of Certain Property of the Debtor Qimonda Richmond, LLC*, dated February __, 2010 [Docket No. ____] (the "RS Stalking Horse Order"); and Purchaser having presented the highest and best bid for the Property; and upon the record of the hearing to consider approval of the proposed Sale (the "Sale Hearing"); and the Court having determined that the relief requested by the Motion is proper, lawful, necessary, appropriate and in the best interests of the Debtor, its estate, creditors and direct and indirect equity holders, and all parties-in-interest; and upon the Declaration of _____ (the _____ Declaration"); and any responses and objections to the Motion, including reservations of rights having been withdrawn, resolved, or overruled by this Order; and the Court having determined that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor:

THE COURT FINDS AND DETERMINES THAT:[2]

*General Findings and Notice*

A.      On February 20, 2009 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code"), thereby initiating the Bankruptcy Case and creating its bankruptcy estate (the "Estate").

B.      The Debtor is a limited liability company duly organized, and in good standing, under the laws of the State of Delaware.

C.      No trustee has been appointed in the Bankruptcy Case, and the Debtor continues to manage the Estate as a debtor-in-possession.

D.      As evidenced by the certificate(s) of service previously filed with the Court, and based on the representations of counsel at the Sale Hearing: (i) service of the Motion was proper,

---

2       Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate pursuant to Bankruptcy Rule 7052, as made applicable by Bankruptcy Rule 9014.

adequate and sufficient under the applicable Federal Rules of Bankruptcy Procedure and the Local Rules of this Court, (ii) proper, timely, adequate and sufficient notice of the Motion, the Auction and the Sale Hearing has been provided and a reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded by written and publication notice to all interested persons and entities, including: (1) the Office of the United States Trustee; (2) the Purchaser; (3) the official committee of unsecured creditors appointed in the Bankruptcy Case (the "Committee"); (4) counsel to the agent for the postpetition lender; (5) all entities known to have asserted any Encumbrances in, upon or against the Property; (6) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion or with jurisdiction over the Debtor's business and Property or any part thereof; (7) other potentially interested purchasers; (8) Qimonda AG, (9) Qimonda Holding BV; and (10) all parties listed on the Debtors' creditor matrix; (iii) such notice was good, sufficient and appropriate under the particular circumstances, and (iv) no other or further notice of the Motion, Auction or the Sale Hearing is required.

E.     The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue of this case and the Motion in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

*Corporate Power, Authority and Ownership of the Property*

F.     Subject to entry of this Order, (i) the Debtor has the full authority, ability, standing and right, under the Bankruptcy Code and applicable nonbankruptcy law, to enter into and perform under and consummate the Purchase Agreement and all other documents contemplated thereby, and to sell, assign, transfer, convey and deliver the Property to the Purchaser pursuant to the Purchase Agreement and this Order, (ii) the Sale of the Property by the

Debtor pursuant to the Purchase Agreement has been validly and duly authorized by all necessary corporate action of the Debtor, (iii) the Debtor has all of the power and authority necessary to consummate the transactions contemplated by the Purchase Agreement, and (iv) the Debtor has taken all action necessary to authorize and approve the Purchase Agreement and the consummation by the Debtor of the transactions contemplated thereby.

G.     The Debtor is the sole and lawful owner of, and holds good and marketable title to, the Property.  The transfer of the Property to the Purchaser pursuant to this Order will be a legal, valid, and effective transfer of the Property, and will vest the Purchaser, to the exclusion of all other parties, with all right, title, and interest of the Debtor in and to the Property free and clear of all Encumbrances.

*The Sale Process*

H.     As evidenced by the record of the Bankruptcy Case and at the Sale Hearing, and on the papers filed in connection therewith, (i) the Debtor has marketed the Property and conducted the sale process in compliance with applicable law and orders of this Court, (ii) the Auction was duly noticed but was not required, and (iii) a reasonable opportunity was provided to any interested party to make a higher or better offer for the Property.

I.     The Purchase Agreement resulted from the Debtor's marketing of the Property, undertaken in full compliance with the RS Stalking Horse Order and applicable law.  The highest and best offer that resulted from these activities was the offer from Purchaser, as embodied in the Purchase Agreement, pursuant to which Purchaser will pay the Debtor the Purchase Price for the Property, subject to all rights, remedies, obligations and other provisions in the Purchase Agreement.

J.     Based on the facts and circumstances of the Debtor, additional marketing activities are unlikely to lead to any higher or better offer and would be costly and burdensome,

and result in additional delays and costs. Any benefit to be gained by additional marketing of the Property is likely to be outweighed by the costs and burdens associated therewith.

*The Purchase Agreement*

K.     Purchaser's offer, as set forth in the Purchase Agreement, provides for the sale and transfer of the Property to Purchaser. Such offer is the highest and best offer received for the assignment, transfer, conveyance, delivery and Sale of the Property. Purchaser complied in all respects with the RS Stalking Horse Order and any other applicable order of this Court in negotiating and entering into the Purchase Agreement and the Sale, and the Purchase Agreement likewise complies with the RS Stalking Horse Order and any other applicable order of this Court.

L.     The Purchase Price to be paid by Purchaser under the Purchase Agreement is fair value, and constitutes reasonably equivalent and reasonable market value and fair consideration for the Property under the circumstances.

M.     Purchaser is a bona fide third party purchaser for value of the Property and is not an insider (as defined in the Bankruptcy Code) of the Debtor or Qimonda North America Corp. ("QNA" and together with the Debtor, the "Debtors"). As set forth in the _____ Declaration, Purchaser seeks to consummate the purchase of the Property in good faith and for no improper motive, reason or purpose.

N.     The Purchase Agreement was negotiated, proposed and entered into in good faith, from arm's length bargaining positions, and without collusion. Therefore, Purchaser, as a good faith purchaser, is entitled to the full protections of section 363(m) of the Bankruptcy Code with respect to the Property and the transactions contemplated by the Purchase Agreement. Neither the Debtor, the Purchaser nor any of the entities that have consented to the sale pursuant to section 363(f) of the Bankruptcy Code has engaged in any conduct that would cause or permit

the Purchase Agreement or the transfer of the Property to be void or voidable under section 363(n) of the Bankruptcy Code.

O.     The Purchaser would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtor, the Estate, and its creditors and direct and indirect equity holders, if the Sale of the Property to the Purchaser was not free and clear of all Encumbrances of any kind or nature whatsoever, or if the Purchaser would, or in the future could, be liable for the Excluded Liabilities (as defined in the Purchase Agreement).

P.     Sound business reasons exist for the Sale of the Property pursuant to the Purchase Agreement.   Entry into the Purchase Agreement and consummation of the transactions contemplated thereby constitute the exercise by the Debtor of sound business judgment and such acts are in the best interests of the Debtor, the Estate, its creditors and direct and indirect equity holders, and all parties-in-interest.   The Court finds that the Debtor has articulated reasonable and compelling circumstances and good and sufficient business reasons justifying the Sale of the Property pursuant to the Purchase Agreement in accordance with sections 105 and 363 of the Bankruptcy Code.   Such business reasons include, but are not limited to, the fact that:   (i) there is substantial risk of deterioration of the value of the Property if the transactions contemplated in the Purchase Agreement are not consummated quickly; (ii) the Sale of the Property pursuant to the Purchase Agreement will reduce or minimize continuing, significant costs and expenses being incurred by the Debtor by having to, among other things, maintain, insure and provide security for the Property; (iii) the Purchase Agreement constitutes the highest and best offer for the Property; and (iv) the consummation of the Purchase Agreement will present the best opportunity to realize the value of the Property and avoid decline and devaluation of the Property.   In addition, the Sale of the Property pursuant to the Purchase Agreement will (i)

enable the Debtor to take advantage of a favorable offer in a market that may decline; and (ii) enable the Debtor to sell the Property for fair market value.

Q.     The consideration provided by the Purchaser for the Property is the highest and otherwise best offer received by the Debtor and is fair and reasonable.  A sale of the Property other than one free and clear of Encumbrances would impact materially and adversely on the Estate, and would yield substantially less value for the Estate, with less certainty than provided by the Sale of the Property to the Purchaser.  Consequently, a sale of the Property other than one free and clear of Encumbrances would be of substantially less benefit to the Estate.  In reaching this determination, the Court has taken into account both the consideration to be realized directly by the Debtor and the indirect benefits of such sale.  Therefore, the Sale of the Property contemplated by the Purchase Agreement is in the best interests of the Debtor, the Estate, its creditors and direct and indirect equity holders, and all parties-in-interest.

R.     Time is of the essence to closing the Sale, and the Purchase Agreement contains strict time deadlines for the consummation of the transaction contemplated therein.

*Sale of the Property Free and Clear of Encumbrances*

S.     The Debtor may sell the Property free and clear of all Encumbrances of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Encumbrances who either (i) are identified in decretal paragraph 28 (based on the conditions set forth therein), (ii) did not object, or (iii) withdrew their objections to the Sale or to the Motion are deemed to have consented to the relief granted herein pursuant to section 363(f)(2) of the Bankruptcy Code.

T.     All other holders of Encumbrances fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Encumbrances, if any, attach to the cash proceeds of the Sale of the Property ultimately

attributable to the property against or in which they assert such Encumbrances with the same order, priority, validity, force, and effect which they now have against the Property, subject to any claims and defenses the Debtor or its Estate may possess with respect thereto.

U.     Approval of the Purchase Agreement and consummation of the Sale of the Property in the Purchase Agreement at this time are in the best interests of the Debtor, the Estate, its creditors and direct and indirect equity holders, and all parties-in-interest.

V.     Purchaser is obligated to pay any fee or commission or like payment to any broker, finder or financial advisor retained in the Bankruptcy Case as a result of the consummation of the transaction contemplated by the Purchase Agreement based upon any arrangement made by or on behalf of the Seller, provided that nothing herein shall relieve the Seller of its obligations to make any such payments, pursuant to applicable orders of this Court, to professionals retained in these cases.

NOW, THEREFORE, AFTER DUE DELIBERATION, THE COURT ORDERS, ADJUDGES, AND DECREES THAT

*General Provisions and Authority*

1.     The Motion is granted in all respects.  All responses or objections to the Motion or reservations of rights to the relief requested therein that have not been withdrawn, waived or settled are overruled on the merits and denied in their entirety.

2.     The Purchase Agreement and all of the transactions including, but not limited to the Lease contemplated thereby are approved and shall be binding on the Debtor, the Estate and all creditors, direct and indirect equity holders and parties in interest in the Bankruptcy Case.

3.     Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is authorized to enter into, perform under, comply with, implement and to take all other action as is necessary to consummate the terms of the Purchase Agreement including, but not limited to, executing and

delivering all additional agreements, instruments, and documents required under the Purchase Agreement and such other agreements that are necessary or appropriate to consummate the transactions contemplated by the Purchase Agreement including, but not limited to Lease, all without the need for further motion or Court order.

4.      Except as expressly permitted or otherwise specifically provided for in the Purchase Agreement, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon Closing, good and marketable title in and to the Property shall be transferred to the Purchaser free and clear of all Encumbrances of any kind or nature whatsoever, including, but not limited to, (i) those that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Debtor's or the Purchaser's interest in the Property, or any similar rights, (ii)  those relating to taxes arising under or out of, in connection with, or in any way relating to ownership or operation of the Property prior to the Closing, and (iii) (a) all mortgages, deeds of trust, security interests, rights of entry, licenses to access to the Property, easements, conditional sale or other title retention agreements, pledges, liens, judgments, demands, Encumbrances, interests, rights of first refusal, or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income, or other exercise of any attributes of ownership, (b) all debts arising in any way in connection with any agreements, acts, or failures to act, of the Debtor or any of the Debtor's predecessors or affiliates, and (c) claims (as defined in the Bankruptcy Code), obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests, and matters of any kind and nature, whether known or unknown, contingent or otherwise, whether arising prior to or subsequent to the Petition Date, including, without limitation, any product liability, guarantee, assurance, or warranty (whether expressed or implied) or that arise by operation of law, and whether imposed by agreement, understanding,

law, equity or otherwise, including but not limited to all claims arising under doctrines of successor liability, with all such Encumbrances of any kind or nature whatsoever to attach to the net proceeds of the Sale of the Property with the same order, priority, validity, force, and effect which they now have against the Property, subject to any claims and defenses the Debtor or its Estate may possess with respect thereto, subject to decretal paragraph 28 below.

5.     The transfer of the Property to the Purchaser pursuant to the Purchase Agreement constitutes a legal, valid, and effective transfer of the Property, shall vest the Purchaser with the Debtor's right, title, and interest in and to the Property as the sole and exclusive owner thereof free and clear of all Encumbrances of any kind or nature whatsoever, and shall vest the Purchaser with good and marketable title in and to the Property.

6.     The aggregate consideration, including cash and non-cash consideration, provided by the Purchaser for the Property under the Purchase Agreement shall be deemed to constitute reasonably equivalent and reasonable market value and fair consideration for the Property under the Bankruptcy Code and shall not be subject to challenge under any applicable nonbankruptcy law.

7.     Each and every federal, state, and local governmental agency, department or authority is directed to accept, file and record any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

*Good Faith Protections*

8.     The transactions contemplated by the Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale of the Property pursuant to the Purchase Agreement shall not affect the validity of the Sale of the Property to the Purchaser, unless such consummation is stayed pending

appeal. The Purchaser is a good faith purchaser of the Property, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

9. The consideration provided by the Purchaser for the Property under the Purchase Agreement is the product of non-collusive, arm's length negotiations, and is fair and reasonable and may not be avoided under the provisions of section 363(n) of the Bankruptcy Code.

*Sale of the Property Free and Clear of Encumbrances*

10. Those parties asserting Encumbrances against, in or to the Property who did not respond or object to the Sale of the Property, or who have withdrawn or resolved their responses or objections, are deemed to have consented to the Purchase Agreement and the transactions contemplated thereby and authorized herein pursuant to section 363(f)(2) of the Bankruptcy Code. Those parties asserting Encumbrances against, in or to the Property who did respond or object and have not withdrawn such responses or objections fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

11. Subject to decretal paragraph 28 below, any holder or potential holder of an Encumbrance against, in or to the Property is provided adequate protection, within the meaning of section 363(e) of the Bankruptcy Code, by the terms of this Order, including, but not limited to, the provisions herein that provide for Encumbrances, if any, to attach to the proceeds of the Property ultimately attributable to the property against or in which they assert such Encumbrances.

12. Except as expressly permitted or otherwise specifically provided by the Purchase Agreement or this Order, all persons and entities, including, but not limited to, all debt holders, equity security holders, governmental, tax, and regulatory authorities, lenders, employees, trade, and other creditors, including, but not limited to Qimonda AG, Qimonda Holding BV and the other Seller's Parent Entities that may hold an Encumbrance of any kind or nature whatsoever

against, in or to the Property (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtor, the Property, the operation of the Property prior to the Closing, or the transfer of the Property to the Purchaser under the terms of the Purchase Agreement, are forever barred, estopped, and permanently enjoined from asserting any Encumbrance against the Purchaser, its successors and assigns, its property, or the Property or proceeds thereof (or the recipients of such proceeds).

13. If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing an Encumbrance in the Property shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or other releases of all Encumbrances which the person or entity has with respect to the Property, then (i) the Debtor is authorized to execute at Closing, and within two (2) business days thereafter, file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Property, and (ii) the Purchaser is authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances in the Property of any kind or nature whatsoever.

14. On the Closing of the Sale of the Property pursuant to the Purchase Agreement, all parties are authorized to execute such documents and take all actions as may be necessary to release their Encumbrances in the Property, if any, as such Encumbrances may have been recorded or may otherwise exist. All persons and entities that are in possession of any of the Property are directed to surrender possession of such Property to Purchaser at the Closing.

15.     This Order (i) shall be effective as a determination that, as of the Closing, all Encumbrances of any kind or nature whatsoever existing as to the Property prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (ii) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Property.

16.     Any Excluded Assets, whether owned by the Debtor or any of the Excluded Asset Owners, remaining on or about the Property at the end of the term of the Lease, through acceleration or otherwise, shall be deemed abandoned; and the Purchaser is permitted to retain or dispose of such assets and to keep the proceeds of any use or disposition, in its sole and absolute discretion, and without any duty, liability or obligation to the Debtor or any of the Excluded Asset Owners with respect thereto.

_No Successor Liability_

17.     Consummation of the Purchase Agreement and the transactions contemplated thereby and therein do not effect a _de facto_ merger or consolidation of the Debtor with Purchaser.  Purchaser is not the alter ego of, a successor-in-interest to, or a continuation or substantial continuation of the Debtor or the enterprise(s) of the Debtor.  Purchaser shall not be liable for any acts or omissions of the Debtor in the conduct of its business or arising under or related to the Property other than as set forth in the Purchase Agreement.  Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the

Purchase Agreement, to the extent allowed by law, the Purchaser shall not be liable for any bankruptcy claims, other claims, written notices, causes of action, proceedings, complaints, investigations or other proceedings against the Debtor or any of its predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any such liability that may be imposed by statute (e.g., under so-called "bulk-sale" laws) or any theory of antitrust, environmental, products liability, successor or transferee liability, labor law, de facto merger, or substantial continuity, whether known or unknown as of the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the ownership or operation of the Property prior to the Closing.

18. Except to the extent Purchaser otherwise specifically agreed in the Purchase Agreement or this Order, Purchaser shall have no liability, responsibility or obligation for any claims, liabilities or other obligations of the Debtor or its Estate, including without limitation, any claims, liabilities or other obligations related to the Property prior to Closing. Under no circumstances shall the Purchaser be deemed a successor of or to the Debtor for any Encumbrances against, in or to the Debtor or the Property.

19. The Sale of the Property shall not be subject to any Encumbrances, and Encumbrances of any kind or nature whatsoever shall remain with, and continue to be obligations of, the Debtor. All persons holding Encumbrances against the Property of any kind or nature whatsoever (including but not limited to, the Debtor and/or its respective successors, including any trustee, creditors, employees, unions, former employees and shareholders, administrative agencies, governmental units, secretaries of state, federal, state and local officials,

maintaining any authority relating to any environmental, health and safety laws, and their respective successors or assigns) shall be, and are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Encumbrances of any kind or nature whatsoever against the Purchaser, its property, its successors and assigns, or the Property, as an alleged successor or otherwise, with respect to any Encumbrance of any kind or nature whatsoever such person or entity had, has, or may have against or in the Debtor, the Estate, officers, directors, shareholders, or the Property. Following the Closing, no holder of an Encumbrance shall interfere with the Purchaser's title to or use and enjoyment of the Property based on or related to such Encumbrance, or any actions that the Debtor may take in the Bankruptcy Case.

*Binding Nature of the Order*

20. This Order and the Purchase Agreement shall be binding in all respects upon all creditors (whether known or unknown) of the Debtor, all parties-in-interest in the Estate and the Bankruptcy Case, all successors and assigns of the Purchaser, the Debtor and their affiliates, subsidiaries and parents, the Property, and any trustee appointed or elected in the Bankruptcy Case or upon a conversion to chapter 7 of the Bankruptcy Code and shall not be subject to rejection pursuant to section 365 of the Bankruptcy Code. Nothing contained in any chapter 11 plan confirmed in the Bankruptcy Case or the order confirming any such chapter 11 plan shall conflict with, impair, negate or be contrary to or inconsistent with the provisions of the Purchase Agreement or this Order.

21. This Court retains jurisdiction to enforce and implement the terms and provisions of the Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (i) resolve any disputes arising under or related to the

Purchase Agreement, except as otherwise provided therein, (ii) interpret, implement, and enforce the provisions of this Order, (iii) protect the Purchaser against (a) any of the Debtor's liabilities including specifically the Excluded Liabilities or (b) any Encumbrances against, in or to the Property, of any kind or nature whatsoever, which attach to the proceeds of the Sale of the Property; *provided*, *however*, that in the event the Court abstains from exercising or declines to exercise such jurisdiction or is without jurisdiction with respect to the Purchase Agreement or this Order, such abstention, refusal to exercise, or lack of jurisdiction shall have no effect upon, and shall not control, prohibit, or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

22.     The terms and provisions of the Purchase Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, the Estate, its creditors and direct and indirect equity holders, and all parties-in-interest, the Purchaser, and its respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting Encumbrances in the Property to be sold to the Purchaser pursuant to the Purchase Agreement.  Notwithstanding any subsequent appointment or election of any trustee(s), responsible officer, or other fiduciary or representative under any section of any chapter of the Bankruptcy Code, such trustee(s), responsible officer, or other fiduciary or representative shall be bound by the terms and provisions of the Purchase Agreement and this Order.

23.     The provisions of this Order and the terms and conditions of the Purchase Agreement shall be binding upon, fully enforceable against and inure to the benefit of any trustee, responsible officer or other fiduciary appointed under any section of the Bankruptcy Code or any applicable law.  Such binding effect is an integral part of the Sale and this Order.

*Miscellaneous*

24.    The failure specifically to include any particular provisions of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement be authorized and approved in their entirety. Notwithstanding the foregoing, to the extent of any inconsistency between this Order and the Purchase Agreement, the terms of this Order shall govern.

25.    The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Estate.

26.    The provisions of this Order are non-severable and mutually dependent.

27.    Purchaser is not and will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the transaction contemplated by the Purchase Agreement based upon any arrangement made by or on behalf of the Seller, provided that nothing herein shall relieve the Seller of its obligations to make payments, pursuant to applicable orders of this Court, to professionals retained in these cases.

*Required Payments Pursuant to the Order*

28.    On the Closing Date, Seller is permitted to and shall make the following payments from the proceeds of the Sale (without any reduction for commissions, costs, fees, expenses, the Break-Up Fee, the Reimbursement Amount or otherwise) to:

1. Henrico County, of an amount equal to $\$\_\_\_$ plus \_\_% statutory interest to the date of closing, to satisfy and fully discharge Henrico County's real estate tax claims against the Debtor, less any tax payments made through the date of closing; and

2. the Post Termination Cash Collateral Account (as defined in the *Order Granting Motion of the Debtors, Pursuant to Bankruptcy Rule 9019 and Certain Provisions of*

*the Final DIP Order, for Entry of an Order Authorizing the Debtors to Enter into a Termination Agreement Terminating the Debtors' Postpetition Credit Facility*, dated December 16, 2009 [Docket No. 987] (the "DIP Settlement Order")), in the amounts required under the DIP Settlement Order.

29.    The Purchaser is authorized in accordance with Section 2.1(c) of the Purchase Agreement to remit the Remaining Purchase Price to such party as directed in writing by Seller.

30.    Henrico County is deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.

*Modification of the Automatic Stay*

31.    The automatic stay provisions of Bankruptcy Code section 362 are hereby vacated and modified to the extent necessary to permit the Purchaser to exercise any or all default rights and remedies with respect to the Lease; provided that such right or remedies shall not be effective until the earlier of (i) a determination by this Court, pursuant to an order entered after notice and a hearing (which hearing may be sought on an expedited basis provided that Purchaser, the Debtors and the Committee receive not less than two (2) Business Days notice of such hearing), or (ii) five (5) Business Days after Debtor or Purchaser, as the case may be, gives notice to the other of an event or condition that gives rise to such default rights or remedies.

*No Stay Pursuant to FED. R. BANK. P. 6004(h)*

32.    The stay of orders authorizing the (i) use, sale, or lease of property as provided for in FED. R. BANK. P. 6004(h) shall not apply to this Order, and this Order is immediately effective and enforceable.

   **SO ORDERED.**


Dated: March ___, 2010
    Wilmington, Delaware          _____
                                  THE HONORABLE MARY F. WALRATH
                                  UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT M

## LEASE

**(attached hereto)**

# DEED OF LEASE

THIS DEED OF LEASE (the "Lease") is executed this _____ day of _____, 2010 (the "Effective Date"), by and between RICHMOND SEMICONDUCTOR LLC, a Delaware limited liability company ("Landlord"), and QIMONDA RICHMOND, LLC, a Delaware limited liability company ("Tenant").

WHEREAS, Tenant wishes to lease the Leased Premises (as defined below) from Landlord and Landlord is willing to lease the Leased Premises to Tenant.

NOW, THEREFORE, it is hereby mutually covenanted and agreed by and between the parties hereto that this Lease is made upon the terms, covenants and conditions hereinafter set forth.

## ARTICLE 1 - LEASE OF PREMISES

Section 1.01.  Lease of Premises.  Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the land described on Exhibit A attached hereto (the "Land"), together with (i) the Personal Property (as defined in the Purchase and Sale Agreement, dated February 11, 2010 (the "Purchase Agreement") by and between Tenant and Landlord) and (ii) all of the buildings and other improvements located on the Land (the "Improvements" and together with the Land and the Personal Property, the "Leased Premises").  Landlord at all times reserves the right to use the Land and Improvements on a non-exclusive basis with Tenant, subject to any reasonable restrictions imposed by Tenant with respect to Tenant's Property (as defined below) and Third Party Equipment (as defined below).

Section 1.02  Condition of Leased Premises.  Tenant acknowledges and agrees that Tenant, as prior owner of the Leased Premises, will have examined or otherwise have knowledge of the condition of the Leased Premises prior to the execution and delivery of this Lease. Regardless, however, of any inspection made or not made by Tenant of the Leased Premises and whether or not any patent or latent defect or condition was revealed or discovered thereby, Tenant is leasing the Leased Premises "as is" in its present condition.  Tenant waives and releases any claim or action against Landlord in respect of the condition of the Premises including any defects or adverse conditions latent or patent, matured or unmatured, known or unknown by Tenant or Landlord as of the date hereof.

# ARTICLE 2 - TERM AND POSSESSION

Section 2.01.   Term.   The term of this Lease shall commence on the Effective Date and shall terminate on the earlier to occur of (i) September 30, 2010 subject to Landlord's right to terminate this pursuant to Section 2.02 below and (ii) ten (10) days following the date on which all of Tenant's Property and Third Party Equipment is removed from the Leased Premises (the earlier of such dates, the "Termination Date").  The period commencing on the Effective Date and terminating on the Termination Date shall be known as the "Term."

Section 2.02.   Landlord's Right to Terminate.   At any time prior to the Termination Date, Landlord, at its option and upon ten (10) days prior written notice to Tenant shall have the right to remove from this Lease any buildings located on the Land in which no Tenant's Property and or Third Party Equipment is located.  Upon such notice to Tenant, said buildings shall no longer be deemed to be part of the Leased Premises; provided, the foregoing shall not relieve Tenant of any of its obligations hereunder except under Article 7 with respect to any such buildings that have been removed from the Lease.

Section 2.03.   Surrender of the Premises.   Upon the expiration or earlier termination of this Lease, Tenant shall, at its sole cost and expense, immediately (a) surrender the Leased Premises to Landlord in broom clean condition and in good order and condition, (b) remove from the Leased Premises Tenant's Property and Third Party Equipment, and (c) repair any damage caused by any such removal, damage by casualty, and condemnation, excepted.  All of Tenant's Property or Third Party Equipment that is not removed on or prior to the Termination Date shall be conclusively deemed to have been abandoned and Landlord shall be entitled to dispose of such property at Tenant's cost without incurring any liability to Tenant.  In addition, to the extent any of Tenant's Property or Third Party Equipment is owned by a third party, Tenant shall indemnify and hold harmless Landlord from and against any claims made by any such third party as a result of the failure of Tenant to remove such Tenant's Property or Third Party Equipment from the Leased Premises on or prior to the Expiration Date.  This Section 2.03 shall survive the expiration or any earlier termination of this Lease.

Section 2.04.   Holding Over.   If Tenant retains possession of the Leased Premises after the expiration or earlier termination of this Lease, Tenant shall be a tenant at sufferance and the monthly rent payable hereunder shall increase to five hundred thousand dollars ($500,000) per month, payable on the first day of each calendar month.  Acceptance by Landlord of rent after such expiration or earlier termination shall not result in a renewal of this Lease, nor shall such acceptance create a month-to-month tenancy.  In the event a month-to-month tenancy is created by operation of law, either party shall have the right to terminate such month-to-month tenancy upon thirty (30) days' prior written notice to the other, whether or not said notice is given on the rent paying date.  This Section 2.04 shall in no way constitute consent by Landlord to any holding over by Tenant upon the expiration or earlier termination of this Lease, nor limit Landlord's remedies in such event.

## ARTICLE 3 - RENT

Section 3.01.  Base Rent.  Tenant shall pay to Landlord the monthly base rent in an amount equal to Two Hundred Fifty Thousand Dollars ($250,000), provided so long no Default (as defined below) has occurred, Landlord shall abate a portion of such monthly base rent and the amount payable for each month shall be $1 per month  ("Base Rent").  Base Rent, as abated, for the period that commences on the date hereof and terminates on the Termination Date shall be payable simultaneously with the execution and delivery of this Lease.

Section 3.02.  Absolutely Net Lease.  It is the intent of Landlord and Tenant that the rent provided in this Article 3 shall be net to the Landlord, and the Tenant shall pay, without notice or demand, and without abatement, deduction or setoff and save the Landlord harmless form and against all real property taxes, property insurance, expenses of maintenance, repair and replacement, and all other operating expenses, charges and obligations relating to the use and operation of the Leased Premises, which may arise or become due during the term of this Lease.  If Tenant is required to make any payment or incur any expense as provided in this Lease and fails to do so then Landlord, at its option and upon five (5) business days prior notice to Tenant, may make the payment or incur the expense on Tenant's behalf, and the cost thereof shall be charged to Tenant as Additional Rent and shall be due and payable by Tenant within ten (10) days from receipt of Landlord's invoice.

Section 3.03.  Payment of Additional Rent.

(a)      In addition to Base Rent, (1) Tenant shall also pay and discharge when due and payable all other amounts, liabilities and obligations relating to the Leased Premises and all other amounts payable by Tenant hereunder, including, without limitation, Impositions (as defined below) and the insurance required to be carried by Tenant under this Lease, and (2) if Tenant fails to pay in a timely manner any of those items referred to in clause (1) above, Tenant shall also pay and discharge every fine, penalty, interest and cost which may be added for non-payment or late payment of such items (the items referred to in clauses (1) and (2) above, whether payable to Landlord or a third party, being referred to herein collectively as the "Additional Rent"), and such payments shall be made within ten (10) days after either Landlord or the applicable third party who may be billing Tenant therefor shall deliver an invoice to Tenant therefor.

Section 3.04.  Late Payment Interest Charges.  Tenant acknowledges that Landlord shall incur certain additional unanticipated administrative and legal costs and expenses if Tenant fails to pay timely any payment required hereunder.  Therefore, in addition to the other remedies available to Landlord hereunder (a) if any payment required to be paid by Tenant to Landlord hereunder is not paid within five (5) business days following written notice from Landlord such unpaid amount shall bear interest from the due date thereof to the date of payment at the prime rate of interest, as reported in the Wall Street Journal (the "Prime Rate") plus three percent (3%) per annum (the "Default Rate").

## ARTICLE 4 – TAXES AND IMPOSITIONS

Section 4.01. Payment of Taxes and Impositions. Except as otherwise specifically provided herein, Tenant shall pay to the applicable Governmental Authority (as defined below), as hereinafter provided, all of the following items (collectively, "Impositions") imposed by any Governmental Authority: (a) real property taxes and assessments levied against the Land and Improvements or any part thereof, including, without limitation, improvements district fees and charges, and any payments in lieu of the foregoing ("Taxes"); (b) personal property taxes; (c) occupancy and rent taxes; (d) water, water meter and sewer rents, rates and charges; (e) excises; (f) levies; (g) license and permit fees; (h) service charges with respect to police protection, fire protection, street and highway construction, maintenance and lighting, sanitation and water supply, if any; (i) fines, penalties and other similar or like governmental charges applicable to the foregoing and any interest or costs with respect thereto; and (j) any and all other governmental levies, fees, rents, assessments or taxes and charges, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever, and any interest or costs with respect thereto, which at any time during the Term are: (1) assessed, levied, confirmed, imposed upon, payable out of or in respect of or charged with respect to, the Leased Premises, or the use and occupancy thereof by Tenant; and (2) encumbrances or liens on (except to the extent arising from the acts or omissions of Landlord): (i) the Leased Premises (ii) the sidewalks or streets in front of or adjoining the Leased Premises; (iii) any vault, passageway or space in, over or under such sidewalk or street; or (iv) any other appurtenances of the Leased Premises; or (v) any personal property, equipment or other facility used in the operation thereof, each such Imposition, or installment thereof, during the Term to be paid not later than fifteen (15) Business Days prior to the due date thereof. For the purposes hereof, a "Governmental Authority" shall mean the United States of America, the Commonwealth of Virginia, the County of Henrico and any agency, department, commission, board, bureau instrumentality or political subdivision of any of the foregoing having jurisdiction over the Leased Premises or any portion thereof.

Section 4.02. Evidence of Payment. Subject to Section 4.03 below, Tenant shall promptly furnish to Landlord copies of official receipts of the appropriate imposing authority, or other evidence reasonably satisfactory to Landlord, evidencing the payment of all or any Imposition(s). Any certificate, advice or bill of the appropriate official designated by law to make or issue the same or to receive payment of any Tax and/or Imposition asserting non-payment of such Tax and/or Imposition shall be prima facie evidence that such Tax and/or Imposition is due and unpaid at the time of the making or issuance of such certificate, advice or bill, at the time or date stated therein.

Section 4.03. Taxes. Landlord and Tenant acknowledge that Taxes have been paid through December 31, 2008. For any period after such date and until the Termination Date, Tenant shall pay all Taxes and Impositions, provided, for any period for which Taxes and Impositions are payable a portion of which occurs during the Term and a portion or which occurs after the Term, Taxes and Impositions shall be payable by Tenant for only such portion of such period as occurs during the Term. To the extent Landlord receives a refund of Taxes paid by Tenant pursuant to this Article 4 or Section 3.02 of this Lease, Landlord shall promptly pay such amounts over to Tenant.

# ARTICLE 5 - OCCUPANCY AND USE

Section 5.01.  Use.  (a) Tenant shall use the Leased Premises solely for the purpose of allowing third parties to dismantle and remove the equipment located in the Improvements or on the Land which are not owned by Tenant or Landlord ("Third Party Equipment") and ancillary uses related thereto and administering and maintaining and removing Tenant's Property and for such activities that are reasonably related to removing, administering and maintaining Tenant's Property.

(b)      During the Term, Tenant shall use commercially reasonable efforts to cause all of Tenant's Property and Third Party Equipment to be removed from the Leased Premises as expeditiously as possible and, in any event, no later than the Termination Date.  Any Tenant's Property or Third Party Equipment not removed on or prior to the Termination Date may be removed by Landlord pursuant to Section 2.03.

(c)      Tenant shall comply with all obligations that Tenant has or may have to the owners of the Third Party Equipment pursuant to any agreements, court orders or other undertakings and shall indemnify and hold harmless Landlord for Tenant's failure to perform the same.

(d)      By August 31, 2010 Tenant shall cause all Tenant's Property or Third Party Equipment then located in the 300 mm building to be relocated out of such building for the remainder of the Term.

(e)      Tenant agrees to cause Landlord to be named as an additional insured under any policy of insurance maintained by any owner of Third Party Equipment under which Tenant is an additional insured on the same terms and conditions under which Tenant is an additional insured.

Section 5.02.  Covenants of Tenant Regarding Use.

(a)      Tenant shall (i) use and maintain the Leased Premises in a safe, careful and lawful manner, (ii) comply in all material respects with existing and future covenants that encumber the Leased Premises, and all laws, rules, regulations, orders, ordinances, directions and requirements of any Governmental Authority now in force or which may hereafter be in force.

Section 5.03.  Landlord's Rights Regarding Use.  Without limiting any of Landlord's rights specified elsewhere in this Lease,  Landlord, its agents, employees and contractors and any mortgagee of the Improvements  shall have the right to enter any part of the Leased Premises at reasonable times upon reasonable notice (except in the event of an emergency where no notice shall be required) for the purposes of examining or inspecting the same (including, without limitation, testing to confirm Tenant's compliance with this Lease), showing the same to prospective mortgagees or tenants, and making such repairs, alterations or improvements to the Leased Premises as Landlord may deem necessary or desirable; provided, however, that all such entries shall be temporary, and all such work shall be done as promptly as reasonably possible

and so as to cause as little interference to Tenant and the conduct of Tenant's business for the Permitted Use as reasonably possible and such work shall not cause any material additional costs associated with operating the Leased Premises.  Landlord shall incur no liability to Tenant for such temporary entry, nor shall such temporary entry constitute an eviction of Tenant or a termination of this Lease, or entitle Tenant to any abatement of rent therefor.

## ARTICLE 6 - UTILITIES

Tenant shall obtain in its own name and pay directly to the appropriate supplier the cost of all utilities and services serving the Leased Premises.  Landlord shall not be liable in damages or otherwise for any failure or interruption of any utility or other service caused by the failure of the public utility to provide utility services and no such failure or interruption of service by a public utility shall entitle Tenant to terminate this Lease or withhold sums due hereunder.

## ARTICLE 7 - REPAIRS, MAINTENANCE AND ALTERATIONS

Section 7.01.  Repair and Maintenance of Leased Premises.  Tenant shall, at its own cost and expense, maintain the Leased Premises (including the Personal Property) in their current condition, perform routine maintenance to the electrical systems located inside or serving any of the Improvements, heating and air conditioning systems serving only the Leased Premises, plate glass, floors, windows and doors, and plumbing systems inside the Building.  In no event, however, shall Tenant be required to make any capital improvements to, or repairs to structural elements of, the Leased Premises.

Section 7.02.  Alterations.  Tenant shall not alter or permit alterations in or to the Leased Premises without the consent of Landlord which may be granted or withheld in Landlord's sole discretion.  In the event requests such consent, Landlord may require as a condition to its consent that Tenant comply with such covenants relating to alterations as Landlord may impose in its sole discretion.

## ARTICLE 8 - INDEMNITY AND INSURANCE

Section 8.01.  Release.  All of Tenant's trade fixtures, merchandise, machinery, inventory and other personal property which is owned, leased or controlled by Tenant (including the trade fixtures, merchandise, machinery, inventory and personal property of others but excluding Third Party Equipment) and located in or about the Leased Premises at the invitation, direction or acquiescence (express or implied) of Tenant (all of which property shall be referred to herein, collectively, as "Tenant's Property"), shall be and remain at Tenant's sole risk.  Landlord shall not be liable to Tenant, its agents, employees, or contractors for, and Tenant, hereby releases Landlord from (a) any and all liability for theft or damage to Tenant's Property or any of the Third Party Equipment, and (b) any and all liability for any injury to Tenant or its employees, agents, contractors, guests and invitees in or about the Leased Premises, unless such liability is due to Landlord's gross negligence or wilful misconduct.  This Section 8.01 shall survive the expiration or earlier termination of this Lease.

Section 8.02.  <u>Tenant Indemnification</u>.  Tenant shall defend, indemnify and hold Landlord, its agents, employees and contractors harmless from and against any and all claims, demands, damages, demands, penalties, costs, liabilities, losses, and expenses (including reasonable attorneys' fees and expenses at the trial and appellate levels actually incurred, without regard to statutory interpretation) to the extent (i) arising out of or relating to any act, omission, negligence, or willful misconduct of Tenant or Tenant's agents, employees, contractors, customers or invitees in or about the Leased Premises, or the Improvements, (ii) arising out of or relating to any of Tenant's Property or Third Party Equipment, (iii) arising out of any other act or occurrence within the Leased Premises or (iv) arising out of the failure of Tenant to comply with its obligations hereunder.  This <u>Section 8.02</u> shall survive the expiration or earlier termination of this Lease.

Section 8.03.  <u>Landlord Indemnification</u>.  Landlord shall defend, indemnify and hold Tenant, its agents, employees and contractors harmless from and against any and all claims, demands, damages, demands, penalties, costs, liabilities, losses, and expenses (including reasonable attorneys' fees and expenses at the trial and appellate levels actually incurred, without regard to statutory interpretation) to the extent (i) arising out of or relating to any act, omission, negligence, or willful misconduct of Landlord or Landlord's agents, employees, contractors, customers or invitees in or about the Leased Premises, or the Improvements, or (ii) arising out of the failure of Landlord to comply with its obligations hereunder.

Section 8.04.  <u>Indemnification Claims</u>.  If a claim is made against the Tenant or Landlord pursuant to <u>Section 8.02</u> or <u>Section 8.03</u> above (each an "Indemnified Party), and the Indemnified Party believes to be covered by the indemnification obligations hereunder, the Indemnified Party  shall promptly notify the other party of the claim and, in such notice shall offer to the other party the opportunity to assume the defense of the claim within fifteen (15) business days after receipt of the notice (with counsel reasonably acceptable to the Indemnified Party).   The failure of the Indemnifed Party to timely give notice shall not affect the rights of the Indemnifed Party under <u>Section 8.02</u>, <u>Section 8.03</u> and this <u>Section 8.04</u> unless the other party is actually and materially prejudiced by such failure.  If the other party  timely elects to assume the defense of the claim, the other party shall have the right to settle the claim on any terms it considers reasonable and without the Indemnifed Party's prior written consent, as long as the settlement shall not require the Indemnifed Party to render any performance or pay any consideration, and does not include or involve the admission or plea of no contest to any alleged illegal or immoral act of the Indemnifed Party (or any other act that would damage the public image or public reputation of the Indemnifed Party or any of its affiliates); and the other party shall not have the right to settle any such claim.  If the other party fails timely to elect to assume the defense of the claim or thereafter fails to defend diligently after notice and an opportunity to cure as is reasonable under the circumstances, then the Indemnifed Party shall have the right to take over the defense of the claim and to settle the claim on any terms the Indemnifed Party considers reasonable.  Any such settlement shall be valid as against the other party.  If the other party assumes the defense of a claim, the Indemnifed Party may employ its own counsel but such employment shall be at the sole expense of the Indemnifed Party.  <u>Section 8.02</u> and <u>Section 8.03</u> above shall have no application to any claim related to Hazardous Substances or any environmental condition that may be discovered in, on or under the Land, or the compliance or

non-compliance with Environmental Laws, which shall be governed by the provisions of Article 14 of this Lease.

Section 8.05. Insurance. During the Term of this Lease and subject to Section 8.05 below, Tenant shall maintain, at its own cost and expense:

(a) Insurance against loss or damage to the Improvements, including without limitation, by fire, windstorm, lightning, tornado and hail and against loss and damage by such other, additional risks as may be now or hereafter embraced by an "all-risk" form of insurance policy. The amount of such insurance shall be not less than one hundred percent (100%) of the full replacement cost (insurable value) of the Improvements (as established by an MAI appraisal), without reduction for depreciation. Full replacement cost, as used herein, means, with respect to the Improvements, the cost of replacing the Improvements without regard to deduction for depreciation, exclusive of the cost of excavations, foundations and footings below the lowest basement floor. Tenant shall also maintain insurance against loss or damage to furniture, furnishings, fixtures, equipment and other items (whether personalty or fixtures) included in the Improvements. Each policy shall contain a replacement cost endorsement and either an agreed amount endorsement (to avoid the operation of any co-insurance provisions) or a waiver of co-insurance provisions, all subject to Landlord's approval, which approval shall not be unreasonably withheld. The maximum deductible shall be $10,000,000, except as specified otherwise.

(b) Commercial general liability insurance against claims for personal injury, bodily injury, death and property damage occurring on, in or about the Leased Premises or the Improvements in amounts not less than $3,000,000 per occurrence and $5,000,000 in the aggregate.

(c) Boiler and machinery insurance (including explosion coverage), if steam boilers or other pressure-fired vessels are in operation at the Leased Premises. Minimum liability coverage per accident must equal the greater of the replacement cost (insurable value) of the Improvements housing such boiler or pressure-fired machinery or $2,000,000. If one or more HVAC units are in operation at the Demised Premises, "Systems Breakdowns" coverage shall be required, as determined by Landlord. Minimum liability coverage per accident must equal the replacement value of such unit(s).

(d) Worker's Compensation and Employer's Liability Insurance covering all appropriate persons.

All such insurance shall (i) be with insurers fully licensed and authorized to do business in the state within which the Leased Premises is located and which have and maintain a claims paying ability rating of A- VII or better by A.M. Best (or equivalent acceptable to any applicable rating agency), (ii) contain the complete addresses of the Leased Premises (or a complete legal descriptions), (iii) be for terms of at least one year, with premium prepaid, (iv) be subject to the approval of Landlord as to insurance companies, amounts, content, forms of policies and expiration dates, which approval shall be deemed granted by Landlord by execution of this Lease and (v) include standard, non-contributory, clauses naming Landlord as an

additional insured under all liability insurance policies and as a loss payee on all property insurance policies and as a loss payee on all loss of rents or loss of the business income insurance policies.

Tenant shall, as of the date hereof, deliver to Landlord evidence that said insurance policies have been prepaid as required above with original certificates signed by an authorized agent of the applicable insurance companies evidencing such insurance satisfactory to Landlord. Certified copies of such policies must be delivered to Landlord within thirty (30) days of the date hereof. Tenant shall renew all such insurance and deliver to Landlord certificates and policies evidencing such renewals at least thirty (30) days before any such insurance shall expire. Tenant further agrees that each such insurance policy: (i) shall provide for at least thirty (30) days' prior written notice to Landlord prior to any policy reduction or cancellation for any reason other than non-payment of premium and at least ten (10) days' prior written notice to Landlord prior to any cancellation due to non-payment of premium; (ii) shall contain an endorsement or agreement by the insurer that any loss shall be payable to Landlord in accordance with the terms of such policy notwithstanding any act or negligence of Landlord or any other person which might otherwise result in forfeiture of such insurance; (iii) shall waive all rights of subrogation against Landlord; (iv) in the event that the Leased Premises or the Improvements constitutes a legal non-conforming use under applicable Buildings, zoning or land use laws or ordinances, shall include an ordinance and law coverage endorsement which will contain Coverage A: "Loss Due to Operation of Law" (with a minimum liability limit equal to Replacement Cost with Agreed Value Endorsement), Coverage B: "Demolition Cost" coverages in amounts as required by Landlord. Approval of any insurance by Landlord shall not be a representation of the solvency of any insurer or the sufficiency of any amount of insurance. In the event Tenant fails to provide, maintain, keep in force or deliver and furnish to Landlord the policies of insurance required by this Lease or evidence of their replacement or renewal as required herein. Landlord may, but shall not be obligated to, procure such insurance and Tenant shall pay all amounts advanced by Landlord therefor, together with interest thereon at the Default Rate from and after the date advanced by Landlord until actually repaid by Tenant, promptly upon demand by Landlord. Landlord shall not be responsible for nor incur any liability for the failure of the insurer to perform even though Landlord has caused the insurance to be placed with the insurer after failure of Tenant to furnish such insurance. Tenant shall not obtain insurance for the Improvements and the Leased Premises in addition to that required by Landlord without the prior written consent of Landlord, which consent will not be unreasonably withheld provided that (i) Landlord is a named insured on such insurance, (ii) Landlord receives complete copies of all policies evidencing such insurance, and (iii) such insurance complies with all of the applicable requirements set forth herein.

Section 8.06. All insurance to be obtained pursuant to Section 8.05 shall contain a standard mortgagee clause naming Landlord and any mortgagee as additional insureds.

Section 8.07. Tenant shall comply with the requirements of all policies of insurance which Tenant is required to maintain pursuant to this Article 8, together with the requirements and rules instituted by the various insurance carriers from time to time with respect to such policies.

# ARTICLE 9 - CASUALTY

Section 9.01.  Casualty.  In the event of total destruction of any of the Improvements, the Land, the Leased Premises or utility lines or access roads thereto, by fire or other casualty, this Lease shall terminate. If the Improvements, the Land or the Leased Premises should be partially damaged by fire or other casualty, this Lease shall not terminate, provided, Tenant shall have no obligation to rebuild or repair any damaged portion; provided Tenant shall take reasonably appropriate measures to prevent further damage to any such damaged portion.

Section 9.02. Property Insurance.  Tenant shall have no right in or claim to the proceeds of any policy of insurance maintained by the Tenant even though the cost of such insurance is borne by the Tenant.

# ARTICLE 10 - EMINENT DOMAIN

Section 10.01.  If the entire Leased Premises shall be taken by exercise of the power of eminent domain or condemnation (or by purchase in lieu thereof), then this Lease shall terminate as of the time when Landlord is divested of its interest in the Leased Premises

Section 10.02.  If a portion of the Leased  Premises shall be taken by exercise of the power of eminent domain or condemnation (or by purchase in lieu thereof) and such taking results in the loss of any building comprising a part of the Improvements on the Leased Premises in its entirety or a substantial portion of a building on the Leased Premises, Tenant may, at its option terminate this Lease as to the building so lost and that portion of the Leased Premises on which the "lost" building is situated and which serves the lost building.  Tenant shall provide notice to Landlord within fifteen (15)  days after receipt of notice of any contemplated taking. Within ten (10) days of such taking, Tenant shall provide notice to Landlord of its intent to terminate the Lease and shall specify the portion of the Demised Premises and Improvements in which it intends to retain its interest.

Section 10.03.   Any condemnation award for the taking of any portion of the Leased Premises shall belong solely to Landlord and Tenant shall make no claim therefor.

# ARTICLE 11 - ASSIGNMENT AND SUBLEASE

Section 11.01.  Assignment and Sublease.

Tenant shall not assign or pledge this Lease or sublet the Leased Premises or mortgage or otherwise encumber the Leased Premises in whole or in part without Landlord's prior written consent which may be granted or withheld in Landlord's sole discretion.  Any reorganization of the Tenant in chapter 11 of the United States Code shall not be deemed to be a transfer or assignment hereunder and shall be deemed to be permissible so long as Tenant's leasehold interest vests in the reorganized entity without interruption and the reorganized entity is bound by and undertakes to perform in any confirmed plan all of the obligations of this Lease and

provided that the reorganized debtor has the ability to perform all of the obligations of this Lease.

Notwithstanding the foregoing, Tenant has the right to permit third parties to enter upon the Leased Premises pursuant to Article 5 of the Lease.

## ARTICLE 12 - TRANSFERS BY LANDLORD

Section 12.01.  Sale of the Improvements.  Landlord shall have the right to sell the Improvements or any portion thereof at any time during the Term, subject to the rights of Tenant hereunder, provided that any transferee shall automatically be deemed to have assumed all obligations of Landlord accruing or arising from and after the date of such transfer, and such sale shall operate to release Landlord from liability hereunder accruing or arising after the date of such conveyance, but not before.

Section 12.02.  Estoppel Certificate.  Within ten (10) business days following receipt of a written request from Landlord, Tenant shall execute and deliver to Landlord, without cost to Landlord, an estoppel certificate in such form as Landlord may reasonably request certifying (i) that this Lease is in full force and effect and unmodified or stating the nature of any modification, (ii) the date to which rent has been paid, (iii) that there are not, to Tenant's knowledge, any uncured defaults or specifying such defaults if any are claimed, and (iv) any other matters or state of facts reasonably required respecting the Lease.  Such estoppel may be relied upon by Landlord and by any purchaser or mortgagee of the Land or Improvements.

Section 12.03.  Subordination.  Landlord shall have the right to subordinate this Lease to the lien and/or equitable title of any mortgage encumbering the Land or Improvements or any portion thereof, by so declaring in such mortgage, Within ten (10) business days following receipt of a written request from Landlord, Tenant shall execute and deliver to Landlord, without cost to Landlord, such a subordination agreement that is commercially reasonable for use in lease transactions comparable to this Lease.

## ARTICLE 13 - DEFAULT AND REMEDY

Section 13.01.  Default.  The occurrence of any of the following shall be a "Default":

(a)     Tenant fails to pay any Additional Rent when due and such failure continues for a period of ten (10) business days after the due date thereof.

(b)     Tenant fails to perform or observe any material term, condition, covenant or obligation required under this Lease for a period of thirty (30) days after written notice thereof from Landlord;

(c)     Abandonment of the Leased Premises by Tenant; provided, however, that Tenant's abandonment of the Leased Premises shall not constitute a Default if, prior to abandoning the Leased Premises, Tenant has made reasonable arrangements to (i) insure that

Tenant's insurance for the Leased Premises will not be voided or cancelled with respect to the Leased Premises as a result of such vacancy, (ii) insure that the Leased Premises are secure, and (iii) insure that the Leased Premises will be properly maintained in accordance with this Lease after such vacation, and will be inspected by Tenant at intervals as may be reasonably required to insure such maintenance is being performed.

(d)     Tenant shall assign or sublet all or a portion of the Leased Premises in contravention of the provisions of Article 11 of this Lease.

(e)     Tenant fails to maintain the insurance required to be maintained by Tenant pursuant to the terms hereof.

Section 13.02.  Remedies.  Upon the occurrence of any Default and while the Default continues, Landlord shall have the following rights and remedies, in addition to those allowed by law or in equity, any one or more of which may be exercised without further notice to Tenant:

(a)     Terminate this Lease by giving Tenant notice of termination, in which event this Lease shall expire and terminate on the date specified in such notice of termination and all rights of Tenant under this Lease and in and to the Leased Premises shall terminate.  Tenant shall remain liable for all obligations under this Lease arising up to the date of such termination, and Tenant shall surrender the Leased Premises to Landlord on the date specified in such notice.

(b)     Without terminating this Lease, and with or without notice to Tenant, re-enter the Leased Premises and cure any default of Tenant, and Tenant shall reimburse Landlord as Additional Rent for any costs and expenses which Landlord thereby incurs; and Landlord shall not be liable to Tenant for any loss or damage which Tenant may sustain by reason of Landlord's action.

(c)     Terminate this Lease as provided in subparagraph (a) above and recover from Tenant an amount which, at the date of such termination is equal to the sum of the following:  (i) the value of the excess, if any, discounted at the prime rate of interest (as reported in the *Wall Street Journal*) or 10% per annum, whichever discount rate is greater, of (A) the Additional Rent and all other sums that would have been payable hereunder by Tenant for the period for the remainder of the Lease Term had this Lease not been terminated (said period being referred to herein as the "Remaining Term"),; (ii) the documented costs of recovering possession of the Leased Premises and all other documented expenses incurred by Landlord due to Tenant's Default, including, without limitation, reasonable attorney's fees actually incurred, without regard to statutory interpretation, and the cost to prepare the Leased Premises for re-letting (all such costs and expenses set forth in this clause (ii) being referred to herein, collectively, as the "Default Damages"); and (iii) the amount of any Base Rent that has been abated hereunder and any Additional Rent that accrued prior to the date of termination, plus any late payment interest charges due under Section 3.04 above and any other sums of money and damages owing on the date of termination by Tenant to Landlord under this Lease or in connection with the Leased Premises (all amounts set forth in this clause (iii) being referred to herein, collectively, as the "Prior Obligations").  The amount as calculated above shall be deemed immediately due and payable.  Landlord and Tenant acknowledge and agree that the payment of the amount set forth

in clause (i) above shall not be deemed a penalty, but shall merely constitute payment of liquidated damages, it being understood that actual damages to Landlord are extremely difficult, if not impossible, to ascertain. Tenant expressly acknowledges and agrees that the liabilities and remedies specified in this subparagraph (c) shall survive the termination of this Lease.

(d)     Sue for injunctive relief or to recover damages for any loss resulting from the Default.

Section 13.03.  Limitation of Landlord's Liability.  If Landlord shall fail to perform any term, condition, covenant or obligation required to be performed by it under this Lease and if Tenant shall, as a consequence thereof, recover a money judgment against Landlord, Tenant agrees that it shall look solely to Landlord's right, title and interest in and to the Land, the Leased Premises and the Improvements for the collection of such judgment, including, without limitation, any proceeds therefrom; and Tenant further agrees that no other assets of Landlord shall be subject to levy, execution or other process for the satisfaction of Tenant's judgment.

Section 13.04.  Nonwaiver of Defaults.  Landlord's failure or delay in exercising any of its rights or remedies or other provisions of this Lease shall constitute a waiver thereof or affect its right thereafter to exercise or enforce such right or remedy or other provision.  No waiver of any default shall be deemed to be a waiver of any other default.  No act or omission by Landlord or its employees or agents during the Lease Term shall be deemed an acceptance of a surrender of the Leased Premises, and no agreement to accept such a surrender shall be valid unless in writing and signed by Landlord.

Section 13.06.  Attorneys' Fees.  If Tenant defaults in the performance or observance of any of the terms, conditions, covenants or obligations contained in this Lease and Landlord obtains a judgment against Tenant for all or substantially all of the relief originally prayed for by Landlord in their pleadings or filings, then Tenant agrees to reimburse Landlord for reasonable attorneys' fees actually incurred in connection therewith, without regard to statutory interpretation.

## ARTICLE 14 - TENANT'S RESPONSIBILITY REGARDING ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES

Section 14.01.  Environmental Definitions.

(a)     "Environmental Law" shall mean any federal, state or local statute, law, rule, regulation, ordinance, code or rule of common law in effect and in each case as amended, and any legally binding judicial or administrative interpretation thereof, to the extent relating to protection of the environment or human exposure to Hazardous Substances, including the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. 11001 *et seq.*; the Resource Conservation and Recovery Act, 42 U.S.C.  6901 *et seq.*; the Federal Water Pollution Control Act, 33 U.S.C. 1251 *et seq.*; the Clean Air Act, 42 U.S.C.  7401 *et seq.*; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. 136 *et seq.*; the Safe Drinking Water Act, 42 U.S.C.

300f *et seq.*; the Toxic Substance Control Act, 15 U.S.C. 2601 *et seq.*; the Oil Pollution Act of 1990, 33 U.S.C. 2701 *et seq.*; the Hazardous Materials Transportation Act, 49 U.S.C. 5101 *et seq.*; the Atomic Energy Act, 42 U.S.C. 2011 *et seq.*; any laws regulating the use of biological agents or substances including medical or infectious wastes; and any corresponding or analogous foreign, state or local laws, regulations or ordinances.

(b)    "Hazardous Substances" shall mean any wastes, substances, radiation or materials (whether solids, liquids or gases):(a) which are defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "restricted hazardous wastes," "toxic substances," "toxic pollutants," "hazardous air pollutants," "pollutants," "contaminants," "toxic chemicals," "toxics," "hazardous chemicals," "extremely hazardous substances," "regulated substances" or "pesticides" as defined as such in any applicable Environmental Law, (b) which are or contain any radioactive materials, asbestos, asbestos-containing materials, urea formaldehyde foam insulation, radon, polychlorinated biphenyls (PCBs), toxic mold, methyl-tertiary butyl ether (MTBE), lead-based paints or petroleum or petroleum products (including, without limitation, crude oil or any fraction thereof), (c) which pose a hazard to human health, safety, natural resources, employees or the environment and (d) exposure to which is prohibited, limited or regulated by Environmental Law.

Section 14.02.  Restrictions on Tenant.  Tenant shall not cause, and will take commercially reasonable action to not permit, the use, generation, release, manufacture, refining, production, processing, storage or disposal of any Hazardous Substances on, under or about the Leased Premises, or the transportation to or from the Leased Premises of any Hazardous Substances, except as reasonably necessary or appropriate for its Permitted Use and in compliance with all applicable Environmental Laws.  Tenant and its representatives, agents, employees shall at all times comply, and shall take commercially reasonable action to cause its customers, contractors, invitees, and licensees, including the owner or purchaser of any Third Party Equipment, to comply, with all applicable Environmental Laws with regard to the Leased Premises, including maintaining and fulfilling all obligations under the Permits (as defined in the Purchase Agreement).  Tenant, its representatives, agents and employees shall, and shall take commercially reasonable action to cause its customers, contractors, invitees, and licensees, including the owner or purchaser of any Third Party Equipment to, promptly provide Landlord copies of all submittals to government agencies required of Tenant under Environmental Laws and the Permits (as defined in the Purchase Agreement).

Section 14.03.  Notices, Affidavits, Etc.  Tenant shall promptly (a) notify Landlord once Tenant has knowledge of (i) any violation by Tenant or its employees, agents, representatives, customers, licensees, invitees or contractors, including the owner or purchaser of any Third Party Equipment, ("Tenant Parties"), of any Environmental Laws on, under or about the Leased Premises after the Effective Date, or (ii) the release, presence or threatened or suspected release or presence of any Hazardous Substances on, under, from or about the Leased Premises that could result in liability under Environmental Laws and (b) deliver to Landlord any notice received by Tenant or, to Tenant's knowledge, Tenant Parties relating to (a)(i) and (a)(ii) above from any source.

Section 14.04.  Tenant's Obligations with Respect to Contamination.

(a)     Solely to the extent relating to an event or condition (i) first occurring or existing after the Effective Date or (ii) for which Tenant was obligated to commence remediation under Section 6.3 of the Purchase Agreement, upon discovery of the release or threatened release of Hazardous Substances on, under, from, or about the Leased Premises caused by Tenant or a Tenant Party (in the case of (i) above), or commencing on the date hereof (in the case of (ii) above), (each, a "Tenant Release") Tenant shall promptly remediate or continue such remediation or, in the case of a Tenant Release caused by a Tenant Party, use commercially reasonable efforts to cause such Tenant Party to promptly remediate, such Hazardous Substances in accordance with relevant cleanup criteria and applicable Environmental Laws and keep Landlord informed of Tenant's progress with respect to such remediation. Without relieving Tenant of its obligations under this Lease and without waiving any default by Tenant under this Lease, Landlord will have the right, but not the obligation, to take such reasonable action as Landlord deems necessary or advisable to remediate, remove, resolve or minimize the impact of or otherwise deal with any Tenant Release. In the event of a Tenant Release, Tenant shall, on demand, pay to Landlord all reasonable costs and expenses incurred by Landlord in connection with any reasonable action taken in connection therewith by Landlord.

(b)     Upon discovery of the release, presence or threatened or suspected release or presence of Hazardous Substances on, under, from, or about the Leased Premises, regardless of the cause, Tenant shall and shall cause Tenant Parties to:

(i)     As reasonably requested by Landlord, assist Landlord to take reasonable steps to stop any continuing release; prevent any future threatened release; and prevent or limit any human, environmental, or natural resource exposure to any previously released Hazardous Substance

(ii)    Exercise due or appropriate care with respect to the Hazardous Substances concerned;

(iii)   Provide full cooperation, assistance, and access to the persons that are authorized to conduct response actions; comply with land use restrictions that are part of a response action, and not impede any institutional control employed as part of a response action;

(iv)    Comply with all governmental information requests and administrative subpoenas directed to Tenant;

(v)     Provide all notices legally required of Tenant with respect to the discovery or release of Hazardous Substances at the Leased Premises; and

(vi)    Keep Landlord informed of its actions required by this Section 14.04(b).

Section 14.05.  Tenant's Indemnification.  Tenant shall indemnify Landlord and Landlord's managing agent from any and all claims, losses, liabilities, costs, expenses and damages, including attorneys' fees, costs of testing and remediation costs, incurred by Landlord

in connection with (a) any breach by Tenant of its obligations under this Article 14, except to the extent caused by Landlord, its agents, employees or contractors, (b) any Tenant Release, or (c) any violation of Environmental Law by Tenant or a Tenant Party first occurring during the Term, except to the extent caused by Landlord, its agents, employees or contractors.

Section 14.06.  Facility Decommissioning.  Other than as relating to the Tenant's Property, the Third-Party Property or Tenant Releases, notwithstanding any other provision of this Lease to the contrary, Tenant shall have no obligation under this Lease to decommission, disassemble, close, decontaminate, remediate, clean, modify, or remove any structure, building, building component, improvement, infrastructure, vessel, container, piping, tubing, conduit, duct, equipment, tool, device, chattel or fixture included or contained in the Leased Premises, except in connection with the maintenance or removal of Tenant's Property or Third Party Equipment from the Leased Premises or in the event of a Tenant Release.

Section 14.07.  Survival.  The covenants and obligations under this Article 14 shall survive the expiration or earlier termination of this Lease.

Section 14.08.  Default.  An immaterial failure of Tenant to comply with the terms, conditions, covenants or obligations in this Article 14, except in each case for Tenant's failure to comply with Section 14.05 with respect to such matters, shall not be considered a Default pursuant to Section 13.01(b).

Section 14.09.  Permits.  (a) If requested by Landlord, Tenant will use commercially reasonable efforts to assist with the transfer of any of the Permits to Landlord, to the extent allowed under applicable law.  (b) Prior to terminating any of the Permits, Tenant shall provide notice to Landlord of its intent to terminate and give Landlord a reasonable opportunity to request Tenant's assistance with transfer as described in subsection (a) of this section.

## ARTICLE 15 - MISCELLANEOUS

Section 15.01.  Benefit of Landlord and Tenant.  This Lease shall inure to the benefit of and be binding upon Landlord and Tenant and their respective successors and assigns.

Section 15.02.  Governing Law.  This Lease shall be governed in accordance with the laws of the State where the Land is located.

Section 15.03.  Force Majeure.  Landlord and Tenant (except with respect to the payment of any monetary obligation) shall be excused for the period of any delay in the performance of any obligation hereunder when such delay is caused by work stoppages, boycotts, slowdowns or strikes; shortages of materials, equipment, labor or energy; unusual weather conditions; or unusual and unanticipated delays of governmental or political bodies; acts of God; governmental restrictions, governmental regulations, enemy or hostile governmental action; civil commotion; fire or other casualty; and other causes beyond the reasonable control of the party obligated to perform ("Force Majeure"). In no event shall the financial inability of a party hereto to perform its obligations under this Lease constitute or be an event of Force Majeure.

Section 15.04.  Examination of Lease.  Submission of this instrument by Landlord to Tenant for examination or signature does not constitute an offer by Landlord or Tenant to lease the Leased Premises.  This Lease shall become effective, if at all, only upon the execution by and delivery to both Landlord and Tenant.

Section 15.05.  Indemnification for Leasing Commissions.  Each party hereby represents and warrants to the other that the neither party dealt with a real estate broker in connection with the negotiation and execution of this Lease and that no other party is entitled, as a result of the actions of the respective party, to a commission or other fee resulting from the execution of this Lease.  Each party shall indemnify, defend and hold harmless the other from and against any and all claims, demands, liabilities, liens, losses, costs, expenses (including reasonable attorney's fees), and damages, of any kind or nature, for the breach of this representation and warranty on its part and shall pay any compensation to any  broker or person who the indemnifying party dealt with in connection with the negotiation and execution of this Lease and who may be entitled to compensation as a result thereof.

Section 15.06.  Notices.

Any notice or other communication required or permitted hereunder shall be given in writing by (a) personal delivery, (b) reputable overnight delivery service with proof of delivery, (c) United States Mail, postage prepaid, certified mail, return receipt requested, or (d) legible facsimile transmission, sent to the intended addressee at the address (or facsimile number) set forth below, or to such other address (or facsimile number) or to the attention of such other person as the addressee shall have designated by written notice sent in accordance herewith. Any notice so given shall be deemed to have been given upon receipt or refusal to accept delivery, or, in the case of (i) certified mail, the date of deposit in the United States Mail; or (ii) facsimile transmission, as of the date of the facsimile transmission provided that an original of such facsimile is also sent to the intended addressee by means described in clauses (a), (b) or (c) above.  Unless changed in accordance with the preceding sentence, the addresses for notices given pursuant to this Agreement shall be as follows:

|  |  |
|---|---|
| If to Landlord: | Richmond Semiconductor LLC |
|  | 12851 Foster Street, Suite 205 |
|  | Overland Park, KS 66213 |
|  | Attn:  Chad L. Williams |
|  | Telephone:  (913) 814-9988 |
|  | Facsimile:  (913) 814-7766 |
|  |  |
| With a copy to: | Hogan & Hartson LLP |
|  | 555 Thirteen Street, N.W. |
|  | Washington, D.C.  20004 |
|  | Attn:  Edward R. Dolan, Esq. |
|  | Attn:  Lee E. Berner, Esq. |
|  | Telephone:  (202) 637-5600 |
|  | Facsimile:  (202) 637-5910 |

If to Tenant:            Qimonda Richmond, LLC
                                    6000 Technology Boulevard
                                    Sandston, VA 23150
                                    Facsimile: (919) 474-6888
                                    Attention: Legal Department

With copies to (for information purposes only):

                                    Simpson Thacher & Bartlett LLP
                                    425 Lexington Avenue
                                    New York, NY 10017-3954
                                    Facsimile: (212) 455-2502
                                    Attention: D. Rhett Brandon and Morris J.
                                    Massel

                                    The Official Committee of Unsecured Creditors
                                    of Qimonda North America and Qimonda
                                    Richmond, LLC
                                    c/o Jones Day
                                    2727 North Harwood
                                    Dallas, Texas 75201
                                    Facsimile: (214) 969-5100
                                    Attention: Troy B. Lewis and Daniel P. Winikka

Whenever notice must be given, or funds or documents delivered, or any other action must be taken pursuant to this Agreement and the last day for such notice, delivery or action is a day other than a business day, then such notice may be given, or such funds or documents may be delivered, or such other action may be taken, on the next succeeding business day. Saturdays, Sundays and any day on which banks in New York City are permitted or required to be close are not considered business days.

       Section 15.07. <u>Partial Invalidity; Complete Agreement</u>. If any provision of this Lease shall be held to be invalid, void or unenforceable, the remaining provisions shall remain in full force and effect. This Lease represents the entire agreement between Landlord and Tenant covering everything agreed upon or understood in this transaction and supercedes all prior negotiations, term sheets, letters of intent and other verbal or written understandings or agreements between the parties. There are no oral promises, conditions, representations, understandings, interpretations or terms of any kind as conditions or inducements to the execution hereof or in effect between the parties. No change or addition shall be made to this Lease except by a written agreement executed by Landlord and Tenant.

       Section 15.08. <u>Representations and Warranties</u>.

       (a) Tenant hereby represents and warrants that (i) Tenant is duly organized, validly existing and in good standing (if applicable) in accordance with the laws of the State under which it was organized; (ii) Tenant is authorized to do business in the State where the Improvements located; and (iii) the individual(s) executing and delivering this Lease on behalf of

Tenant has been properly authorized to do so, and such execution and delivery shall bind Tenant to its terms.

(b)     Landlord hereby represents and warrants that (i) Landlord is duly organized, validly existing and in good standing (if applicable) in accordance with the laws of the State under which it was organized; (ii) Landlord is authorized to do business in the State where the Building is located; and (iii) the individual(s) executing and delivering this Lease on behalf of Landlord has been properly authorized to do so, and such execution and delivery shall bind Landlord to its terms.

Section 15.09.  Parking.  Throughout the Lease Term, Landlord shall provide Tenant, at no additional charge use of all of the parking spaces located on that Land; provided, Tenant may use such parking area on a non-exclusive basis with tenants, guests, invitees and licensees of Landlord.

Section 15.10.  Time.  Time is of the essence of each term and provision of this Lease.

Section 15.11.  No Levy  Tenant's interest in the Leased Premises is a usufruct, not subject to levy and sale, and not assignable by Tenant except as expressly set forth herein.

Section 15.12.  Quiet Enjoyment.  So long as Tenant has not committed a Default hereunder that remains uncured, Landlord agrees that Tenant shall have the right to quietly use, possess and enjoy the Leased Premises for the Lease Term, without hindrance by anyone claiming by, through or under Landlord.

Section 15.13.  No Recordation.  Tenant shall not have the right to record this Lease or a memorandum thereof.

**(SIGNATURES CONTAINED ON FOLLOWING PAGE)**

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the day and year first above written.

LANDLORD:

RICHMOND SEMICONDUCTOR, LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____

_____

TENANT:

QIMONDA RICHMOND, LLC., a Delaware limited liability company

By:_____
Printed Name:_____
Title:_____

**EXHIBIT A**

**SITE PLAN OF LEASED PREMISES**

[TO BE ADDED]

077020-0006-10709-Active.11926275.2

**<u>EXHIBIT N</u>**

**GUARANTY**

**(attached hereto)**

GUARANTY

THIS GUARANTY (this **"Guaranty"**) is made as of _____ ___, 2010, by _____, a _____ _____ (**"Guarantor"**), to and for the benefit of **QIMONDA RICHMOND, LLC**, a Delaware limited liability company (**"Seller"**).

WHEREAS, pursuant to that certain Purchase and Sale Agreement dated as of February __, 2010 (the "**Purchase Agreement**") between Richmond Semiconductor, LLC, a Delaware limited liability company ("**Buyer**"), and Seller, Seller has agreed to sell or cause to be sold to Buyer and Buyer has agreed to purchase from Seller the Property (as defined in the Purchase Agreement), which includes certain real and personal property (the "**Property**"), on the terms and conditions set forth therein;

WHEREAS, in connection with the acquisition of the Property by Buyer and the Closing (as defined in the Purchase Agreement) under the Purchase Agreement, Guarantor is required, and has agreed, to execute and deliver this Guaranty;

WHEREAS, Seller is willing to consent to such acquisition in satisfaction of a condition to Closing under the Purchase Agreement only upon the condition that Guarantor executes and delivers to Seller this Guaranty and agrees to perform and to comply with his, her or its obligations under this Guaranty; and

WHEREAS, Guarantor acknowledges and confirms that (a) the selling of the Property by Seller constitutes valuable consideration to Guarantor, and (b) this Guaranty is intended to be an inducement to Seller to consent to Buyer's acquisition of the Property in satisfaction of a condition to Closing under the Purchase Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and of the covenants and agreements hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, and as an inducement for Seller to consent to Buyer's acquisition of the Property in satisfaction of a condition to Closing under the Purchase Agreement, Guarantor, intending to be legally bound hereby, agrees as follows:

1.      All capitalized terms in this Guaranty and not defined herein shall have the defined meanings provided in the Purchase Agreement (unless otherwise indicated).

2.      Guarantor irrevocably, unconditionally and absolutely guarantees to Seller the due and punctual payment and performance when due of the obligation of Buyer to indemnify, defend and hold harmless Seller and its Representatives under Section 1.6 of the Purchase Agreement (including any legal fees incurred by Seller for which Buyer is obligated to pay under Section 1.6 of the Purchase Agreement) (the **"Guaranteed Obligations"**).

3.      The liability of Guarantor under this Guaranty shall be primary and direct and not conditional or contingent upon the enforceability of any obligation, the solvency of

Buyer or any other Person, any obligation or circumstance which might otherwise constitute a legal or equitable discharge or defense of a surety or guaranty or the pursuit by Seller of any remedies it may have against Buyer or any other guarantor of the Guaranteed Obligations or any other Person. Without limiting the generality of the foregoing, Seller shall not be required to make any demand on Buyer or any other guarantor of the Guaranteed Obligations or any other Person or to pursue or exhaust its remedies against any property of Buyer or any other guarantor of the Guaranteed Obligations or any other Person before, simultaneously with or after enforcing its rights and remedies hereunder against Guarantor, and any one or more successive and/or concurrent actions may be brought against Guarantor in the same action brought against Buyer or any other guarantor of the Guaranteed Obligations or any other Person or in separate actions, as often as Seller may deem advisable, in its sole discretion. The obligations of Guarantor hereunder shall not in any way be affected by the partial or complete unenforceability or invalidity of any other guaranty for any of the Guaranteed Obligations.

4.      Guarantor acknowledges and agrees that his, her or its obligations as Guarantor shall not be impaired, modified, changed, released or limited in any manner whatsoever by any impairment, modification, change, release or limitation of the liability of the Buyer of the Guaranteed Obligations or any other Person or its or their respective estates in bankruptcy resulting from the operation of any present or future provision of the bankruptcy laws or other similar statute, or from the decision of any court.

5.      Guarantor acknowledges and agrees that Seller shall have the full right and power, in its sole discretion and without any notice to or consent from Guarantor and without affecting or discharging, in whole or in part, the liability of Guarantor hereunder to deal in any manner with the Guaranteed Obligations and any security or guaranties therefor, including, without limitation, to (A) release, extend, renew, accelerate, compromise or substitute and administer the Guaranteed Obligations and other obligations under the Purchase Agreement in any manner he, she or it sees fit, (B) otherwise make any change, amendment or modification whatsoever to the terms or conditions of the Purchase Agreement, and/or (C) take or fail to take any other action whatsoever with respect to the Guaranteed Obligations. Guarantor hereby waives and agrees not to assert against Seller any rights which a guarantor or surety could exercise, other than the defense of payment.

6.      The Guarantor hereby represents and warrants that:

a. this Guaranty constitutes a legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms;

b. all consents, approvals, authorizations, permits of, filings with and notifications to, any governmental entity necessary for the due execution, delivery and performance of this Guaranty by the Guarantor have been obtained or made and all conditions thereof have been duly complied with, and no other action by any governmental entity is required in connection with the execution, delivery or performance of this Guaranty;

c.  the execution, delivery and performance of this Guaranty will not violate any law or result in a material breach or violation of, or default under, any material contractual obligations of the Guarantor or give rise to any right of termination, cancellation, modification or acceleration of any material right or obligation of the Guarantor; and

d.  the Guarantor has the financial capacity to pay the Guaranteed Obligations and to perform its obligations under this Guaranty.

7.      Any notice or request hereunder shall be given to Guarantor or to Seller at their respective addresses set forth below or at such other address as such Person may hereafter specify in a notice given in the manner provided in the Purchase Agreement.

Guarantor:      _____
                _____
                _____
                _____
                Facsimile:  _____
                Attention:  _____

With copies (for information purposes only):

        Hogan & Hartson L.L.P.
        555 Thirteenth Street, N.W.
        Washington, D.C.  20004
        Facsimile:  (202) 637-5910
        Attention:  Edward C. Dolan, Esq.
        Attention:  Lee E. Berner, Esq.

Seller:     Qimonda Richmond, LLC
            6000 Technology Boulevard
            Sandston, VA, 23150
            Facsimile: (919) 474-6888
            Attention: Legal Department

With copies to (for information purposes only):

        Simpson Thacher & Bartlett LLP
        425 Lexington Avenue
        New York, NY 10017-3954
        Facsimile: (212) 455-2502
        Attention: D. Rhett Brandon and Morris J. Massel

        The Official Committee of Unsecured Creditors of Qimonda North America
        and Qimonda Richmond, LLC
        c/o Jones Day

2727 North Harwood
Dallas, Texas 75201
Facsimile: (214) 969-5100
Attention: Troy B. Lewis and Daniel P. Winikka

8.      Guarantor hereby agrees and acknowledges that no course of action between Buyer and Seller or delay, renewal or extension of this Guaranty or any rights or obligations hereunder, release of Guarantor or any of the foregoing, or delay, failure or omission on Seller's part in enforcing this Guaranty or the Purchase Agreement or in exercising any right, remedy, option or power hereunder or thereunder shall affect the liability of Guarantor or operate as a waiver of such or of any other right, remedy, power or option or of any default, nor shall any single or partial exercise of any right, remedy, option or power hereunder or thereunder affect the liability of Guarantor or preclude any other or further exercise of such or any other right, remedy, power or option, except to the extent Guarantor is actually prejudiced thereby. No waiver by Seller of any one or more defaults by Guarantor in the performance of any of the provisions of this Guaranty shall operate or be construed as a waiver of any future default or defaults, whether of a like or different nature.

9.      If any term or provision of this Guaranty is adjudicated to be invalid under applicable laws or regulations, such provision shall be inapplicable to the extent of such invalidity or unenforceability without affecting the validity or enforceability of, the remainder of this Guaranty which shall be given effect so far as possible.

10.     This Guaranty shall be effective on the date hereof and shall continue in full force and effect until the date that Seller makes the final distribution pursuant to the terms of a plan of reorganization or liquidation approved by the Bankruptcy Court and the Bankruptcy Court enters an order closing the Bankruptcy Case.

11.     This Guaranty shall be governed by and construed in accordance with the internal laws of the Commonwealth of Virginia without giving effect to its choice of law provisions. The parties hereby waive trial by jury in any action, suit, proceeding or counterclaim brought by either of them against the other in matters arising out of or in any way connected with this Guaranty.

12.     This Guaranty constitutes the entire agreement between Guarantor and Seller with respect to the subject matter hereof, and supersedes all prior oral or written agreements and understandings, if any, relating to the subject matter hereof or thereof. Neither this Guaranty nor any provision hereof may be changed, modified, amended, restated, waived, supplemented, canceled or terminated other than by an agreement in writing signed by Seller and Guarantor. Guarantor acknowledges that Guarantor has been advised by counsel in connection with the negotiation and execution of this Guaranty and is not relying upon oral representations or statements inconsistent with the terms and/or provisions of this Guaranty or such documents. Any waiver of this Guaranty by Seller shall be limited solely to the express terms and provisions of such waiver.

13.     This Guaranty is not intended to benefit or confer any rights upon the Buyer or upon any third party other than Seller, who is an intended beneficiary hereof and for whose benefit this Guaranty is explicitly made.  Seller is hereby authorized to assign, grant, transfer or otherwise pledge any of its respective rights and/or obligations hereunder without any consent from or authorization by the Guarantor to a reorganized Seller, liquidation trust, a successor entity pursuant to a plan of liquidation or reorganization so long as such plan transfer's substantially all of Seller' assets (after making the distributions contemplated thereunder) or a bankruptcy trustee as a result of a conversion of Seller's pending Chapter 11 reorganization to a Chapter 7 liquidation.  The Guarantor may not assign, grant, transfer or otherwise pledge any of its respective rights and obligations under this Guaranty without the prior written consent of Seller except to a successor by merger or consolidation or to an entity that acquires all or substantially all of the assets of Guarantor so long as such successor assumes the obligations of Guarantor hereunder and has sufficient creditworthiness to perform the obligations of Guarantor hereunder.  Subject to the foregoing, this Guaranty and the rights and obligations set forth herein shall inure to the benefit of, and be binding upon the parties hereto, and each of their respective successors, heirs and assigns.

14.     Notwithstanding anything that may be expressed or implied in this Guaranty or any document or instrument delivered contemporaneously herewith, by its acceptance of the benefits of this Guaranty, Seller acknowledges and agrees that it has no right of recovery against any general partner of Guarantor for any matter for which Guarantor is obligated hereunder and no general partner of Guarantor shall have any personal liability under this Guaranty and the Seller further covenants and agrees and acknowledges that the only rights of recovery that the Seller has to recover under this Guaranty are against Guarantor (but not against any general partner of Guarantor) under and to the extent provided in this Guaranty and the limitations described herein.  The foregoing is not intended to constitute a waiver of any provision of applicable law that limits the right of Seller to recover against any other person or entity.

**[Remainder of page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the day and year first above written.

**GUARANTOR:**

[ENTITY NAME]

By:_____
Name:_____
Title:_____

# Exhibit B

**[RS Bidding Procedures]**

# THE BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale (the "Proposed Sale") of certain Property of Qimonda Richmond, LLC (the "Debtor"). The Debtor will seek entry of an order from the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") authorizing and approving the Proposed Sale to the Proposed Purchaser (defined below) or to another Qualified Bidder (defined below) that is determined to have made the offer that provides the highest or best aggregate value to the Debtor (the "Sale Transaction"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the RS PSA (defined below).

## RS PSA

On February 11, 2010, the Debtor entered into a purchase and sale agreement (the "RS PSA") with Richmond Semiconductor LLC (the "Buyer" or "Proposed Purchaser"). Pursuant to the RS PSA, the Buyer proposes to acquire the Property (as defined in the RS PSA) free and clear of all Encumbrances (as defined in the RS PSA).

Recognizing the Buyer's expenditure of time, energy, and resources, the Debtor has agreed to provide certain bidding protections to the Buyer. Specifically, the Debtor has determined that the RS PSA furthers the goals of the Bidding Procedures by setting a floor which all other Qualified Bids (defined below) must exceed. As a result, the Debtor has agreed that under certain circumstances, as set forth in the RS PSA, the Debtor will reimburse the Buyer for certain of its expenses of up to $125,000 (the "Expense Reimbursement") and pay to the Buyer a breakup fee of $240,000 (the "Breakup Fee"). The Buyer will have an opportunity to "credit bid" such Breakup Fee and Expense Reimbursement in any subsequent bids it elects to make in the Auction (defined below).

The Proposed Purchaser is a Qualified Bidder (defined below), and the RS PSA is a Qualified Bid (defined below).

The Buyer's offer to purchase the Property as set forth in the RS PSA may be terminated by the Buyer pursuant to the terms and conditions set forth in Section 9 of the RS PSA.

## The Bidding Process

On February ___, 2010, the Court entered an Order Approving Debtor's Motion, Pursuant to Sections 105(a), 105(d) and 363(b) of the Bankruptcy Code, for Entry of an Order Approving Bidding Procedures And Bidding Protections In Connection with the Sale of Certain Property of the Debtor [Docket No. _____] (the "RS Stalking Horse Order").

Subject to the Bidding Procedures Order, the Debtor and its advisors shall (i) determine whether any bid for the Property is a Qualified Bid, (ii) coordinate the efforts of Qualified Bidders in conducting their due diligence investigations, (iii) receive offers from Qualified Bidders, and (iv) negotiate in good faith any offers made to purchase the Property (collectively, the "Bidding Process"). The Buyer is a Qualified Bidder and the RS PSA is a

Qualified Bid. The Debtor shall consult with certain restricted members of the Official Committee of Unsecured Creditors (the "Committee") and its professionals regarding the Debtor's determination as to whether bids are Qualified Bids and bidders are Qualified Bidders. Only Qualified Bidders may participate in the Bidding Process and bid at the Auction. Neither the Debtor nor its representatives shall be obligated to furnish information of any kind whatsoever to any person that is not a Qualified Bidder, and the Debtor and its professionals shall use good faith efforts to provide all Qualified Bidders with substantially similar information. The Debtor, after consultation with the Committee's professionals, shall have the right to adopt such other rules for the Bidding Process that will better promote the goals of the Bidding Process and that are not materially inconsistent with any of the other provisions hereof, the RS PSA, the Bidding Procedures Order or any Bankruptcy Court order.

## Participation Requirements

Any person that wishes to participate in the Bidding Process (a "Potential Bidder") must become a "Qualified Bidder". As a prerequisite to becoming a Qualified Bidder (and thus, among other things, prior to being able to conduct due diligence), a Potential Bidder must deliver (unless previously delivered) to the Debtor, not later than March 8, 2010 at 4:00 p.m. (prevailing New York City time):

(i)     An executed confidentiality agreement in form and substance acceptable to the Debtor; and

(ii)     Sufficient information, as requested by the Debtor, to allow the Debtor to determine that the Potential Bidder has the financial wherewithal and any required authorizations to close the Sale Transaction, including, but not limited to, current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Debtor) of the Potential Bidder or of those entities that will guarantee the obligations of the Potential Bidder.

A Qualified Bidder is a Potential Bidder that delivers the documents described in subparagraphs (i) and (ii) above, and that the Debtor determines is reasonably likely (based on financial information submitted by the Potential Bidder, experience and other considerations deemed relevant by the Debtor) to submit a *bona fide* offer and to be able to consummate a sale if selected as a Successful Bidder.

Notwithstanding anything herein to the contrary, any creditor of the Debtor that has a valid lien on all or some portion of the Property not subject to a bona fide dispute or any pending challenge or litigation that secures a valid claim (each a "Secured Creditor") shall be deemed to be a Qualified Bidder to the extent of its valid secured claim; however such Secured Creditor must satisfy the Debtor that the Secured Creditor has the financial wherewithal and any required authorizations to close the Sale Transaction, including, but not limited to, current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Debtor) of the Secured Creditor or of those entities that will guarantee the obligations of the Secured Creditor to the extent of its offer in excess of its valid secured claim. If such Secured Creditor submits all Required Bid Documents in accordance with the terms of the Bidding Procedures, such bid submitted by such Secured Creditor shall be

deemed a Qualified Bid. Any such Secured Creditor shall have the right to submit a credit bid to the extent of its valid secured claim pursuant to section 363(k) of the Bankruptcy Code for the portion of the Property on which such Secured Creditor has a lien.

The Debtor shall consult with the Committee's professionals and restricted members in connection with the Debtor's determinations as to whether a Potential Bidder is a Qualified Bidder. No later than seven (7) business days after a Potential Bidder delivers all of the materials required by subparagraphs (i) and (ii) above, the Debtor shall determine, and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.

## Due Diligence

The Debtor may continue to afford any Qualified Bidder the time and opportunity to conduct reasonable due diligence; provided, however, that the Debtor shall not be obligated to furnish any due diligence information after the Bid Deadline (defined below). The Debtor will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from such Qualified Bidders. Neither the Debtor nor any of its representatives are obligated to furnish any information to any person other than a Qualified Bidder.

## Bid Deadline

A Qualified Bidder that desires to make a bid shall deliver written copies of its bid to (i) Qimonda Richmond, LLC, c/o Qimonda North America Corp., 3608 Shannon Rd., Suite 100, Durham, NC 27707 (Attn: Miriam Martinez and Scott Ryan); (ii) Advanced Technology Resource Group of CMN Inc. &b/a Collier International, 601 Union Street, Suite 5300, Seattle, Washington 98101 (Attn: Nick Papa); and (iii) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Attn: Morris J. Massel, Esq. and Rhett Brandon, Esq.), not later than 4:00 p.m. (prevailing New York City time) on March 10, 2010 (the "Bid Deadline").

## Bid Requirements

All bids must include (unless such requirement is waived by the Debtor, after consultation with the Committee's professionals and only if not materially inconsistent with any of the other provisions hereof, the RS PSA, the Bidding Procedures Order or any Bankruptcy Court order) the following documents (the "Required Bid Documents"):

- The identity of the bidder and the officer(s) or authorized agent(s) who will appear on behalf of such bidder;

- A purchase price, the value of which is determined by the Debtor (after consultation with the Committee's professionals and restricted members) to be at least equal to or greater than the purchase price in the RS PSA for the applicable Property bid on plus $500,000 (the "Initial Incremental Bid Amount");

- A letter stating that the bidder's offer is irrevocable until April 15, 2010 (as may be extended by written agreement of the Debtor and such bidder) (the "Termination Date");

- An executed copy of a purchase agreement pursuant to which the Qualified Bidder proposes to acquire the applicable Property, which purchase agreement shall include (i) the Termination Date, and (ii) a representation that the Qualified Bidder will make all necessary regulatory or other filings and pay the fees associated with such filings;

- A good-faith cash deposit, which shall be made with the Debtor's escrow agent upon the submission of a Qualified Bid in an amount equal to at least 10% of the purchase price set forth in the applicable purchase agreement for such Qualified Bidder (the "Good Faith Deposit"); provided that for a Secured Creditor's credit bid pursuant to section 363(k) of the Bankruptcy Code solely for the Property subject to the liens of such Secured Creditor, the Good Faith Deposit requirement may be satisfied to the extent of such Secured Creditor's valid secured claim and such Secured Creditor will agree to forfeit its allowed secured claim to the extent used as some or all of its Good Faith Deposit; if a Secured Creditor's valid secured claim is less than the required Good Faith Deposit, such Secured Creditor shall post the remainder of the Good Faith Deposit in cash;

- Written evidence of a commitment for financing or other evidence of the ability to consummate the sale satisfactory to the Debtor, with appropriate contact information for such financing sources; provided that for any bid that is entirely financed as a credit bid of a Secured Creditor to the extent of its valid secured claim pursuant to section 363(k) of the Bankruptcy Code, no such evidence shall be required;

- A redline of bidder's proposed purchase agreement over that of the RS PSA;

- A redline of bidder's proposed "Deed of Lease" over that attached as an exhibit to the RS PSA; and

- A redline of bidder's proposed form of sale order over the form of order attached to the RS PSA.

A bid received from a Qualified Bidder that includes all of the Required Bid Documents and meets all of the above requirements is a "Qualified Bid".

The Debtor reserves the right to determine, after consultation with the Committee's professionals and restricted members, the value of any Qualified Bid(s) for the Property, and which Qualified Bid(s) provide the highest or best aggregate value to the Debtor. Proposals will be evaluated on numerous grounds; however, proposals that are unconditional and contemplate sales of the Property that may be consummated on or soon after the Sale Hearing are preferred.

## "As Is, Where Is"

The sale of the Property shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtor, its agents or its estate except to the extent set forth in the RS PSA or the purchase agreement of another Successful Bidder. By submitting a bid, each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Property prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Property in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Property, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures or, (i) as to the Proposed Purchaser, as expressly stated in the terms of the sale of the Property set forth in the RS PSA and ancillary documents, or (ii) as to another Successful Bidder, as expressly stated in the terms of the sale of the Property set forth in the applicable agreement and ancillary documents.

## Free Of Any And All Encumbrances

Except as otherwise provided in the RS PSA or another Successful Bidder's purchase agreement, all of Debtor's right, title and interest in and to the Property subject thereto shall be sold free and clear of Encumbrances to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Encumbrances to attach to the net proceeds of the sale of the Property with the same validity and priority as such Encumbrances applied against the Property.

## Auction

If a Qualified Bid other than that submitted by the Proposed Purchaser has been received by the Debtor, the Debtor shall conduct an auction (the "Auction") with respect to the Property. The Auction shall commence on March 12, 2010 at 9:00 a.m. (prevailing New York City time). The Debtor shall notify all Qualified Bidders that have submitted Qualified Bids of the time and place of the Auction.

Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. During the Auction, bidding shall begin initially with the Qualified Bid(s) that provide the highest or best aggregate value to the Debtor, as determined by the Debtor (after consultation with the Committee's professionals and restricted members) and subsequently continue in minimum increments of at least $250,000. Other than otherwise set forth herein, the Debtor may conduct the Auction in the manner it determines (after consultation with the Committee's professionals) will result in the highest, best or otherwise financially superior offer(s) for the Property that is not materially inconsistent with any of the other provisions hereof, the RS PSA, the Bidding Procedures Order or any Bankruptcy Court order.

At the conclusion of the Auction, the Debtor (after consultation with the Committee's professionals and restricted members) shall identify the offer for the Property that provides the highest or best aggregate value to the Debtor (the "Successful Bid", and the entity or entities submitting such Successful Bid, the "Successful Bidder(s)") and advise the Qualified

Bidders of such determination. The Qualified Bidder whose final bid is deemed to be highest and best following the conclusion of the Auction will be the "Successful Bidder", and such bid, the "Successful Bid". Immediately after the announcement of the Successful Bid, the Successful Bidder shall execute and deliver a purchase agreement incorporating the price and terms offered in the Successful Bid (the "Final Sale Agreement"). Upon submission of the Final Sale Agreement by the Successful Bidder, the Debtor will execute the Final Sale Agreement and shall seek Bankruptcy Court approval of the Final Sale Agreement at a hearing before the Bankruptcy Court to be held not more than two business days after conclusion of the Auction.

## Acceptance of Qualified Bids

The Debtor shall sell the Property to the Successful Bidder(s) upon the approval of the Successful Bid(s) by the Bankruptcy Court after a hearing (the "Sale Hearing"). The Debtor's presentation of the Successful Bid(s) to the Bankruptcy Court for approval does not constitute the Debtor's acceptance of the bid(s). The Debtor will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing. All parties in interest in the chapter 11 cases reserve their right to object to the Debtor's selection of the Successful Bidder(s), and the Bankruptcy Court's approval of the respective purchase agreements.

## Sale Hearing

The Sale Hearing shall be conducted by the Bankruptcy Court on March 16, 2010 at 11:30 a.m. (prevailing New York City time). Following the approval of the sale of the Property to the Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate an approved sale within ten (10) business days after entry of an Order approving the Sale, the Debtor shall be authorized (after consultation with the Committee's professionals), but not required, to deem the next highest or otherwise best Qualified Bid, as disclosed at the Sale Hearing, the Successful Bid, and the Debtor (after consultation with the Committee's professionals) shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such bid without further order of the Bankruptcy Court.

## Combination Bidding

Qualified Bidders may form joint ventures or partnerships to submit bids with respect to the Sale Transaction, with the prior written consent of the Debtor. For the avoidance of doubt, separate bidders on any Sale Transaction may, but are not required to, combine their bids with the prior written approval of the Debtor.

## Return of Good Faith Deposit

As noted above, all Qualified Bidders will be required to submit the Good Faith Deposit with the Debtor on or before the Bid Deadline in the amount of set forth in the RS PSA. Good Faith Deposits of all Qualified Bidders shall be held in a separate non-interest-bearing account until a proposal is no longer irrevocable as provided herein, at which time they will be returned to the Qualified Bidder; provided, however, that if a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such

Successful Bidder, the Debtor will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become the property of the Debtor. To the extent that any defaulting Successful Bidder is a Secured Creditor, such creditor's allowed secured claim will be reduced by an amount equal to ten (10) percent of such creditor's Credit Bid.

## The Committee

The Debtor shall provide to the Committee's professionals information, which information may be shared with restricted members of the Committee, regarding the qualification of bidders, the valuation of bids and such other information related to the sale process as may be reasonably requested by the Committee. Throughout the process, the Debtor shall consult with the Committee's restricted members and its professionals as provided herein.

## Additional Requirements

All persons who submit a bid to purchase (i) the Property or (ii) any other assets of Debtor that are governed by a stalking horse order entered by the Bankruptcy Court that will be sold concurrently with the Property (each, an "Asset Lot"), must in such bid itemize the purchase price set forth in such bid among the assets sought to be purchased by the third party offeror in a manner consistent with the methodology used by Buyer and, as applicable, the stalking horse bidder for the Asset Lot. Furthermore, the Bidding Procedures shall provide that all persons who submit a bid for an Asset Lot, must bid on all of the assets in such Asset Lot, and such bid cannot select only portions of the assets in an Asset Lot; provided, however, that such bids may include (i) one or more Asset Lots and/or (ii) other assets of Seller other than assets in an Asset Lot.

## Bankruptcy Court Oversight

The Bankruptcy Court shall decide any controversy regarding the qualification of bidders and the valuation of bids.

## Reservation of Rights

The Debtor reserves the right to (i) determine in its reasonable discretion (after consultation with the Committee's professionals and restricted members) which offer provides the highest or best aggregate value to the Debtor, and (ii) reject at any time prior to entry of a Bankruptcy Court order approving an offer, without liability, any offer other than the RS PSA that the Debtor in its reasonable discretion (after consultation with the Committee's professionals and restricted members) deem to be (x) inadequate or insufficient, (y) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or procedures set forth therein or herein, or (z) contrary to the best interests of the Debtor and its estate.

The selection of a Successful Bidder(s) shall be within the reasonable business judgment of the Debtor (after consultation with the Committee's professionals and restricted members) and subject to the approval of the Bankruptcy Court, and economic considerations may not be the sole criteria upon which the Debtor may base its decision. In assessing whether

an offer provides the highest or best aggregate value to the Debtor, the Debtor may consider, among other things, the net economic effect upon the Debtor's estate. The presentation of a particular offer to the Bankruptcy Court for approval does not constitute the Debtor's acceptance of the offer. The Debtor will be deemed to have accepted an offer only when the offer has been approved by the Bankruptcy Court at the Sale Hearing. At or before the Sale Hearing, the Debtor (after consultation with the Committee's professionals) may impose such other terms and conditions on the Qualified Bidders the Debtor may determine to be in the best interests of the Debtor, its estate, its creditors, and other parties in interest that are not materially inconsistent with any of the other provisions hereof, the RS PSA, the RS Stalking Horse Order or any Bankruptcy Court order.

# Exhibit C

## [Barrett Declaration]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
                                                    )
In re                                               )          Chapter 11
                                                    )
QIMONDA RICHMOND, LLC, et al.,[1]                   )          Case No. 09-10589 (MFW)
                                                    )
      Debtors.                                    )          Jointly Administered
                                                    )
------------------------------------------------------------x

## DECLARATION OF DOUGLAS O. BARRETT IN SUPPORT
## OF THE RICHMOND SEMICONDUCTOR LLC STALKING HORSE NOTICE

STATE OF WASHINGTON                    )
                                       ) ss:
COUNTY OF KING                         )

      DOUGLAS O. BARRETT, being duly sworn, states the following:

      1.     I am the Senior Vice President of the Advanced Technology Resource Group of CMN, Inc. ("CMN") d/b/a Colliers International ("ATREG").  ATREG is one of three sales agents jointly retained to assist Qimonda Richmond, LLC ("QR"), one of the above captioned debtors and debtors in possession (collectively, the "Debtors"), in selling substantially all of QR's assets (collectively, the "Consultant").[2]  I submit this declaration on behalf of QR and in conjunction with the *Notice of Entry Into an Asset Purchase Agreement with Richmond Semiconductor LLC and Proposed Bidding Protections and Bidding Procedures with Respect Thereto* (the "RS Stalking Horse Notice") filed contemporaneously herewith, in support of the

---

[1]      The Debtors in these chapter 11 cases, along with the last four (4) digits of each debtor's federal tax identification number, are: Qimonda Richmond, LLC (7867) and Qimonda North America Corp. (4654).

[2]      See *Order Approving The Application Of The Debtors For An Order Authorizing The Retention And Employment Of Advanced Technology Resource Group Of CMN, Inc. d/b/a Colliers International, Gordon Brothers Commercial & Industrial, LLC And Emerald Technology Valuations, LLC As Sales Consultant For The Debtors.* [Docket No. 284].

1

awarding of certain RS Bidding Protections (as defined below) by QR to Richmond

Semiconductor LLC ("RS") in connection with the Purchase and Sale Agreement between RS

and QR, dated as of February 11, 2010 (the "RS PSA") pursuant to the Sales Procedures Order.[3]

Except as otherwise noted, I have personal knowledge of the matters set forth herein.

## PROFESSIONAL BACKGROUND

2.      I am one of the founders and a director of ATREG.  For more than ten years,

ATREG has represented many of the largest and most recognized semiconductor companies in

the disposition or acquisition of semiconductor facilities and related specialized equipment, and

in consulting assignments.  Our clients include IBM, Infineon, Atmel, Maxim Integrated

Products, Matsushita, Fujitsu, NEC, Freescale, LSI Logic, Agere, ON Semiconductor, IDT, NXP

and Renesas.  ATREG's assignments have ranged from the sale of operational facilities for the

continued manufacture of semiconductor products to the sale of facilities for adaptive re-use by

non-semiconductor companies, as is the case of the proposed sale described in the RS Stalking

Horse Notice.  ATREG assists its clients on these types of transactions throughout the United

States, Europe and Asia.

## CONTINUATION OF THE SALE PROCESS

3.      On September 24, 2009, this Court approved the sale of 300mm tools owned by

QR and certain related assets and infrastructure to Texas Instruments Incorporated for an

aggregate purchase price of $172,500,000.  The transaction closed on October 13, 2009.

4.      QR and the Consultant have been aggressively marketing QR's remaining assets,

including 210 acres of land located in Sandston, Virginia, the buildings and other improvements

on the land and other related assets (collectively, the "Property").  Throughout this process, the

---

[3]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the RS
Stalking Horse Notice.

Consultant has been assisted by a local real estate representative, Morton G. Thalhimer, Inc. d/b/a Thalhimer/Cushman & Wakefield ("Thalhimer").

5.     The Consultant and/or Thalhimer have had discussions with numerous parties who have shown interest in the Property.  We have solicited the interest of several thousand potential purchasers and, as a result of these efforts, (a) the Consultant and/or Thalhimer had follow-up discussions with more than thirty (30) parties who have expressed an interest in all or a portion of the Property, and (b) QR received no less than five (5) formal and informal letters of intent and three (3) draft asset purchase agreements (including the one from RS) relating to the Property.  QR, with the assistance of the Consultant, Thalhimer and its other advisors, continued to pursue these transactions, seeking to execute binding asset purchase agreements in one or more transactions for all or a portion of the Property for the highest or otherwise best value realizable by QR.

## THE RS TRANSACTION

6.     The Consultant first made contact with RS or its principals in the summer of 2009.  RS or its principals toured the Property in November 2009.  In December 2009, QR and RS or its principals began discussing a potential sale of the Property.  Over the next several weeks, QR and RS or its principals exchanged drafts of a non-binding letter of intent for the Property and ultimately signed the non-binding letter of intent as of December 31, 2009.  Subsequently, QR and RS or its principals negotiated an asset purchase agreement and QR and its advisors worked diligently with RS or its principals to refine its terms.  After extensive negotiations, on February 11, 2010, QR and RS executed the RS PSA.  Pursuant to the terms of the RS PSA, QR will convey to RS or its principals the Property free and clear of Encumbrances in exchange for a purchase price of $12,000,000 (the "Transaction").

7.     I understand that, pursuant to the RS PSA, QR is obligated to seek and obtain this Court's approval of certain bidding protections.  Specifically, under the proposed bidding protections, (i) if the Property (or a portion thereof) is sold to an alternative buyer, and RS is not in default under the RS PSA, at the closing of a transaction with the alternative buyer, RS is entitled to the payment of (a) a break-up fee in an amount equal to $240,000 and (b) an expense reimbursement for reasonable, out-of-pocket, documented costs and expenses of RS related to the transaction of up to $125,000, and (ii) if the Debtor is in default under the RS PSA and RS is not in default thereunder and RS terminates the RS PSA, RS is entitled to the payment of an expense reimbursement for reasonable, out-of-pocket, documented costs and expenses of RS related to the transaction of up to $125,000 (collectively, the "RS Bidding Protections").

## THE BIDDING PROTECTIONS ANALYSIS

8.     Counsel to QR has advised me that in considering whether to approve the RS Bidding Protections, this Court's inquiry is governed by Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.3d 527 (3d Cir. 1999) (hereinafter, "O'Brien").  QR's counsel has further advised me that in conducting an analysis under O'Brien, the Court may consider up to nine related factors in determining the appropriateness of the RS Bidding Protections.  I address each of those factors below.

9.     Relationship of the Parties Negotiating the RS Bidding Protections.  The parties, with the assistance of counsel, negotiated at length and only agreed upon the terms of the RS PSA, including the RS Bidding Protections, after extensive negotiations.  RS conducted its own due diligence before submitting a draft asset purchase agreement and the negotiations between QR, RS and their respective professionals were conducted in good faith and at arm's length.  To

the best of my knowledge, no parties involved in the drafting of the RS PSA or the negotiation of the RS Bidding Protections have any officers, directors, or employees in common.[4]

10.    <u>Whether the RS Bidding Protections Hamper, Rather than Encourage, Bidding</u>. In exchange for awarding the RS Bidding Protections, RS has assigned a value to the Property and agreed upon a form of an asset purchase agreement, which QR can now use to remarket the Property.  At the time the RS PSA was executed, QR was in negotiations with another bidder who sought to purchase all of QR's remaining assets, including the Property.   By establishing the value of the Property and the terms of a sale as RS has done, QR can now encourage other interested parties to bid against the price established by RS.  This process will allow QR to seek higher or otherwise better offers thereby maximizing value for its estate.

11.    Parties are not often willing to expend the requisite money, time, or human resources to advance a potential sale transaction to the point of consummation only to be outbid at the last minute by a purchaser who is not burdened by these expenditures.  Indeed, Section 4.1(b) of the RS PSA indicates that RS is unwilling to hold its offer open to purchase the Property unless it is assured the RS Bidding Protections.  Therefore, absent authorization to award the RS Bidding Protections to RS, QR may lose the opportunity to sell the Property not only to RS, but also any other party interested in bidding against the price established by RS.

---

[4]    As further described in a supplemental declaration filed with the Court on February 4, 2010, which is incorporated by reference herein, a principal of RS retained an independently owned and operated company, Colliers Spectrum Cauble, Inc. ("<u>CSR</u>"), as its agent for the QR transaction.  CSC is a party to a license agreement with Colliers International Property Consultants USA, Inc. ("<u>CIPC USA</u>") that authorizes it to do business as "Colliers Spectrum Cauble" and to identify its association with the Colliers International worldwide affiliation of independently owned and operated businesses.  The license agreement with CIPC USA does not create any ownership interest in CMN, access to CMN's proprietary data or right to share proceeds from the transaction, and CSC and CMN are working entirely and exclusively for their respective clients.   <u>See</u> *Second Supplemental Declaration of Douglas Barrett in Support of Application of the Debtors For An Order Authorizing The Retention And Employment Of Advanced Technology Resource Group Of CMN, Inc. d/b/a Colliers International, Gordon Brothers Commercial & Industrial, LLC And Emerald Technology Valuations, LLC As Sales Consultant For The Debtors* [Docket No. 1117].

12.     Reasonableness of the RS Bidding Protections Relative to the Purchase Price.
The proposed break up fee is $240,000 (which represents 2.0% of the purchase price for the
Property) and the proposed expense reimbursement for reasonable, out-of-pocket, documented
costs and expenses is capped at $125,000.  Together, the RS Bidding Protections represent
approximately 3% of the purchase price.  I believe the RS Bidding Protections are fair and
reasonable in light of the in-depth analysis required, and the due diligence investigation and
negotiations already undertaken by RS to effectuate Transaction.  Furthermore, by awarding
these protections to RS, the Property will have a market price assigned to it and the terms of the
sale will be established, which will facilitate the process for other potential bidders to bid on the
Property.  In addition, the amount of proposed RS Bidding Protections was closely negotiated,
consistent with market practice and not excessive.

13.     Whether the Property Is Placed in a Sales Configuration Mode.  The RS PSA
significantly reduces the work and expenses that a potential bidder must incur to outbid RS.
First, RS's apparent willingness to consummate the transaction is a signal to prospective
purchasers that RS has conducted the necessary due diligence and is satisfied with the results.
Therefore, to the extent that a prospective purchaser wishes to conduct its own due diligence, the
scope, depth and expense of such due diligence may be lessened.  Second, any expenses a
potential purchaser would incur in retaining counsel and drafting sale documentation would be
drastically reduced following the public filing of the RS PSA.

14.     Attraction of New Bidders.  The Debtors are hopeful that designating RS as the
stalking horse bidder for the Property – and the amount of RS Bidding Protections – will
encourage successive bidding from not yet identified, but interested parties.  I believe the RS
Bidding Protections will do so because they are simultaneously no greater than what is
absolutely necessary to induce RS to enter into the RS PSA but not so great such that prospective

purchasers will be deterred by having to outbid RS by an amount greater than the RS Bidding

Protections and the initial bid increment (as set forth in the bidding procedures, a copy of which

is annexed to the RS Stalking Horse Notice). Thus, rather than deterring successive bidding, the

RS Bidding Protections are designed to generate momentum toward a competitive auction and

the consummation of a sale.

15. <u>Maximization of Value</u>. The Court's authorization to award the RS Bidding

Protections will provide a clear benefit to QR's estate. Specifically, induced by the RS Bidding

Protections, RS undertook the extensive research required to negotiate and execute the RS PSA.

Other bidders will now be able to rely on RS's due diligence to offer competing bids. This

process will provide a benefit to the estate by increasing the likelihood that the price at which the

Property is sold will reflect its true market value, while setting a price floor. The Transaction also

establishes a fixed timeline for completion of the sale in an otherwise relatively low volume real

estate market.

16. <u>Committee Support</u>. The Debtors have engaged and solicited input from the

Committee's professionals and certain restricted members of the Committee at every stage of the

sale process including, but not limited to the sharing of the any letters of intent, the Debtors'

designation of RS as the stalking horse bidder and the setting of the RS Bidding Protections.

Following such consultation, the Committee has approved the Debtors' decision to award the RS

Bidding Protections to RS.

17. <u>Availability of Safeguards to the Estates</u>. Under the circumstances, there are no

safeguards other than the RS Bidding Protections that will induce RS to enter into the RS PSA.

RS has communicated its unwillingness to enter into the RS PSA without the RS Bidding

Protections. Absent the RS Bidding Protections, RS is at risk of being outbid by any last-minute

bidder who is waiting to capitalize on RS's efforts. For that reason, and the reasons discussed

above, RS is not willing to accept any lesser protections than those contemplated through the RS Bidding Protections.

18.     Impact of the Protections on Unsecured Creditors.  As described above, in light of the current market for the Property, failure to close the Transaction will likely mean that the Property will be sold at a substantially lower value.  Unsecured creditors directly benefit from the RS Bidding Protections not only because they ensure RS's participation, but because the RS PSA sets a baseline for an auction that will guarantee that all of the Property is sold at its maximum value.  Therefore, the incremental and speculative costs to each unsecured creditor arising from the RS Bidding Protections are greatly outweighed by the limitation of downside risk – in addition to the upside potential – that they provide.

19.     Furthermore, as indicated above, the Committee, a fiduciary for all unsecured creditors, has indicated its support for the execution of the RS PSA and the awarding of the RS Bidding Protections.  To the extent any unsecured creditors choose to object to the RS Bidding Protections, they will do so in contravention of the judgment of their representatives.

## CONCLUSION

20.     For the reasons stated above, I believe that the RS Bidding Protections are reasonable and an actual and necessary cost of maximizing the value of the estates.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: *Feb. 9th*, 2010

_____
Douglas O. Barrett

STATE OF WASHINGTON )
                                ) ss:
COUNTY OF KING )

SWORN TO AND SUBSCRIBED
before me this 9th day of February 2010.

_____
Notary Public
My Commission Expires: 5/11

# Exhibit D

## [RS Stalking Horse Order]

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------
)
In re                                                            )
)
QIMONDA RICHMOND, LLC, et al.,[1]          )          Case No. 09-10589 (MFW)
)
                                     Debtors,          )          Jointly Administered
-----------------------------------------------------------------

**ORDER (I) AUTHORIZING QIMONDA RICHMOND, LLC TO AWARD
BIDDING PROTECTIONS TO RICHMOND SEMICONDUCTOR LLC; (II)
AFFORDING THE PAYMENT OF THE BIDDING PROTECTIONS
ADMINISTRATIVE EXPENSE TREATMENT UNDER SECTIONS 503 AND 507
OF THE BANKRUPTCY CODE; AND (III) APPROVING BIDDING
PROCEDURES IN CONNECTION WITH
THE SALE OF CERTAIN ASSETS OF QIMONDA RICHMOND, LLC**

Upon consideration of the *Notice of Entry Into Asset Purchase Agreement*

*with Richmond Semiconductor LLC and Proposed Bidding Protections and Bidding*

*Procedures with Respect Thereto* [Docket No. _____] (the "RS Stalking Horse Notice")

filed herein by Qimonda Richmond, LLC ("QR"); the Court finding that (i) the Court has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a core

proceeding pursuant to 28 U.S.C. § 157, and (iii) notice of the RS Stalking Horse Notice

was sufficient under the circumstances and that no other or further notice need be

provided; and upon the Declaration of Douglas O. Barrett (the "Barrett Declaration") in

1

support of the RS Bidding Protections;[2] and upon the legal and factual bases set forth in the RS Stalking Horse Notice, the Barrett Declaration and the record of these cases which establish just cause for the relief granted herein; and the Court having determined that the relief sought in the RS Stalking Horse Notice is in the best interests of the above captioned debtors and debtors in possession (collectively, the "Debtors") and their estates, as well as stakeholders thereof, and after due deliberation and sufficient cause appearing therefore, it is hereby:

ORDERED, the RS Bidding Procedures annexed hereto as Exhibit 1 are hereby approved and such RS Bidding Procedures shall govern the sale of the Property; and it is further

ORDERED, that the RS Bidding Protections, including the Break Up Fee and the Expense Reimbursement, the provisions related to the Deposit (as defined in the RS PSA) and to termination as set forth in the RS PSA and the Escrow Agreement (as defined in the RS PSA), as applicable, are hereby authorized and approved; and it is further

------------

[Footnote continued]

[1]    The Debtors in these chapter 11 cases, along with the last four (4) digits of each debtor's federal tax identification number, are: Qimonda Richmond, LLC (7867) and Qimonda North America Corp. (4654).

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the RS Stalking Horse Notice.

ORDERED, that the Break Up Fee and the Expense Reimbursement shall be treated as administrative expenses under sections 503(b)(1) and 507(a)(2) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and paid as specified by this Order and the RS PSA; and it is further

ORDERED, that if QR receives a Qualified Bid (as defined in the RS Bidding Procedures) for the Property prior to the bid deadline of March 10, 2010 at 4:00 p.m. (prevailing New York City time), the Debtors will conduct an auction for the Property on March 12, 2010 at 9:00 a.m. (prevailing New York City time) at Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (the "<u>Auction</u>"); and it is further

ORDERED, that the Debtors shall provide notice of the Bid Deadline (as defined in the RS Bidding Procedures) in the form annexed hereto as Exhibit 2 (the "<u>Bid Deadline Notice</u>") by (a) serving the Bid Deadline Notice on all parties whom the Debtors, their advisors and the Committee's professionals have indicated as parties who have previously shown interest in or may be interested in purchasing the Property, (b) publishing the Bid Deadline Notice in the national edition of *The Wall Street Journal* within seven (7) calendar days after entry of this Order; and it is further

ORDERED, that, payment of the Break Up Fee, the Expense Reimbursement and the Deposit shall be made in accordance with the RS PSA and the Escrow Agreement, as applicable; and it is further

ORDERED, that to the extent there is any inconsistency between the terms of this Order and the RS PSA, the terms of this Order and the exhibits hereto shall control; and it is further

ORDERED, that this Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

Dated: _____, 2010
Wilmington, Delaware

_____
THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

# Exhibit E

**[NOTICE OF AUCTION]**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------x
                                    )
In re                               )       Chapter 11
                                    )
QIMONDA RICHMOND, LLC, et al.,[1]   )       Case No. 09-10589 (MFW)
                                    )
                    Debtors.        )       Jointly Administered
                                    )
-------------------------------------------------------x
```

## NOTICE OF MULTIPLE ASSET AUCTIONS

**PLEASE TAKE NOTICE THAT:**

1.      On February 20, 2009, Qimonda Richmond, LLC and Qimonda North America Corp. (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").  Set forth below are the name, address and respective case number for each Debtor:

| DEBTOR | ADDRESS | CASE NO. |
|---|---|---|
| Qimonda Richmond, LLC | 6000 Technology Blvd. Sandston, VA 23150 | 09-10589 |
| Qimonda North America Corp. | 3608 Shannon Rd. Suite 100 Durham, NC 27707 | 09-10590 |

2.      On [____], 2010 Qimonda Richmond, LLC ("QR") filed three separate motions seeking authority to enter three separate asset purchase agreements (the "APAs") with each of Texas Instruments Incorporated ("TI"), Richmond Semiconductor LLC ("RS") and Global Alliance Tech., Limited ("GATE", together with TI and GATE, the "Bidders") [Docket Nos. TI, __; RS___; GATE ___] (the "Sale Motions").  Under the terms of the TI APA, the RS APA and the GATE APA (collectively, the "APAs"), QR proposes to sell certain assets to each Bidder (the "TI Assets," the "RS Assets" and the "GATE Assets", respectively and collectively, the "Assets").  A list of the TI Assets, the RS Assets and the GATE Assets are annexed to the respective APA.

3.      On [____], 2010, the Court entered three separate orders approving certain bidding procedures (the "Bidding Procedures") and bidding protections related to each APA [Docket Nos. TI, __; RS___; GATE ___].

4.      Pursuant to the Bidding Procedures, any bidder that wants to submit a bid for the either the TI Assets, the RS Assets or the GATE Assets must submit a Qualified Bid (as defined

---

[1]     The debtors in these chapter 11 cases, along with the last four (4) digits of each debtor's federal tax identification number, are: Qimonda Richmond, LLC (7867) and Qimonda North America Corp. (4654).

in the applicable Bidding Procedures) no later than the bid deadline of March 10, 2010 at 4:00 p.m. (prevailing New York City time).

5.     Qualified Bidders (as defined in the applicable Bidding Procedures) who submit a timely Qualified Bid will be invited to an auction for the TI Assets, the RS Assets or the GATE Assets (as applicable), which will be conducted on March 12, 2010 at 9:00 a.m. (prevailing New York City time).

6.     Copies of the Sale Motions, the APAs and the respective Bidding Procedures may be obtained by (a) visiting Epiq Bankruptcy Solutions, LLC's website at http://chapter 11.epiqsystems.com/qimonda, (b) calling (866) 798-7938, or (c) contacting the Debtors' Claims Agent, in writing, at Qimonda Richmond, LLC Claims Processing Center, c/o Epiq Bankruptcy Solutions, LLC, FDR Station, P.O. Box 5112, New York, NY 10150-5112. The Sale Motions, the APAs and the respective Bidding Procedures can also be viewed on the website for the United States Bankruptcy Court for the District of Delaware at www.deb.uscourts.gov.

Dated: _____, 2010                      BY ORDER OF THE COURT:
        Wilmington, Delaware

Mark D. Collins
Michael J. Merchant
Lee E. Kaufman
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700

                – and –

Mark Thompson
Morris J. Massel
Terry Sanders
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York  10017
Telephone:  (212) 455-2000

*Attorneys for the Debtors and*
*Debtors in Possession*