## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------x

| | |
|---|---|
| In re ) | Chapter 11 |
| ) | |
| QIMONDA RICHMOND, LLC, et al.,[1] ) | Case No. 09-10589 (MFW) |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | |
| ) | **Hearing Date: March 16, 2010 at 11:30 a.m.** |
| ) | **Objection Deadline: March 8, 2010 at 4:00 p.m.** |

-------------------------------------------------------x

## MOTION OF QIMONDA RICHMOND, LLC FOR ENTRY OF AN ORDER (I) AUTHORIZING THE SALE OF CERTAIN PROPERTY TO RICHMOND SEMICONDUCTOR LLC FREE AND CLEAR OF ENCUMBRANCES; (II) AUTHORIZING QIMONDA RICHMOND, LLC'S ENTRY INTO PURCHASE AND SALE AGREEMENT WITH RICHMOND SEMICONDUCTOR LLC; AND (III) DEEMING ANY REMAINING NON-DEBTOR ASSETS ABANDONED AND TRANSFERRED TO QIMONDA RICHMOND, LLC

Qimonda Richmond, LLC ("QR"), by and through its undersigned counsel, files this motion (the "Motion") for entry of an order, in the form annexed hereto as Exhibit A, pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code") (I) authorizing the sale of the Property (defined below) to Richmond Semiconductor LLC ("RS") free and clear of Encumbrances (defined below); (II) authorizing QR's entry into that certain Purchase and Sale Agreement between QR and RS, dated as of February 11, 2010, a copy of which is annexed hereto as Exhibit B (the "RS PSA"); and (III) deeming any Non-Debtor Assets (defined below) remaining on the Property on the Closing Date (as defined in the RS PSA) abandoned and transferred to QR. In support of the Motion, QR respectfully represents:

---

[1] The debtors in these chapter 11 cases, along with the last four (4) digits of each debtor's federal tax identification number, are: Qimonda Richmond, LLC (7867) and Qimonda North America Corp. (4654).

## PRELIMINARY STATEMENT

1.     In September 2009, the Court approved the sale by QR of several hundred semiconductor and related assets to Texas Instruments Incorporated (the "2009 TI Transaction").[2]  The 2009 TI Transaction closed on October 13, 2009.  After the closing of the 2009 TI Transaction, the Debtors' remaining assets (the "Remaining Assets") consist of, among other things, a 1,364,343 square foot semiconductor manufacturing facility (the "Facility") located on a 210 acre parcel of real estate in Sandston, Virginia (with the Facility, the "Property").

2.     Since the fall of 2009, in an effort to execute one or more value maximizing transactions, the Debtors, their professionals and their sales consultants (the "Consultant")[3] continued to aggressively market the Remaining Assets.  In addition, the Consultant has worked extensively with Morton G. Thalhimer, Inc. d/b/a Thalhimer/Cushman & Wakefield ("Thalhimer"), the local real estate agent retained by the Debtors to assist with the marketing and sale of the Property.[4]  The Consultant and Thalhimer have continued discussions with numerous parties who previously had shown interest in QR's assets and have contacted new parties that the Consultant and Thalhimer identified as potential purchasers.  As a result of these efforts, the Consultant and Thalhimer have had discussions with more than thirty parties who have expressed an interest in the Property and QR received no less than five formal and informal

---

[2]     See Order (I) Authorizing the Sale by Qimonda Richmond, LLC to Texas Instruments Incorporated of Certain Assets Free and Clear of Encumbrances, (II) Approving Asset Purchase Agreement, and (III) Authorizing the Debtor to Purchase Certain Additional Assets, dated September 24, 2009 [Docket No. 785].

[3]     The "Consultants" include Advanced Technology Resource Group of CMN, Inc. d/b/a Colliers International, Gordon Brothers Commercial & Industrial, LLC and Emerald Technology Valuations, LLC.

[4]     See Order Approving the Application of the Debtors for an Order Authorizing the Retention and Employment of Morton G. Thalhimer, Inc. d/b/a Thalhimer/Cushman & Wakefield as Local Property Broker, dated July 19, 2009 [Docket No. 555].

2

letters of intent and three draft asset purchase agreements relating to the Property. As part of that process, the Consultant and Thalhimer have coordinated and hosted numerous potential purchasers at the Property for tours and due diligence visits.

3.      QR's and RS's principals have been in contact since the summer of 2009. After touring the Property, in December 2009, the parties began discussing the terms of a potential transaction. Thereafter, QR's and RS's principals exchanged drafts of a non-binding letter of intent for the Property, and which was ultimately executed on December 31, 2009. Subsequently, QR's and RS's principals negotiated an asset purchase agreement and QR and its advisors worked diligently with RS to refine its terms. After extensive negotiations, on February 11, 2010, QR and RS executed the RS PSA. Pursuant to the terms of the RS PSA, QR will convey the Property to RS in exchange for a purchase price of $12,000,000.00 (the "Transaction"). Concurrent with the closing of the Sale, QR and RS plan to enter into a lease of the Property whereby QR will lease the Property from RS (the "Lease"). The Lease, which under most foreseeable circumstances is at virtually no cost to QR's estate, will provide ample time for QR to wind down its operations, remove its remaining assets and allow TI and GATE (both defined below) to remove recently purchased equipment from the Facility.

4.      In accordance with the terms of the Bidding Procedures Process Order,[5] on February 11, 2010 QR filed with the Court the *Notice of Entry into Purchase and Sale Agreement with Richmond Semiconductor LLC and Proposed Bidding Protections and Bidding Procedures with Respect Thereto* [Docket No. 1123] (the "RS Stalking Horse Notice"), which designated RS as the stalking horse bidder for the Property and attached bidding protections and

---

[5]      On July 21, 2009, the Court entered the *Order Granting Debtors' Motion, Pursuant to Sections 105(a), 105(d) and 363(b) of the Bankruptcy Code, for Entry of an Order Approving Bidding Protection Procedures and Bidding Procedures in Connection with the Sale of Certain Property of the Debtors* [Docket No. 561] (the "Bidding Procedures Process Order").

3

bidding procedures (the "RS Bidding Procedures") that would govern the sale of the Property under the RS PSA. The proposed order approving the RS Stalking Horse Notice (the "Proposed RS Stalking Horse Order") includes certain bidding protections for RS, including (a) a break-up fee in an amount equal to $240,000 and an expense reimbursement, capped at $125,000.00, each payable if QR consummates a sale transaction for the Property with a third-party; (b) certain termination rights in the RS PSA for RS, and (c) RS's right to the return of its deposit under certain circumstances. A copy of the RS Bidding Procedures, which is identical to those filed with the TI Stalking Horse Notice, is annexed hereto as Exhibit C.

5. On February 11, 2010, QR also entered into two other asset purchase agreements and filed related stalking horse notices pursuant to the Bidding Procedures Process Order for a significant portion of the Remaining Assets. In one transaction, QR is seeking to sell, among other things, certain 300mm semiconductor tools and related assets to Texas Instruments Incorporated ("TI") for a purchase price of $20,700,000 (the "TI Transaction"). In the other transaction, QR is seeking to sell an ASML XF:1400F scanner and certain related assets to Global Alliance Tech., Limited ("GATE") for a purchase price of $7,800,000 (the "GATE Transaction").

6. By the end of the Lease term, QR is required to have all third party equipment removed from the Facility unless the owners thereof reach an accommodation with RS. Certain assets that were previously leased to QR by third parties for QR's manufacturing operations still remain in the Facility (the "Non-Debtor Assets"). The leases relating to the Non-Debtor Assets have either been rejected or terminated and QR has notified the owners of the Non-Debtor Assets of the need to remove them. Nonetheless, the owners of the Non-Debtor Assets have refused to remove them from the Facility despite attempts by QR to reach a consensual resolution. If the

4

owners of the Non-Debtor Assets fail to reach an accommodation or remove their assets in a timely manner, the Transaction could be jeopardized or QR may be required to pay penalties to RS. Accordingly, QR requests that the Sale Order (defined below) deem the Non-Debtor Assets remaining on the Property on the Closing Date abandoned and vest title to the Non-Debtor Assets in QR on such date (the "Abandonment Mechanism").

7.      After a comprehensive and aggressive global marketing process, QR, in a sound exercise of its business judgment, has determined that the Transaction, when combined with the TI Transaction and the GATE Transaction, each of which is subject to higher or otherwise better offers, maximizes value for all parties in interest. As discussed in further detail below, the sale of the Property will minimize QR's maintenance and insurance expenses and potential remediation costs relating to the Property. After closing these three transactions, QR will have few additional critical assets and will move expeditiously to sell off the remaining assets. Therefore, by this Motion, QR seeks authority to sell the Property to RS (or the Successful Bidder at the Auction (both as defined in the RS Bidding Procedures) and approval of the Abandonment Mechanism.

## JURISDICTION

8.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The bases for the relief requested herein are sections 105(a), 363(b), 363(f) and 363(m) of the Bankruptcy Code and Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (each a "Bankruptcy Rule").

## RELIEF REQUESTED

9.      By this Motion, QR seeks entry of an order (the "Sale Order," in the form annexed hereto as Exhibit A): (i) authorizing the sale of the Property to RS (or the Successful Bidder(s) at

5

the Auction)s free and clear of the Encumbrances;[6] (ii) authorizing QR's entry into the RS PSA; and (iii) deeming any Non-Debtor Assets remaining in the Facility on the Closing Date abandoned and transferred to QR.

## CASE BACKGROUND

10.    On February 20, 2009, the Debtors each filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code. The Debtors' cases have been consolidated for procedural purposes only and are jointly administered. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases. On March 5, 2009, the United States Trustee for the District of Delaware appointed the Official Committee of Unsecured Creditors (the "Committee").

## THE RS PSA AND THE LEASE[7]

11.    The salient terms of the RS PSA are as follows:

(a)    Purchase Price. The Purchase Price for the Property is $12,000,000.00. See RS PSA, § 1.3.

(b)    Purchased Assets. The Property includes, among other things, the Land, the Improvements (*i.e.*, buildings and fixtures), certain Personal Property located on the Land and Improvements and certain Appurtenant Rights associated with the Land and Improvements. See RS PSA, § 1.1; Exhibit A.

---

[6]    All capitalized terms not otherwise defined herein have the meanings ascribed to them in the RS PSA and the Lease, as applicable. The RS PSA defines "Encumbrances" as all "liens, charges, pledges, mortgages, security interests, deeds of trust, restrictions, easements, claims, licenses, leases and other rights of usage and all encumbrances of every type and description." RS PSA, § 5.1(c).

[7]    This summary of the RS PSA and Lease is provided for the Court's convenience and, as applicable, in compliance with Rule 6004-1(b)(iv) of the Local Rules for the United States Bankruptcy Court for the District of Delaware. To the extent the summary differs in any way from the terms of the RS PSA or the Lease the terms of the RS PSA and the Lease shall control.

RLF1 3540729v.1

(c) <u>Key Representations and Warranties</u>.

    (i) *Title to the Assets; Absence of Liens.*

        (1) QR is the sole and lawful owner of, and holds good and marketable title to, the Property subject to the Permitted Exceptions and Encumbrances that will be addressed in the Sale Order;

        (2) To the actual knowledge of certain QR employees, no portion of the Land or any Improvement is the subject of, or affected by, any condemnation or eminent domain proceedings currently instituted or pending, and to the actual knowledge of such employees, no such proceedings are threatened; and

        (3) Neither the Land, the Improvements nor the other Property are subject to any Encumbrances (other than Permitted Exceptions or any Encumbrances that shall be released or cured on or prior to Closing).

        <u>See</u> RS PSA, § 5.1(d).

    (ii) *Environmental.* Among other environmental representations:

        (1) To QR's actual knowledge, there are no pending or threatened material actions or legal proceedings based on the release of Hazardous Substances or the violation of Environmental Laws at the Property (or conditions, facts or circumstances which would reasonably be expected to give rise thereto);

        (2) QR is in material compliance with applicable Environmental Laws; and

        (3) There has been no material release of Hazardous Substances at the Property, such that QR is or would be reasonably expected to be liable for remediation with respect thereto.

        (4) <u>See</u> RS PSA, § 5.1(j).

(d) <u>Risk of Loss</u>. Prior to Closing, QR shall have full risk of loss with respect to the Property. Upon Closing, full risk of loss with respect to the Property shall pass to RS. <u>See</u> RS PSA, § 8.4.

(e) <u>Conditions to Closing</u>.

(i)    *Conditions to Each Party's Obligations to Effect the Closing.* Prior to Closing:

    (1)    there shall be no injunction or judicial decree prohibiting consummation of the Transaction;

    (2)    the Court shall have entered the Proposed RS Stalking Horse Order and the Sale Order, which shall not have been reversed or stayed at the time of the Closing and shall not be the subject of an appeal or motion for rehearing or new trial; and

    (3)    all filings, consents and approvals necessary to permit the parties to perform the transactions contemplated shall have been duly obtained, made or given, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect.

See RS PSA, § 4.1.

(ii)    *Conditions to Obligations of RS.* Prior to Closing:

    (1)    QR shall have delivered to RS all of the items required to be delivered under the RS PSA;

    (2)    Subject to certain exceptions regarding materiality and timing, the representations and warranties of QR set forth in the RS PSA shall be true and correct in all material respects as of the Closing Date as though made at and as of the Closing;

    (3)    QR shall have performed and observed, in all material respects, all covenants and agreements of the RS PSA to be performed and observed by QR as of the date of Closing;

    (4)    The Title Company shall have issued or irrevocably committed to issue to RS the Title Policy; and

    (5)    The Air Products Lease shall have been terminated or rejected with the authority of the Bankruptcy Court.

See RS PSA, § 4.2.

(iii)    *Conditions to Obligations of QR.* Prior to Closing:

8

(1) QR shall have received the Purchase Price as adjusted as provided in the RS PSA, and payable in the manner provided for in the RS PSA;

(2) RS shall have delivered to QR all of the items required to be delivered pursuant to the RS PSA;

(3) Subject to certain exceptions regarding materiality and timing, the representations and warranties of RS set forth in the RS PSA shall be true and correct in all material respects as of the Closing Date as though made at and as of the Closing; and

(4) RS shall have performed and observed, in all material respects, all covenants and agreements of the RS PSA to be performed and observed by RS as of the date of Closing.

See RS PSA, § 4.3.

(f) Termination. Among other ways, the RS PSA may be terminated prior to the Closing Date as follows:

(i) by either party upon written notice to the other party, if the Closing has not occurred on or before April 15, 2010 (as may be extended by written agreement of the parties) (the "Termination Date"); provided that the party seeking to terminate the RS PSA may not effect such termination if it is then in breach of its obligations under the RS PSA in any material respect after giving effect to any applicable cure period;

(ii) by RS, upon written notice to QR, if QR shall consummate a sale of all or any portion of the Assets pursuant to a competing bid; and

(iii) by RS, upon written notice to QR, if the Court does not enter (A) the RS Stalking Horse Order on or before March 5, 2010, or (B) the Sale Order on or before March 26, 2010, unless extended to a later date by mutual consent of QR and RS.

(iv) by RS in the event that QR is unwilling or unable to cure a Title Defect; or

(v) by RS in the event of Major loss[8] or damage to the Property.

---

[8] "Major" loss or damage refers to the following: loss or damage to the Property such that the cost of repairing or restoring the premises in question to substantially the same condition which existed prior to the

9

See RS PSA, § 9.1.

(g)      Good Faith Deposit. Simultaneously with the execution and delivery of the RS PSA, RS will deposit with the Title Company $1,200,000.00 (the "Deposit"). The Deposit shall be applied to the Purchase Price at Closing or treated as liquidated in the event of RS's failure to close in accordance with the terms of the Escrow Agreement. RS's failure to timely deliver the Deposit shall be a material default, and entitles QR, at QR's sole option and as its sole remedy to terminate the RS PSA upon two (2) business days' written notice to RS. See RS PSA, § 1.5.

(h)      Successor Liability. The parties intend that, except where expressly prohibited under applicable Law or in the RS PSA, upon the Closing, RS shall not be deemed to: (i) be the successor of QR, (ii) have, *de facto*, or otherwise, merged with or into QR, (iii) be a mere continuation or substantial continuation of QR or the enterprise(s) of QR, or (iv) be liable for any acts or omissions of QR in the conduct of the QR's business or arising under or related to the Property other than as set forth in the RS PSA. The parties have requested a finding as to successor liability in the Sale Order. See RS PSA, § 1.7.

(i)      Indemnity.

         (i)      *Post Closing.* From and after the Closing Date, RS shall indemnify QR from any material liabilities relating to the Property first existing, initiated or occurring after the Closing Date related to activities of RS including, without limitation, liabilities relating to Environmental Laws. See RS PSA, § 1.6.

         (ii)      *Post Termination Date.* From and after the Termination Date (as defined in the Lease), RS shall indemnify QR from any liabilities relating to the Property (1) first existing, initiated or occurring after the Termination Date related to activities of RS including, without limitation, liabilities relating to Environmental Laws, and (2) relating to the preservation, decommissioning or remediation (or failure thereof) of the tools, equipment and fixtures contained in the Property except to the extent resulting from the maintenance and removal of Excluded Equipment from the Property (the "Assumed Liabilities"). Except for the Assumed Liabilities, RS shall not assume any duties, debts, liabilities or obligations of QR relating to the Property. See RS PSA, § 1.6.

         (iii)      *Guaranty.* Prior to Closing, RS shall deliver to QR a guaranty executed by the sole member of RS guaranteeing to QR the

---

event of damage would be, in a written opinion of an architect or other qualified expert selected by QR and reasonably approved by RS, equal to or greater than $1,000,000.00.

10

performance of the obligation of RS to indemnify QR under Section 1.6 of the RS PSA (*i.e.*, relating to environmental liabilities). See RS PSA, § 3.3(f).

12.   The salient terms of the Lease are as follows:

(a)   Term. The Lease shall commence upon the Closing of the PS PSA and shall terminate on the earlier to occur of: (1) September 30, 2010, subject to RS's right to terminate earlier pursuant to the Lease and (2) ten days following the date that all of QR's property and any equipment owned by third parties is removed from the Leased Premised (the earlier of such dates, the "Termination Date").

(b)   Payment Obligations.

(i)   *Base Rent.* The Base Rent is $1 per month provided that no Default has occurred, in which case the Base Rent shall be increased to $250,000 per month. See Lease, § 3.01.

(ii)   *Additional Rent.* QR shall pay all other amounts, liabilities and obligations relating to the Leased Premised including, without limitation, all insurance expenses and applicable taxes ("Additional Rent"). See Lease, §§ 3.04 and 4.01.

(iii)   *Holding Over.* If QR retains possession of the Leased Premises after the expiration or earlier termination of the Lease, the monthly rent shall increase to $500,000 per month. See Lease, §2.04.

(iv)   *Other Obligations of QR.* QR shall pay for utility services for the Leased Premises and shall, at its own expense, maintain the Leased Premises in their current condition, including the performance of routine maintenance. See Lease, Article 6 and § 7.01.

(c)   Release and Indemnification.

(i)   *Release.* RS shall not be responsible for QR's property located on the Leased Premises, which includes, among other things, all of QR's trade fixtures and personal property that is owned, leased or controlled by QR. RS shall not be liable to QR for any damage to QR's property or any injury to QR's employee or agents. See Lease, § 8.01.

(ii)   *QR Indemnification.* QR shall indemnify RS for any liabilities (1) arising out of or relating to the negligence or willful misconduct of QR's employees and agents; (2) arising out of or relating to any of QR's property of equipment owned by third parties; (3) arising out of or relating to any act or occurrence within the Lease Premises; or (4) arising out of QR's failure to comply with its obligations

11

under the Lease. QR's indemnification obligations shall survive the expiration or earlier termination of the Lease. See Lease, § 8.02.

(iii) *RS Indemnification.* RS shall indemnify QR for any liabilities arising out of or relating to the negligence or willful misconduct of RS's employees or agents or arising out of RS's failure to comply with its obligations under the Lease. See Lease, § 8.03.

(d) Default. The occurrence of any of the following shall be a "Default":

(i) QR's failure (which failure continues uncured for ten days) to pay Additional Rent when due;

(ii) QR's failure (which failure continues uncured for thirty days after written notice from RS) to perform or observe any material term, condition, covenant or obligation under the Lease;

(iii) QR's abandonment of the Leased Premises, *except* if QR has made reasonable arrangements to ensure (1) that that QR's insurance remains in place during the vacancy; (2) that the Leased Premises are secure; and (3) that the Leased Premises will be properly maintained in accordance with the Lease;

(iv) QR's assignment or sublet of all or a portion of the Leased Premises not in accordance with the terms of the Lease; or

(v) QR fails to maintain the insurance required by the Lease.

See RS PSA, § 13.01.

## THE REMARKETING AND AUCTION PROCESS[9]

13. After the filing of this Motion and in accordance with the terms of the Proposed Bidding Protection Order, the Debtors shall:

- solicit Qualified Bids from Qualified Bidders prior to the bid deadline of March 10, 2010 at 4:00 p.m. (prevailing New York City time);

- conduct an auction, if necessary, on March 12, 2010 at 9:00 a.m. (prevailing

---

[9] This summary of the bidding process is provided for the Court's convenience only. To the extent the summary differs in any way from the terms of the RS Bidding Procedures, the terms of the RS Bidding Procedures shall control. All capitalized terms not otherwise defined in this section of the Motion have the meanings ascribed to them in the RS Bidding Procedures.

RLF1 3540729v.1

New York City time); and

- seek the Court's approval of the Final Sale Agreement at a hearing that is scheduled for March 16, 2010 at 11:30 a.m. (prevailing New York City time).

14.     The RS Bidding Procedures and the bidding procedures related to the TI Transaction and the GATE Transaction each permit a Qualified Bidder to place a single bid on (i) the Property, (ii) all of the assets in the three transactions (plus any remaining assets of QR), or (iii) the Property plus all of the assets in either the TI Transaction or the GATE Transaction.[10]

## BASIS FOR RELIEF

### A.     Applicable Legal Standards

15.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363(b) does not set forth a standard for determining when it is appropriate for a court to authorize the disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtor. See In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991); In re Trans World Airlines Inc., No. 01-0056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001). Furthermore, "a [debtor in possession] is entitled to great judicial deference in deciding which bid to accept as the best and highest bid on the sale of the Debtor's assets; and, although the [the debtor in possession's] discretion is not without limit, the Court should not step in and assume a role and responsibility properly placed by the Code in

---

[10]     Other than the credit bidding rights of secured creditors, which are preserved, bidders cannot break-up the collection of assets in the Transaction, the TI Transaction or the GATE Transaction.

13

another's hands." In re Castre, Inc., 312 B.R. 426, 430-31 (Bankr. D. Colo. 2004) (citing In re Gulf States Steel, Inc. of Alabama, 285 B.R. 497, 516 (Bankr. N.D. Ala. 2002) (in sustaining a debtor's decision to sell its assets to a particular bidder, the court acknowledged that the debtor, as a participant in the industry, is in a better position than the Court to choose between bidders).

16.     A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. Lionel, 722 F.2d at 1071. A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where the sale maximizes the value of the debtor's estate. See In re Integrated Resources, Inc. 147 B.R. 650, 659 (S.D.N.Y. 1992) (citing In re Atlanta Packaging Products, Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988) ("It is a well-established principle of bankruptcy law that the... [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.").

17.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a "sound business purpose" justifies the sale of assets outside the ordinary course of business; (b) whether adequate and reasonable notice has been provided to interested persons; (c) whether the debtor has obtained a fair and reasonable price; and (d) whether the parties have acted in good faith. See Abbotts Dairies, 788 F.2d 143 (3d Cir. 1986); Delaware & Hudson Ry., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (D. Del. 1987); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); In re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc., 77 B.R. 15, 17 (Bankr. E.D.

14

Pa. 1987).

18.     Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11.  Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]."  11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  See In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); In re Pincus, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. See, e.g., In re Chinichian, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

## B.     The Transaction Should Be Approved

### (a)     A "Sound Business Purpose" Justifies the Transaction of the Property Outside the Ordinary Course of Business

19.     QR has determined that the sale of the Property in the Transaction is most likely to maximize the value of QR's estate.  With the Debtors' postpetition financing now paid down, the Debtors endeavor to sell their remaining assets for the benefit of their prepetition creditors. The Debtors with the assistance and guidance of the Consultants and Thalhimer, have run a fulsome and extensive marketing and sale process, which has yielded the Transaction, the TI Transaction and the GATE Transaction.

15

20.     The Transaction (when combined with the TI Transaction and the GATE Transaction) will result in the sale of most of the Remaining Assets.    By packaging the substantial majority of its remaining assets in three concurrent sales, QR avoids significant execution risks related to closing separate and multiple sales.  While QR engaged in discussions with a potential bidder who has indicated an interest in purchasing all of QR's remaining assets, the Transaction (when combined with the TI Transaction and the GATE Transaction) is higher and otherwise better.

21.     Finally, the Transaction is supported by the Committee.  The Committee has determined that the sale of the Property on the terms of the RS PSA (or the Successful Bidder at the Auction) will maximize the value of the Property and is in the best interests of QR's estates and creditors.

### (b)     Adequate and Reasonable Notice Has Been Provided to Interested Persons

22.     QR is providing notice of this Motion and the Auction to all parties who have previously expressed interest in acquiring the Property and all parties identified by the Consultants and Thalhimer as being potentially interested in acquiring the Property.  QR submits that service of this Motion (and publication of notice of the sale) provides more than adequate and reasonable notice for any interested party to submit a competing bid for the Property. Accordingly, adequate and reasonable notice has been provided to "interested persons."

### (c)     QR Has Obtained a Fair and Reasonable Price for the Property

23.     The Purchase Price to be paid by RS to QR for the Property is fair and reasonable. After months of marketing and negotiations with many interested parties, QR, the Consultants and Thalhimer are satisfied that they have obtained a reasonable market price for the Property. Despite the depressed real estate market, QR has been able to obtain a purchase price that

16

captures value for a highly specialized parcel of real estate. Furthermore, QR is also receiving an economic benefit from transferring maintenance, insurance and decommissioning obligations to RS.

### (d)    All Parties Have Acted in Good Faith

24.    The Transaction is the product of good faith, arm's length negotiations between and among QR, RS and its principals. The Transaction was negotiated with the active involvement of QR's management and advisors. For nearly four weeks, QR, RS and RS's principals – with the assistance of their respective counsel – have been engaged in extensive negotiations, due diligence and days of detailed negotiations. In addition, RS and its principals (a) do not share common ownership with either Debtor, (b) are independently controlled and operated, and (c) are not otherwise affiliated with the Debtors or their officers and directors. Furthermore, RS does not have any connection to TI or GATE.

### C.    The Transaction Satisfies the Requirements of Section 363(f) of the Bankruptcy Code

25.    Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if

(a)    such a sale is permitted under applicable non-bankruptcy law;

(b)    the party asserting such a lien, claim or interest consents to such sale;

(c)    the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property;

(d)    the interest is the subject of a *bona fide* dispute; or

(e)    the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.

17

See 11 U.S.C. § 363(f); Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).

26. QR has satisfied the standards under section 363(f) of the Bankruptcy Code to allow for the sale of the Property free and clear of Encumbrances. First, parties asserting Encumbrances against, in or to the Property who do not object to the sale thereof can and should be deemed to consent to the Transaction under section 363(f)(2) of the Bankruptcy Code. If any party asserting an Encumbrance objects to the Transaction, QR will demonstrate that such objection should be overruled under one or more of the other subsections of section 363(f) of the Bankruptcy Code. For example, certain Encumbrances may be subject to *bona fide* disputes or QR will be able to satisfy the requirements of section 363(f)(1) or (5).[11]

27. Without permitting the sale of Property free and clear of the Encumbrances, QR would not be able to satisfy a key provision of the RS PSA (see RS PSA, § 5.1(d)) and would not be able to close the Transaction. Furthermore, as indicated in RS PSA, RS will be unwilling to close on the Transaction if the Encumbrances remain attached to the Property. Even if RS was willing to consummate the Sale with the Encumbrances in place, RS certainly would insist on a substantially reduced purchase price, yielding substantially less value to QR's estate.

28. In reviewing the interests of holders of Encumbrances, such interests are adequately protected by the terms of the proposed Sale Order. All Encumbrances on the Property will attach with the same order, priority, enforceability and validity to the consideration paid by RS to QR as such Encumbrances currently have with respect to the respective assets. Furthermore, QR does not anticipate using the proceeds for general corporate purposes, as it has

---

[11] To the extent required, QR reserves the right to supplement this Motion to respond to such objections either at or prior to a hearing on the Motion to address any specific objections.

18

sufficient liquidity since the 2009 TI Transaction to satisfy its current obligations.

**D.     The Transaction is Proposed in "Good Faith" under 363(m) of the Bankruptcy Code**

29.     QR additionally requests that the Court find that RS is entitled to the protections

provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Property.

30.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under
> subsection (b) . . . of this section of a sale . . . of property does not
> affect the validity of a sale . . . under such authorization to an
> entity that purchased . . . such property in good faith, whether or
> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) protects a buyer of assets sold pursuant to section 363 from

the risk that it will lose its interest in the purchased assets if the order allowing the sale is

reversed on appeal.

31.     Although the Bankruptcy Code does not define "good faith buyer," the Third

Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "[t]he requirement

that a buyer act in good faith . . . speaks to the integrity of his conduct in the course of the sale

proceedings." Abbotts Dairies, 788 F.2d at 147 (citing In re Rock Indus. Mach. Corp., 572 F.2d

1195, 1198 (7th Cir. 1978) (internal quotations omitted).  To constitute lack of good faith, a

party's conduct in connection with the sale must usually amount to "fraud, collusion between the

buyer and other bidders or the trustee or an attempt to take grossly unfair advantage of other

bidders." Id. (citing Rock Indus. Mach. Corp., 572 F.2d at 1198; see also In re Bedford Springs

Hotel, Inc., 99 B.R. 302, 305 (Banks. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833,

839 (D.N.J. 1995).  Due to the absence of a bright line test for good faith, the determination is

based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the

sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting Rock

19

Indus. Machinery Corp., 572 F.2d at 1198 (7th Cir. 1978)).

32.     As required by section 363(m) of the Bankruptcy Code, the Debtors, RS and RS's principals have acted in good faith in negotiating the Transaction.  There is no evidence of fraud or collusion in the terms of the Transaction.  To the contrary, the Transaction is the culmination of a lengthy negotiation process in which all parties have been represented by sophisticated counsel and advisors.  In addition, neither RS nor its principals are insiders (as that term is defined in section 101(31) of the Bankruptcy Code) of the Debtors, and all negotiations have been conducted at arm's length and on a good faith basis.

33.     The RS Bidding Procedures and the Auction were designed to ensure that no party has been or will be able to exert undue influence over the process.  Furthermore, the RS Bidding Procedures and the Auction were designed to prevent any party from engaging in any conduct that would cause or permit the sale of the Property to be avoided or the imposition of costs or damages under section 363(n) of the Bankruptcy Code.  Under the circumstances, RS should be afforded the benefits and protections that section 363(m) of the Bankruptcy Code provide to good faith buyers.

**E.     QR's Entry into the Lease Should Be Approved**

34.     QR's entry into the Lease in conjunction with the closing of the Transaction is not only necessary to effectuate the Transaction but also maximizes the value of QR's estate.  So long as QR is not in default under the Lease, and does not holdover beyond the term of the Lease, the Lease is at no cost to QR's estate.  In addition, the Lease will allow QR to safely and economically wind down its operations and sell the assets that remain following the TI Transaction and GATE Transaction.  Furthermore, TI and GATE require a reasonable period of time to remove the assets they are purchasing in the TI Transaction and GATE Transaction, respectively.  To ensure that such disassembly and removal is conducted safely and efficiently, it

20

is necessary for QR to maintain control of the Property during this critical period. Therefore, QR's entry into the Lease is a sound exercise of its business judgment and is in the best interests of QR's creditors and all parties in interest.

**F.     The Abandonment Mechanism is Justified Under the Circumstances**

35.     The Abandonment Mechanism is appropriate and necessary under the circumstances in order to consummate the Transaction and maximize the value of QR's estate. Specifically, delays in removing the Non-Debtor Assets will result in an extension of the Lease and an unnecessary extension QR's financial obligations during such term and may give RS the right to terminate the Transaction. The Abandonment Mechanism is also fair and equitable because, after numerous attempts to reach a commercial resolution with the owners of the Non-Debtor Assets, such owners apparently desire to abandon their equipment. Such third-party owners will receive notice of this Motion and will have ample opportunity to either respond or to enter into reasonable negotiations with QR and/or RS regarding the disposition of the Non-Debtor Assets. Therefore, in order to maximize the value of QR's estate, QR respectfully requests that the Abandonment Mechanism be approved pursuant to section 105(a) of the Bankruptcy Code.

**G.     Relief from the Fourteen Day Waiting Period under Bankruptcy Rule 6004(h) is Appropriate**

36.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." QR requests that the Sale Order be effective immediately by providing that the fourteen day stays under Bankruptcy Rule 6004(h) is waived.

37.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes

21

to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen day stay period, *Collier on Bankruptcy* suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY 15th Ed. Rev., ¶6064.09 (15th rev. ed. 1996). Furthermore, *Collier on Bankruptcy* provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

38.     Under the RS PSA, the Court's entry of a waiver of Bankruptcy Rule 6004(h) is a condition to closing. See RS PSA, § 4.1. In addition, this request is supported by the need to more quickly reduce the substantial costs required to insure and maintain the Property that are currently being paid by QR. Thus, QR requests that the Court waive the fourteen-day stay period under Bankruptcy Rule 6004(h).

## PROCEDURE

39.     No previous request for the relief sought herein has been made to this or any other Court.

40.     Notice of the Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to RS; (c) counsel to the owners of the Non-Debtor Assets; (d) counsel to each of TI and GATE; (e) counsel to the Committee; (f) counsel to and the agent for the Debtors' postpetition lenders; (g) all entities known to have asserted any Encumbrances in, upon or against the assets of QR; (h) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion or with jurisdiction over QR's business or any part thereof; (i) other

potentially interested purchasers as identified by the Debtors or their advisors or professionals; (j) Qimonda AG and counsel to the insolvency administrator over the estate of Qimonda AG; (k) all known subsidiaries of Qimonda AG; (l) Infineon Technologies Investment B.V. and Infineon Technologies AG; (m) all parties that have requested service pursuant to Bankruptcy Rule 2002; (n) all parties that have filed proofs of claim in the Debtors' chapter 11 cases; and (o) parties listed on the Debtors' creditor matrix that will not otherwise receive notice through this paragraph. Furthermore, pursuant to the Proposed RS Stalking Horse Order, notice of the Auction will be published in the national edition of the *Wall Street Journal* within seven business days of the entry of the Proposed RS Stalking Horse Order. QR submits that, under the circumstances, no other or further notice is required.

23

## CONCLUSION

WHEREFORE, QR respectfully requests that the Court enter an order, substantially in the form annexed hereto as Exhibit A, (i) authorizing the sale of the Property to RS free and clear of the Encumbrances; (ii) authorizing QR's entry into the RS PSA; and (iii) deeming any Non-Debtor Assets remaining on the Property on Closing Date abandoned and transferred to QR; and (iv) granting such other and further relief as the Court deems just and proper.

Dated: February 22, 2010
      Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

– and –

Mark Thompson (admitted *pro hac vice*)
Morris J. Massel (admitted *pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

*Attorneys for the Debtors and*
*Debtors in Possession*

24