**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| QIMONDA RICHMOND, LLC, et al., | ) | Case No. 09-10589 (MFW) |
| | ) | |
| Debtors | ) | |

## OPINION[1]

Before the Court is the Debtor's objection to the Motion of Google, Inc. ("Google") for allowance of an administrative claim. For the following reasons, the Court sustains the Debtor's objection and denies the Motion.

## I.   BACKGROUND

Qimonda North America Corp. ("the Debtor") was a manufacturer of, inter alia, memory modules.  The Debtor sold memory modules to Google, Inc., pursuant to purchase orders placed by Google.

On February 20, 2009, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Shortly thereafter, Google filed a motion for allowance and payment of an administrative expense pursuant to section 503(b)(1) of the Code seeking at least $1,236,050 for conversion of memory modules Google had returned to the Debtor for repair which Google

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, which is made applicable to contested matters by Rule 9014 of the Federal Rules of Bankruptcy Procedure.

asserted were still in the possession of the Debtor as of the
petition date but had been sold by it to others.  The Debtor
opposed the motion and a hearing on it was held on March 16,
2010, at which time evidence was presented.  The parties filed
post-trial briefs on April 16, 2010.  The matter is now ripe for
decision.


II.   <u>JURISDICTION</u>

     This Court has jurisdiction over this core matter pursuant
to 28 U.S.C. §§ 1334 & 157(b)(2)(A), (B) & (O).


III. DISCUSSION

     A.   <u>Parties' Course of Dealings</u>

     Since the Debtor's formation in 2006 until shortly before
its bankruptcy filing, the Debtor sold hundreds of thousands of
memory modules to Google pursuant to purchase orders issued by
Google which incorporated Google's standard terms and conditions
(the "Terms and Conditions").  (Ex. G-1.)  The memory modules
were not customized but were highly standardized, mass-produced
units that were sold by the Debtor to many customers.  (Tr. at
63, 89, 111.)

     Under the Terms and Conditions, if any product sold was
defective, Google could return it to the Debtor for repair,

replacement, or refund, at the Debtor's option.[2]  (Ex. G-1 at ¶
9; Tr. at 80-81, 97.)  Although industry standards allowed
returns for replacement or refund only, Google agreed to allow
the Debtor to test (and if necessary) repair the modules or
return them to Google when they passed.  (Tr. at 55.)

If Google felt that a module was defective, Google[3] would
seek authority from the Debtor to return the module, which the
Debtor would grant pursuant to a Return Material Authorization
("RMA").  (Tr. at 97-98, 115; Ex. D-1.)  When a module was
returned by Google, the Debtor in its discretion would either
test the module itself or send it to an overseas vendor for
testing.  (Tr. at 115-19.)  If the Debtor did the testing and
found the module was not defective,[4] it would usually return it
to Google.  (Tr. at 102, 119.)  If the testing was done overseas

---

[2]  Google could also repair the module itself and receive
the cost of repair or could utilize the defective product and get
a discount.  (Ex. G-1 at ¶ 9.)  Although the Terms and Conditions
stated that the warranty period for return of defective product
was one year, Google's commodity manager, Andrew Dorsey,
testified that he had negotiated a verbal agreement with the
Debtor to extend that period to three years.  (Tr. at 78-79.)
Although the Debtor disputes that any verbal agreement was
effective, the resolution of this issue is not necessary to the
Court's decision.

[3]  The requests for return were sent through Google's
vendor, Material in Motion.  (Tr. at 58.)  Google was not
satisfied that Material in Motion was keeping the return process
moving and periodically had to get involved to be sure the
returns were flowing properly.  (Id. at 72.)

[4]  Historically, 49% of the returned modules passed the
testing.  (Tr. at 60-61, 65, 88; Exs. G-12 & G-13.)

3

and the module passed, the module was returned to the Debtor's
general inventory and the Debtor satisfied the RMA with
replacement modules.  (Tr. at 115-19.)  The decision on where to
send the module for testing depended on how many modules needed
to be tested and on the Debtor's work load.  (Tr. at 116.)  If
the module was defective, the Debtor would repair it when its
manufacturing schedule permitted and place it in its general
inventory.  (Tr. at 102.)  In that instance, the Debtor would
send Google a replacement from its general inventory or issue a
credit for a refund.  (Tr. at 97, 100-102.)  Because the modules
had no identifying feature, but were mass produced, it was
impossible for the Debtor to determine if it returned to Google
after repair the exact module that Google had sent it.  (Tr. at
101.)  Google admits that neither it nor the Debtor kept track of
the specific modules that were sent back to the Debtor or
returned to Google.  (Tr. at 71, 81, 83.)  Google did not really
care if it got the exact module back, as long as it was of the
same type.  (Tr. at 81-82, 85, 89.)

    B.    Factual Basis for Conversion Claim

    Google contends that it is entitled to an administrative
claim in the amount of at least $1,236,050 for conversion of
memory modules that Google had returned to the Debtor pre-
petition for repair but were never sent back to it.  (Tr. at 99.)
The claim represents approximately 21,000 returned modules based

on 80 RMAs.  (Exs. G-13, D-5.)  Google asserts that it owns those
modules and that the Debtor sold them post-petition to others.
(Tr. at 77.)

The Debtor presented evidence that the Debtor had never
received 166 of the modules represented by one of the RMAs and
that eight of the RMAs (representing 950 modules) had already
been satisfied by the Debtor sending replacement modules.  (Tr.
at 106-08; Exs. G-12, G-13, D-2, D-3 & D-18 at ¶ 9.)  The Debtor
also presented testimony that many modules it held in inventory
which could have been Google returns were sold by it pre-
petition, not post-petition.  (Tr. at 111; Exs. D-4 & D-18 at ¶
8.)

Google's witness admitted that he did not keep track of
product returns, relying instead on Material in Motion to do so.
(Tr. at 71.)  He admitted, however, that he had doubts about the
accuracy of their records and would instead rely on the Debtor's
records to determine what modules had been returned.  (Id. at
72.)

C.    Legal Basis for Conversion Claim

Google asserts that at all times it retained title to the
modules that it returned to the Debtor.  Google contends that the
Debtor converted its property post-petition giving rise to an
administrative claim.  See, e.g., Reading Co. v. Brown, 391 U.S.
471, 477 (1968) (concluding that post-petition tort claim was

5

entitled to administrative priority); <u>In re MD Promenade, Inc.</u>, Case No. 08-34113-SGJ-7, 2009 WL 80203, at *6 (Bankr. N.D. Tex. Jan. 8, 2009) (recognizing possibility that landlord had administrative claim for post-petition conversion of its property); <u>In re Hayes Lemmerz Int'l, Inc.</u>, 340 B.R. 461, 480 (Bankr. D. Del. 2006) (finding that the debtor had converted lessor's property post-petition by stripping parts from its equipment for use in debtor's equipment giving rise to an administrative claim); <u>In re Women First Healthcare, Inc.</u>, 332 B.R. 115, 123 (Bankr. D. Del. 2005) (stating that a post-petition tort can create an administrative claim).

The Debtor disputes Google's entitlement to an administrative claim contending that it did not convert any property of Google, because once Google returned the modules to the Debtor, title in them revested in the Debtor under applicable law.  Under California's Uniform Commercial Code ("the UCC"),[5] when a buyer of goods returns or refuses to retain goods for any reason, title to the goods reverts to the seller.  Cal. Com. Code § 2401(4) (providing that "[a] rejection or other refusal by the buyer to receive or retain the goods, whether or not justified, or a justified revocation of acceptance revests title to the goods in the seller . . . by operation of law.").  <u>See also</u> <u>In re</u>

_____

    [5]  The Terms and Conditions apparently provide that California law applies.  (Ex. G-1 at ¶ 15.)

Pac. Express, Inc., 780 F.2d 1482, 1489 (9th Cir. 1986) (applying California law and concluding that title revested in the seller when the buyer refused to retain the goods after delivery); Aztec Energy Partners, Inc. v. Sensor Switch, Inc., 531 F. Supp. 2d 226, 230 (D. Conn. 2007) (concluding that under UCC § 2-401(4) if the buyer returned the goods for any reason to the seller, title revested in the seller); Shelby Int'l, Inc. v. Wiener, 563 S.W.2d 324, 328 (Tex. Civ. App. 1978) (holding that title revested in seller under California law when buyer revoked his acceptance of goods).  Because the Debtor had title to the returned modules, the Debtor argues that its resale of them to other customers could not be a conversion of property of Google.

Google contends that the parties' agreement, rather than the UCC, controls.  See Cal. Com Code § 2719 (allowing parties to modify or limit remedies available under 2401).  Cf. U. S. Achievement Acad. v. Pitney Bowes, Inc., 458 F. Supp. 2d 389, 402 (E.D. Ky. 2006) (holding that a party can contractually waive its right to reject or revoke acceptance of goods).  Google contends that section 7 of the Terms and Conditions provided a different array of remedies from those available under the UCC and that section 9 of the Terms and Conditions provided that title passed from the Debtor to Google, with no provision stating that title passed back to the Debtor when Google returned the modules for repair.  Therefore, Google contends that section 2-401(4) of the

7

UCC is not applicable and that title to the returned modules did not revest in the Debtor.  Instead, Google contends that the Debtor received the modules as a bailee and has the burden of returning Google's property.  See, e.g., LaPlace v. Briere, 962 A.2d 1139, 1148 (N.J. Super. Ct. App. Div. 2009).

The Court disagrees with Google's assertion that the Terms and Conditions eliminated the effect of section 2-401(4) of the UCC.  There is nothing in section 7 or 9 of the Terms and Conditions that specifically states that title to any returned goods remains in Google, notwithstanding the effect of section 2-401(4) of the UCC.  In fact, some of the remedies available to Google under the Terms and Conditions are directly inconsistent with Google retaining title to the goods.  For example, on return the Debtor was entitled to replace the module with another similar module or keep it and refund Google's money.

Therefore, the Court concludes that the Terms and Conditions did not change the effect of section 2401(4) of the UCC.   Under that section, when Google returned the modules, it relinquished title to those goods and title reverted to the Debtor "by operation of law."  Cal. Com. Code § 2401(4).  See also Pac. Express, 780 F.2d at 1489; Aztec Energy Partners, 531 F. Supp. 2d at 230; Shelby Int'l, 563 S.W.2d at 328.

The parties' course of dealings under the Terms and Conditions supports the Court's conclusion.  Throughout their

8

history, neither Google nor the Debtor ever tracked the specific
modules that were returned by Google.  On many occasions the
Debtor, in its discretion, put the modules returned by Google in
its open inventory and resold them to other customers.  In
addition, rather than repair the specific modules that were
returned by Google, the Debtor often simply shipped replacement
modules from its open inventory to Google.  This was possible
because rather than being manufactured specifically for Google,
the modules were mass-produced standardized product that the
Debtor sold to many customers.

California law, the language of the Terms and Conditions,
and the parties' course of dealings are all consistent with the
Debtor's contention that title to the modules passed back to it
when Google returned them and are inconsistent with Google's
assertion that it retained title to the specific modules returned
to the Debtor.  Therefore, the Court concludes that title to the
modules revested in the Debtor when they were returned by Google
pre-petition.  As a result, the Court concludes that there is no
basis for a conversion or administrative claim by Google.

Google contends, nonetheless, that title could not have
revested in the Debtor because Google had no right to reject the
modules under the UCC.  In many instances Google installed the
modules into its servers and they did not fail for some time.
Google consequently argues that it was precluded from rejecting

9

the modules under the UCC because installation is an "act inconsistent with the seller's ownership."  <u>See, e.g.</u>, <u>John C. Kohler v. United States</u>, 498 F.2d 1360, 1367 (Ct. Cl. 1974) (holding that buyer's retention and use of boiler was an act inconsistent with seller's ownership and constituted acceptance precluding rejection); <u>United States for Use of Fram Corp. v. Crawford</u>, 443 F.2d 611, 613 (5th Cir. 1971) (concluding that installation by the buyer of heavy equipment supplied by the seller is an act inconsistent with the seller's ownership precluding rejection); <u>Marblelite Co. v. City of Philadelphia</u>, 222 A.2d 443, 444 (Pa. Super. Ct. 1966) (holding that use of traffic signal equipment was inconsistent with seller's ownership and constituted acceptance); <u>Park Cty. Implement Co. v. Craig</u>, 397 P.2d 800, 802 (Wyo. 1964) (concluding that buyers accepted hoist and dump bed when they began installing them on the vehicle).

The Court finds the cases cited by Google distinguishable. The installation and use of the modules in this case were not inconsistent with the revesting of title in the Debtor when they were returned by Google.  The modules consist of computer chips on a board; not heavy equipment or kitchen cabinets.  They are easily installed and uninstalled in a server.  Further, according to Google, the parties' agreement permitted Google to return the modules up to three years after delivery.  (Tr. at 78-79.)

Clearly the parties contemplated that Google would install and use the modules in the interim.

The Court concludes that Google has failed to prove its conversion claim.  In order to establish a conversion claim under California law, three elements must be established: (1) the plaintiff had title or the right to possession of the property; (2) the defendant converted the property by a wrongful act or disposition of the plaintiff's property rights; and (3) damages. Because the Court finds that Google did not have title to the modules, no conversion occurred.  At most, Google has a general unsecured claim.

IV.  <u>CONCLUSION</u>

For the foregoing reasons the Court sustains the Debtor's objection and will deny the motion for allowance of an administrative claim filed by Google, Inc.

An appropriate Order is attached.

BY THE COURT:

Dated: August 3, 2010

Mary F. Walrath
United States Bankruptcy Judge