## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| QIMONDA RICHMOND, LLC, <u>et al.</u>,[1] | ) | Case No. 09-10589 (MFW) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

-------------------------------------------------------------x

## DISCLOSURE STATEMENT WITH RESPECT TO JOINT PLAN OF LIQUIDATION OF THE DEBTORS AND DEBTORS IN POSSESSION, QIMONDA RICHMOND, LLC AND QIMONDA NORTH AMERICA CORP.

---

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL TO THE BANKRUPTCY COURT BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AT THIS TIME.**

**A HEARING TO CONSIDER THE ADEQUACY OF THIS DISCLOSURE STATEMENT UNDER SECTION 1125 OF THE BANKRUPTCY CODE HAS BEEN SET BY THE BANKRUPTCY COURT FOR JULY 12, 2011 AT 11:30 a.m. (PREVAILING EASTERN TIME). THE PLAN PROPONENTS RESERVE THE RIGHT TO AMEND, SUPPLEMENT OR OTHERWISE MODIFY THIS DISCLOSURE STATEMENT PRIOR TO AND UP TO SUCH HEARING.**

---

**IMPORTANT DEADLINES**
(all times set forth in the Disclosure Statement are prevailing Eastern Time)
- **Deadline for Solicitation Agent to Receive Votes to Accept or Reject the Plan: August 22, 2011 at 4:00 p.m.**
- **Deadline for Filing and Serving Objections to the Plan with the Bankruptcy Court: August 22, 2011 at 4:00 p.m.**
- **Plan Confirmation Hearing: September 19, 2011 at 10:30 a.m.**

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Qimonda Richmond, LLC (7867) and Qimonda North America Corp. (4654).

Mark Thompson (admitted *pro hac vice*)
Morris J. Massel (admitted *pro hac vice*)
Terry Sanders (admitted *pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

-and-

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:(302) 651-7700
Facsimile:(302) 651-7701
E-mail:   collins@rlf.com
          merchant@rlf.com
          kaufman@rlf.com


Counsel for Debtors and Debtors In Possession
Co-Proponent of the Plan


Craig F. Simon (admitted *pro hac vice*)
Daniel P. Winikka (admitted *pro hac vice*)
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
Telephone: (214) 969-4573
Facsimile:  (214) 969-5100

-and-

William P. Bowden (No. 2553)
Amanda M. Winfree (No. 4615)
ASHBY & GEDDES, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
Telephone:  (302) 654-1888
Facsimile:  (302) 654-2067
Email: wbowden@ashby-geddes.com
          awinfree@ashby-geddes.com


Counsel for the Official Committee of
Unsecured Creditors
Co-Proponent of the Plan

Dated:  June 7, 2011

**Table of Contents**

I.      INTRODUCTION ....................................................................................................... ~~6~~3

        A.      General ......................................................................................................... ~~6~~3
        B.      Summary of Treatment of Claims and Equity Interests Under the Plan ............... ~~7~~4
        C.      Sources and Uses of Cash ............................................................................ ~~12~~8
        D.      Entities Entitled to Vote on the Plan ............................................................ ~~14~~11
        E.      The Solicitation Process .............................................................................. ~~16~~12
        F.      Voting Instructions ..................................................................................... ~~16~~13
        G.      Confirmation Hearing ................................................................................. ~~18~~14

II.     BACKGROUND TO THESE CHAPTER 11 CASES .................................................... ~~19~~16

        A.      The Company's Business .............................................................................. ~~19~~16
        B.      Summary of Certain Prepetition Indebtedness and Financings ........................ ~~20~~17

III.    EVENTS LEADING TO THESE CHAPTER 11 CASES ............................................. ~~23~~19

IV.     ADMINISTRATION OF THE CHAPTER 11 CASES .................................................. ~~23~~20

        A.      Relief Obtained at the Outset of These Chapter 11 Cases ............................... ~~23~~20
        B.      Unsecured Creditors .................................................................................... ~~27~~23
        C.      Schedules and Statements ............................................................................ ~~27~~24
        D.      Claims Bar Date .......................................................................................... ~~28~~24
        E.      The Sale Process .......................................................................................... ~~28~~24
        F.      Summary of Legal Proceedings ..................................................................... ~~29~~25
        G.      Collection Actions ....................................................................................... ~~37~~34
        H.      Google Motion for an Administrative Expense Claim ...................................... ~~39~~36
        I.      Other Matters ............................................................................................. ~~39~~36

V.      SUMMARY OF THE PLAN ..................................................................................... ~~40~~36

        A.      General ......................................................................................................... ~~40~~36
        B.      Overview of Chapter 11 ............................................................................... ~~40~~37
        C.      Unclassified and Administrative Expense Claims and Priority Claims ............... ~~41~~37
        D.      Classification and Treatment of Classified Claims and Equity Interests ........... ~~43~~40
        E.      Means for Implementation of the Plan ............................................................ ~~45~~42
        F.      Provisions Governing Distributions ................................................................ ~~52~~48
        G.      Procedures for Resolving Disputed, Contingent and Unliquidated Claims
                or Equity Interests ....................................................................................... ~~57~~54
        H.      Treatment of Executory Contracts and Unexpired Leases ................................ ~~58~~55
        I.      Conditions Precedent to the Effective Date ..................................................... ~~59~~56
        J.      Release, Exculpation, Injunction and Related Provisions ................................. ~~59~~56
        K.      Retention of Jurisdiction ............................................................................... ~~64~~64
        L.      Miscellaneous Provisions .............................................................................. ~~65~~65

i

**VI.**   STATUTORY REQUIREMENTS FOR CONFIRMATION OF the PLAN ...............~~67~~67

    A.   Best Interests of Creditors Test/Liquidation Analysis ......................................~~69~~68
    B.   Feasibility .................................................................................................~~70~~70
    C.   Acceptance by Impaired Classes .................................................................~~70~~70
    D.   Confirmation Without Acceptance by All Impaired Classes ..........................~~71~~71

**VII.**   PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION
       AND CONSUMMATION OF THE PLAN ...........................................................~~72~~72

    A.   The Debtors May Not Be Able To Obtain Confirmation of the Plan ...............~~72~~72
    B.   Risk of Non-Occurrence of the Effective Date ................................................~~73~~72
    C.   The Debtors Cannot State with any Degree of Certainty the Size of the
       Relevant Classes of Claims ..........................................................................~~73~~73
    D.   Because a Portion of Recoveries are Based on Litigation Results, There
       May Be Material Differences in Recoveries Because of the Uncertainty of
       Litigation ....................................................................................................~~73~~73
    E.   The Liquidating Trusts Expenses May Increase Materially, Causing a
       Diminution of Recovery to Creditors ............................................................~~73~~73
    F.   If the Plan Cannot be Confirmed or Consummated, the Debtors May Have
       to Liquidate under Chapter 7 of the Bankruptcy Code ....................................~~74~~74

**VIII.**   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES .........~~74~~74

    A.   Federal Income Tax Consequences ..............................................................~~76~~76
    B.   Backup Withholding and ~~information~~ Information Reporting .........................~~79~~79
    C.   Importance of Obtaining Professional Tax Assistance ....................................~~79~~79

**IX.**   CONCLUSION AND RECOMMENDATION ..........................................................~~80~~80

**EXHIBITS**

| | |
|---|---|
| 1 | Plan of Liquidation |
| 2 | Proposed Disclosure Statement Order |

**PLAN SUPPLEMENT DOCUMENTS**

| | |
|---|---|
| 1 | Liquidation Trust Agreement |
| 2 | Liquidating Trustee Agreement |
| 3 | List of Executory Contracts to be Assumed (if any) |
| 4 | List of Liquidating Trust Committee Appointees |
| 5 | The Liquidating Trustee |

**THE PLAN PROPONENTS (AS DEFINED BELOW) RECOMMEND THAT HOLDERS OF CLAIMS IN CLASSES 2A AND 2B VOTE TO ACCEPT THE PLAN, AS THE PLAN PROVIDES FOR THE BEST AVAILABLE RECOVERY TO CREDITORS IN SUCH CLASSES.**

ALL CAPITALIZED TERMS IN THIS DISCLOSURE STATEMENT NOT OTHERWISE DEFINED HEREIN SHALL HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN, ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT 1.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT.  THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH, NOR REVIEWED BY, AND THE BENEFICIAL INTERESTS IN THE QIMONDA LIQUIDATING TRUSTS TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE SECURITIES AND EXCHANGE COMMISSION (THE "**S.E.C.**") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR WITH ANY OTHER SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS.  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE S.E.C., ANY OTHER SECURITIES REGULATORY AUTHORITY, OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE S.E.C., NOR ANY OTHER SECURITIES REGULATORY AUTHORITY, NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

EXCEPT AS OTHERWISE SET FORTH HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF.

RLF1 4454759v. 1

NO PERSON HAS BEEN AUTHORIZED BY THE PLAN PROPONENTS IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS ANNEXED HERETO TO OR INCORPORATED BY REFERENCE OR REFERRED TO IN THE DISCLOSURE STATEMENT AND/OR PLAN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

THE SUMMARIES OF THE PLAN AND THE RELATED DOCUMENTS IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE PLAN AND THE RELATED DOCUMENTS. ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE PLAN DOCUMENTS, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS HERETO.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, THE PLAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN. THIS DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN HEREIN IS ONLY A SUMMARY. HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES-IN-INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED EXHIBITS AND ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.

# I. INTRODUCTION

## A. General

Qimonda Richmond, LLC ("QR"), its direct parent, Qimonda North America Corp. ("QNA", together with QR, the "Debtors") and the Official Committee of Unsecured Creditors (the "Committee", together with the Debtors, the "Plan Proponents") hereby transmit this disclosure statement (as may be amended, supplemented or otherwise modified from time to time, the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") in connection with the solicitation of votes in connection with the confirmation of the *Joint Plan of Liquidation for Qimonda Richmond, LLC and Qimonda North America Corp.*, dated as of June 7, 2011, a copy of which is annexed hereto to as Exhibit 1 (as may be amended, supplemented or otherwise modified from time to time, the "Plan").

The purpose of this Disclosure Statement is to set forth information: (i) regarding the history of the Debtors and their businesses; (ii) describing the Chapter 11 Cases; (iii) concerning the Plan; (iv) advising the holders of Claims and Interests of their rights under the Plan; and (v) assisting the holders of claims entitled to vote on the Plan in making an informed judgment regarding whether they should vote to accept or reject the Plan.

On [____], 2011, after notice and a hearing (the "Disclosure Statement Hearing"), the Bankruptcy Court entered an order (the "Disclosure Statement Order"): (i) approving this Disclosure Statement as containing "adequate information" to enable a hypothetical, reasonable investor typical of holders of Claims against or Interests in the Debtors to make an informed judgment as to whether to accept or reject the Plan; and (ii) authorizing the Plan Proponents to use this Disclosure Statement in connection with the solicitation of votes to accept or reject the Plan. The Disclosure Statement Order establishes August 22, 2011 at 4:00 p.m. as the deadline for the return of Ballots accepting or rejecting the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Order, annexed hereto as Exhibit 2 sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating ballots (each a "Ballot", collectively, the "Ballots"). In addition, detailed voting instructions accompany each Ballot. Each holder of a claim entitled to vote on the Plan should read this Disclosure Statement and the exhibits hereto, including the Plan and the Disclosure Statement Order, as well as the instructions accompanying the Ballot in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. No solicitation may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on the Plan, holders of claims entitled to vote should not rely on any information relating to the Debtors and their businesses other than the information contained in this Disclosure Statement, the Plan, and all Exhibits hereto and thereto.

Additional copies of this Disclosure Statement (including the exhibits hereto) are available upon reasonable request made to the office of the Debtors' counsel, Simpson Thacher

& Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, Attn: Terry Sanders, Esq. (212) 455-2000 (phone) or (212) 455-2502 (facsimile).  Additional copies of this Disclosure Statement (including the exhibits hereto) can also be accessed free of charge from the following website:  http://dm.epiq11.com/qimonda.

**B.      Summary of Treatment of Claims and Equity Interests Under the Plan**

The following chart is a summary of the classification and treatment of Claims against and Interests in the Debtors and the potential distributions under the Plan.  Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims against and Interests in the Debtors.  Each "Estimated Aggregate Claims Amount" and the "Estimated Recovery" set forth below are estimates only, and therefore subject to change.  The Claim amounts used for the purposes of calculating the projected recovery percentage for General Unsecured Claims are the Debtors' good faith estimates, and the actual amounts of such General Unsecured Claims that may become Allowed General Unsecured Claims could vary materially, causing the actual recovery percentage to vary materially from these estimates.  Numerous material Claims are subject to litigation or other adjustments, and actual Allowed Claim amounts may differ materially from these estimated amounts.  In addition, no future recoveries from any litigation described herein are accounted for in calculating the projected recovery percentage for General Unsecured Claims.  See "Summary of Legal Proceedings" for a description of certain disputed Claims and litigation matters that could result in future recoveries.  The "Estimated Recovery" percentage represents estimated total distributions and not distributions on the Effective Date, which will be lower due to the need to reserve for all disputed Claims at the Face Amount.  Distributions to holders of Claims who are current or former employees will be net of applicable employment taxes and withholding taxes.

| Class | Description | Treatment | Estimated Recovery Total |
|-------|-------------|-----------|--------------------------|
| N/A | DIP Claims<br><br>Estimated Aggregate Claims Amount: $0.0 | Subject to the terms of the DIP Termination Agreement:<br><br><br>(1) to the extent any obligations are outstanding and payable under the DIP Facility that may have arisen prior to the Effective Date, all such outstanding and payable obligations shall (a) be Allowed in an amount to be agreed upon by the Debtors and the holders of such Claims and (b) be paid in full in Cash or otherwise satisfied in a manner acceptable to the holders of such claims in accordance with the terms of the DIP Termination | 100% |

4

| Class | Description | Treatment | Estimated Recovery Total |
|---|---|---|---|
| | | Agreement; and<br><br>(2) to the extent any contingent liabilities arise on or after the Effective Date, such obligations shall, pursuant to section 364(c)(1) of the Bankruptcy Code, and notwithstanding anything in the Plan to the contrary, constitute Allowed superpriority claims and be payable from and have recourse to all unencumbered assets (and proceeds thereof) transferred to the Qimonda Liquidating Trusts. | |
| N/A | Administrative Expense Claims<br><br>Estimated Aggregate Claims Amount:<br>QR: $5.1 million<br>QNA: $0.1 million | Holders of Allowed Administrative Expense Claims will be paid the full unpaid amount of such Allowed Administrative Expense Claim in Cash | 100% |
| N/A | Professional Fee Claims<br><br>Estimated Aggregate Claims Amount:<br>QR: $4.1 million<br>QNA: $2.3 million | Holders of Allowed Professional Fee Claims will be paid the full unpaid amount of such Allowed Professional Fee Claim in Cash. | 100% |
| N/A | Priority Tax Claims<br><br>Estimated Aggregate Claims Amount:<br>QR: $0.0<br>QNA: $0.1 million[2] | All governmental taxing units holding Allowed Priority Tax Claims shall receive Cash on account of such Claim in an amount equal to the Allowed amount of such Claim. | 100% |

---

[2] This estimate includes accrued interest.

RLF1 4454759v. 14065862v

| N/A | Other Priority Claims[3]  Estimated Aggregate Claims Amount: QR: $1.0 million QNA: $11.3 million | Each holder of an Allowed Other Priority Claim shall receive:  (1) full payment in Cash of its Allowed Other Priority Claim; or  (2) treatment of its Allowed Other Priority Claim in a manner that leaves such Claim Unimpaired. | 100% |
|---|---|---|---|
| 1A | Secured Claims against QR  Estimated Aggregate Claims Amount: $2.1[4] million, excluding Secured Claim of Kingston[5] | Holders of Allowed Secured Claims will receive one of the following treatments:  (1) the collateral securing such Allowed Secured Claim;  (2) Cash in an amount equal to the value of the collateral securing such Allowed Claim; or  (3) the treatment required under section 1124(2) of the Bankruptcy Code for such Claim to be reinstated or rendered Unimpaired. | 100% |
| 1B | Secured Claims against QNA  Estimated Aggregate Claims Amount: $0.0 | Holders of Allowed Secured Claims will receive one of the following treatments:  (1) the collateral securing such Allowed Secured Claim;  (2) Cash in an amount equal to the value of the collateral securing such | 100% |

---

[3] The estimated amounts for Other Priority Claims include claims asserted by former employees (other than the Employee Settlement Agreement) up to the statutory cap of $10,950. For the purposes of this analysis, the Debtor-portion of tax obligations for wage-related claims is estimated at 8.0%.

[4] This estimate includes accrued interest and does not include contingent, unliquidated or disputed claims.

[5] As described in further detail below in the "Summary of Legal Proceedings," approximately $40.4 million has been placed in a segregated reserve relating to, and pending the disposition of, the Kingston Lien Avoidance Action.

RLF1 4454759v. 14065862v

| | | Allowed Claim; or<br><br>(3) the treatment required under section 1124(2) of the Bankruptcy Code for such Claim to be reinstated or rendered Unimpaired. | |
|---|---|---|---|
| 2A | General Unsecured Claims against QR<br><br>Estimated Aggregate Claims Amount: $390.0 million - $600.0 million[6] | Each holder of a General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the QR Unsecured Creditor Liquidating Trust Share. | 8.7% to 13.4% plus (a) any recoveries on the QR Liquidating Trust Claims, including the Kingston Lien Avoidance Action and the other Avoidance Actions, (b) any distributions in respect of QR's allowed claim against QAG and (c) distributions under the Employee Settlement Agreement.[7] |

---

[6] This estimate does not include contingent or unliquidated claims. This estimate includes the $28.4 million Intercompany Claim of QNA against QR classified in Class 3A. For the purposes of this analysis, the Debtor-portion of tax obligations for wage-related claims is estimated at 8.0%.

[7] See "Summary of Legal Proceedings" below.

RLF1 4454759v. 14065862v

| | | | |
|---|---|---|---|
| 2B | General Unsecured Claims against QNA<br><br>Estimated Aggregate Claims Amount: $33.0 million - $35.0 million[8] | Each holder of a General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the QNA Unsecured Creditor Liquidating Trust Share. | 6.1% to 11.1% plus (a) any recoveries on the QNA Liquidating Trust Claims, including the QNA-Kingston Adversary Proceeding, the other Avoidance Actions and certain Other A/R Recovery Actions, (b) any distributions in respect of QNA's allowed claim against QAG or Patent Proceeds under the QAG Global Settlement;[9] and (c) distributions on QNA's Intercompany Claim against QR. |
| 3A | Intercompany Claims of QNA against QR<br><br>Aggregate Allowed Claim Amount: $28.4 million | QNA ~~'s Allowed Unsecured Claim will be included in Class 2A and~~ shall receive, in full and final satisfaction of ~~such~~ its Allowed Intercompany Claim against QR, its Pro Rata share of the QR Unsecured Creditor Liquidating Trust Share. | Same as Class 2A Estimated Recovery. |
| 3B | Intercompany Claims of QR against QNA<br><br>Allowed Claim Amount: $0.0 | Because the Debtors' books and records do not reflect the existence of any Claims of QR against QNA, and the Debtors and the Committee do not believe QR has any such valid Claims, there will be no Allowed Claims of QR against QNA under the Plan. | Not applicable. |
| 4A | Equity Interests in QR | Holders of Equity Interests in QR shall not receive or retain any property under the Plan in respect of such | 0% |

---

[8]   This estimate does not include contingent or unliquidated claims.  For the purposes of this analysis, the Debtor-portion of tax obligations for wage-related claims is estimated at 8.0%.

[9]   See "Summary of Legal Proceedings" below.

RLF1 4454759v. 14065862v

| | | Equity Interests. | |
|---|---|---|---|
| 4B | Equity Interests in QNA | Holders of Equity Interests in QNA shall not receive or retain any property under the Plan in respect of such Equity Interests. | 0% |

## C.    Sources and Uses of Cash

### 1.    QR

#### a.    Sources of Cash

The cash available in QR's estate to fund the Plan and the QR Liquidating Trust will come from:  (a) the remaining net Cash proceeds QR received from the sale of its assets, together with any interest thereon; (b) any recoveries on the QR Liquidating Trust Claims, including without limitation the Kingston Lien Avoidance Action, the IRB Avoidance Action and other Avoidance Actions; (c) any distributions in respect of QR's allowed claim in the QAG insolvency proceeding or in respect of the Employee Settlement Agreement; and (d) a Cash payment of approximately $218,750 from a proposed settlement with an affiliate.  See Sections IV.E and IV.F regarding "The Sale Process" and "Summary of Legal Proceedings."

QR currently estimates that, as of the Effective Date (which, for this purpose, is assumed to occur on October 15, 2011), it will have available Cash of $70.6 72.7 million,[10] not including restricted Cash of $42.5 40.4 million held in respect of the Kingston Lien Avoidance Action ($40.4 million) and certain Secured Claims ($2.1 million).

#### b.    Uses of Cash

QR's Cash as of the Effective Date will be used to fund the QR Liquidating Trust to enable the Liquidating Trustee to pay Liquidating Trust Expenses, Allowed DIP Claims, Allowed Administrative Expense Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims and Allowed Secured Claims, and to make distributions on Allowed General Unsecured Claims.  QR currently anticipates that available Cash will be applied initially as follows (in millions):

Estimated Available Cash ....................................................................... $72.7[11]

Estimated Funding of Liquidating Trust Expenses[12] .............................. ($11.9)

---

[10]   This amount is net of estimated accrued but unpaid Professional Fee Claims through October 15, 2011.

[11]   This amount is net of estimated accrued but unpaid Professional Fee Claims through October 15, 2011, it does not include the $40.4 million reserved for the Kingston Lien Avoidance Action.

[12]   This amount includes funds reserved to pay the fees of the Liquidating Trustee, post-Effective Date professional fees and all related expenses over the duration of the QR Liquidating Trust. These fees assume that all litigation is prosecuted through trial.  To the extent such fees and expenses are ultimately less than

Estimated Administrative Expense Claims..............................................($5.1)
Estimated Secured Claims ........................................................................($2.1)
Estimated Priority Tax Claims...................................................................($0.0)
Estimated Other Priority Claims...............................................................($1.0)

Estimated Cash Remaining ......................................................................$52.6

    Less Committee Financial Advisor Incentive Fee .............................($0.3)

Estimated Cash Remaining to Initially Fund QR Unsecured
    Creditor Liquidating Trust Share .......................................................$52.3[13]

## 2. QNA

### a. Sources of Cash

The cash available in QNA's estate to fund the Plan and the QNA Liquidating Trust will come from: (a) the remaining net Cash QNA has from the collection of its receivables and the collection of the G2 Arbitration Award, together with any interest thereon; (b) any recoveries from the QNA Liquidating Trust Claims, including without limitation the QNA-Kingston Adversary Proceeding or other collection actions,[14] and any Avoidance Recoveries from the Avoidance Actions; (c) any distributions on QNA's Allowed Claim against QR; (d) any distributions in respect of QNA's allowed claim in the QAG insolvency proceeding or in respect of Patent Proceeds under the QAG Global Settlement; and (e) a Cash payment of approximately $218,750 from a proposed settlement with an affiliate. See Sections IV.F and IV.G regarding "Summary of Legal Proceedings" and "Collection Actions."

QNA currently estimates that, as of the Effective Date (which, for this purpose, is assumed to occur on October 15, 2011), it will have available Cash of $~~21.3~~ 21.1 million.[15]

### b. Uses of Cash

---

this amount, such excess will be distributed to holders of Allowed General Unsecured Claims pursuant to the Plan.

[13] This amount does not include the proceeds of any additional distribution relating to the Employee Settlement Agreement because distributions to QR on account of the Employee Settlement Agreement are not expected to be made on the Effective Date. Based on the low-end of the recovery percentage range set forth in the table in Article I.B above, the distribution to QR under the Employee Settlement Agreement would be approximately $0.

[14] QNA currently has uncollected accounts receivable from various third parties. Although QNA is attempting to collect these amounts, there can be no assurance of collections on such amounts.

[15] This amount is (a) net of estimated accrued but unpaid Professional Fee Claims through October 15, 2011 and (b) includes ~~a~~ an estimated $1.4 million initial distribution on the Effective Date on account of QNA's Allowed Intercompany Claim against QR.

QNA's Cash as of the Effective Date will be used to fund the QNA Liquidating Trust to enable the Liquidating Trustee to pay Liquidating Trust Expenses, Allowed DIP Claims, Allowed Administrative Expense Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims and Allowed Secured Claims, and to make distributions on Allowed General Unsecured Claims. QNA currently anticipates that available Cash will be applied initially as follows (in millions):

| | |
|---|---|
| Estimated Available Cash | $21.1[16] |
| Estimated Funding of Liquidating Trust Expenses[17] | ($8.5) |
| Estimated Administrative Claims | ($0.1) |
| Estimated Secured Claims | ($0.0) |
| Estimated Priority Tax Claims | ($0.1) |
| Estimated Other Priority Claims | ($11.3) |
| Estimated Cash Remaining | $1.1 |
| Less Creditors' Committee Financial Advisor Incentive Fee | ($0.1) |
| Estimated Cash Remaining to Initially Fund QNA Unsecured Creditor Liquidating Trust Share | $1.0[18] |

## D.    Entities Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan. Holders of Claims or Interests that are not Impaired by the Plan are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan. Holders of Claims or Interests that will not receive a distribution or retain any property under the Plan are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan.

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in the Debtors. A Claim or Interest is placed in a

---

[16]    This amount is (a) net of estimated accrued but unpaid Professional Fee Claims through October 15, 2011 and (b) includes a an estimated $1.4 million initial distribution on the Effective Date on account of QNA's Allowed Intercompany Claim against QR.

[17]    This amount includes funds reserved to pay the fees of the Liquidating Trustee, post-Effective Date professional fees and all related expenses over the duration of the QNA Liquidating Trust. These fees assume that all litigation is prosecuted through trial. To the extent such fees and expenses are ultimately less than this amount, such excess will be distributed to holders of Allowed General Unsecured Claims pursuant to the Plan.

[18]    This amount includes a an estimated $1.4 million initial distribution on the Effective Date on account of QNA's Intercompany Claim against QR. Based on the low-end of the recovery percentage range set forth in the table in Article I.B above, the expected distribution to QNA on account of its Intercompany Claim against QR would be approximately an incremental $1.1 million.

particular Class for purposes of voting on the Plan and of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

| Summary of Classification and Treatment of Claims and Equity Interests | | | |
|---|---|---|---|
| **Class** | **Claim** | **Status** | **Voting Rights** |
| N/A | DIP Claims | Unimpaired | Not Entitled to Vote |
| N/A | Administrative Expense Claims | Unimpaired | Not Entitled to Vote |
| N/A | Professional Fee Claims | Unimpaired | Not Entitled to Vote |
| N/A | Priority Tax Claims | Unimpaired | Not Entitled to Vote |
| N/A | Other Priority Claims | Unimpaired | Not Entitled to Vote |
| 1A-1B | Secured Claims | Unimpaired | Deemed to Accept |
| 2A-2B | General Unsecured Claims | Impaired | Entitled to Vote |
| 3A-3B | Intercompany Claims | Impaired | Deemed to Accept |
| 4A-4B | Equity Interests | Impaired | Deemed to Reject |

The following sets forth the Classes that are entitled to vote on the Plan and the Classes that are not entitled to vote on the Plan:

➢ The Debtors are **NOT** seeking votes from the holders of Allowed DIP Claims, Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims and Other Priority Claims of Secured Claims in Classes 1A and 1B because those Classes, and the Claims of any holders in those Classes, are Unimpaired under the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, those Classes are conclusively presumed to have accepted the Plan.

➢ The Debtors are **NOT** seeking votes from the holders of Equity Interests in Classes 4A and 4B. Instead, the Debtors request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to Classes 4A and 4B. Classes 4A and 4B are Impaired and will receive no distribution under the Plan. Pursuant to section 1126(g) of the Bankruptcy Code, Classes 4A and 4B are presumed to have rejected the Plan.

➢ The Debtors **ARE** soliciting votes to accept or reject the Plan from holders of General Unsecured Claims in Classes 2A and 2B because Claims in Classes 2A and 2B are Impaired under the Plan and will receive distributions under the Plan. Accordingly, holders of Claims in Classes 2A and 2B have the right to vote to accept or reject the Plan.

➢ The Debtors are not seeking votes from holders of Claims in Classes 3A and 3B because each Debtor that would otherwise be entitled to vote to accept or reject the Plan as a holder of such a Claim will be deemed to have voted to accept the Plan.

RLF1 4454759v. 14065862v

**E. The Solicitation Process**

The following materials constitute the Solicitation Package:

o the Plan, the Disclosure Statement, and the Disclosure Statement Order (excluding the exhibits thereto) either on a CD-Rom or in paper format;

o a paper copy of the Confirmation Hearing Notice; and

      o paper copies of the appropriate Ballot, substantially in the form annexed as Exhibit 2 to the Disclosure Statement Order, voting instructions, a pre-addressed, postage pre-paid return envelope, and an appropriate letter explaining the solicitation process and urging the holders of Classes 2A and 2B Allowed General Unsecured Claims to vote to accept the Plan, substantially in the form annexed to the Disclosure Statement Order as Exhibit 3.

Holders of Class 2A and Class 2B General Unsecured Claims are entitled to vote to accept or reject the Plan and will be served with the Solicitation Package.

Holders of Allowed DIP Claims, Allowed Administrative Expense Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Class 1 Allowed Secured Claims and Class 4 Equity Interests are, pursuant to the Bankruptcy Code, deemed to either accept or reject the Plan and are therefore not entitled to vote. Holders of claims in such Classes, in lieu of the Solicitation Package, will receive (a) the Confirmation Hearing Notice and (b) the appropriate "Notice of Non-Voting Status."

Parties who wish to receive additional copies of these documents may request a copy from the Solicitation Agent (defined below) by writing to:

Qimonda Richmond, LLC Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014
New York, NY 10150-5014

or by calling (646) 282-2400. The Plan, the Disclosure Statement and the Disclosure Statement Order can also be obtained by any party by accessing the Debtors' web site at: http://dm.epiq11.com/qimonda.

**F. Voting Instructions**

The Debtors, with the approval of the Bankruptcy Court, have engaged Epiq Bankruptcy Solutions, LLC (the "Solicitation Agent") to assist in the solicitation process. The Solicitation Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process. The Solicitation Agent will

13

also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will file the Voting Report as soon as practicable before the Confirmation Hearing.

**Only the holders of Claims in Classes 2A and 2B are entitled to vote to accept or reject the Plan (other than Class 3A and 3B, which are deemed to vote in favor of the Plan), and they may do so by completing the Ballot and returning it in the envelope provided to the Solicitation Agent by the Voting Deadline (as defined below). Voting Instructions are attached to each Ballot.**

The deadline to vote on the Plan is **August 22, 2011 at 4:00 p.m. (the "Voting Deadline").**

Ballots must be actually received by the Solicitation Agent by the Voting Deadline by using the envelope provided, or by First Class Mail to:

> Qimonda Richmond, LLC Ballot Processing Center
> c/o Epiq Bankruptcy Solutions, LLC
> FDR Station, P.O. Box 5014
> New York, NY 10150-5014

If by hand delivery or overnight mail to:

> Qimonda Richmond, LLC Ballot Processing Center
> c/o Epiq Bankruptcy Solutions, LLC
> 757 Third Avenue, 3rd Floor
> New York, NY 10017

If you have any questions on the procedures for voting on the Plan, please call the Solicitation Agent at the following telephone number: (646) 282-2400.

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM, BUT WHICH DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR WHICH INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, SHALL NOT BE COUNTED.**

**EACH HOLDER OF A CLAIM MUST VOTE ALL OF THEIR CLAIMS WITHIN A PARTICULAR PLAN CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT THEIR VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM IN CLASSES 2A AND 2B WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.**

**ALL BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES. IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT.**

<u>For all Holders of Claims in Classes 2A and 2B:</u>

By signing and returning a Ballot, each holder of a Claim in Classes 2A and 2B will be certifying to the Bankruptcy Court and the Plan Proponents that, among other things,

> ➢ the holder has received and reviewed a copy of the Disclosure Statement and Solicitation Package and acknowledges that the solicitation is being pursuant to the terms and conditions set forth therein;

> ➢ the holder has cast the same vote with respect to all Claims in a single Class; and

> ➢ no other Ballots with respect to the amount of the Claims have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots are thereby revoked.

## G.     Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the bankruptcy court, after notice, to hold a hearing on confirmation of a plan filed under chapter 11 of the Bankruptcy Code. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

### 1.     Confirmation Hearing

**The Confirmation Hearing will commence on September 19, 2011 at 10:30 a.m.**, before the Honorable Mary F. Walrath, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 5th Floor, Courtroom 4, 824 Market Street, Wilmington, DE 19801.  The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on all Persons who have requested notice in these Chapter 11 Cases, and the Persons who have filed objections to the Plan ("<u>Plan Objections</u>"), without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may adopt additional procedures governing the Confirmation Hearing.  The Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Notice of the Confirmation Hearing will be provided in the manner prescribed by the Bankruptcy Court, and will also be available on the Debtors' website.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

### 2.     Plan Objection Deadline

The deadline for filing Plan Objections **August 22, 2011 at 4:00 p.m.** (the "Plan Objection Deadline").  All Plan Objections must be filed with the Bankruptcy Court and served on the Plan Proponents and certain other parties in accordance with the Disclosure Statement Order on or before the Plan Objection Deadline. In accordance with the Confirmation Hearing Notice filed with the Bankruptcy Court, Plan Objections or requests for modifications to the Plan, if any, must:

**a.** be in writing;

**b.** conform to the Bankruptcy Rules and the Local Bankruptcy Rules;

**c.** state the name, address and phone number of the objecting Person and the amount and nature of the Claim or Interest of such Person;

**d.** state with particularity the basis and nature of the Plan Objection and, if practicable, a proposed modification to the Plan that would resolve such Plan Objection; and

**e.** be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the "Notice Parties" identified in the Confirmation Hearing Notice on or prior to the Plan Objection Deadline.

The proposed schedule will provide Persons sufficient notice of the Plan Objection Deadline pursuant to Bankruptcy Rule 2002(b).  The Plan Proponents believe that the Plan Objection Deadline will afford the Bankruptcy Court, the Plan Proponents and other parties in interest reasonable time to consider the Plan Objections prior to the Confirmation Hearing.

**THE BANKRUPTCY COURT MAY NOT CONSIDER PLAN OBJECTIONS UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.**

## II.     BACKGROUND TO THESE CHAPTER 11 CASES

**A.     The Company's Business**

### 1.  Summary of the Company's Business

Prior to the Petition Date, the Debtors and various international affiliates, most of which are wholly owned direct and indirect subsidiaries of QAG (collectively, the "Global Companies"), designed memory technologies and developed, manufactured, marketed and sold a large variety of memory products on a module, component and chip level.  The Global Companies specialized in the production of dynamic random access memory ("DRAM").  The Global Companies had operations, investments and customers located mainly in Europe, Asia and North America.

Most of the Global Companies and their predecessors began operations as a part of Siemens AG's semiconductor group in 1999, when Siemens AG contributed substantially all of its semiconductor group to its subsidiary, Infineon Technologies AG ("Infineon").  Following the

formation of Infineon, the Global Companies continued operations collectively as the memory products segment of Infineon. Effective on May 1, 2006, Infineon and certain of its subsidiaries contributed substantially all of the assets, liabilities, operations and activities, as well as the employees, of their memory products segment to form the Global Companies. On August 9, 2006, Qimonda AG ("QAG") was listed on the New York Stock Exchange.

The Global Companies divided their DRAM production into front-end and back-end production lines. The Global Companies' front-end facilities were operated by subsidiaries in Dresden, Germany and Richmond, Virginia, and the back-end facilities were operated by subsidiaries in Germany, Portugal, China and Malaysia. In the front-end process, electronic circuits were produced on a silicon wafer, which involves several hundred process steps over a period of approximately two months in a clean room environment. QR's Richmond, Virginia facility produced DRAM chips from 200 millimeter and 300 millimeter wafers. Because of the very small geometries involved in wafer processing, highly complex and specialized equipment, materials and techniques are used. At the end of the front-end process, the chips were tested on the wafer for functionality. The back-end manufacturing required the packaging, assembling and testing of the chips. Once chips were complete, they were held in the Global Companies' distribution centers. QNA was responsible for, among other things, all sales to North American customers of the Global Companies' products.

### 2. Corporate Structure

The Debtors' ultimate corporate parent, QAG, is a majority-owned subsidiary of Infineon, which owns 77.5% of QAG. The remaining 22.5% of the shares of QAG are publicly owned. Qimonda Holding B.V., a Dutch company, is a wholly-owned subsidiary of QAG and is the direct parent of QNA.

### 3. Employees

As of the Petition Date, QNA employed approximately 879 hourly and salaried workers, down from 2,810 in October 2008. None of the employees were covered by collective bargaining agreements with labor unions. Currently, QNA only has two employees.

Although all employees were employees of QNA, a large majority of the employees worked in QR's Richmond, Virginia facility. As the employer, QNA administered and paid all salaries, wages and benefits. On a monthly basis, in the ordinary course, QNA charged QR for the employees that worked at QR's facility. As of the Petition Date, QR owed QNA an aggregate of $28,404,951 for employee-related costs and other cost-sharing items QNA had paid. Pursuant to the Plan, QNA will have an Allowed Intercompany Claim against QR for this amount, which is classified in Class 3A.

### B. Summary of Certain Prepetition Indebtedness and Financings

The Debtors' prepetition capital structure consisted primarily of several lease transactions in which QR is the lessee.

Prior to the Petition Date, QR was party to four separate leasing transactions and certain related security agreements: (i) a leveraged lease agreement between Wells Fargo Bank Northwest, National Association ("Wells Fargo"), as lessor, and QR, dated as of September 28, 2007 (as subsequently amended, the "Wells Fargo Agreement"); (ii) a master lease agreement between General Electric Capital Corporation ("GECC") and QR, dated as of December 21, 2007 (as subsequently amended, the "GECC Agreement"), (iii) a master lease agreement between RBS Asset Finance, Inc. ("RBS") and QR, dated as of December 21, 2007 (as subsequently amended, the "RBS Agreement"); (iv) a lease agreement between Overland Leasing Group LLC ("Overland") and QR, dated as of December 30, 2008 (as subsequently amended, the "Overland Agreement"); (v) a security agreement between Kingston Technology International Ltd. (and together with its affiliates, "Kingston") and QR, dated as of September 19, 2008 (as subsequently amended, the "Kingston Agreement"); and (vi) a security agreement between ABN AMRO Bank N.V. and QR, dated as of January 9, 2009 (the "ABN Agreement").

Prior to the Petition Date, the assets of QNA were unencumbered.

## 1. Leveraged Lease Transaction Involving 200mm Semiconductor Manufacturing Equipment

In 2007, QR entered into a $290 million leveraged lease transaction involving the sale and leaseback of certain of QR's 200mm semiconductor manufacturing equipment (the "200mm Leveraged Lease Transaction"). Macquarie Electronics USA Inc. ("Macquarie"), as the "equity participant" in connection with the 200mm Leveraged Lease Transaction, advanced approximately $48 million to partially fund the purchase of the equipment and if the lease was fully performed, would receive title to the equipment at the conclusion of the lease. Various lenders (the "Loan Participants") represented by Bank of Utah, as indenture trustee ("BU"), loaned the balance of the purchase price and were entitled to receive rent payments over a period of approximately four years to recover the principal amount of their loans plus interest at a fixed rate. The 200mm Leveraged Lease Transaction was structured through a trust created for this purpose, and Wells Fargo, as owner and trustee, took title to the equipment and leased the equipment back to QR pursuant to the Wells Fargo Agreement. Prior to the Petition Date, QR defaulted on the Wells Fargo Agreement. The status of the litigation relating claims filed in respect of the 200mm Leveraged Lease Transaction is described in the "Summary of Legal Proceedings" in Article IV.F.5.a.

## 2. Leveraged Lease Transactions Involving 300mm Semiconductor Manufacturing Equipment

### a. GECC

The GECC Agreement is a master lease agreement related to and secured by certain 300mm semiconductor manufacturing equipment that QR sold to GECC and then leased back (the "300mm Leveraged Lease Transaction"). Initially, GECC paid approximately $100 million to purchase the equipment from QR.[5] Prior to the Petition Date, QR defaulted on the GECC

---

[5] As discussed below, additional amounts were funded under a separate schedule to the GECC Agreement, which was subsequently assigned to RBS pursuant to the RBS Agreement.

Agreement and GECC terminated the GECC Agreement. The status of issues with GECC relating to the 300mm Leveraged Lease Transaction is described in the "Summary of Legal Proceedings" in Article IV.F.5.b.

      **b.**     **RBS**

RBS was the assignee of certain of GECC's obligations under the GECC Agreement and therefore leased certain 300mm semiconductor manufacturing equipment to QR pursuant to the RBS Agreement. QR's prepetition defaults under the GECC Agreement also resulted in defaults under the RBS Agreement. On September 9, 2009, the Bankruptcy Court entered an order authorizing QR to reject the RBS Agreement pursuant to section 365 of the Bankruptcy Code [Docket No. 696]. RBS filed claims against QR arising from QR's defaults under, and rejection of, the RBS Agreement. Throughout the Chapter 11 Cases, (a) RBS' asserted damages have been mitigated through the sale of certain of its equipment to third parties and (b) QR continued to house and maintain RBS's remaining equipment.

On May 24, 2010, the Bankruptcy Court approved a settlement agreement between QR and RBS that resulted in a complete resolution of the issues between the parties [Docket No. 1453]. Under the settlement (a) RBS is deemed to hold an (i) Allowed Administrative Expense Claim against QR equal to $2.15 million and (ii) Allowed General Unsecured Claim against QR equal to $7.75 million; (b) QR conveyed to RBS its remaining equipment (including certain additional, non-leased equipment over which RBS held a security interest); and (c) the parties mutually released one another.

### 3. Overland Lease Transaction Involving 300mm Semiconductor Manufacturing Equipment

The Overland Agreement is a master lease agreement related to and secured by certain equipment QR used to produce the 300mm wafers. On September 9, 2009, the Bankruptcy Court entered an order authorizing QR to reject the Overland Agreement pursuant to section 365 of the Bankruptcy Code [Docket No. 696]. Overland filed claims against QR arising from QR's defaults under, and rejection of, the Overland Agreement. Overland's asserted damages have been mitigated through the sale of certain of its equipment to third parties. The claims Overland has asserted against QR include: (a) a $4,262,316 of General Unsecured Claim arising from QR's rejection of the Overland Agreement and (b) a $2,843,974 ~~Other Priority~~ Administrative Expense Claim arising from postpetition rents, taxes and fees allegedly due to Overland. QR has not to date objected to Overland's claims. QR reserves all rights with respect thereto.

### 4. Kingston and ABN Lien Grants

Pursuant to the Kingston Agreement, on September 19, 2008, QR granted a security interest in certain 300mm equipment to Kingston as security for QAG's performance under a long term supply agreement between QAG and Kingston. Pursuant to the ABN Agreement, on January 9, 2009, QR granted a security interest in certain 300mm equipment to ABN as security related to an agreement between ABN and QAG. QR commenced adversary proceedings in the Bankruptcy Case to avoid the liens granted under the Kingston Agreement and the ABN Agreement. As described in Article IV.F.3, the Kingston avoidance action is still pending and the ABN avoidance action has been settled.

## III.     EVENTS LEADING TO THESE CHAPTER 11 CASES

Toward the end of March 2007, prices for DRAM products fell precipitously, driven by seasonal demand weakness, the effects of an earlier build-up of inventories at original equipment manufacturers and capacity conversions from NAND to DRAM by some competitors. During 2007 and through 2008, prices for DRAM fell further due to output growth across the industry driven mostly by capacity increases and technology conversions to more efficient technologies.

The Global Companies attempted to combat the falling prices by refocusing on a diversification strategy and implementing various restructuring programs. In addition, QAG sought financing as a consequence of further price declines in the DRAM market and QAG's need for continued productivity improvements. In December 2008, QAG announced a financing package lead by the German Free State of Saxony. Despite intensive and complex negotiations and financial support committed by customers, QAG could not consummate the rescue financing package. On January 23, 2009, QAG filed an application with the local court in Munich, Germany to open insolvency proceedings under the insolvency laws of Germany.

With QAG no longer purchasing output from QR, the Debtors could no longer fund ongoing operations in Richmond, Virginia. Consequently, the Debtors were compelled to ramp down all production at QR. Shortly thereafter, the Debtors initiated these Chapter 11 Cases.

## IV.     ADMINISTRATION OF THE CHAPTER 11 CASES

On February 20, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Bankruptcy Court. The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## A.     Relief Obtained at the Outset of These Chapter 11 Cases

On or shortly after the Petition Date, the Debtors filed several motions and applications seeking the entry of certain interim orders (collectively, the "First Day Orders") and final orders (collectively, the "Final Orders"), which were intended to facilitate the transition between the Debtors' prepetition and postpetition business operations by approving certain regular business conduct that may not be authorized specifically under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court.

### 1.  Stabilizing Operations

Recognizing that any interruption of the Debtors' business would negatively impact the Debtors' business, the Debtors filed a number of motions to stabilize operations. Thereafter, the Bankruptcy Court entered a number of "first day" orders granting the Debtors the authority to, among other things, continue certain existing cash management programs. Indeed, the relief granted by the Bankruptcy Court helped facilitate the Debtors' smooth transition into the Chapter 11 Cases, allowing the Debtors to continue their operations with minimal interruption and avoiding an unnecessary degradation of value of the Estates.

### a. Employee Compensation

The Debtors rely on their employees for their day-to-day business operations. The Debtors believed that absent the ability to honor prepetition wages, salaries, benefits, commissions and the like, their employees might have sought alternative employment opportunities, perhaps with the Debtors' competitors, thereby depleting the Debtors' workforce, hindering the Debtors' ability to meet their remaining customer obligations and likely diminishing the Debtors' ability wind-down their business and conduct an orderly sale process. The loss of valuable employees would have been distracting at a critical time when the Debtors were focused on stabilizing their operations. Accordingly, the Bankruptcy Court entered orders authorizing the Debtors to pay, among other amounts, certain prepetition claims and obligations for (1) wages, salaries and other compensation, (2) reimbursable employee expenses, and (3) employee medical and similar benefits for employees employed after the filing date [Docket Nos. 38 and 154, respectively].

### b. Fees and Taxes

The Debtors believed that, in some cases, certain governmental authorities had the ability to exercise rights that would be detrimental to the Debtors' restructuring if the Debtors failed to meet the obligations imposed upon them to remit certain taxes and fees. Therefore, the Debtors sought to eliminate the possibility of any unnecessary distractions. Accordingly, the Debtors sought, and the Bankruptcy Court entered, a First Day Order authorizing the Debtors to pay fees and taxes, including sales and use taxes and certain other governmental charges, as necessary or appropriate to avoid harm to the Debtors' business operations [Docket No. 34].

### c. Insurance Coverage

The Debtors believed that the maintenance, of and entry into, future insurance policies was critical to the preservation of the value of the Debtors' estates, and that payment of any unpaid prepetition amounts was necessary to keep their insurance policies in current effect and ensure that there were no inadvertent lapses in coverage. Accordingly, the Bankruptcy Court entered an order authorizing the Debtors to continue prepetition insurance coverage and enter into new insurance policies [Docket No. 35].

### d. Cash Management Systems

As part of a smooth transition into these Chapter 11 Cases and in an effort to avoid administrative inefficiencies, maintaining the Debtors' cash management system with a multitude of banks and various depository functions was of critical importance. Thus, the Debtors sought and the Bankruptcy Court entered an order authorizing the Debtors to continue using the existing cash management system, bank accounts and business forms and authorizing the Debtors to open new bank accounts. Further, the Court deemed the Debtors' bank accounts debtors-in-possession accounts and authorized the Debtors to maintain and continue using these accounts in the same manner and with the same account numbers, styles and document forms as those employed before the Petition Date. [Docket Nos. 33 and 153, respectively].

RLF1 4454759v. 14065862v

###### e. Utilities

Section 366 of the Bankruptcy Code protects debtors from utility service cutoffs upon a bankruptcy filing while providing utility companies with adequate assurance that the debtors will pay for postpetition services. The Debtors agreed to provide the utilities with a two-week deposit as the adequate assurance required by the Bankruptcy Code. Consequently, the Bankruptcy Court entered an order approving procedures for, among other things, determining adequate assurance for utility providers and prohibiting utility providers from altering, refusing or discontinuing services without further Bankruptcy Court order [Docket Nos. 43 and 155, respectively].

###### f. Customer Programs

Prior to the Petition Date, the Debtors engaged in customer programs such as warranty, price protection and rebate programs, and similar programs designed to develop customer loyalty, encourage repeat business and ensure customer satisfaction. The Debtors believed that these customer programs would assist them in retaining current customers and increasing revenue in the wind-down period. The continuation of these customer programs and retention of core customers was viewed as a critical element of maximizing the value of the Estates. The Bankruptcy Court entered an order authorizing the Debtors to continue their customer programs and honor certain prepetition commitments owed to customers up to $2.0 million [Docket No. 36].

##### 2. Debtor in Possession Financing and Use of Cash Collateral

As of the Petition Date, none of the Debtors' cash on hand was encumbered by any third-party lien. In order for the Debtors to have sufficient liquidity to effectuate an orderly sale process and wind down their business, on March 19, 2009, the Debtors sought approval to enter into a $40 million senior secured debtor in possession credit facility (the "DIP Facility") from a group of lenders (the "DIP Lenders") led by GB Merchant Partners, LLC (in such capacity, the "DIP Agent").

Henrico County, Virginia, the Indenture Trustee for the Wells Fargo Agreement, QAG and the Committee filed objections in connection with the interim approval of the DIP Facility [Docket Nos. 161, 162, 164 and 165, respectively].

On March 27, 2009, the Bankruptcy Court entered an order (the "Interim DIP Order") authorizing the Debtors to borrow up to $20 million on an interim basis under the DIP Facility [Docket No. 198]. In addition to approving the interim financing, the Bankruptcy Court authorized the Debtors to grant the DIP Agent first priority and junior liens on certain encumbered and unencumbered collateral and other additional rights provided in the Interim DIP Order.

After entry of the Interim DIP Order, the Debtors determined that in order to run a comprehensive sale process, the Debtors would need access to an addition $20 million over the $40 million already proposed. On May 7, 2009, the Bankruptcy Court entered a final order [Docket No. 335] (the "Final DIP Order") approving the $60 million DIP Facility.

On October 13, 2009, the Debtors used the proceeds from the sale of certain assets to completely pay-down the DIP Facility. On December 16, 2009, the Bankruptcy Court approved a Termination Agreement between the Debtors, the DIP Agent and DIP Lenders [Docket No. 987] (the "DIP Termination Agreement"). Among other things, the DIP Termination Agreement: (a) created a blocked cash collateral account in favor of the DIP Lenders and the DIP Agent to cover any post-termination indemnity obligations in favor of the DIP Lenders or the DIP Agent, which included a mechanism to incrementally (i) fund the account with the proceeds of the sales of collateral securing the DIP Facility and (ii) release funds in the account to the Debtors on an established timeframe; (b) specified certain terms to be included in a chapter 11 plan that would be acceptable to the DIP Lenders and the DIP Agent; (c) provided for the incremental release of the DIP Agent's liens and security interests in the Debtors' assets; and (d) specified the mechanics by which the documents governing the DIP Facility would terminate.

No post-termination indemnity obligations to the DIP Lenders have arisen to date, and the Debtors anticipate that the remaining cash collateral held by the DIP Lenders will be remitted to the Qimonda Liquidating Trusts shortly after the Effective Date.

[The DIP Agent and the DIP Lenders have informed the Debtors that the Plan, as filed with the Court on July __, 2011, is an "Acceptable Plan" (as defined in the DIP Termination Agreement).]

### 3. Employment and Compensation of Advisors

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Bankruptcy Court authorized the Debtors to retain and employ the following advisors:

- **a.** Simpson Thacher and Bartlett LLP and Richards, Layton and Finger, P.A. as bankruptcy and corporate counsel [Docket Nos. 149 and 157, respectively];

- **b.** Alvarez & Marsal North America LLC as restructuring and financial advisor [Docket No. 151];

- **c.** Epiq Bankruptcy Solutions, LLC as claims agent [Docket No. 32];

- **d.** Advanced Technology Resource Group Of CMN, Inc. d/b/a Colliers International, Gordon Brothers Commercial & Industrial, LLC and Emerald Technology Valuations, LLC as sales agents (collectively, the "Sales Agents") [Docket No. 284];

- **e.** McGuireWoods LLP as special Virginia Counsel and conflicts counsel [Docket Nos. 554 and 774, respectively];

- **f.** Morton G. Thalhimer, Inc. d/b/a Thalimer/Cushman & Wakefield as local real estate broker [Docket No. 555];

- **g.** Hengeler Mueller, Partnerschaft von Rechtsanwälten as their special German counsel [Docket No. 556];

**h.**     Elliott Greenleaf as special Delaware litigation counsel [Docket No. 775];

**i.**     Silverman Acampora LLP as special avoidance action counsel [Docket No. 1747];

**j.**     Pachulski Stang Ziehl & Jones LLP as special conflicts counsel [Docket No. 1965];

**k.**     C&W Consultants, Inc. as asset recovery consultant [Docket No. 1966]; and

**l.**     Wollmuth Maher & Deutsch LLP as special conflicts counsel [Docket No. 2324].

In addition, on March 17, 2009, the Bankruptcy Court entered an order approving certain procedures for the interim compensation and reimbursement of Retained Professionals in the Chapter 11 Cases [Docket No. 131].

## B.     Unsecured Creditors

### 1.     Appointment of the Committee

On March 5, 2009, the United States Trustee for the District of Delaware (the "UST") appointed the Committee pursuant to section 1102 of the Bankruptcy Code. The members of the Committee include: (a) Applied Materials, Inc.; (b) Sumco USA Sales Corporation; (c) Tokyo Electron Limited; (d) Siltronic Corporation; (e) Bonnie Lee Wright; (f) JSR Micro, Inc.; and (g) Air Products And Chemicals, Inc.

The Committee retained Jones Day as counsel, Ashby & Geddes, P.A., as Delaware counsel, and Imperial Capital, LLC as financial advisors. On April 20, 2009 and April 29, 2009, the Bankruptcy Court entered orders approving the retention of Jones Day and Ashby & Geddes, P.A. [Docket Nos. 289 and 311, respectively]. On May 15, 2009, the Bankruptcy Court entered an order approving the retention of Imperial Capital, LLC [Docket No. 370].

### 2.     Meeting of Creditors

The meeting of creditors pursuant to section 341 of the Bankruptcy Code was held on March 27, 2009 at 11:00 a.m. at J. Caleb Boggs Federal Building, 844 King Street, 2nd Floor, Room 2112, Wilmington, Delaware 19801. In accordance with Bankruptcy Rule 9001(5), a representative of the Debtors, and counsel to the Debtors, attended the meeting and answered questions posed by the UST and other parties in interest present at the meeting.

## C.     Schedules and Statements

On March 19, 2009, the Bankruptcy Court entered an order granting the Debtors an extension of time to file their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") [Docket No. 150]. On April 30, 2009, the Debtors filed their Schedules and Statements with the Bankruptcy Court [Docket Nos. 315-18]. On June 18, 2009, the Debtors filed amended Schedules and Statements [Docket Nos. 454-56].

**D.    Claims Bar Date**

By order dated June 26, 2009 [Docket No. 495], the Bankruptcy Court set August 20, 2009 as the general claims bar date and October 29, 2009 as the governmental claims bar date. The Debtors have received approximately 1,300 proofs of claim.

**E.    The Sale Process**

In light of QAG's determination to discontinue its business, the Debtors were compelled to wind-down their businesses and initiate a process to market and sell all of their assets to maximize returns for creditors.  To provide the Debtors with key strategic advice, the Debtors retained the Sales Agents to, among other things, prepare a comprehensive marketing strategy, implement a multi-phase sale process and assist the Debtors in executing one or more value maximizing transactions.

The Debtors' initial efforts during the sale process were focused on selling their Richmond, Virginia manufacturing facility (the "Facility") to a strategic purchaser as a "turn-key" operation.  Thereafter, the Debtors began a process to sell substantial portions of the Debtors' assets in multiple sale transactions.

The Bankruptcy Court approved the following sales of QR's assets pursuant section 363 of the Bankruptcy Code: (i) on September 24, 2009, the sale of 322 300mm semiconductor tools and certain supporting infrastructure to Texas Instruments Incorporated ("TI") for $172.5 million;[19] (ii) on March 16, 2010, the sale of (a) 34 300mm tools and other equipment to TI for $20.7 million; (b) one specialized 300mm tool to Global Alliance Tech., Ltd. for $7.8 million; and (c) the Facility and associated real estate to Richmond Semiconductor for $12.0 million; and (iii) on May 25, 2010, the sale of 19 300mm and 200mm semiconductor tools and various related assets to TI for $3.0 million.

In addition to the above mentioned sale transactions, the Debtors sold individual and smaller groups of assets pursuant to various court-approved procedures and auctions [Docket Nos. 158 and 1497].  Since the Petition Date, the Debtors have received approximately $11.9 million in proceeds from selling assets through such procedures and auctions.

Concurrent with the sale of the Facility to Richmond Semiconductor, QR entered into a lease of the Facility (the "Facility Lease") to allow the Debtors to complete the wind-down of their business and sell their remaining assets.  On August 27, 2010, QR exercised its right to terminate the Facility Lease.

---

[19]    All dollar amounts listed in this section are gross amounts.

**F.      Summary of Legal Proceedings**

**1.      Legal Proceedings Involving Affiliates**

**a.      The QAG Insolvency Proceedings**

On January 23, 2009, QAG filed an application to open insolvency proceedings with the insolvency court in Munich, Germany.  On April 15, 2009, the Munich court opened formal insolvency proceedings for QAG (the "QAG Insolvency Proceedings") and named Dr. Michael Jaffé as the insolvency administrator over the estate of QAG (the "QAG Administrator").

On June 15, 2009, the QAG Administrator filed a petition under chapter 15 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia (the "Virginia Bankruptcy Court") seeking recognition of the QAG Insolvency Proceedings as a "foreign main proceeding."  On July 22, 2009, the Virginia Bankruptcy Court entered an order recognizing the QAG Insolvency Proceedings as a foreign main proceeding (the "Chapter 15 Order").  In conjunction with the Chapter 15 Order, the Virginia Bankruptcy Court entered a Supplemental Order granting the Debtors relief from the automatic stay to proceed in the Bankruptcy Court in Delaware rather than Virginia to determine any right, obligation or claim they have against QAG, including, without limitation, the IP Adversary Proceeding (as defined below) that was then pending in the Bankruptcy Court.  The Supplemental Order, however, reserved QAG's right to object or argue that any particular controversy between QAG and the Debtors should be determined by a competent German court rather than the Bankruptcy Court.

**b.      The QAG Information Technology Settlement**

On September 21, 2009, QNA initiated an adversary proceeding in the Chapter 11 Cases against the QAG Administrator and QAG.  In the complaint, QNA sought to enjoin the QAG Administrator's threatened termination of QNA's access to the Global Companies' information technology systems, which, prior to the Petition Date and the initiation of QAG's insolvency proceedings, had operated as an integrated system.  Thereafter, on December 16, 2009, the Court approved an agreement setting forth a procedure by which the Debtors' data would be extricated from QAG's systems [Docket No. 989] (the "IT Settlement Agreement").  The IT Settlement Agreement provided for QNA's withdrawal of an adversary proceeding and motion to enforce the automatic stay it had previously filed relating to QNA's access to the information systems.

**c.      Bankruptcy/Insolvency Claims Between QAG and the Debtors**

QR and QNA filed proofs of claim against QAG in the QAG Insolvency Proceedings in amounts equal to $1,419,769.192 and $703,836,635,[20] respectively (collectively the "German Insolvency Claims").[21]      The German Insolvency Claims included, among others: (a)

---

[20]      While these claims were actually filed in Euros, the applicable amounts have been converted to United States Dollars based on the conversation rate as of March 31, 2009.

[21]      QR has also filed a proof of claim in the German insolvency proceedings of another QAG affiliate, Qimonda Dresden GmbH & Co. OHG ("QD"), in an amount equal to €127,980.

approximately $127 million of claims arising from intercompany loans made by QNA to QAG; (b) approximately $52 million of claims arising from QR's sale of wafers to QAG in the ordinary course of business; (c) approximately $783 million in fraudulent transfer claims relating to underpricing of wafers QR sold to QAG dating back to 2007; and (d) approximately $1 billion in cash sweep claims (approximately $900 million of which were contingent upon QAG successfully reversing the set-off of intercompany transactions in the pre-bankruptcy period under German insolvency law). The QAG Administrator objected to all of the German Insolvency Claims.

The QAG Administrator filed proofs of claim in these Chapter 11 Cases against QR and QNA in amounts equal to $1,199,614,656 and $539,346,406, respectively (the "QAG Claims").[22] The QAG Claims included, among others, (a) approximately $270 million in claims arising from trade receivables; (b) approximately $684 million in claims arising from intercompany loans made by QAG to QR; and (c) approximately $700 million in claims for the potential avoidance of the setoff of intercompany transactions that occurred within the 90 days preceding QAG's insolvency filing, which QAG alleged could be subject to claw back under German insolvency law. In 2010, the Debtors filed an adversary proceeding in the Chapter 11 Cases to, among other things, recharacterize or equitably subordinate the QAG claims (the "US Claims Litigation").

### d. The QAG Intellectual Property Litigation

The Committee, after an independent investigation and analysis, asserted that the Debtors owned certain intellectual property rights relating to DRAM technologies, the ownership of which was also being claimed by QAG. The Committee alleged that the Debtors were assigned certain rights when QAG and its subsidiaries, including the Debtors, were spun off from Infineon in May 2006. Further, the Committee alleged that following the May 2006 spin-off, QNA employees developed certain technologies and created certain inventions, filed related patent applications, and assigned their rights in such inventions and patents to QNA.

On July 19, 2009 the Bankruptcy Court approved a stipulation between the Debtors and the Committee granting the Committee standing to commence and prosecute an adversary proceeding in these Chapter 11 Cases against QAG for a declaratory judgment that the aforementioned intellectual property was property of the Debtors' Estates. [Docket No. 557]. Thereafter, the Committee commenced an adversary proceeding against the QAG Administrator on behalf of the estates in the Chapter 11 Cases (the "IP Adversary Proceeding", together with the US Claims Litigation German Insolvency Claims, the "Global Disputes"), seeking a declaration that the Debtors, and not QAG, owned certain patents and patent applications (the "Disputed Patents"). The QAG Administrator filed several counterclaims in the IP Adversary Proceeding, including a request for a declaratory judgment finding that the QAG Administrator owned the disputed intellectual property, in addition to claims of unjust enrichment and conversion against the Debtors.

---

[22] The QAG Administrator has also filed a proof of claim on behalf of QD against QR in an amount equal to $137,230.

### e. Global Settlement with QAG

To avoid expensive, complex and lengthy litigation, the Debtors, the QAG Administrator and the Committee mediated the Global Disputes. From July 6 through July 9, 2010, the Debtors, the QAG Administrator and the Committee engaged in mediation in London, England with the assistance of Otto L.O. de Witt Wijnen, an arbitrator and mediator with the International Chamber of Commerce. On July 9, 2010, the Debtors, the QAG Administrator and the Committee executed a binding term sheet, which, as described more fully below, outlined a global settlement of all outstanding issues between them (the "QAG Term Sheet").

The material terms of the global settlement are as follows:

- The German Insolvency Claims. The QAG Administrator allowed a EUR 69.7 million claim for QNA and a EUR 7.7 million claim for QR against QAG.[23] The Debtors agreed to withdraw and not assert the balance of their claims.

- The QAG Claims. The QAG Administrator withdrew, with prejudice, the QAG Claims against the Debtors and agreed not to assert the QAG Claims.

- The Cash Payment. QAG paid $8.0 million in cash to QNA.

- Quitclaim on Patents. The Debtors executed a quitclaim deed that conveyed all rights in the Disputed Patents to QAG and confirmed that QAG is the proper owner thereof.

- Sale of the Disputed Patents. In addition to the initial $8.0 million paid to QNA, QNA is entitled to a percentage of the gross proceeds QAG receives from any sale, licensing or other transaction with respect to the global patent portfolio (the "Patent Proceeds"). Specifically:

  o 7.5% of Patent Proceeds in excess of $100 million and up to $150 million;

  o 10.0% of Patent Proceeds in excess of $150 million and up to $200 million; and

  o 2.0% of Patent Proceeds in excess of $200 million.

- Litigation. The Debtors and the Committee withdrew, with prejudice, all pending litigation against QAG, including the US Claims Litigation and the IP Adversary Proceeding.

- Releases. The Debtors, the QAG Administrator and the Committee mutually released one another.

Elpida Memory, Inc. and Samsung Electronics Co. Ltd. (collectively, the "Objectors") objected to approval of the QAG Term Sheet. On August 19, 2010, the Bankruptcy Court entered an order approving the resolution of the Global Disputes on the terms of the QAG Term Sheet

---

[23] Based on listed exchange rates as of June 2, 2011, such amounts are approximately $100.7 million and $11.1 million, respectively.

[Docket No. 1692] (the "QAG Settlement Approval Order") and overruled the objections of the Objectors. At no time before or after entry of the QAG Settlement Approval Order did the Objectors seek or obtain a stay pending appeal. Thereafter, the Debtors, the QAG Administrator and the Committee consummated a settlement agreement incorporating the terms of the QAG Term Sheet and the QAG Settlement Approval Order. On September 14, 2010, the Objectors appealed the Settlement Approval Order to the United States District Court for Delaware. The appeal is pending.

      **f.**      **Settlement with Infineon**

Infineon is the majority owner of QAG, which is the Debtors' indirect parent company. Infineon and certain of its subsidiaries (collectively, but excluding QAG or any direct or indirect subsidiary or QAG, the "Infineon Parties") filed unsecured proofs of claim against QNA in the aggregate amount of approximately $4,795,024, plus unliquidated amounts, in connection with various prepetition agreements. The Infineon Parties also filed unsecured proofs of claim against QR in the aggregate amount of $7,500, plus unliquidated amounts, in connection with various prepetition agreements.

On February 18, 2011, QNA and QR commenced three separate adversary proceedings against certain of the Infineon Parties by filing complaints seeking to avoid and recover certain transfers as preferences under sections 547 and 550 of the Bankruptcy Code (Adversary Proceeding Nos. 11-5084 (MFW), 11-50846 (MFW), and 11-50848 (MFW)). QNA's complaint against one of the Infineon Parties, Infineon Technologies North America Corp. ("Infineon North America"), also asserted that certain prepetition transfers made by QNA to Infineon North America constituted constructive fraudulent transfers under section 548 of the Bankruptcy Code and applicable state law. QNA's complaint against Infineon North America sought to avoid and recover such alleged fraudulent transfers, and to equitably subordinate or disallow Infineon North America's claims against QNA. In the aggregate, QNA's complaints against the Infineon Parties sought to avoid and recover at least $1,915,348 from the Infineon Parties. QR sought to avoid and recover at least $281,133 from the Infineon Parties.

By Settlement Agreement and Mutual General Release dated as of June 6, 2011 (the "Infineon Settlement"), the Debtors and the Infineon Parties settled their various disputes in exchange for payment by the Infineon Parties of $437,500 (to be divided equally between QR and QNA), subject to approval by the Bankruptcy Court. Under the Infineon Settlement, all of the Infineon Parties' claims against the Debtors are disallowed in their entirety, and the Debtors and the Infineon Parties are to exchange mutual general releases. The occurrence of the effective date under the Infineon Settlement is conditioned upon, among other things, final approval of the Employee Settlement Agreement (as defined below), which contains a release by the employee-plaintiffs of claims against certain Infineon Parties. ~~A motion to approve~~ On June 23, 2011, the Bankruptcy Court entered an order approving the Infineon Settlement ~~was filed June 6, 2011~~[Docket No. 2381].

## 2. WARN Act Claims and Employee Severance Claims

On February 20, 2009, two Worker Adjustment and Retraining Notification Act ("WARN Act") cases were filed against the Debtors, which were consolidated into an amended

complaint (the "WARN Act Case").  In the WARN Act Case, the plaintiffs, on behalf of themselves and all former employees similarly situated, allege that the Debtors violated the federal WARN Act by failing to provide at least 60 days advance notice of their termination.[24] The potential class members include North Carolina and Virginia employees who were involuntarily terminated as a result of layoffs and plant closings on or about February 3, 2009. The plaintiffs seek as compensation 60 days of wages, benefits under the Employee Retirement Income Security Act of 1974, interest and attorneys' fees.  On July 8, 2009, the Debtors filed an answer to the first amended complaint, which asserted several affirmative defenses. Furthermore, on November 16, 2009, the Debtors filed an amended answer.

On February 22, 2009, Cheryl Maxey, Lawrence D. Meyer, Jacob Evans, and Claude Edmonds, on behalf of themselves and all others similarly situated  filed a complaint against the Debtors, claiming that, as a result of layoffs at various facilities of the Debtors throughout North America in late 2008 and early 2009, they and a class of similarly situated individuals were terminated without cause and without receiving severance that the Debtors were legally obligated to pay pursuant to written agreements, an ERISA plan, or a policy and practice of paying severance (the "Maxey Action").  The Debtors explained to the plaintiffs that the Debtors planned to assert various defenses to the claims raised in the Maxey Action.  No class has been certified in the Maxey Action.

On February 22, 2009, Brian Carey and John Earle, on behalf of themselves and all others similarly situated, filed a complaint against the Debtors, alleging that they and a class of similarly situated individuals were terminated without cause as a result of layoffs at QR's Sandston, Virginia facility in late 2008 or early 2009 (the "Carey Action").  In the Carey Action, the plaintiffs assert that each class member (1) was offered a separation agreement as part of that termination, which separation Agreement provided for severance payments upon signing a release of claims; (2) was offered a new position with one of the Debtors in exchange for declining to execute and return the separation agreement and release of claims and, thus, waiving a right to severance payments; (3) did not execute and return the separation agreement and, instead, accepted the new position; and (4) either never commenced employment in the new position or briefly commenced employment in the new position before being terminated again. The Debtors answered the complaint on April 23, 2009, denying liability and asserting various affirmative defenses.  No class has been certified in the Carey Action.

After engaging in a process to settle the WARN Act Case, the Maxey Action and the Carey Action, including a mediation process presided over by James L. Garrity, Jr., Esq., a former Judge of the U.S. Bankruptcy Court for the Southern District of New York, in May 2011, the Debtors, the Committee and the representatives of the WARN Act Case, the Maxey Action and the Carey Action agreed upon the terms of a settlement agreement (the "Employee Settlement Agreement").

The salient terms of the Employee Settlement Agreement are as follows:

---

[24] While the original complaint included a claim based on a California analog of the federal WARN Act, the Plaintiffs have withdrawn that claim.

The plaintiffs in each of the WARN Act Case, the Carey Action and the Maxey Action (collectively, the "Class Members") shall, collectively have:

- An Allowed Priority Claim against QNA in the total amount of $8.0 million. Of this amount, $4.5 million will be paid within five business days after the Employee Settlement Agreement becomes effective by its terms, and the remaining $3.5 million will be paid within five business days after the Effective Date. In the event QNA is unable to satisfy such claim at the time it is due, QR will be obligated to loan funds to QNA on an unsecured administrative claim basis to ensure such payments can be made when due. If QR is required to make such a loan, QR shall have an Allowed Administrative Expense Claim against QNA in respect of such loan for any such amounts paid, which can be paid after the Effective Date from proceeds, if any, from QNA's contingent assets or litigation claim recoveries.

- A $10 million Allowed General Unsecured Claim against QR.

- A $17 million Allowed General Unsecured Claim against QNA; provided that the first $1.75 million of any distributions made on account of this claim will be paid to the settlement administrator, for the benefit of the Class Members, and any distribution thereafter will be paid fifty percent (50%) to the settlement administrator, for the benefit of the Class Members, and fifty percent (50%) to QR.

Furthermore, the Settlement Agreement provides that the parties will allocate the cost of administering the payments and the cost of the "employer portion" of payroll taxes related to settlement distributions to the Class Members in the following manner: QNA's estate will pay the first $200,000 of these combined costs, with the remainder being shared equally between QNA's estate and the Class Members (each paying fifty percent (50%) of these costs), provided, however, that QNA's total contribution shall be no more than $300,000 inclusive of the initial $200,000 payment.

On June 7, 2011, the Bankruptcy Court preliminarily approved the Settlement Agreement [Docket No. 2238]. A final hearing to approve the Employee Settlement Agreement is currently scheduled for August 10, 2011.

### 3. Avoidance Actions

#### a. Preference Actions

Section 547 of the Bankruptcy Code allows a debtor to avoid certain "preferential" transfers made by the estate within 90 days or one year prior to the Petition Date, as applicable, where such transfers (i) were made for the benefit of a creditor, (ii) were on account of an antecedent debt, (iii) were made while the debtor was insolvent and (iv) would enable such creditor to receive more than such creditor would receive if (A) the case were a case under chapter 7 of the Bankruptcy Code, (B) the transfer had not been made and (C) such creditor received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

On February 3, 2011, the Bankruptcy Court entered an order authorizing the Debtors to abandon, as potential assets of the estates, certain potential preference actions where the Debtors, upon consultation with the Committee, determined that prosecution was unlikely to yield a net positive return to the estates [Docket No. 2054]. Thereafter, on or before February 20, 2011, the Debtors commenced approximately 30 avoidance actions pursuant to section 547 of the Bankruptcy Code (the "Preference Actions").

To date, none of the Preference Actions have reached the trial stage. Under the Plan, any and all rights and claims of the Estates against the defendants in the Avoidance Actions shall be preserved for pursuit by the Qimonda Liquidating Trusts.

### b. ABN AMRO

On January 9, 2009, QAG directed QR to enter into a security agreement (the "ABN Security Agreement") with ABN AMRO Bank N.V. ("ABN AMRO") whereby QR granted ABN AMRO a security interest in certain of its assets to secure QAG's obligations to ABN AMRO under a certain Credit Limit Agreement (the "Credit Limit Agreement"), up to €12,000,000. QR was not a party to or otherwise obligated under the Credit Limit Agreement.

On August 28, 2009, QR filed an adversary proceeding against ABN AMRO seeking to avoid the liens and obligations under the ABN Security Agreement as fraudulent conveyances (Adversary Proceeding No. 09-52136 (MFW) (the "ABN Adversary Proceeding")). On April 21, 2010, QR and The Royal Bank of Scotland N.V. (the successor in interest to ABN AMRO) entered into a settlement agreement resolving the ABN Adversary Proceeding whereby the liens were avoided and preserved for the benefit of QR's estate, and The Royal Bank of Scotland N.V. received an Allowed General Unsecured Claim in the QR bankruptcy case in the amount of $400,000. The settlement agreement was approved by the Bankruptcy Court by order entered May 24, 2010, and the ABN Adversary Proceeding was dismissed with prejudice.

### c. Kingston

In July 2007, Kingston and QAG entered into a Prepayment Agreement for Assurance of Supply dated as of July 25, 2007 (as amended, the "Prepayment Agreement") pursuant to which QAG agreed to deliver certain DRAM memory products (the "Product") to Kingston, and Kingston agreed to make a prepayment to QAG in the amount of $200,000,000 (the "Prepayment") on account of yet-to-be shipped Product. Under the terms of the Prepayment Agreement, the balance of the Prepayment was purportedly reduced to the extent that Product was received by Kingston or its affiliates from time to time after a certain date.

In September 2008, QAG directed QR to grant a security interest in certain of QR's assets to Kingston pursuant to a security agreement, dated as of September 19, 2008 (the "Kingston Security Agreement"), to secure QAG's obligations to Kingston under the Prepayment Agreement. On September 18, 2008, the Prepayment Agreement was amended. QR was not party to or otherwise obligated under the Prepayment Agreement.

Kingston filed a proof of claim against QR in the Bankruptcy Case asserting a secured claim in the amount of $111,229,032 on account of the Kingston Security Agreement (the

"Kingston Claim"). Under the terms of the Kingston Security Agreement, the Kingston Claim was limited to the value of collateral identified therein, and did not represent a recourse obligation of QR. Kingston has asserted that the entire Kingston Claim is a recourse obligation of QR.

On August 28, 2009, QR filed an adversary proceeding against Kingston seeking to avoid the liens and obligations under the Kingston Security Agreement as fraudulent conveyances, and objecting to the allowance of the Kingston Claim (Adversary Proceeding No. 09-52137 (MFW) (the "Kingston Lien Avoidance Action").

QR's assets that are the subject of the Kingston Security Agreement have been sold pursuant to sales conducted under section 363 of the Bankruptcy Code. By agreement with Kingston, and pursuant to the applicable orders of the Bankruptcy Court, approximately $40.4 million of proceeds of such sales have been segregated by QR, and Kingston's alleged lien has attached thereto, subject to the outcome of the Kingston Lien Avoidance Action.

Discovery has commenced in the Kingston Lien Avoidance Action and is expected to conclude in 2011. A trial date has not been set.

Under the Plan, any and all rights and claims of QR's estate against Kingston shall be preserved and pursued by the QR Liquidating Trust.

### 4. Claims Related to the Industrial Revenue Bonds

QR has commenced an adversary proceeding against Citibank, National Association ("Citibank") and U.S. Bank, National Association ("U.S. Bank") seeking to avoid and recover for the benefit of QR's estate over $33,000,000 in cash that QR transferred to, or for the benefit of, Citibank less than two months prior to QR's bankruptcy filing (the "IRB Avoidance Action"). In particular, QR seeks to avoid and recover the sum of $33,715,873, which Citibank debited from QR's bank account less than two months prior to QR's bankruptcy filing on account of reimbursement obligations under a letter of credit that Citibank previously issued to collateralize certain industrial revenue bonds. U.S. Bank was the successor indenture trustee for such bonds. QR alleges that Citibank and U.S. Bank are the transferees and/or beneficiaries of a preferential transfer or avoidable offset.

Through the IRB Avoidance Action, QR also seeks to avoid any security interest that Citibank may assert on (a) funds deposited into QR's account within the ninety (90) days prior to the bankruptcy filing, and (b) certain equipment pledged by QR in favor of Citibank in September 2008, approximately five months prior to QR's bankruptcy filing, for no consideration. Under the Plan, any and all rights and claims of QR's estate against Citibank and U.S. Bank shall be preserved and pursued by the QR Liquidating Trust.

### 5. Certain Litigation Relating to Leveraged Leases

#### a. 200mm Leveraged Lease Transaction

On May 6, 2009, the Bankruptcy Court entered an Order pursuant to section 365 of the Bankruptcy Code authorizing QR to reject the Wells Fargo Agreement, along with an associated participation agreement, which included certain potential indemnity obligations in favor of BU, Macquarie and Wells Fargo [Docket No. 334].

BU, Macquarie and Wells Fargo each filed an unsecured claim in respect of QR's rejection of the Wells Fargo Agreement and related agreements in the amounts of $212,887,333, $191,478,086 and $191,443,873, respectively. QR and the Committee believe these claims are substantially overstated and duplicative. QR and the Committee also believe fraudulent transfer claims exist against BU, Macquarie, Wells Fargo and/or the other Loan Participants relating to the obligations incurred or transfers made in connection with the 200mm Leveraged Lease Transaction. The parties have entered into a tolling agreement with respect to such claims. Under the Plan, any and all rights and claims of QR's estate against BU, Macquarie, Wells and/or the Loan Participants are preserved for pursuit by the QR Liquidating Trust.

On May 14, 2010, QR filed an objection to the claim of BU, asserting, among other things, that portions of the claim are invalid or overstated. On July 30, 2010, BU filed a response denying that any portions of its claims are invalid or overstated. The parties thereafter exchanged initial disclosures. Fact discovery, however, was subsequently stayed by agreement between the parties. On April 11, 2011, QR filed objections to the claims of Wells Fargo and Macquarie, asserting, among other things, that such claims are duplicative and should be disallowed [Docket Nos. 2210, 2211]. On May 26, 2011, Wells Fargo and Macquarie filed a joint response to QR's objection, asserting that the claims are not duplicative and that pursuant to the terms of the documents, such entities are entitled to the full amount of their asserted claim. ~~The parties are currently in discussions regarding~~ One June 23, 2011, the Bankruptcy Court entered an agreed consolidated discovery schedule with respect to the claims objections related to BU, Macquarie and Wells Fargo.

### b. GECC

Arising from QR's defaults of the GECC Agreement, GECC asserted duplicative claims against both QR and QNA in the amount of $93,865,390, which claims have been mitigated in part through the disposition of the equipment. The Debtors and GECC have been in discussions regarding GECC's claims in respect of the 300mm Leveraged Lease Transaction. The Debtors have asserted, among other things, that: (i) GECC does not have any valid claims against QNA, (ii) GECC's claims against QR are overstated, and (iii) fraudulent transfer claims may exist against GECC arising from the sale and leaseback transaction, including potential avoidance of the obligations owed thereunder as well as recovery of transfers made pursuant thereto. GECC disputes these assertions. The parties entered into a tolling agreement with respect to the fraudulent transfer claims. The Debtors intend to either negotiate a consensual resolution with GECC or object to GECC's claims at the appropriate time. Under the Plan, any and all rights and claims of Estates against GECC are preserved for pursuit by the Qimonda Liquidating Trusts.

### G. Collection Actions

### 1. The G2 Arbitration

34

Prior to the Petition Date, QNA sold to G2 Technology, Inc. ("G2") certain semiconductor memory products for resale. On May 29, 2009, QNA filed an arbitration demand with respect to approximately $8.4 million in outstanding invoices owed by G2. The G2 arbitration proceeded pursuant to an order of the Bankruptcy Court. G2 asserted numerous defenses and counterclaims to QNA's demand. Following the conclusion of extensive discovery and summary judgment proceedings, an arbitration hearing was conducting in February 2011. On April 15, the arbitrator issued his award in favor of QNA that directed G2 to pay QNA the sum of $8,401,240.42 plus interest from November 1, 2008 until paid, plus attorneys' fees and costs in the amount of $2,564,166.25. The arbitrator denied all of G2's counterclaims. On May 4, 2011, the Bankruptcy Court entered an order that confirmed the arbitration award and disallowed G2's proof of claim in its entirety [Docket No. 2252]. On May 10, 2011, G2 and QNA settled issues regarding the collection of the arbitration award, which, among other things, required G2 to pay to QNA $11.75 million in full satisfaction of the award. On June 7, 2011, the Bankruptcy Court approved the settlement [Docket No. 2336].

## 2. QNA-Kingston Adversary Proceeding

The Prepayment Agreement provided, among other things, that Kingston and any of its affiliates could offset against the Prepayment certain amounts owed to QAG or any of its affiliates under purchase orders submitted by Kingston. Kingston ordered Product from QNA using purchase orders, and QNA sold Product under the purchase order and then delivered invoices to Kingston pertaining to the amounts due. QNA was not a party to or otherwise obligated under the Prepayment Agreement. QNA received no amount of the Prepayment in cash from any entity.

Prior to September 2008, QNA delivered Product to Kingston and QNA was paid by Kingston for such Product. QAG did not pay or reimburse QNA on account of such Product, and Kingston did not offset any amounts from the Prepayment on account of such Product. However, from September 15, 2008 until January 2009, QNA delivered Product to Kingston but QNA was not paid by Kingston. The invoices pertaining to this Product were in excess of $89 million in the aggregate. Rather than paying QNA for such Product, Kingston purportedly "offset" such amounts owed to QNA against the Prepayment, and QAG purportedly "reimbursed" QNA for certain of such amounts.

However, for most, if not all, of the Product sold by QNA to Kingston from September 15, 2008 to January 2009, QNA believes that it never received any value because (i) Kingston did not pay QNA for any such Product, and (ii) QAG never effectuated a "reimbursement" that constituted value to QNA. In addition, with respect to certain invoices prior to September 15, 2008, on four occasions, QNA, at the direction of QAG, issued a credit memo for more than $3 million to Kingston, purporting to authorize Kingston to short pay those invoices and presumably set off the amounts against QAG's prepayment obligation. These credit memos aggregated over $13 million, and the vast majority of those amounts were not for the product discount QAG had agreed to under the Prepayment Agreement, but rather for a purported reduction of the QAG prepayment obligation.

On January 12, 2010, the Bankruptcy Court entered an Order (1) Approving a Stipulation Among the Debtors and the Official Committee of Unsecured Creditors Regarding Prosecution

of Certain Causes of Action Against Kingston Technology International Ltd. and (2) Granting the Committee Standing to Pursue Such Claims [Docket No. 1047]. Through such order, the Committee has been granted the authority to investigate and prosecute on behalf of the Debtors' Estates claims pertaining to amounts due and owing by Kingston to QNA and related to the Prepayment Agreement.

On February 18, 2011, the Committee, on behalf of QNA's estate, filed an adversary proceeding against Kingston seeking to recover the value of the Product sold to Kingston on account of breach of contract, as fraudulent conveyances or on account of other theories of liability (Adversary Proceeding No. 11-50848-MFW (the "QNA-Kingston Adversary Proceeding")). On May 6, 2011 Kingston filed an answer, denying all claims and requesting a jury trial.

Discovery has not yet commenced in the QNA-Kingston Adversary Proceeding, and a trial date has not yet been set. Under the Plan, any and all rights and claims of QNA's estate against Kingston shall be preserved and pursued by the ~~QR~~ QNA Liquidating Trust.

### 3. Other Collection Actions

The Debtors have outstanding receivables and claims against third parties that the Plan Proponents believe the Debtors are entitled to collect (the "Other A/R Recovery Actions"). The Debtors are currently investigating and/or pursuing the Other A/R Recovery Actions. The claims asserted in the Other A/R Recovery Actions aggregate up to $3.6 million plus interest, substantially all of which are claims held by QNA. Under the Plan, the Other A/R Recovery Actions shall be preserved and pursued by the Qimonda Liquidating Trusts.

### H. Google Motion for an Administrative Expense Claim

On October 30, 2009, Google, Inc. ("Google") filed a motion with the Bankruptcy Court seeking an Administrative Expense Claim for approximately $1.2 million against QNA [Docket No. 890]. In its motion Google asserted that its claim is entitled to administrative priority on account of QNA's alleged postpetition conversion of Google-owned semiconductor modules that Google had purchased from QNA prior to the Petition Date. Google had returned the modules to QNA prior to the Petition Date for testing, repair or replacement. QNA objected to Google's motion, in which it responded that to the extent it was liable to Google for any of the modules that had been returned to QNA for testing, repair or replacement, such obligation (or the failure to satisfy such obligation) constituted a general unsecured claim not entitled to administrative priority. On March 16, 2010, a hearing was held before the Bankruptcy Court. On August 3, 2010, the Bankruptcy Court sustained QNA's objection and denied Google's motion, holding that because Google did not have title to the modules when they were returned to QNA, no conversion claim can exist.

On June 1, 2011, the Bankruptcy Court entered an order approving a settlement between QNA and Google [Docket No. 2323]. Pursuant to the settlement, Google has an Allowed General Unsecured Claim against QNA in amount equal to $1,086,950.00 and an Allowed Administrative Expense Claim against QNA in amount equal to $37,500.00.

## I.    Other Matters

On May 13, 2009, Schenker, Inc. ("Schenker") filed a motion for relief from the automatic stay [Docket No. 348]. Schenker owned and operated a warehouse that was previously used by QR to store semiconductor components (the "Components"). Schenker alleged that it held a secured claim against QR (to the extent of a prepetition debt purportedly owed by QR) and sought relief from the automatic stay to liquidate the Components and credit the proceeds against QR's debt. Henrico County, Virginia ("Henrico") and QR filed objections to the motion [Docket Nos. 435 and 436, respectively]. The matter was resolved consensually and on August 19, 2009, the Court entered an order lifting the automatic stay to allow Schenker to liquidate the Components [Docket No. 634].

## V.    SUMMARY OF THE PLAN

### A.    General

If the Plan is confirmed, the Debtors remaining assets will be liquidated on an orderly basis and proceeds will be distributed to holders of Allowed Claims in accordance with the terms of the Plan. The Plan Proponents believe the Plan provides the best recoveries possible for holders of Allowed Claims and strongly recommend that, if such holders are entitled to vote, they vote to accept the Plan. The Plan Proponents believe that any alternative to confirmation of the Plan, such as conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or attempts by another party in interest to file a plan, would result in significant delays, litigation and additional costs and, ultimately, would lower the recoveries for Holders of Allowed Claims.

The Plan does not substantively consolidate the Debtors. Instead, the Plan separately classifies claims against QR and QNA, respectively. As discussed more fully in Article IV.C of the Plan, the Debtors will establish the Liquidating Trusts to pay all Allowed Claims entitled to receive cash distributions from the respective Debtors.

### B.    Overview of Chapter 11

Chapter 11 is the primary business reorganization chapter of the Bankruptcy Code and can be used to wind-down a debtor's operations and sell its assets in a way that promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the debtor's legal and equitable interests in property as of the commencement of the chapter 11 case. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim against or equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code, to the terms and conditions of the confirmed plan. Subject to certain limited exceptions, the order

RLF1 4454759v. 14065862v

issued by the bankruptcy court confirming a plan provides for the treatment of claims and equity interests in accordance with the terms of the confirmed plan and discharges a debtor from its prepetition obligations.

## C. Unclassified and Administrative Expense Claims and Priority Claims

### 1. DIP Claims

On the Effective Date, subject to the terms of the DIP Termination Agreement, (1) to the extent any obligations are outstanding and payable under the DIP Facility, including, without limitation, any DIP Contingent Liabilities that may have arisen prior to the Effective Date, all such outstanding and payable obligations shall (a) be allowed in an amount to be agreed upon by the Debtors and the holders of such Claims and (b) be paid in full in Cash or otherwise satisfied in a manner acceptable to the holders of such claims in accordance with the terms of the DIP Termination Agreement; (2) to the extent any DIP Contingent Liabilities arise on or after the Effective Date, such obligations shall, pursuant to section 364(c)(1) of the Bankruptcy Code, and notwithstanding anything in this Plan to the contrary, constitute Allowed superpriority claims and be payable from and have recourse to all unencumbered assets (and proceeds thereof) transferred to the Qimonda Liquidating Trusts; and (3) to the extent that this Plan, as confirmed, constitutes an "Acceptable Plan" under and as defined in the DIP Termination Agreement, within three (3) business days of notice of the Effective Date, the DIP Agent shall return to the Qimonda Liquidating Trusts any remaining cash collateral or expense deposits held by the DIP Agent or its designee pursuant to the terms of the DIP Termination Agreement.

### 2. Administrative Expense Claims

Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, unless otherwise agreed by the holder of an Administrative Expense Claim and the applicable Debtor or the Liquidating Trustee, each holder of an Allowed Administrative Expense Claim will be paid the full unpaid amount of such Allowed Administrative Expense Claim in Cash: (a) on the Effective Date or as soon as practicable thereafter, but in no event later than 30 days after the Effective Date (or, if not then due, when such Allowed Administrative Expense Claim is due or as soon as practicable thereafter, but in no event later than 30 days after such claim is due); (b) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter, but in no event later than 30 days after such Claim is Allowed; (c) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Liquidating Trustee, as the case may be; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided, however that Administrative Expense Claims do not include Claims filed after the Administrative Expense Claims Bar Date.

### 3. Professional Fee Claims

Subject to the provisions of sections 328, 330, 331 or 363 of the Bankruptcy Code and according to the priorities established pursuant to section 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, all Persons awarded compensation or reimbursement of expenses by the Bankruptcy Court in accordance with, shall be paid in full, in Cash, the amounts

allowed by the Bankruptcy Court (a) on or as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date upon which the Bankruptcy Court order allowing such Claim becomes a Final Order or (b) upon such other terms no more favorable to the claimant than as may be mutually agreed upon between such holder of an Allowed Administrative Expense Claim and the Debtors or the Liquidating Trustee, as the case may be.

### 4. Priority Tax Claims

On the later of the Effective Date or the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, or, in each such case, as soon as practicable thereafter, but in no event later than 30 days after such event, each holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date will receive Cash on account of such Claim an amount equal to the Allowed amount of such Claim

The holder of an Allowed Priority Tax Claim shall not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any Claim or demand for any such penalty shall be subject to treatment as a General Unsecured Claim.

### 5. Other Priority Claims

On or as soon as practicable after the Effective Date, but in no event later than 30 days after the Effective Date, unless otherwise agreed to by the holder an Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, one of the following treatments, in the sole discretion of the Debtors or the Liquidating Trustee, as the case may be: (a) full payment in Cash of its Allowed Other Priority Claim; or (b) treatment of its Allowed Other Priority Claim in a manner that leaves such Claim Unimpaired.

### 6. Bar Dates for Administrative Expense Claims

### a. General Administrative Bar Date Provisions

Requests for payment of Administrative Expense Claims other than:

1. DIP Claims;

2. Professional Fee Claims;

3. Administrative Expense Claims that have been Allowed on or before the Effective Date;

4. Administrative Expense Claims for an expense or liability incurred and payable in the ordinary course of business by a Debtor;

5. Administrative Expense Claims on account of fees and expenses incurred on or after the Petition Date by ordinary course professionals retained by the Debtors pursuant to an order of the Bankruptcy Court;

39

6. Administrative Expense Claims held by a current officer, director or employee of the Debtors for outstanding wages, commissions, accrued benefits, or reimbursement of business expenses;

7. US Trustee Fees; and

8. Postpetition Intercompany Claims

for the period from the Petition Date to the Effective Date must be filed with the Debtors' claims agent, Epiq Bankruptcy Solutions LLC (Qimonda Richmond, LLC Ballot Processing Center, c/o Epiq Bankruptcy Solutions, LLC, FDR Station, P.O. Box 5014, New York, NY 10150-5014) and served on the Liquidating Trustee and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court no later than 60 days after the Effective Date. Any holder of an Administrative Expense Claim for the period from the Petition Date to the Effective Date that is required to, but does not, file and serve a request for payment of such Administrative Expense Claim in accordance with V.C.6.a of the Plan will be forever barred from asserting such Administrative Expense Claim against the Debtors or their respective property or the Qimonda Liquidating Trusts or any assets of the Debtors' Estates, and such Administrative Expense Claims will be deemed waived and released as of the Effective Date. Objections to any Administrative Expense Claim must be filed by the Liquidating Trustee, and served on the requesting party by the later of: (a) 180 days after the Effective Date; and (b) 120 days after the filing of the request for payment of such Administrative Expense Claim. All US Trustee Fees shall be paid by the Debtors through the Effective Date and by the Qimonda Liquidating Trusts, in the ordinary course of business.

### b. Bar Date for Professional Fee Claims

Professionals or other entities asserting a Professional Fee Claim for services rendered solely with respect to a Debtor before the Effective Date must file and serve on the Liquidating Trustee and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or any other applicable order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than sixty (60) days after the Effective Date. Objections to any Professional Fee Claim must be filed and served on the Liquidating Trustee and the requesting party by the later of (a) ninety (90) days after the Effective Date or (b) thirty (30) days after the filing of the applicable request for payment of the Professional Fee Claim. To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Professional Fee Claims.

## D. Classification and Treatment of Classified Claims and Equity Interests

### 1. Classification and Treatment of Claims and Interests

#### a. Classes 1A and 1B – Secured Claims.

*Classification*:  Class 1A consists of Secured Claims against QR and Class 1B consists of Secured Claims against QNA.

*Treatment*: Each holder of an Allowed Secured Claim will be placed in a separate subclass, and each subclass will be treated as a separate Class for distribution purposes. On or as soon as practicable after the Effective Date, but in no event later than 30 days after the Effective Date, each holder of an Allowed Secured Claim shall receive, in full and final satisfaction of such Claim, in the sole discretion of the Debtors, except to the extent any holder of an Allowed Secured Claim agrees to a different treatment, either:

(1)         the collateral securing such Allowed Secured Claim;

(2)         Cash in an amount equal to the value of the collateral securing such Allowed Secured Claim; or

(3)         the treatment required under section 1124(2) of the Bankruptcy Code for such Claim to be reinstated or rendered Unimpaired.

*Voting*: Classes 1A and 1B are Unimpaired, and holders of Secured Claims are conclusively deemed to have accepted the Plan.

**b.      Classes 2A and 2B – General Unsecured Claims.**

*Classification*: Class 2A consists of General Unsecured Claims against QR and Class 2B consists of General Unsecured Claims against QNA.

*Treatment*: Each holder of a General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of QR Unsecured Creditor Liquidating Trust Shares or QNA Unsecured Creditor Liquidating Trust Shares, as applicable.

*Voting*: Classes 2A and 2B are Impaired, and holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

**c.      Classes 3A and 3B – Intercompany Claims.**

*Classification*: Class 3A consists of Intercompany Claims owed by QR to QNA and Class 3B consists of Intercompany Claims owed by QNA to QR.

*Treatment*: ~~Each holder of an Intercompany Claim~~ QNA shall receive, in full and final satisfaction of ~~such~~ its Allowed Intercompany Claim against QR of $28,404,951, its Pro Rata share of the QR Unsecured Creditor Liquidating Trust Share ~~or QNA Unsecured Creditor Liquidating Trust Share, as applicable~~. QR will have no Allowed Intercompany Claim against QNA. Upon entry of the Confirmation Order, the QNA Intercompany ~~Claims~~ Claim against QR shall be deemed to be Allowed.

*Voting*: Classes 3A and 3B are Impaired~~, and holders~~. Holders of Intercompany Claims~~,~~, as proponents of the Plan, are ~~entitled~~ deemed to vote to accept ~~or reject~~ the Plan.

**d.      Classes 4A and 4B – Equity Interests.**

41

*Classification*:  Class 4A consists of Equity Interests in QR and Class 4B consists of Equity Interests in QNA.

*Treatment*:  Holders of Equity Interests in QR and QNA shall neither receive nor retain any property under the Plan.

*Voting*:  Classes 4A and 4B are Impaired, and holders of Equity Interests are conclusively deemed to reject the Plan.

### 2. Non-Consensual Confirmation

Because certain Classes are deemed to have rejected the Plan, the Debtors and the Creditors' Committee will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors and the Creditors' Committee reserve the right to alter, amend, modify, revoke or withdraw the Plan in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

### 3. Solicitation of Debtors

Notwithstanding anything to the contrary herein, each Debtor that would otherwise be entitled to vote to accept or reject the Plan as a holder of a Claim against another Debtor shall not be solicited for voting purposes, and such Debtor will be deemed to have voted to accept the Plan.

### E. Means for Implementation of the Plan

### 1. Corporate Existence of the Debtors

As of the Effective Date, each of the Debtors will cease to exist and the QNA Liquidating Trust Assets and the QR Liquidating Trust Assets will be transferred to and vest in the each of the QNA Liquidating Trust and QR Liquidating Trust, respectively, free and clear of claims, liens and interests.  Except as otherwise provided in the Plan or the Liquidating Trust Agreement, the Liquidating Trustee may compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for Liquidating Trust Expenses, professionals' fees, disbursements, expenses or related support services (including fees related to the preparation of applications on account of Professional Fee Claims) without application to the Bankruptcy Court.

### 2. Appointment of a Liquidating Trustee and a Liquidating Trust Committee.

The Plan Proponents shall file a notice as part of the Plan Supplement designating (a) the Person who has been selected as the Liquidating Trustee and (b) the Persons who have been selected as the members of the Liquidating Trust Committee.  The Plan Proponents shall seek approval of the designation of the Liquidating Trustee and the members of the Liquidating Trust Committee at the Confirmation Hearing.  If such designations are approved by the Bankruptcy

Court, the Persons so designated shall be deemed appointed as Liquidating Trustee and the members of the Liquidating Trust Committee, as applicable, on the Effective Date. The Liquidating Trustee and the members of the Liquidating Trust Committee shall have and perform all of the duties, responsibilities, rights and obligations set forth in this Plan and the Liquidating Trust Agreement. Each member of the Liquidating Trust Committee will be entitled to vote on all matters, except as set forth in the Liquidating Trust Agreement.

The Liquidating Trustee shall be entitled to counsel for the Qimonda Liquidating Trusts.

The Liquidating Trustee shall serve at the direction of the Liquidating Trust Committee as set forth in the Liquidating Trust Agreement, provided, however, the Liquidating Trust Committee may not direct the Liquidating Trustee or the members of the Liquidating Trust Committee to act inconsistently with their duties under the Liquidating Trust Agreement and the Plan. The Liquidating Trust Committee may terminate the Liquidating Trustee in accordance with the provisions of the Liquidating Trust Agreement.

### 3. The Qimonda Liquidating Trusts

### a. Formation of the Qimonda Liquidating Trusts and Transfer of Liquidating Trust Assets

On the Effective Date, the Qimonda Liquidating Trusts shall be established pursuant to the applicable Liquidating Trust Agreement for the purpose of, among other things, (i) investigating, pursuing, litigating and, as applicable, settling, Liquidating Trust Claims, (ii) collecting, receiving, holding, maintaining, administering and liquidating the Liquidating Trust Assets, (iii) resolving all Disputed General Unsecured Claims, including objecting, prosecuting, settling and compromising in any manner approved by the Bankruptcy Court such Disputed General Unsecured Claims, except the Liquidating Trustee may, in its discretion, subject to any relevant provision of the Liquidating Trust Agreement, settle or compromise any Disputed General Unsecured Claim without Bankruptcy Court approval, (iv) resolving all Disputed Secured Claims, Disputed DIP Claims, Disputed Administrative Expense Claims, Disputed Professional Fee Claims, Disputed Priority Tax Claims and Disputed Other Priority Claims, including by objecting, prosecuting, settling, and compromising such Disputed Claims in any manner approved by the Bankruptcy Court, (v) paying all Liquidating Trust Expenses, (vi) making all Distributions to the holders of Allowed Claims from the Qimonda Liquidating Trusts as provided for in the Plan and the Liquidating Trust Agreement, (vii) closing the Chapter 11 Cases, and (viii) otherwise implementing the Plan and finally administering the Estates, all pursuant to and in accordance with the Plan and the Liquidating Trust Agreement. The Qimonda Liquidating Trusts have no objective to, and shall not, engage in a trade or business and shall conduct their activities consistent with the Plan and the Liquidating Trust Agreement.

On the Effective Date, the Debtors' Estates shall transfer and shall be deemed to have irrevocably transferred to the applicable Qimonda Liquidating Trust, for and on behalf of the Beneficiaries, with no reversionary interest in the Debtors, the Liquidating Trust Assets. In addition, the Debtors shall transfer to the Liquidating Trustee for benefit of the Qimonda Liquidating Trusts, the Debtors' evidentiary privileges, including the attorney/client privilege, as they relate to Liquidating Trust Assets, Claims of Beneficiaries and Disputed Claims, and shall

also transfer to the Liquidating Trustee for the benefit of the Qimonda Liquidating Trusts all of its books and records relating to Liquidating Trust Assets, Claims of Beneficiaries and Disputed Claims. Furthermore, the Creditors' Committee's counsel and financial advisor shall provide to the Liquidating Trustee (or such professionals designated by the Liquidating Trustee) documents and other information gathered, and relevant work product developed, during the Chapter 11 Cases in connection with its investigation of potential Liquidating Trust Claims, provided that the provision of any such documents and information shall be without waiver of any evidentiary privileges, including without limitation the attorney-client privilege, work-product privilege or other privilege or immunity attaching to any such documents or information (whether written or oral). The Plan shall be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for such relief. For purposes of this Article, books and records include computer generated or computer maintained books and records and computer data, as well as electronically generated or maintained books and records or data, along with books and records of any Debtor maintained by or in the possession of third parties, wherever located.

The Qimonda Liquidating Trusts and the Liquidating Trustee will each be a "representative" of the Estates under section 1123(b)(3)(B) of the Bankruptcy Code as provided in the Plan, and the Liquidating Trustee will be the trustee of the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), and, as such, the Liquidating Trustee succeeds to all of the rights, powers and obligations of a trustee in bankruptcy with respect to collecting, maintaining, administering and liquidating the Liquidating Trust Assets for the ratable benefit of the Beneficiaries. To the extent that any Liquidating Trust Asset cannot be transferred to the Qimonda Liquidating Trusts because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Liquidating Trust Asset shall be deemed to have been retained by the applicable Debtor and the Liquidating Trustee shall have been designated as a representative of the applicable Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to collect, maintain, administer and liquidate such Liquidating Trust Asset on behalf of such Estate.

Privileged communications may be shared among the Liquidating Trustee and the Liquidating Trust Committee without compromising the privileged nature of such communications, in accordance with the "joint interest" doctrine.

As soon as reasonably practicable after the Effective Date, (i) the Liquidating Trustee (in consultation with the Liquidating Trust Committee) shall determine the fair market value of the Liquidating Trust Assets as of the Effective Date, based on its good faith determination, and (ii) the Liquidating Trustee shall establish appropriate means to apprise the Beneficiaries of the grantor trust portion of the Qimonda Liquidating Trusts (as described in Article IV.C.6 of the Plan) of the valuation of such holder's interest in the Qimonda Liquidating Trusts. The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Qimonda Liquidating Trusts, the Beneficiaries and the Liquidating Trust Committee) for all federal income tax purposes.

Interests in the Qimonda Liquidating Trusts shall be uncertificated and shall be non-transferable except upon death of the interest holder or by operation of law. Holders of interests in the Qimonda Liquidating Trusts shall have no voting rights with respect to such interests. To

the extent applicable, the issuance of interests in the Qimonda Liquidating Trusts shall be exempt from any securities laws registration requirements to the fullest extent permitted by section 1145 of the Bankruptcy Code. The Qimonda Liquidating Trusts shall have a term of five (5) years from the Effective Date. Notwithstanding the foregoing, the Liquidating Trust Committee may extend such term <u>provided</u> that the Qimonda Liquidating Trusts do not become subject to the Securities Exchange Act of 1934 (as now in effect or hereafter amended) and <u>provided</u> <u>further</u> that the Bankruptcy Court approves an extension based upon a finding that an extension is necessary for the Qimonda Liquidating Trusts to resolve all Claims, reduce all Liquidating Trust Assets to Cash and liquidate.

### b. Funding of the Qimonda Liquidating Trusts

On the Effective Date, the Qimonda Liquidating Trusts shall be funded with the Liquidating Trust Assets and any net recoveries of Avoidance Actions obtained by the Debtors prior to the Effective Date, and thereafter, by the recoveries from Liquidating Trust Claims which may be pursued by the Liquidating Trustee as set forth in the Plan or by such other means as approved by the Liquidating Trust Committee, acting through a majority thereof.

### c. Rights and Powers of the Qimonda Liquidating Trusts and the Liquidating Trustee

The Liquidating Trustee shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code, and the right to seek testimony and the production of documents pursuant to of the Bankruptcy Rules, including the right to undertake the following actions and any other actions permitted under the Liquidating Trust Agreement: (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Liquidating Trust Agreement; (2) investigate, and if appropriate, pursue, commence, prosecute, appeal, settle, abandon or compromise any Liquidating Trust Claims (subject to certain limitations set forth in the Plan); (3) collect, receive, hold, maintain, invest, administer and liquidate the Liquidating Trust Assets; (4) calculate and make Distributions to holders of Allowed Claims and pay Liquidating Trust Expenses pursuant to the Plan and the Liquidating Trust Agreement; (5) establish and administer any Disputed Reserves; (6) object to Disputed Claims and, subject to any limitation set forth in the Plan, prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; (7) retain, employ and compensate professionals and other agents, <u>provided</u>, <u>however</u>, that any such compensation shall be made only out of the Liquidating Trust Assets, to the extent not inconsistent with the status of the Qimonda Liquidating Trusts as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d) for federal income tax purposes; (8) file all federal, state and local tax returns and pay any taxes of the Debtors and the Qimonda Liquidating Trusts required to be filed or paid by applicable law; and (9) otherwise implement the Plan and the Liquidating Trust Agreement and finally administer the Estates, including closing the Chapter 11 Cases and terminating and dissolving the Debtors and

ultimately, the Qimonda Liquidating Trusts; all pursuant to the Plan and the Liquidating Trust Agreement.

### d. Obligation of the Liquidating Trustee to Pay Claims under the Plan

All payments to be made under the Plan, including, without limitation, payments required to be made on the Effective Date to holders of Allowed Secured Claims, Allowed DIP Claims, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Professional Fee Claims or Allowed Other Priority Claims and on any Subsequent Distribution Date thereafter, shall be made by the Liquidating Trustee, except to the extent deemed made by the Debtors for tax purposes pursuant to Article IV.C.6 of the Plan.

### e. Distribution of Liquidating Trusts Assets

Distributions of the QNA Unsecured Creditor Liquidating Trust Share and QR Unsecured Creditor Liquidating Trust Share, as applicable, to holders of Allowed General Unsecured Claims, both as set forth in the Plan and the Liquidating Trust Agreement, shall be made by the Liquidating Trustee when the aggregate proceeds and income available for distribution are sufficient, in the Liquidating Trustee's sole and absolute discretion (after consultation with the Liquidating Trust Committee) to economically distribute monies, except to the extent deemed made by the Debtors for tax purposes pursuant to Article IV.C.6 of the Plan.

### f. Tax Treatment

Each Qimonda Liquidating Trust is intended to be treated for U.S. federal income tax purposes (i) in part as a grantor trust that is a liquidating trust within the meaning of Treasury Regulations § 301.7701-4(d), and (ii) in part as one or more disputed ownership funds within the meaning of Treasury Regulations § 1.468B-9(b)(1). For U.S. federal income tax purposes, the transfer of the Liquidating Trust Assets (to the extent not distributed to holders of Allowed Claims as of the Effective Date) to the respective Qimonda Liquidating Trust will be treated as a transfer of the Liquidating Trust Assets from the Debtors to the holders of Allowed Claims, subject to any liabilities of the Debtors or the respective Qimonda Liquidating Trust payable from the proceeds of such assets, followed by such holders' transfer of such assets (subject to such liabilities) to the respective Qimonda Liquidating Trust. The holders of Allowed Claims will thereafter be treated for U.S. federal income tax purposes as the grantors and deemed owners of their respective shares of the Liquidating Trust Assets (subject to such liabilities). Such holders of Allowed Claims shall include in their annual taxable incomes, and pay tax to the extent due on, their allocable shares of each item of income, gain, deduction, loss and credit, and all other such items shall be allocated by the Liquidating Trustee to such holders using any reasonable allocation method. Notwithstanding the foregoing, distributions made as of the Effective Date to holders of Allowed Claims are intended to be treated for U.S. federal income tax purposes as distributions directly from the Debtors to the holders of such Allowed Claims, and such holders shall include in their taxable incomes any interest earned on such distributions from the Effective Date to the date on which the actual distribution is made.

The Liquidating Trust Agreement will: (i) require that the Liquidating Trustee file income tax returns for each of the Qimonda Liquidating Trusts as a grantor trust (and file separate returns for the disputed ownership fund(s) pursuant to Treasury Regulations § 1.468B-9(b)(1)); (ii) pay all taxes owed by each Qimonda Liquidating Trust on any net income or gain of the Qimonda Liquidating Trust, including net income or gain of the disputed ownership fund(s), on a current basis from Liquidating Trust Assets; (iii) provide for consistent valuations for all Liquidating Trust Assets by the Liquidating Trustee and holders of Allowed Claims, and require that such valuations be used for all tax reporting purposes; (iv) limit the investment powers of the Liquidating Trustee in accordance with IRS Revenue Procedure 94-45; and (v) require that the Qimonda Liquidating Trusts, in accordance herewith, distribute at least annually all net income and the net proceeds from the sale or other disposition of all Liquidating Trust Assets in excess of amounts reasonably necessary to maintain the value of the remaining Liquidating Trust Assets and pay Liquidating Trust Expenses and Claims, including Disputed Claims.

### g. Fees and Expenses of the Qimonda Liquidating Trusts

Except as otherwise ordered by the Court, the Liquidating Trust Expenses on or after the Effective Date shall be paid from the Qimonda Liquidating Trusts in accordance with the Liquidating Trust Agreement without further order of the Bankruptcy Court; provided that the members of the Liquidating Trust Committee shall serve without compensation. The Debtors, the Liquidating Trustee, Liquidating Trust Committee and all professionals shall have no personal liability in the event there are insufficient funds to pay Liquidating Trust Expenses.

### 4. Directors/Officers/Equity/Debts of the Debtors on the Effective Date.

On the Effective Date, the authority, power and incumbency of the persons then acting as directors and officers of the Debtors shall be terminated and such directors and officers shall be deemed to have resigned or to have been removed without cause.

On the Effective Date, all Equity Interests in the Debtors (including all instruments evidencing such Equity Interests), and any other note, bond, indenture or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors (other than and expressly excluding the DIP Termination Agreement and the provisions of the DIP Facility and the other "Loan Documents" (as defined in the DIP Facility) that survived the Termination Date (as defined in the DIP Termination Agreement)), shall be deemed canceled and extinguished on the Effective Date (whether surrendered for cancellation or otherwise) without further action under any applicable agreement, law, regulation or rule, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged.

### 5. Liquidation of the Debtors

Except as otherwise provided in the Plan, upon the transfer pursuant to the Plan of the Liquidating Trust Assets to the Qimonda Liquidating Trusts, the Debtors will be deemed dissolved and their business operations withdrawn for all purposes without any necessity of filing any document, taking any further action or making any payment to any governmental authority in connection therewith. Notwithstanding the foregoing, as soon as practicable on or after the Effective Date, the Qimonda Liquidating Trusts, on behalf of the Debtors shall: (a) file

47

their certificates of dissolution, together with all other necessary corporate documents, to effect dissolution of the Debtors under the applicable laws of their states of incorporation; and (b) complete and file their final federal, state and local tax returns, and, in the discretion of the Liquidating Trustee, pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of each Debtor or its respective Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws. The filing of certificates of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders or the board of directors of each such Debtor and expressly without the need to pay any franchise or similar taxes in order to effectuate such dissolution. As of the Effective Date, the Qimonda Liquidating Trusts shall assume any outstanding responsibility of the Debtors under the Plan. All Claims against the Debtors are deemed fully satisfied, waived and released in exchange for the treatment of such Claims under the Plan, and holders of Allowed Claims against any Debtor shall have recourse solely to the applicable Liquidating Trust Assets for the payment or satisfaction of their Allowed Claims in accordance with the terms of the Plan.

### 6. Operations of the Debtors Between the Confirmation Date and the Effective Date

The Debtors shall continue to operate as Debtors in Possession during the period from the Confirmation Date through and until the Effective Date.

### 7. Term of Injunctions or Stays

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Cases are closed.

### 8. Creditors' Committee

As of the Effective Date, the Creditors' Committee shall dissolve, and its members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Cases. The retention and employment of the Retained Professionals retained by the Creditors' Committee shall terminate as of the Effective Date, provided, however, that the Creditors' Committee shall exist, and its Retained Professionals shall be retained and their fees and expenses paid by the Qimonda Liquidating Trusts after such date with respect to (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code, including responding to any objections to such applications, whether formal or informal, and attendance at any hearing with respect to the consideration of the applications; and (b) motions seeking the enforcement of the provisions of the Plan or the Confirmation Order.

### 9. Termination of Professionals

On the Effective Date, the engagement of each Retained Professional retained by either of the Debtors or the Creditors' Committee shall be terminated without further order of the Bankruptcy Court or act of the parties; provided, however, (a) such Retained Professional shall be entitled to prosecute their respective Professional Fee Claims and represent their respective

constituents with respect to applications for payment of such Professional Fee Claims, and (b) nothing herein shall prevent the Liquidating Trustee from retaining any such Retained Professional on or after the Effective Date, which retention shall not require Bankruptcy Court approval.

## 10. Post-Confirmation Reporting

After the Effective Date, the Liquidating Trustee shall (a) file unaudited reports of its activities and the financial affairs of the Qimonda Liquidating Trusts with the Bankruptcy Court on a quarterly basis, within thirty (30) days after the conclusion of each such quarterly period, (b) comply with the provisions of Section 3(b)(I)(iv) of the DIP Termination Agreement with respect to the monthly certificate described therein, in each case until the earlier of the entry of a final decree closing each of the Chapter 11 Cases, or a Bankruptcy Court order converting or dismissing each of the Chapter 11 Cases. Such filed unaudited quarterly reports (referenced in subclause (a) above) shall contain information regarding the liquidation or other administration of property comprising the Liquidating Trust Assets, the distributions made by the Liquidating Trustee and other matters required to be included in such reports in accordance with the Liquidating Trust Agreement and any applicable Bankruptcy Court and United States Trustee guidelines for such matters. In addition, the Liquidating Trustee of the Qimonda Liquidating Trusts will file tax returns provided in this Article IV of the Plan and in the Liquidating Trust Agreement.

## F. Provisions Governing Distributions

### 1. Distributions on the Effective Date and Initial Distribution Date

On the Effective Date or as soon thereafter as is reasonably practicable, the Debtors (in consultation with the Creditors' Committee) or the Liquidating Trustee (in consultation with the Liquidating Trust Committee), as applicable, shall make, or shall make adequate reserves for, the distributions required to be made under the Plan to holders of Allowed Secured Claims, Allowed DIP Claims, Allowed Administrative Expense Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims and Allowed Other Priority Tax Claims.

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Liquidating Trustee shall, after setting aside Cash for the Liquidating Trust Expenses, make the Initial Distribution.

### 2. Disputed Reserves

#### a. Establishment of Disputed Reserves

On the Effective Date or as soon thereafter as is reasonably practicable, the Debtors (in consultation with the Creditors' Committee) or the Liquidating Trustee (in consultation with the Liquidating Trust Committee), as applicable, shall establish a Disputed Reserve for Disputed Secured Claims, Disputed DIP Claims, Disputed Administrative Expense Claims, Disputed Professional Fee Claims, Disputed Priority Tax Claims and Disputed Other Priority Claims, which reserve shall be administered by the Liquidating Trustee. The Liquidating Trustee shall reserve in Cash or other property, for distribution on account of each Disputed Secured Claim,

Disputed DIP Claim, Disputed Administrative Expense Claim, Disputed Professional Fee Claim, Disputed Priority Tax Claim and Disputed Other Priority Claim, the Face Amount with respect to each such Disputed Claim.

On the Initial Distribution Date, and after making all Distributions to Beneficiaries required to be made on such date under the Plan, the Liquidating Trustee shall establish a separate Disputed Reserve for Disputed General Unsecured Claims, which Disputed Reserve shall be administered by the Liquidating Trustee. The Liquidating Trustee shall reserve in Cash or other property, for Distribution on account of each Disputed General Unsecured Claim, the full amount distributable with respect to the asserted amount (or such lesser amount as may be estimated by the Court) with respect to each Disputed Claim.

### b. Maintenance of Disputed Reserves

To the extent that the property placed in a Disputed Reserve consists of Cash, that Cash shall be deposited in an interest-bearing account. The property in the Disputed Reserves shall be held in trust for the benefit of the holders of Claims ultimately determined to be Allowed. Each Disputed Reserve shall be closed and extinguished by the Qimonda Liquidating Trusts when all Distributions and other dispositions of Cash or other property required to be made hereunder will have been made in accordance with the terms of the Plan. Upon closure of a Disputed Reserve, all Cash (including any investment yield on the Cash) or other property held in that Disputed Reserve shall revest in and become the property of the Qimonda Liquidating Trusts. All funds or other property that vest or revest in the Qimonda Liquidating Trusts pursuant to this paragraph shall be (a) used to pay and create an adequate reserve for future Liquidating Trust Expenses, and (b) thereafter distributed on a Pro Rata basis to holders of Allowed Claims in accordance with the terms of the Plan.

### 3. Subsequent Distributions

Any Distribution that is not made on the Effective Date or the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by the Qimonda Liquidating Trusts in a Disputed Reserve pursuant to Article V.B of the Plan and distributed (in full, in the case of Secured Claims, DIP Claims, Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims or Other Priority Claims; and up to its ratable proportion with respect to the Claims in Class 2A-B or Class 3A-B) on the first Subsequent Distribution Date after such Claim is Allowed or, with respect to Secured Claims, DIP Claims, Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims and Other Priority Claims, at such earlier date as determined by the Liquidating Trustee; provided that prior to making any distribution on a Subsequent Distribution Date, the Liquidating Trustee shall adjust the reserve of Cash for Liquidating Trust Expenses (whether upward or downward) in his or her sole discretion. No interest shall accrue or be paid on the unpaid amount of any distribution paid on a Subsequent Distribution Date in accordance with Article V.C. of the Plan.

### 4. Record Date for Distributions

Except as otherwise provided in a Final Order of the Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the date of the entry of the Confirmation Order will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the date of the entry of the Confirmation Order. The Liquidating Trustee shall have no obligation to recognize any transfer of any Claim occurring after the date of the entry of the Confirmation Order. In making any Distribution with respect to any Claim, the Liquidating Trustee shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of Claim filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the date of the entry of the Confirmation Order and upon such other evidence or record of transfer or assignment that are known to the Liquidating Trustee as of the date of the entry of the Confirmation Order.

### 5. Delivery of Distributions

#### a. General Provisions; Undeliverable Distributions

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made by the Liquidating Trustee at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim filed by such holder or (b) the last known address of such holder if no proof of claim is filed or if the Debtors or Liquidating Trustee have been notified in writing of a change of address. If any Distribution is returned as undeliverable, the Liquidating Trustee may, in his or her discretion, but is not obligated to, make such efforts to determine the current address of the holder of the Claim with respect to which the Distribution was made as the Liquidating Trustee deems appropriate, but no Distribution to any holder shall be made unless and until the Liquidating Trustee has determined the then-current address of the holder, at which time the Distribution to such holder shall be made to the holder without interest. Amounts in respect of any undeliverable Distributions made by the Liquidating Trustee shall be returned to, and held in trust by, the Liquidating Trustee until the Distributions are claimed or are deemed to be unclaimed property upon the expiration of four (4) months from the return of the undeliverable Distribution, as set forth below in V.F.5.c of the Plan. The Liquidating Trustee shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible.

#### b. Minimum Distributions

Notwithstanding anything herein to the contrary, if a distribution to be made to a holder of an Allowed General Unsecured Claim on the Initial Distribution Date or any subsequent date for such Distributions would be $100 or less, no such Distribution is required to be made to that holder.

#### c. Unclaimed Property

Except with respect to property not distributed because it is being held in a Disputed Reserve, Distributions that are not claimed by the expiration of four (4) months from the date the Distribution is made, will be deemed to be unclaimed property under section 347(b) of the

Bankruptcy Code and shall vest or revest in the Qimonda Liquidating Trusts, and the Claims with respect to which those Distributions are made shall be automatically cancelled. After the expiration of that four (4) month period, the claim of any Entity to those Distributions shall be discharged and forever barred. Nothing contained in the Plan shall require the Liquidating Trustee to attempt to locate any holder of an Allowed Claim. All funds or other property that vests or revests in the Qimonda Liquidating Trusts pursuant to this Article shall be distributed by the Liquidating Trustee to the other holders of Allowed Claims in accordance with the provisions of the Plan or the Liquidating Trust Agreement.

### 6. Surrender of Cancelled Instruments and Securities

#### a. Generally

As a condition precedent to receiving any Distribution hereunder on account of an Allowed Claim evidenced by instruments, securities or other documentation cancelled, the holder of such Claim shall tender such instrument, security or other documentation evidencing such Claim to the Qimonda Liquidating Trusts. Any Distributions pursuant to the Plan on account of any Claim evidenced by such instruments, securities or other documentation shall, pending such surrender, be treated as an undeliverable Distribution; provided, however, all notes, instruments and other securities issued under the DIP Facility shall be deemed terminated and cancelled upon the Effective Date to the extent not already surrendered and cancelled.

#### b. Failure to Surrender Cancelled Instruments

If any holder of an Allowed Claim evidenced by instruments, securities or other documentation cancelled, fails to surrender such instrument, security or other documentation within one year after the Effective Date, its Claim for a Distribution under the Plan on account of such instrument, security, or other documentation shall be discharged, and such holder shall be forever barred from asserting such Claim against the Qimonda Liquidating Trusts or its property. In such case, any property held on account of such Claim shall be disposed.

### 7. Lost, Stolen, Mutilated or Destroyed Instrument or Security

Any holder of an Allowed Claim evidenced by instruments, securities or other documentation cancelled that has been lost, stolen, mutilated or destroyed, shall, in lieu of surrendering such instrument, security or documentation deliver to the Qimonda Liquidating Trusts (i) an affidavit of loss reasonably satisfactory to the Liquidating Trustee setting forth the unavailability of such instrument, security, or other documentation and (ii) such additional security or indemnity as may reasonably be requested by the Liquidating Trustee to hold the Qimonda Liquidating Trusts harmless from any damages, liabilities, or costs incurred in treating such Entity as a holder of an Allowed Claim.

RLF1 4454759v. 14065862v

**8. Manner of Cash Payments Under the Plan or the Liquidating Trusts Agreement**

Cash payments made pursuant to the Plan or the Liquidating Trust Agreement shall be in United States dollars by checks drawn on a domestic bank selected by the Qimonda Liquidating Trusts or by wire transfer from a domestic bank, at the option of the Liquidating Trustee.

**9. Time Bar to Cash Payments by Check**

Checks issued by the Liquidating Trustee on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for the reissuance of any check that becomes null and void shall be made directly to the Liquidating Trustee by the holder of the Allowed Claim to whom the check was originally issued. Any Claim in respect of such voided check shall be made in writing on or before the later of the first anniversary of the Effective Date or the four (4) month anniversary of the date on which the Distribution was made. After that date, all Claims in respect of void checks shall be discharged and forever barred and the proceeds of those checks shall revest in and become the property of the Qimonda Liquidating Trusts as unclaimed property in accordance with section 347(b) of the Bankruptcy Code and be distributed.

**10. Limitations on Funding of Disputed Reserves**

Except as expressly set forth in the Plan, neither the Debtors, the Creditors' Committee, the Qimonda Liquidating Trusts nor the Liquidating Trustee shall have any duty to fund the Disputed Reserves.

**11. Withholding and Reporting Requirements**

In connection with the Plan, to the extent applicable, the Liquidating Trustee in its capacity as a disbursing agent under the Plan or any third party disbursing agent acting at the direction of the Liquidating Trustee (each a "Disbursing Agent") will comply with all applicable tax withholding and reporting requirements imposed on it or the Qimonda Liquidating Trusts by any governmental unit, and all Distributions pursuant to the Plan will be subject to applicable tax withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, each Disbursing Agent will be authorized to take any actions that may be necessary or appropriate to comply with such tax withholding and reporting requirements, including, without limitation, liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms the Disbursing Agent believes are reasonable and appropriate, including requiring Claim holders to submit appropriate tax and withholding certifications. To the extent any Claim holder fails to submit appropriate tax and withholding certifications as required by the Disbursing Agent, such Claim holder's Distribution may, in the Disbursing Agent's reasonable discretion, be deemed undeliverable.

Notwithstanding any other provision of the Plan, each Entity receiving (or deemed to receive) a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental unit on account of the Distribution, including income, withholding and other tax obligations.

The Debtors and the Disbursing Agent reserve the right to allocate and distribute all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens and similar encumbrances.

**12. No Payments of Fractional Dollars**

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

**13. Interest on Claims**

Except as specifically provided for in the Plan or the Confirmation Order or required by applicable law, interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after that Disputed Claim becomes an Allowed Claim. Except as expressly provided herein or in a Final Order of the Court, no Claim shall be Allowed to the extent that it is for postpetition interest or other similar charges.

**14. Setoff and Recoupment**

The Liquidating Trustee may, but shall not be required to, setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any claims or defenses of any nature whatsoever that any of the Debtors, the Estates or the Liquidating Trustee may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors, the Estates or the Liquidating Trustee of any right of setoff or recoupment that any of them may have against the holder of any Claim

**15. Insurance Preservation and Proceeds**

Nothing in the Plan, including any releases, shall diminish or impair the enforceability of any policies of insurance that may cover claims against the Debtors or any other Person. Holders of Claims which are eligible to be satisfied, in whole or in part, through any such policy shall be obligated, as a condition to receiving any Distributions under the Plan, to seek recovery or assist the Debtors in seeking recovery under such policies with regard to such Claims.

**16. Application of Distributions**

To the extent applicable, all Distributions to a holder of an Allowed Claim shall apply first to the principal amount of such Claim until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date, and the remaining portion of such Distributions, if any, shall apply to any interest accrued on such Claim after the Petition Date (but only to the extent otherwise provided under the Plan)

G. **Procedures for Resolving Disputed, Contingent and Unliquidated Claims or Equity Interests**

1. **No Distribution Pending Allowance**

Notwithstanding any other provision of the Plan, the Qimonda Liquidating Trusts shall not distribute any Cash or other property on account of any Disputed Claim unless and until such Claim becomes Allowed.

2. **Resolution of Disputed Claims**

Notwithstanding any other provision of the Plan, the Qimonda Liquidating Trusts shall not distribute any Cash or other property on account of any Disputed Claim unless and until such Claim becomes Allowed.

3. **Objection Deadline**

All objections to Disputed Claims shall be filed and served upon the holders of each such Claim by the Claims Objection Deadline, unless otherwise ordered by the Court after notice and a hearing.

4. **Estimation of Claims**

At any time, (a) prior to the Effective Date, the Debtors, and (b) subsequent to the Effective Date, the Liquidating Trustee may request that the Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Qimonda Liquidating Trusts have previously objected to such Claim or whether the Court has ruled on any such objection, and the Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. If the Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Court. If the estimated amount constitutes a maximum limitation on the Claim, the Debtors or the Qimonda Liquidating Trusts, as applicable, may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Court.

5. **Disallowance of Claims**

Except as otherwise agreed, or ordered by the Bankruptcy Court, any and all proofs of Claim filed after the applicable Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice or action, order or approval of the Bankruptcy Court, and holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation Hearing the Bankruptcy Court has entered an order deeming such

Claim to be timely filed; provided that nothing herein shall be deemed to disallow or otherwise expunge any such claim set forth on the Schedules, which is not disputed, contingent or unliquidated.

## H.    Treatment of Executory Contracts and Unexpired Leases

### 1.    Rejection of Executory Contracts and Unexpired Leases

The Plan shall constitute a motion to reject all executory contracts and unexpired leases not previously rejected pursuant to an order of the Bankruptcy Court unless otherwise set forth in the Plan Supplement, and the Debtors shall have no further liability thereunder.  The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code and that the rejection thereof is in the best interest of the Debtors, their Estates and all parties in interest in the Chapter 11 Cases.

### 2.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Claims created by the rejection of executory contracts and unexpired leases pursuant to V.H.1 of the Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Debtors and the Creditors' Committee no later than thirty (30) days after the entry of the Confirmation Order by the Bankruptcy Court.  Any Claims arising from the rejection of an executory contract or unexpired lease for which proofs of claim are not timely filed within that time period will be forever barred from assertion against the Debtors, the Estates, their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction.  Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan.

## I.    Conditions Precedent to the Effective Date

The following are conditions precedent to the Effective Date that must be satisfied or waived:

1.    The Confirmation Order has become a Final Order.

2.    The Confirmation Order shall be in full force and effect.

3.    The Liquidating Trust Agreement shall have been executed.

4.    The Liquidating Trustee shall have been appointed and shall have accepted such appointment.

5.    The members of the Liquidating Trust Committee shall have been appointed and shall have accepted such appointment.

Notwithstanding the foregoing, the Debtors and the Creditors' Committee reserve the right to waive the occurrence of any condition precedent to the Effective Date or to modify any of the foregoing conditions precedent. Any such written waiver of a condition precedent set forth in this Article may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## J.  Release, Exculpation, Injunction and Related Provisions

~~**1.  Releases**~~

**1.  _a._Release by Debtor Exculpated Parties of DIP Released Parties**.

~~*As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, any other Debtor Exculpated Party and any Person seeking to exercise the rights of the Estates, in each case, whether individually or collectively, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to forever release, waive, and discharge the DIP Released Parties of all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, Causes of Action, and liabilities which the Debtors, any other Debtor Exculpated Party or the Estates are entitled to assert, including, without limitation, any derivative Claims asserted on behalf of the Debtors, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission, transaction, or occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases or the Plan (other than the rights under the Plan and the contracts, releases, and other agreements or documents delivered or to be delivered hereunder); provided, however, that nothing contained herein is intended to operate as a release of any potential claims based upon gross negligence or willful misconduct.*~~

*AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE DEBTORS, ANY OTHER DEBTOR EXCULPATED PARTY AND ANY PERSON SEEKING TO EXERCISE THE RIGHTS OF THE ESTATES, IN EACH CASE, WHETHER INDIVIDUALLY OR COLLECTIVELY, INCLUDING, WITHOUT LIMITATION, ANY SUCCESSOR TO THE DEBTORS OR ANY ESTATE REPRESENTATIVE APPOINTED OR SELECTED PURSUANT TO SECTION 1123(B)(3) OF THE BANKRUPTCY CODE, SHALL BE DEEMED TO FOREVER RELEASE, WAIVE, AND DISCHARGE THE DIP RELEASED PARTIES OF ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, REMEDIES, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, AND LIABILITIES WHICH THE DEBTORS, ANY OTHER DEBTOR EXCULPATED PARTY OR THE ESTATES ARE ENTITLED TO ASSERT, INCLUDING, WITHOUT LIMITATION, ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING*

*OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS, THE ESTATES, THE CONDUCT OF THE DEBTORS' BUSINESSES, THE CHAPTER 11 CASES OR THE PLAN (OTHER THAN THE RIGHTS UNDER THE PLAN AND THE CONTRACTS, RELEASES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED OR TO BE DELIVERED HEREUNDER); PROVIDED, HOWEVER, THAT NOTHING CONTAINED HEREIN IS INTENDED TO OPERATE AS A RELEASE OF ANY POTENTIAL CLAIMS BASED UPON GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.*

**b.** **Release by Committee Exculpated Parties of DIP Released Parties.**

*As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Committee Exculpated Parties shall be deemed to forever release, waive, and discharge the DIP Released Parties of all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, Causes of Action, and liabilities which the Committee Exculpated Parties are entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission, transaction, or occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases or the Plan (other than the rights under the Plan and the contracts, releases, and other agreements or documents delivered or to be delivered hereunder); provided, however, that nothing contained herein is intended to operate as a release of any potential claims based upon gross negligence or willful misconduct.*

**c.** **Releases by DIP Released Parties of Exculpated Parties.**

*As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the DIP Released Parties shall be deemed to forever release, waive, and discharge the Exculpated Parties of all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, Causes of Action, and liabilities which the DIP Released Parties are entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission, transaction, or occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the DIP Facility, the DIP Termination Agreement, the Chapter 11 Cases or the Plan (other than the rights under the Plan and the contracts, releases, and other agreements or documents delivered or to be delivered hereunder); provided, however, that nothing contained herein is intended to operate as a release of any potential claims based upon gross negligence or willful misconduct.*

## 2. Exculpation

*Subject to certain exceptions, the Exculpated Parties shall neither have nor incur any liability to any Entity for any and all Claims, Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity,*

*whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances taking place or arising from and after the Petition Date related in any way to the Debtors, including, without limitation, those that any of the Debtors would have been legally entitled to assert (whether individually or collectively) or that any holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of any of the Debtors or the Estates and further including those in any way related to the Liquidating Trust Agreement, Chapter 11 Cases, or the Plan, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, DIP Facility, the Liquidating Trust Agreement or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other postpetition act taken or omitted to be taken in connection with the Debtors; provided, however, that such exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, however, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents.*

*SUBJECT TO ARTICLE IX.G OF THE PLAN, THE EXCULPATED PARTIES SHALL NEITHER HAVE NOR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY AND ALL CLAIMS, CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES TAKING PLACE OR ARISING FROM AND AFTER THE PETITION DATE RELATED IN ANY WAY TO THE DEBTORS, INCLUDING, WITHOUT LIMITATION, THOSE THAT ANY OF THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF ANY OF THE DEBTORS OR THE ESTATES AND FURTHER INCLUDING THOSE IN ANY WAY RELATED TO THE LIQUIDATING TRUST AGREEMENT, CHAPTER 11 CASES, OR THE PLAN, INCLUDING ANY ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR RELATED TO, FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, CONFIRMING OR CONSUMMATING THE PLAN, THE DISCLOSURE STATEMENT, DIP FACILITY, THE LIQUIDATING TRUST AGREEMENT OR ANY OTHER CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY OTHER POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH THE DEBTORS; PROVIDED, HOWEVER, THAT SUCH EXCULPATION SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; PROVIDED, FURTHER, HOWEVER, THAT EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF*

### 3. Preservation of Causes of Action

#### a.      Vesting of Causes of Action

Except as otherwise provided in the Plan or the Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code any and all Liquidating Trust Claims that the Debtors' Estates may hold against any Person, together with proceeds of the foregoing, if any, are reserved for, assigned to, and shall become property of the Qimonda Liquidating Trusts, respectively, on the Effective Date.

Except as otherwise provided in the Plan, Confirmation Order or the Liquidating Trust Agreement, after the Effective Date, the Liquidating Trustee shall have the exclusive right to institute, prosecute, abandon, settle, or compromise any Liquidating Trust Claims, in its sole discretion and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases.

#### b.      Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action against any Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors expressly reserve such Cause of Action, including all Liquidating Trust Claims to be transferred by the Debtors to the Qimonda Liquidating Trusts pursuant to the Plan, which include without limitation the Avoidance Actions, the Kingston Lien Avoidance Action, the IRB Avoidance Action, the QNA-Kingston Adversary Proceeding, the Other A/R Recovery Actions, any claims related to the 200mm Leveraged Lease Transaction and the 300mm Leveraged Lease Transaction, and potential claims and causes of actions against directors and officers related to breaches of duty related to, among other things, the granting of liens against the estates, for possible adjudication by the Liquidating Trustee, and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Causes of Action have been released in the Plan or any other Final Order (including the Confirmation Order).  In addition, the Qimonda Liquidating Trusts reserve the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that any such obligation, transfer, or transaction may be reviewed by the Qimonda Liquidating Trusts subsequent to the Effective Date and may be the subject of an

action after the Effective Date, regardless of whether: (i) such Entity has filed a proof of claim against the Debtors in the Chapter 11 Cases; (ii) the Debtors or the Qimonda Liquidating Trusts have objected to any such Entity's proof of claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtors or the Qimonda Liquidating Trusts have objected to any such Entity's scheduled Claim; or (v) any such Entity's scheduled Claim has been identified by the Debtors or the Qimonda Liquidating Trusts as disputed, contingent, or unliquidated.

### 4. Releases of Liens

Except as otherwise provided in the Plan, or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, liens, pledges or other security interests against property of the Estates shall be fully released and discharged and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens, pledges or other security interest, except as set forth in the following proviso, shall revert to the Debtors and the Qimonda Liquidating Trusts; provided, however, and notwithstanding the foregoing, (a) the liens of the DIP Agent, for the benefit of itself and the DIP Lenders, on any remaining cash collateral or expense deposits held pursuant to the DIP Termination Agreement or otherwise shall be deemed released or extinguished on the Effective Date if and to the extent that this Plan, as confirmed, constitutes an "Acceptable Plan" as defined in the DIP Termination Agreement, and (b) no interest or right of the DIP Agent or the DIP Lenders under the DIP Termination Agreement or the provisions of the DIP Facility or the other "Loan Documents" (as defined in the DIP Facility) that survived the Termination Date (as defined in the DIP Termination Agreement) other than the liens which are released in accordance with the terms of subclause (a) above, shall be deemed released, terminated or otherwise extinguished by the provisions of Article IX.D of the Plan.

### 5. Injunction

(a) From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtors, the Creditors' Committee, the Qimonda Liquidating Trusts or the Liquidating Trustee, their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order.

(b) Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtors, the Estates, the Creditors' Committee, the Qimonda Liquidating Trusts, the Liquidating Trustee, their successors and assigns, and their assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

(c) The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Equity Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtors or any of their assets or properties. On the Effective Date, all such Claims against, and Equity Interests in, the Debtors shall be satisfied and released in full.

(d) Except as otherwise expressly provided for in the Plan or with respect to obligations issued pursuant to the Plan, all Parties and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released hereby, from:

- commencing or continuing in any manner any action or other proceeding of any kind against any Debtor, the Qimonda Liquidating Trusts or the Liquidating Trustee, their successors and assigns, and their assets and properties;

- enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Debtor, the Qimonda Liquidating Trusts or the Liquidating Trustee, their successors and assigns, and their assets and properties;

- creating, perfecting, or enforcing any encumbrance of any kind against any Debtor, the Qimonda Liquidating Trusts or the Liquidating Trustee or the property or estate of any Debtor or the Qimonda Liquidating Trusts;

- asserting any right of subrogation against any Debtor, the Qimonda Liquidating Trusts or the Liquidating Trustee or against the property or estate of any the Debtors or the Qimonda Liquidating Trusts, except to the extent a permissible right of subrogation is asserted with respect to a timely filed proof of claim; or

- commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder.

(e) Notwithstanding any provision in the Plan or the Confirmation Order to the contrary, nothing contained in the Plan or the Confirmation Order shall extinguish, impact, or release any right of setoff, recoupment, or subrogation of any kind (a) held by any creditor or vendor which is asserted in a timely filed proof of claim or timely filed objection to the Plan or (b) that is or may be asserted as an affirmative defense or other defense to a Cause of Action or claim asserted by a Debtor or the Qimonda Liquidating Trusts against such creditor or vendor.

(a) FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE DEBTORS, THE CREDITORS' COMMITTEE, THE QIMONDA LIQUIDATING TRUSTS OR THE LIQUIDATING TRUSTEE, THEIR SUCCESSORS AND ASSIGNS, AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

(b) EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE ESTATES, THE CREDITORS' COMMITTEE, THE

QIMONDA LIQUIDATING TRUSTS, THE LIQUIDATING TRUSTEE, THEIR SUCCESSORS AND ASSIGNS, AND THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED PRIOR TO THE EFFECTIVE DATE.

(c) THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND EQUITY INTERESTS IN THE PLAN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND EQUITY INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS OR PROPERTIES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS SHALL BE SATISFIED AND RELEASED IN FULL.

(d) EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR WITH RESPECT TO OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PARTIES AND ENTITIES ARE PERMANENTLY ENJOINED, ON AND AFTER THE EFFECTIVE DATE, ON ACCOUNT OF ANY CLAIM OR EQUITY INTEREST SATISFIED AND RELEASED HEREBY, FROM:

- COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST ANY DEBTOR, THE QIMONDA LIQUIDATING TRUSTS OR THE LIQUIDATING TRUSTEE, THEIR SUCCESSORS AND ASSIGNS, AND THEIR ASSETS AND PROPERTIES;

- ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST ANY DEBTOR, THE QIMONDA LIQUIDATING TRUSTS OR THE LIQUIDATING TRUSTEE, THEIR SUCCESSORS AND ASSIGNS, AND THEIR ASSETS AND PROPERTIES;

- CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST ANY DEBTOR, THE QIMONDA LIQUIDATING TRUSTS OR THE LIQUIDATING TRUSTEE OR THE PROPERTY OR ESTATE OF ANY DEBTOR OR THE QIMONDA LIQUIDATING TRUSTS;

- ASSERTING ANY RIGHT OF SUBROGATION AGAINST ANY DEBTOR, THE QIMONDA LIQUIDATING TRUSTS OR THE LIQUIDATING TRUSTEE OR AGAINST THE PROPERTY OR ESTATE OF ANY THE DEBTORS OR THE QIMONDA LIQUIDATING TRUSTS, EXCEPT TO THE EXTENT A PERMISSIBLE RIGHT OF SUBROGATION IS ASSERTED WITH RESPECT TO A TIMELY FILED PROOF OF CLAIM; OR

- COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND IN RESPECT OF ANY CLAIM OR

EQUITY INTEREST OR CAUSE OF ACTION RELEASED OR SETTLED HEREUNDER.

(e) NOTWITHSTANDING ANY PROVISION IN THE PLAN OR THE CONFIRMATION ORDER TO THE CONTRARY, NOTHING CONTAINED IN THE PLAN OR THE CONFIRMATION ORDER SHALL EXTINGUISH, IMPACT, OR RELEASE ANY RIGHT OF SETOFF, RECOUPMENT, OR SUBROGATION OF ANY KIND (A) HELD BY ANY CREDITOR OR VENDOR WHICH IS ASSERTED IN A TIMELY FILED PROOF OF CLAIM OR TIMELY FILED OBJECTION TO THE PLAN OR (B) THAT IS OR MAY BE ASSERTED AS AN AFFIRMATIVE DEFENSE OR OTHER DEFENSE TO A CAUSE OF ACTION OR CLAIM ASSERTED BY A DEBTOR OR THE QIMONDA LIQUIDATING TRUSTS AGAINST SUCH CREDITOR OR VENDOR.

## 6. Termination of All Employee and Workers' Compensation Benefits

Except as otherwise provided in the Liquidating Trust Agreement, all existing employee benefit plans and workers' compensation benefits not previously expired or terminated by the Debtors will be terminated on or before the Effective Date.

## 7. Exclusions and Limitations on ~~Releases and~~ Exculpation

Notwithstanding anything in the Plan to the contrary, no provision of the Plan or the Confirmation Order, including, without limitation, the exculpation provision contained in Article IX.B of the Plan (other than and expressly excluding the releases set forth in Article IX.A of the Plan, which releases shall be unaffected by the provisions of Article IX.G of the Plan), shall (a) modify, release or otherwise limit the liability of any Person who is, or becomes, the subject of a Liquidating Trust Claim (to the extent, and only to the extent, related to such Liquidating Trust Claim), or (b) modify, release or otherwise limit the liability of any Person not specifically released or exculpated hereunder, including, without limitation, any Person ~~that is a co-obligor or joint tortfeasor of a DIP Released Party or~~ that is otherwise liable under theories of vicarious or other derivative liability or that is a non-Debtor third party guarantor of any obligation of the Debtors.

## K. Retention of Jurisdiction

After the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and the Plan as is legally permissible, including, but not limited to, jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Expense Claim and Professional Fee Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

2. grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3. resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to any amendment to the Plan after the Effective Date;

4. ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5. decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date or instituted by the Qimonda Liquidating Trusts after the Effective Date, including any Liquidating Trust Claims;

6. to hear and determine disputes (i) arising in connection with the interpretation, implementation or enforcement of the Qimonda Liquidating Trusts or the Liquidating Trust Agreement or (ii) arising out of or related to the issuance of any subpoenas or requests for examination pursuant to Bankruptcy Rule 2004 issued before or after the entry of the Confirmation Order relating to the subject matter of the Liquidating Trust Claims;

7. enter such orders as may be necessary or appropriate to implement, interpret, enforce or consummate the provisions of the Plan, the Confirmation Order, the Liquidating Trust Agreement and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, Plan Supplement or the Disclosure Statement;

8. resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

9. resolve and determine any DIP Claims or any other future indemnification claims of the DIP Lenders and the DIP Agent, if any.

10. issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

11. enforce the release and exculpation provisions;

12. enforce the injunction;

13. enforce all orders previously entered by the Bankruptcy Court;

14. resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in the Plan, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

15. enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

RLF1 4454759v. 14065862v

16. resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

17. enter an order and/or the decree contemplated in Fed. R. Bankr. P. 3022 concluding the Chapter 11 Cases.

Notwithstanding anything contained herein to the contrary, the Bankruptcy Court retains exclusive jurisdiction to the fullest extent permitted by applicable law to adjudicate Liquidating Trust Claims and to hear and determine disputes concerning Liquidating Trust Claims and any motions to compromise or settle such Liquidating Trust Claims or disputes relating thereto. Despite the foregoing, if the Liquidating Trustee on behalf of the Qimonda Liquidating Trusts chooses to pursue any Liquidating Trust Claim in another court of competent jurisdiction, the Liquidating Trustee will have authority to bring such action in any other court of competent jurisdiction.

## L. Miscellaneous Provisions

### 1. Modification of Plan

Subject to the limitations contained in the Plan: (1) the Debtors and the Creditors' Committee reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors (in consultation with the Creditors' Committee) or the Qimonda Liquidating Trusts, as the case may be, and upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code.

### 2. Revocation of Plan

The Debtors and the Creditors' Committee reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent plans of liquidation. If the Debtors and the Creditors' Committee revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors, the Creditors' Committee or any other Entity; or (c) constitute an admission of any sort by the Debtors, the Creditors' Committee or any other Entity.

### 3. Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

## 4. Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the state of Delaware, without giving effect to the principles of conflict of laws thereof.

## 5. Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) any Debtor with respect to the holders of Claims or Equity Interests or other parties-in-interest; or (2) any holder of a Claim or other party-in-interest prior to the Effective Date.

## 6. Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The Liquidating Trustee or its valid designee in accordance with the Liquidating Trust Agreement shall be authorized to (1) execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan and (2) certify or attest to any of the foregoing actions.  Pursuant to section 1146(a) of the Bankruptcy Code, the following shall not be subject to any stamp tax, real estate transfer tax, mortgage recording tax, filing fee, sales or use tax or similar tax:  (1) any dissolution or liquidation transaction; (2) the execution and implementation of the Liquidating Trust Agreement, including the creation of the Qimonda Liquidating Trusts, any transfers of the Liquidating Trust Assets or other assets (if any) to, by or from the Qimonda Liquidating Trusts, including the sale, liquidation, transfer, foreclosure, abandonment or other disposition of the Liquidating Trust Assets; or (3) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any agreements of liquidation or dissolution, bills of sale or assignments, applications, certificates or statements executed or filed in connection with any of the foregoing or pursuant to the Plan.  The Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

## 7. Section 1125(e) Good Faith Compliance

The Debtors and the Creditors' Committee, and each of their respective Representatives, shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

### 8. Further Assurances

The Debtors, the Qimonda Liquidating Trusts, all holders of Claims receiving distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

### 9. Service of Documents

Please refer to the Plan for details.

### 10. Filing of Additional Documents

On or before the Effective Date, the Debtors and the Creditors' Committee may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## VI.   STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Plan Proponents believe that: (1) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (2) they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith. Specifically, the Plan Proponents believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

➢ The Plan complies with the applicable provisions of the Bankruptcy Code.

➢ The Plan Proponents will have complied with the applicable provisions of the Bankruptcy Code.

➢ The Plan has been proposed in good faith and not by any means forbidden by law.

➢ Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

➢ Either each Holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Claims and Interests deemed to reject the Plan.

68

> Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code.

> Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

> Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan unless such a liquidation or reorganization is proposed in the Plan.

> At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

> The Debtors have paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

> In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtors will pay quarterly fees no later than the last day of the calendar month, following the calendar quarter for which the fee is owed in each of the Debtors' Chapter 11 Cases for each quarter (including any fraction thereof), to the Office of the UST, until the case is closed.

## A.      Best Interests of Creditors Test/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the bankruptcy court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if each of the debtor's chapter 11 cases were converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed.

In chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully and any such payment is provided for: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

Because the liquidation value of each Debtor is limited to the amount of Cash held in escrow, the Debtors' liquidation analysis focused on the additional costs and diminution in value to the Estates that would occur if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code. That is, in the event of a conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, the liquidation value available to holders of Allowed General Unsecured Claims and Allowed Intercompany Claims would be reduced by: (a) the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtors' chapter 7 cases; (b) unpaid Allowed Administrative Expense Claims of the Chapter 11 Cases; and (c) Allowed Priority Tax Claims and Allowed Other Priority Claims.

The Debtors' costs of liquidation in chapter 7 cases would include, among other things, the compensation of a trustee or trustees, as well as counsel and other professionals retained by such trustees. The trustees and any newly retained professionals would have to expend considerable time and effort to review and understand issues raised by the liquidation of the Debtors, thereby duplicating the efforts of the Debtors, the Creditors' Committee and their respective professionals and resulting in the incurrence of fees and expenses anticipated to exceed materially the fees and expenses that would be incurred by the Liquidating Trustee and its professionals under the Plan. The trustee's fees in any chapter 7 case, which could be as much as 3% of the assets of the Estates under section 326 of the Bankruptcy Code (or approximately $1.6 million in the aggregate based on the Cash transferred to the Qimonda Liquidating Trusts on the Effective Date plus up to 3% of proceeds realized by the Qimonda Liquidating Trusts from the various litigation matters, Avoidance Actions, and collection actions that are being investigated and/or pursued), are also anticipated to exceed the fees paid to the Liquidating Trustee. Finally, due to the lack of familiarity with the Debtors of any trustees appointed in the chapter 7 cases, the litigation matters would likely be extended and distributions in the chapter 7 cases would be made substantially later than the Effective Date assumed in connection with the Plan. This delay would reduce the present value of distributions to holders of General Unsecured Claims. In light of the foregoing, the Debtors believe that creditors will receive greater and more expeditious distributions under the Plan than they would receive through a chapter 7 liquidation. The Plan is, therefore, in the best interests of each Claim holder.

## B.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the reorganized debtors or the need for further financial reorganization, unless the plan contemplates such liquidation. As the Plan provides for the liquidation of the Debtors' assets, to the extent applicable, the Plan Proponents believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

## C.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to

70

which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

The Claims in Classes 1A and 1B are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan.

The Claims in Classes 2A, 2B, 3A and 3B are Impaired under the Plan and the Holders of such Allowed Claims and Interests are entitled to vote to accept or reject the Plan. Each of the voting Classes (Classes 2A, 2B, 3A and 3B) will have accepted the Plan if the Plan is accepted (or deemed accepted) by at least two-thirds in amount and a majority in number of the Claims of such Classes (other than any Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

The members of Classes 4A and 4B will not receive a distribution under the Plan, are deemed to reject the Plan, and are not entitled to vote on the Plan.

## D.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it, <u>provided</u> that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

Because members of Classes 4A and 4B will not receive a distribution under the Plan, the Debtors will be seeking to "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code.

### 1.    No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in it treatment of classes of claims of equal rank (e.g.,

71

classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

## 2. Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class.

*Secured Claims*: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

*Unsecured Claims*: The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

*Interests*: The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (1) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (2) if the class does not receive the amount as required under (1) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code in view of the deemed rejection by Classes 4A and 4B.

The votes of Holders of Classes 4A and 4B are not being solicited because, under Article III of the Plan, there will be no distribution to the Holders of such Classes. Classes 4A and 4B are, therefore, conclusively deemed to have rejected the Plan pursuant to section 1129(b) of the Bankruptcy Code. Notwithstanding the deemed rejection by Classes 4A and 4B or any Class that votes to reject the Plan, the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Interests. The Plan Proponents believe that the Plan and the

treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

## VII. PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

### A. The Debtors May Not Be Able To Obtain Confirmation of the Plan

The Debtors cannot ensure they will receive the requisite acceptances to confirm the Plan. But, even if the Debtors do receive the requisite acceptances, there can be no assurance that the Bankruptcy Court will confirm the Plan. The Bankruptcy Court could still decline to confirm the Plan if it were to determine that any of the statutory requirements for confirmation had not been met, including a determination that the terms of the Plan are not fair and equitable to non-accepting Classes. Therefore, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

### B. Risk of Non-Occurrence of the Effective Date

If the Debtors do not have sufficient Cash on hand to pay, in full, all Allowed DIP Claims, Allowed Administrative Expense Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims on the Effective Date, the Plan may never become effective.

### C. The Debtors Cannot State with any Degree of Certainty the Size of the Relevant Classes of Claims

The Debtors cannot know with any certainty, at this time, the number or amount of Claims in Voting Classes that will ultimately be Allowed. The Claims estimates set forth herein are based on various assumptions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect. Such differences may adversely affect the percentage recovery to holders of such Allowed Claims under the Plan. Accordingly, these make it nearly impossible to state with any certainty what creditor recoveries will be.

### D. Because a Portion of Recoveries are Based on Litigation Results, There May Be Material Differences in Recoveries Because of the Uncertainty of Litigation

In addition to Cash, the Liquidating Trusts Assets include several litigation matters, including without limitation various Avoidance Actions, the Kingston Lien Avoidance Action,

RLF1 4454759v. 14065862v

the IRB Avoidance Action, the QNA-Kingston Adversary Proceeding and the Other A/R Recovery Actions. In addition, pursuant to the settlement with QAG, QNA may become entitled to distributions made on account of the agreed allowed claims against QAG in the QAG Insolvency Proceedings and QNA is entitled to a portion of the Patent Proceeds,and QR and QNA could receive distributions on their respective allowed claims in the QAG Insolvency Proceeding. Since the outcome of each of these matters is speculative, it is impossible to predict what recoveries, if any, the Debtors will realize therefrom.

## E. The Liquidating Trusts Expenses May Increase Materially, Causing a Diminution of Recovery to Creditors

The Debtors' estimate of the Liquidating Trusts Expenses as noted in Article I.C above include the Debtors' estimate of the costs and expenses required to pay: (a) the professionals retained by the Liquidating Trusts in connection with claims administration, reconciliation, or disputes of any asserted Trust Claims; (b) all reasonable compensation of the Liquidating Trustee in the performance of its duties under the Liquidating Trusts Agreement and Plan, including compensation, fees and costs of professionals, consultants, agents and employees retained or to be retained by the Liquidating Trustee for services rendered to the Liquidating Trustee in connection with the Liquidating Trusts Assets, and the reasonable expenses of members of the Liquidating Trusts Committee; and (c) all reasonable expenses relating to liquidating, maintaining and insuring the Liquidating Trusts Assets, including, most significantly, professional fees incurred in prosecution of the various litigation matters that will be pursued to enhance recoveries. The Debtors have assumed in their estimates that all litigation matters proceed through trial. If the QNA Liquidating Trust is required to spend the entire amount reserved for Liquidating Trust Expenses to litigate the QNA Liquidating Trust Claims and no material recoveries are obtained on the QNA Liquidating Trust Claims, holders of General Unsecured Claims against QNA may not receive a recovery.

In addition, if more Cash is required to fund the Liquidating Trusts Expenses, recoveries to creditors may be materially affected. Substantially increased and unexpected funding requirements for Liquidating Trusts Expenses could be the result of: (a) newly filed litigation or developments in pending litigation; or (b) changes in laws or regulations relating the administration of the Liquidating Trusts. While the Debtors, the Liquidating Trusts and the Liquidating Trustee, as applicable, will make all reasonable efforts to mitigate any increases in Liquidating Trusts Expenses, their ability to do so may be constrained. Therefore, the costs and expenses that must be reserved, and which may be expended, to satisfy these obligations, may materially affect creditor recoveries.

## F. If the Plan Cannot be Confirmed or Consummated, the Debtors May Have to Liquidate under Chapter 7 of the Bankruptcy Code

If no plan can be confirmed or consummated, these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Equity Interests and the Debtors' liquidation analysis is set forth in Article VI.A above. The Plan Proponents believe that liquidation under chapter 7 would

result in smaller distributions being made to creditors than those provided for in the Plan because of additional delay and higher costs associated with appointment of a chapter 7 trustee or trustees.

## VIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to certain holders of Allowed Claims that are "United States persons", as defined under Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "Tax Code") .  The following summary is based on the Tax Code, Treasury Regulations promulgated thereunder (the "Regulations"), judicial decisions, administrative rules and pronouncements as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.  This summary does not address the federal income tax consequences to the Debtors, to holders of Equity Interests or to holders whose Claims are not Impaired under the Plan (*i.e.*, Allowed DIP Claims, Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Tax Claims and Allowed Secured Claims). The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular holder of an Allowed Claim in light of its particular facts and circumstances.  In addition, this summary addresses only U.S. federal income taxes.  Thus, the following discussion does not address foreign, state or local tax consequences, or any estate, gift or other non-income tax consequences, of the Plan, nor does it purport to address the federal income tax consequences of the Plan to holders of Allowed Claims that are subject to special treatment under the Tax Code (such as Persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, holders liable for the alternative minimum tax, holders whose functional currency is not the U.S. dollar, holders that received their Claims as compensation, S corporations, broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental entities, pass-through entities such as partnerships and holders of Claims who are themselves in bankruptcy).  Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim or Equity Interest.

If a partnership holds an Allowed Claim, the tax treatment of a partner of such partnership will generally depend upon the status of the partner and the activities of the partnership.  If you are a partner of a partnership holding an Allowed Claim, you should consult your tax advisors.

The following discussion assumes that the Plan will be implemented as described herein and does not address the tax consequences if the Plan is not carried out.  Furthermore, this discussion assumes that holders of Allowed Claims only hold Claims in a single Class.  This discussion further assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.  In addition, a substantial amount of time may elapse between the confirmation date and the receipt

of a final distribution under the Plan. Events subsequent to the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder.

This summary of the U.S. federal income tax consequences of the Plan is not binding on the Internal Revenue Service (the "IRS"), and no ruling will be sought or has been sought from the IRS with respect to any of the tax aspects of the Plan, no opinion of counsel has been obtained or will be obtained by the Debtors with respect thereto, and no tax opinion is given by this Disclosure Statement. The U.S. federal income tax consequences of certain aspects of the Plan may therefore be uncertain due to the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below.

The following discussion is not exhaustive. The discussion is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each holder of an Allowed Claim. Accordingly, each holder of an Allowed Claim is strongly urged to consult with its own tax advisor regarding the U.S. federal, state, local, and foreign income and other tax consequences of the Plan.

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE UNITED STATES INTERNAL REVENUE SERVICE, YOU ARE HEREBY NOTIFIED THAT ANY DISCUSSION OF TAX MATTERS SET FORTH IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) WAS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN AND WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER FEDERAL, STATE, OR LOCAL TAX LAW. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.     **Federal Income Tax Consequences**

1.     **Federal Income Tax Consequences to Holders of Allowed General Unsecured Claims**

In accordance with the Plan, each holder of an Allowed General Unsecured Claim shall be entitled to receive his, her or its Pro Rata share of the QR Unsecured Creditor Liquidating Trust Shares or QNA Unsecured Creditor Liquidating Trust Shares, as applicable.

The Debtors intend that each Qimonda Liquidating Trust will be treated for U.S. federal income tax purposes (i) in part as a grantor trust that is a liquidating trust within the meaning of Treasury Regulations § 301.7701-4(d) (with income and gain on Liquidating Trust Assets taxed at the beneficial owner level on a flow-through basis, as more fully described below), and (ii) in part as one or more Disputed Reserves that are disputed ownership funds within the meaning of Treasury Regulations § 1.468B-9(b)(1) (with net income and gain on Liquidating Trust Assets taxed at the separate entity level of the Disputed Reserves). The remainder of this discussion assumes that this treatment is correct. It is possible that the IRS could require an alternative

characterization of the Qimonda Liquidating Trusts, which could result in different (and possibly adverse) tax consequences to the Qimonda Liquidating Trusts and/or holders of Allowed General Unsecured Claims.

Except to the extent of the Disputed Reserves, the Qimonda Liquidating Trusts will not be treated as taxable entities for U.S. federal income tax purposes. Accordingly, except to the extent distributions are made to holders of Allowed General Unsecured Claims as of the Effective Date (as described below), the Debtors will be deemed to have distributed to the holders of Allowed General Unsecured Claims an undivided interest in their Pro Rata shares of the Liquidating Trust Assets, subject to any liabilities of the Debtors assumed by the Qimonda Liquidating Trusts and any liabilities of the Qimonda Liquidating Trusts themselves, and such holders will be deemed to have contributed such assets (subject to such liabilities) to the Qimonda Liquidating Trusts in exchange for beneficial interests in the Qimonda Liquidating Trusts.

Each holder of an Allowed General Unsecured Claim (such holders are referred to in this discussion as "Beneficial Owners") will recognize gain or loss upon receipt of such Pro Rata share equal to the difference between the "amount realized" by such Beneficial Owner and such holder's adjusted tax basis in his, her or its Claim. The amount realized is equal to the fair market value of such Beneficial Owner's Pro Rata share of the Liquidating Trust Assets (subject to any applicable liabilities), less the amount (if any) allocable to accrued but unpaid interest, as discussed below. Any gain or loss realized by a Beneficial Owner generally should constitute capital gain or loss to such creditor, unless such Claim is not a capital asset in the hands of such Beneficial Owner. If an Allowed General Unsecured Claim is a capital asset and it has been held for more than one year, the holder will realize long-term capital gain or loss. The deductibility of capital losses is subject to limitations. The tax basis of the applicable Liquidating Trust Assets deemed received in the exchange will equal the amount realized by the Beneficial Owner and the holding period for such assets will begin on the day following the exchange. For the avoidance of doubt, holders of Allowed General Unsecured Claims are not intended to be treated for federal income tax purposes as receiving Liquidating Trust Assets that are contributed to any Disputed Reserve until such time as such Disputed Reserve makes distributions, in which case (and at which time) the holders of Allowed General Unsecured Claims are intended to be treated as receiving the distributions actually received from the Disputed Reserve, if any.

For federal income tax purposes, it is intended that each Beneficial Owner be treated as an owner of the applicable Qimonda Liquidating Trust and, thus, will be subject to tax on such Beneficial Owner's Pro Rata share of taxable income or gain (if any) of such Qimonda Liquidating Trust, regardless of whether the corresponding cash proceeds are distributed to each Beneficial Owner. Accordingly, each Beneficial Owner will be required to include its annual taxable income, and pay tax to the extent due on, its allocable share of each item of income, gain, loss, deduction or credit recognized by the applicable Qimonda Liquidating Trust (including interest or dividend income earned on bank accounts and other investments) and the Liquidating Trustee will allocate such items to the holders using any reasonable allocation method. If a Qimonda Liquidating Trust sells or otherwise disposes of a Liquidating Trust Asset in a transaction in which gain or loss is recognized, each Beneficial Owner that is entitled to a distribution from such Liquidating Trust Asset (or the proceeds thereof) will be required to include in income gain or loss equal to the difference between (a) the Beneficial Owner's Pro

77

Rata share of the Cash or property received in exchange for the applicable Liquidating Trust Asset sold or otherwise disposed of and (b) the Beneficial Owner's adjusted basis in its Pro Rata share of the applicable Liquidating Trust Asset. The character and amount of any gain or loss will be determined by reference to the character of the asset sold or otherwise disposed of. Each Beneficial Owner will be required to report any income or gain recognized on the sale or other disposition of an applicable Liquidating Trust Asset whether or not the applicable Qimonda Liquidating Trust distributes the sale proceeds currently and may, as a result, incur a tax liability before the Beneficial Owner receives a distribution from the Qimonda Liquidating Trust.

Notwithstanding the foregoing, distributions made as of the Effective Date to holders of Allowed General Unsecured Claims are intended to be treated for U.S. federal income tax purposes as made directly from the Debtors to the holders of such Allowed Claims, and such holders shall include in their taxable incomes any interest earned on such distributions from the Effective Date to the date on which the actual distribution is made.

The federal income tax consequences to holders of Allowed General Unsecured Claims will differ and will depend on factors specific to each such holder, including, but not limited to: (i) whether the holder's Allowed General Unsecured Claim (or a portion thereof) constitutes a claim for principal or interest, (ii) the origin of the holder's Allowed General Unsecured Claim, (iii) whether the holder reports income on the accrual or cash basis method, (iv) whether the holder receives distributions under the Plan in more than one taxable year, (v) whether the holder's Claim is Allowed or Disputed on the Effective Date, (vi) whether the holder has previously included in income any accrued but unpaid interest with respect to the surrendered Allowed General Unsecured Claim and (vii) whether the holder has taken a bad debt deduction or otherwise recognized a loss with respect to the Allowed General Unsecured Claim.

## 2. Accrued Interest

Holders of Allowed General Unsecured Claims will recognize ordinary income to the extent that they receive Cash or property, including beneficial interests in the Qimonda Liquidating Trusts, that is allocable to accrued but unpaid interest that the holder has not yet included in its income. If an Allowed General Unsecured Claim includes interest, and if the holder receives less than the amount of the Allowed General Unsecured Claim pursuant to the Plan, the holder must allocate the Plan consideration between principal and interest. The Plan provides that, to the extent applicable, all distributions to a holder of an Allowed Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date, and the remaining portion of such distributions, if any, shall apply to any interest accrued on such Claim after the Petition Date (but only to the extent otherwise provided under the Plan). There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such holder and attributable to principal under the Plan is properly allocable to interest. Holders of Allowed General Unsecured Claims are urged to consult their own tax advisors in this regard. If the Plan consideration allocable to interest with respect to an Allowed General Unsecured Claim is less than the amount that the holder has previously included as interest income, the previously included but unpaid interest may be deducted, generally as a loss.

RLF1 4454759v. 14065862v

### 3. Post-Effective Date Cash Distributions

Because certain holders of Allowed General Unsecured Claims, including Disputed Claims that ultimately become Allowed Claims, may receive Cash distributions after the Effective Date, the imputed interest provisions of the Tax Code may apply and cause a portion of the subsequent distributions to be treated as interest. Additionally, because holders may receive distributions with respect to an Allowed General Unsecured Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the holder may be deferred. All holders of Allowed General Unsecured Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Claims.

### 4. Market Discount

If a holder of an Allowed General Unsecured Claim purchased the Claim for an amount that is less than its stated redemption price at maturity, the amount of the difference may be treated as "market discount" for U.S. federal income tax purposes, unless the difference is less than a specified *de minimis* amount. Under the market discount rules, the holder is required to treat any gain on the sale, exchange, retirement or other disposition of, the Allowed General Unsecured Claim as ordinary income to the extent of the market discount that the holder has not previously included in income and which is treated as having accrued on the Allowed General Unsecured Claim at the time of its payment or disposition.

### 5. Bad Debt or Worthless Securities Deduction

A holder who receives in respect of an Allowed General Unsecured Claim an amount less than the holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the Tax Code or a worthless securities deduction under section 165(g) of the Tax Code. The rules governing the character, timing and amount of bad debt and worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed General Unsecured Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### B. Backup Withholding and ~~information~~ Information Reporting

Generally, information reporting requirements will apply to all payments or distributions under the Plan and by the Qimonda Liquidating Trusts, unless you are an exempt recipient. Additionally, a holder may be subject to backup withholding at applicable rates, unless the holder (i) is a person exempt from backup withholding and, when required, demonstrates this or (ii) is a United States Person (as defined by Section 7701(a)(30) of the Tax Code) that provides a correct taxpayer identification number ("TIN") on IRS Form W-9 (or a suitable substitute form) and timely provides the other information and makes the representations required by such form and complies with the other requirements of the backup withholding rules. A holder may become subject to backup withholding if, among other things, the holder (i) fails to properly report interest and dividends for U.S. federal income tax purposes or (ii) in certain

circumstances, fails to certify, under penalty of perjury, that it has furnished a correct TIN. A holder that does not timely provide a correct TIN also may be subject to penalties imposed by the IRS. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your United States federal income tax liability provided the required information is properly furnished to the IRS.

## C.    Importance of Obtaining Professional Tax Assistance

THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN SOME CASES UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM. ACCORDINGLY, EACH HOLDER OF AN ALLOWED CLAIM IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

*[remainder of the page intentionally left blank]*

## IX.    CONCLUSION AND RECOMMENDATION

The Plan Proponents believe the Plan is in the best interests of all creditors and urge the Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Solicitation Agent no later than **August 22, 2011 at 4:00 p.m.**

Dated: June 7, 2011   QIMONDA NORTH AMERICA CORP.


By:          /s/ Scott T. Ryan
Name: Scott T. Ryan
Title:   Vice President, General Counsel and Secretary

QIMONDA RICHMOND, LLC


By:          /s/ Scott T. Ryan
Name: Scott T. Ryan
Title:   Vice President, General Counsel and Secretary


OFFICIAL COMMITTEE OF UNSECURED CREDITORS

By:          /s/ ~~Mark~~ Craig Dobbins
Name: ~~Mark~~   Craig Dobbins

RLF1 4454759v. 14065862v