**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
In re:                         )  Chapter 11
                               )
QIMONDA RICHMOND, LLC, et al., )  Case No. 09-10589  (MFW)
                               )
                               )
               Debtors.        )
_____ )  Jointly Administered
```

**OPINION**[1]

Before the Court is the Objection of Qimonda Richmond, LLC

(the "Debtor") to the proofs of claim filed by Wells Fargo Bank,

Northwest, N.A. ("Wells Fargo") and by Macquarie Electronics USA,

Inc. ("Macquarie") for damages allegedly due as a result of the

rejection by the Debtor of a lease agreement.  For the reasons

set forth below, the Court will sustain the Objection in part.


I.   BACKGROUND

The Debtor is a U.S. subsidiary of an international company,

Qimonda AG, that designed, developed, manufactured, and sold

memory chip modules.  On February 20, 2009, the Debtor filed a

voluntary petition for relief under chapter 11 of the Bankruptcy

Code (the "Petition Date").  On August 19, 2009, Wells Fargo and

Macquarie filed proofs of claim in the amount of $191,443,873 and

$191,478,085.81, respectively.  The Debtor filed objections to

---

[1]   This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Rule 7052 of the
Federal Rules of Bankruptcy Procedure, which is incorporated by
Rule 9014 of the Federal Rules of Bankruptcy Procedure.

the two proofs of claim to which the claimants responded.  After confirmation of its plan of reorganization, the Debtor's successor, the QR Liquidating Trust, filed a motion for summary judgment on the issues raised by the objections to the proofs of claim.  The motion has been fully briefed and is now ripe for decision.


II.  <u>JURISDICTION</u>

The Court has core jurisdiction over the objections to the proofs of claim.  28 U.S.C. §§ 1334 & 157(b)(2)(B).


III. <u>DISCUSSION</u>

A.   <u>Standard of Review</u>

The Court should grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[2]

In considering a motion for summary judgment under Rule 56, the Court must view the inferences from the record in the light most favorable to the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Hollinger v. Wagner Mining</u>

---

[2]  Rule 56 of the Federal Rules of Civil Procedure is made applicable to contested matters by Rules 7056 and 9014 of the Federal Rules of Bankruptcy Procedure.

Equip. Co., 667 F.2d 402, 405 (3d Cir. 1981).  If there does not appear to be a genuine issue as to any material fact and on such facts the movant is entitled to judgment as a matter of law, the Court must enter judgment in the movant's favor.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Carlson v. Arnot-Ogden Mem'l Hosp., 918 F.2d 411, 413 (3d Cir. 1990).

The movant bears the burden of establishing that no genuine issue of material fact exists.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 n.10 (1986); Integrated Water Res., Inc. v. Shaw Envtl., Inc. (In re IT Grp., Inc.), 377 B.R. 471, 475 (Bankr. D. Del. 2007).  A fact is material when it could "affect the outcome of the suit." Anderson, 477 U.S. at 248.

Once the moving party has established its prima facie case, the party opposing summary judgment must go beyond the pleadings and point to specific facts showing there is a genuine issue of fact for trial.  See, e.g., id. at 252; Matsushita, 475 U.S. at 585-86; Michaels v. New Jersey, 222 F.3d 118, 121 (3d Cir. 2000); Robeson Indus. Corp. v. Hartford Accident & Indem. Co., 178 F.3d 160, 164 (3d Cir. 1999).  If the moving party offers only speculation and conclusory allegations in support of its motion, its burden of proof is not satisfied.  See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999).

A proof of claim is entitled to prima facie validity.  Fed.
R. Bankr. P. 3001(f) ("A proof of claim executed and filed in
accordance with these rules shall constitute prima facie evidence
of the validity and amount of the claim.").  See also In re
Allegheny Int'l, Inc., 954 F.2d 167, 173 (3d Cir. 1992) ("a claim
that alleges facts sufficient to support a legal liability to the
claimant satisfies the claimant's initial obligation to go
forward.").  The proofs of claim filed by Wells Fargo and
Macquarie satisfy that standard.  Therefore, the Debtor bears the
burden of presenting sufficient credible evidence to refute at
least one essential allegation in the claims.  Allegheny, 954
F.2d at 173-74.  Wells Fargo and Macquarie, as the claimants,
however, have the burden of persuasion.  Id. at 174.

B.    Facts Relevant to the Claims[3]

In 2007, the Debtor entered into a sale/leaseback
arrangement relating to semiconductor manufacturing equipment
owned by the Debtor (the "Equipment").  As part of that
transaction, the Debtor sold the Equipment to the Qimonda Leasing
Trust 2007 (the "Trust") and simultaneously leased it back
pursuant to an Equipment Lease Agreement (the "Lease").  (Ryan
Decl. Exs. A & C; Dale Decl. Ex. D.)  Pursuant to the Trust
Agreement executed by Wells Fargo and Macquarie, Wells Fargo

---

[3]  As is evident from the declarations filed by the parties,
the facts are undisputed.  (See D.I. 2663 ("Ryan Decl."); D.I.
2314 ("Dale Decl.").)

agreed to serve as the owner trustee of the Trust.  (Ryan Decl.
Ex. A.)  The Trust raised the funds necessary to purchase the
Equipment (approximately $289 million) through an equity
investment of $48,614,812 from Macquarie and a loan totaling
$240,531,938 from various lenders (the "Loan Participants")
represented by the Bank of Utah (the "Indenture Trustee").  (Ryan
Decl. Exs. A & D; Dale Decl. Ex. E.)  A Participation Agreement
was executed by all the parties detailing the transaction.  (Ryan
Decl. Ex. B; Dale Decl. Ex. B.)

     In connection with the transaction, the Trust issued non-
recourse notes to the Loan Participants and granted a security
interest in the Equipment and an assignment of the Lease to the
Indenture Trustee on behalf of the Loan Participants.  (Ryan
Decl. Ex. D at 2 & § 2.05; Dale Decl. Ex. E at 2 & § 2.05.)
Under the Lease, the Debtor was obligated to pay all operating
expenses of the Equipment, as well as rental payments to the
Trust which were sufficient to fully amortize the Loan
Participants' debt in four years.  (Dale Decl. at ¶ 8.)  At the
end of the Lease, Macquarie was entitled to recover the Equipment
or to cause the Trust to re-lease or sell it to the Debtor at the
then current fair rental or fair market value.  (Dale Decl. at ¶
9.)

     After filing its chapter 11 petition on February 20, 2009,
the Debtor rejected the Lease and related Participation Agreement

which was approved by order dated May 6, 2009.  (D.I. 334.)
Thereafter, the Indenture Trustee elected to foreclose and sell
the Equipment.  The Indenture Trustee ultimately sold the
Equipment to Macquarie for $32.5 million pursuant to a
Disposition Agreement dated August 31, 2009.  (Ryan Decl. Ex. F;
Dale Decl. Ex. F.)

In the interim, proofs of claim were timely filed by Wells
Fargo, Macquarie and the Indenture Trustee on August 19, 2009.
(D.I. 495; Ryan Decl. Exs. G & H.)  The Indenture Trustee's claim
sought in excess of $200 million in unpaid rent, liquidated
damages, and other fees and costs due under the Lease.  The
claims filed by Wells Fargo and Macquarie asserted damages in the
amount of approximately $191 million for the anticipated value of
the equipment, and attorneys' fees and other costs.  (Ryan Decl.
Exs. G & H.)  In addition, Macquarie claims in excess of $32.5
million for costs related to its purchase of the Equipment at the
foreclosure sale.  (Ryan Decl. Ex. G.)

C.   Debtor's Objections to the Claims

The Debtor filed objections to the three claims.  The
objections to the Wells Fargo and Macquarie claims are the
subject of the present motion for summary judgment.

1.   Claims for lost residual value of Equipment

The Debtor argues that the claim of Wells Fargo for the
residual value of the Equipment ($191 million) which was lost as

6

a result of the Debtor's rejection of the Lease is duplicative of
the claims of the Indenture Trustee and Macquarie.  It notes that
Wells Fargo has no independent interest in the Trust or the
Equipment but merely acted as a pass-through to convey payments
received under the Lease to the beneficiaries of the Trust, the
Indenture Trustee and Macquarie.  Wells Fargo has also assigned
all its rights under the Lease to the Indenture Trustee to secure
repayment of the notes.  (Ryan Decl. Ex. D at 2; Dale Decl. Ex. D
at 2.)

Similarly, the Debtor argues that Macquarie's claim for the
lost value of the Equipment must be disallowed because Macquarie,
as the equity holder, was not entitled to anything until the
Indenture Trustee was paid in full, which will never happen.
(Ryan Decl. Ex. D at §§ 3.03 & 3.06; Dale Decl. Ex. E at §§ 3.03
& 3.06.)  In addition, the Debtor contends that Macquarie
expressly agreed not to pursue any such claim as part of the
Disposition Agreement, which stated that Macquarie would not

> take any action that would seek or cause the
> disallowance of any portion of . . . the claims filed
> by the Indenture Trustee [in the Debtor's case or in
> QAG's insolvency proceeding] . . . .  Nothing in the
> foregoing provision of this Section 4(h) shall prevent
> [Macquarie] from asserting claims under or pursuing any
> rights or remedies it may have (including under the
> Operative Documents) <u>except to the extent that claims
> asserted thereunder in such proceedings are duplicative
> of claims of the Indenture Trustee</u> asserted [in its
> claims against the Debtor or QAG]. . . .

(Ryan Decl. Ex. F at § 4(h); Dale Decl. Ex. F at § 4(h) (emphasis

added).)

Wells Fargo and Macquarie contend that their claims are not duplicative of the Indenture Trustee's claim or each others but that they each have direct independent claims against the Debtor. Specifically, they argue that under the Lease they were entitled to be paid Supplemental Rent which was defined to include

> all amounts, liabilities and obligations (other than Equipment Lease Rent) that the [Debtor] assumes or agrees to pay under the Operative Documents to [Wells Fargo], [Macquarie] or any other Person whether or not designated as Supplemental Rent, including payments of Termination Value, the End of Term Purchase Option Price, Fair Market Sales Value, Make-Whole Amounts and all indemnity payments pursuant to Section 13 of the Participation Agreement.

(Ryan Decl. Ex. B, App. A at 18; Dale Decl. Ex. B, App. A at 18.) They argue that the Debtor breached its duty under the Lease to return the Equipment or purchase it at its Fair Market Sales Value at the end of the Lease, thereby depriving them of the Equipment's Termination Value[4] or Fair Market Sales Value.[5]

That argument does not help the claimants, however, because the Debtor did return the Equipment (to the Indenture Trustee). Unfortunately, the fair market value of the Equipment at that

---

[4]   The Termination Value was a price to be paid by the Debtor, calculated as a percentage of the cost of the piece of Equipment depending on the date of termination.  (Ryan Decl. Ex. B, App. A at 19; Dale Decl. Ex. B, App. A at 19.)

[5]   The Fair Market Sales Value was to be paid by the Debtor if it chose to buy the Equipment at the end of the Lease.  (Ryan Ex. B, App. A at 6 & Ex. C at § 14(a); Dale Decl. Ex. B, App. A at 6 & Ex. D at § 14(a).)

time (as suggested by the $32.5 million purchase price paid for it by Macquarie)[6] was substantially less than the Indenture Trustee was owed at that time (in excess of $200 million according to its proof of claim).  The Debtor did not guarantee that the fair market value of the Equipment would exceed the claim of the Indenture Trustee.  (Ryan Decl. Ex. B at § 13; Dale Decl. Ex. B at § 13.)  Therefore, the Court concludes that Wells Fargo and Macquarie have no claim for loss of the value of the Equipment.

Wells Fargo and Macquarie argue, however, that their claim is for the Debtor's affirmative destruction of their ownership interest in the Equipment and is no different from a claim they would have if the Debtor destroyed the Equipment and had not insured it.  This is true, but does not provide a basis for a claim either.  If the Equipment had been destroyed and its then fair market value was less than the amount owed to the Indenture Trustee (as it is here), then Wells Fargo and Macquarie would not be entitled to anything.  Wells Fargo and Macquarie assigned all their rights to insurance and other claims under the Lease to the Indenture Trustee.  (Ryan Decl. Ex. D at 2-3; Dale Decl. Ex. E at 2-3.)  Because the Fair Market Sales Value is less than the

---

[6]  The Debtor contends that the price paid by Macquarie did not reflect the true fair market value of the Equipment.  That issue need not be resolved here but will be addressed in connection with the Debtor's objection to the claim of the Indenture Trustee.

amount due to the Indenture Trustee, Wells Fargo and Macquarie can collect nothing from the Debtor.

Wells Fargo and Macquarie argue that even though they may not have a right to payment of a direct claim under the Lease because it has been assigned to the Indenture Trustee, they have a right to indemnification under section 13 of the Participation Agreement.  Wells Fargo and Macquarie argue that section 13 guaranteed that they would be paid for any loss which they may suffer as a result of the Lease, including the failure of the Debtor to pay the Fair Market Sales Value or the Termination Value of the Equipment at the end of the Lease.

Section 13 of the Participation Agreement provides:

(a) <u>General Indemnity</u>.  [The Debtor] hereby agrees to assume, and does hereby assume, liability for, and hereby agrees to indemnify . . . each Indemnitee [including Wells Fargo and Macquarie] from and against any and all liabilities, obligations, losses, damages, penalties, settlements, claims (including Environmental Claims), actions, suits, proceedings or judgments of any kind and nature, costs, expenses (including reasonable attorneys' fees and disbursements) and disbursements (including those reasonable and documented costs and expenses, including reasonable legal and consultant fees and expenses, <u>incurred by</u> such party in connection with the Equipment or the Operative Documents . . . which <u>may be imposed on, incurred by or asserted against any Indemnitee</u>:
> (i) in any way relating to or arising out of this Agreement or any of the other Operative Documents or the transactions contemplated hereby or thereby or the enforcement of any of the rights, remedies or terms of any thereof;
> (ii) in any way relating to the Equipment, any Unit or any Part thereof;

. . .

(iv) in any way relating to or arising out of
any failure by [the Debtor] to perform or
observe any covenant, condition or agreement
in or the falsity or breach of any
representation or warranty of [the Debtor]
made in or pursuant to any Operative
Document;

. . .

(xii) in any way relating to or arising out
of or otherwise in connection with any event
or transaction contemplated by the Operative
Documents (as contemplated by Section 10(c)
and Sections 6(a), 9, 14 and 16 of the
Equipment Lease) and occurring after the
Closing Date (regardless of whether such
transactions are consummated).
(all of the foregoing, "Costs or Expenses").

(Ryan Decl. Ex. B at § 13; Dale Decl. Ex. B at § 13 (emphasis

added).)

The Debtor argues that section 13 is intended only to

indemnify Wells Fargo and Macquarie for claims asserted against

them by third parties.  Further, the Debtor notes that section 13

contains a carve-out of its indemnification obligation and

specifically provides that there can be no claim for the

anticipated value of the Equipment:

Nothing herein shall be deemed to constitute a guaranty
of any useful life or present or future residual value
of the Equipment or a guaranty that any amount of
principal and interest due under the Indenture will be
paid.

(Id.) Consequently, the Debtor argues that any claim for the

Termination Value or Fair Sales Market Value of the Equipment is

11

expressly excluded by the terms of the indemnification provision.

The Debtor relies principally on the decision in Kmart, which held that similar language in a sale/leaseback agreement did not require that the debtor indemnify the beneficiaries of a business trust for their investment losses caused by the debtor's rejection of the lease in its bankruptcy proceeding.  In re Kmart Corp., 362 B.R. 361, 392-94 (Bankr. N.D. Ill.), aff'd 2007 WL 3171316 (N.D. Ill. Oct. 24, 2007).  The Kmart Court held that under New York law[7] it was obliged to construe the indemnity provision strictly.  Id. at 392 (citing Haynes v. Kleinewefers and Lembo Corp., 921 F.2d 453, 456 (2d Cir. 1990)).  In so doing, the Kmart Court concluded that the indemnity at issue was designed only to indemnify claims of third parties (rather than claims against the debtor) because it indemnified the creditors only "from and against claims incurred by, asserted against, or imposed on" the creditors.  362 B.R. at 393.  The Kmart Court therefore determined that the provision did not indemnify the creditors for the lost return on their investment.  Id.  The Kmart Court also concluded that, even if such direct claims against the debtor were covered by the indemnification, they were excluded by the carve-out language which specifically said that

---

[7]  The Participation Agreement is governed by New York law, as was the agreement at issue in Kmart.  (Ryan Decl. Ex. B at § 18(d); Dale Decl. Ex. B at § 18(d).)  See also Kmart, 362 B.R. at 387.

Kmart was not guaranteeing any residual value of the property or the notes.  <u>Id.</u>

The Debtor argues that because the language in the <u>Kmart</u> indemnification and carve-out is virtually identical to section 13 of the Participation Agreement, this Court must conclude that the indemnification at issue was meant only to indemnify Wells Fargo and Macquarie for claims asserted against them by third parties rather than the claims which they have asserted against the Debtor for their lost investment opportunity.  This is bolstered, the Debtor argues, by the fact that the Participation Agreement defines indemnified claims as "Costs or Expenses" making it clear it is not simply for loss of their return on investment.  The Debtor argues that Macquarie took the risk that the Loan Participants would not be repaid and that it would not get anything in exchange for its investment.

Wells Fargo and Macquarie argue, however, that the indemnification provision is broad and covers all claims "in any way relating to" a default by the Debtor under the Lease or any remedies they may have under the Lease.  (Ryan Decl. Ex. B at § 13(a)(iv) & (xii); Dale Decl. Ex. B at § 13(a)(iv) & (xii).) Their claims for the lost value of the Equipment, they contend, are directly related to the Debtor's default of the Lease.  If the Debtor had continued to pay all rental payments, the Indenture Trustee would have been paid in full and Wells Fargo

13

and Macquarie would have held title to the Equipment by the end
of the Lease.

Under New York law, indemnity provisions are to be construed
strictly.  See, e.g., Manley v. Ambase Corp., 337 F.3d 237, 245
(2d Cir. 2003) ("New York law requires indemnification agreements
to be strictly construed; a court cannot find a duty to indemnify
absent manifestation of an 'unmistakable intention' to
indemnify."); Haynes, 921 F.2d at 456-57 (stating that under New
York law, an indemnification agreement "must be strictly
construed so as not to read into it any obligations the parties
never intended" and concluding that parties' agreement to
indemnify seller for obligations arising in the ordinary course
of business did "not support a clear implication of an
unmistakable intent to indemnify" the seller for injuries arising
from seller's negligent modification of machinery used in the
business); Georgia-Pacific Consumer Prods., LP v. Int'l Paper
Co., 566 F. Supp. 2d 246, 251 (S.D.N.Y. 2008) ("Under New York
law, indemnification agreements are strictly construed and a
court may not find a duty to indemnify absent manifestation of a
'clear and unmistakable intent' to do so."); Creative Waste
Mgmt., Inc. v. Capitol Envtl. Servs., Inc., 458 F. Supp. 2d 178,
188 (S.D.N.Y. 2006) ("Under New York law, '[w]hen a party is
under no legal duty to indemnify, a contract assuming that
obligation must be strictly construed to avoid reading into it a

14

duty which the parties did not intend to be assumed." (quoting Hooper Assocs., Ltd. v. AGS Computers, Inc., 74 N.Y.2d 487, 491 (1989)).

In this case, the express language of the indemnification provision provides for indemnification of claims "imposed on, incurred by or asserted against" Wells Fargo or Macquarie in connection with any default of the Lease by the Debtor, event of loss of the Equipment, or any remedies related thereto. (Ryan Decl. Ex. B at § 13(iv) & (xii); Dale Decl. Ex. B at § 13(iv) & (xii).) This language supports the Debtor's argument that it is only to indemnify Wells Fargo and Macquarie for claims of third parties against them. The Court agrees with the reasoning of the Court in Kmart that such a general indemnification clause is designed "to protect [the indemnitee] from third-party claims associated with operation of the properties" not for claims of the indemnitee against the indemnitor under the contract itself. 362 B.R. at 393.

This interpretation is further supported by the fact that indemnification claims are described as "Costs and Expenses." A direct claim arising under the Lease would not necessarily be an out-of-pocket cost or expense of Wells Fargo and Macquarie. Their claim for the lost value of the Equipment or their investment clearly is not an out-of-pocket cost or expense.

This reading is also supported by the carve-out language which expresses the parties' intent <u>not</u> to indemnify Wells Fargo and Macquarie for claims that arise because the Equipment does not have the value anticipated or the Loan Participants do not get repaid (for whatever reason, including the Debtor's failure to pay under the Lease).[8]  The Court agrees with the <u>Kmart</u> Court that such a carve-out from the indemnity of any claim related to the residual value of the property precludes any claim for lost investment when the lease is rejected.  <u>Id.</u>  As the equity investor, Macquarie bore the risk that the Equipment would have no value at the end of the Lease term.  At the time of the foreclosure by the Loan Participants, the Equipment was worth less (as evidenced by the price paid by Macquarie, $32.5 million) than the amount due to the Loan Participants at that time (in excess of $200 million according to the Indenture Trustee's claim).

If the Debtor had failed to pay operating expenses or the rent due to the Indenture Trustee, and if Wells Fargo or Macquarie had made those payments,[9] then they would be entitled

---

[8]  Wells Fargo and Macquarie admit that the indemnity did not guaranty the payment of the rent due to the Indenture Trustee nor guaranty any useful life or present or future residual value of the Equipment.  (D.I. 2775 at ¶ 22.)

[9]  Under the Lease, if the Debtor defaulted in rent payments, Wells Fargo and Macquarie were permitted (but not obligated) to make those payments and cure the default.  (Ryan Decl. Ex. C at § 4.04; Dale Decl. Ex. D at § 4.04.)

16

to be indemnified by the Debtor for the payments made.  In
addition, at the end of the Lease term, after the Indenture
Trustee was paid in full, they would have had title to the
Equipment free of the Indenture Trustee's lien.  However, neither
Wells Fargo nor Macquarie made those payments on behalf of the
Debtor.[10]  Nonetheless, Wells Fargo and Macquarie seek to be
"reimbursed" for the loss in value of the Equipment caused, they
say, by the Debtor's default of the Lease - without having made
any payments themselves on the Debtor's behalf.  To allow their
claims would result in the Debtor being charged thrice for the
same obligation: by the Indenture Trustee, by Wells Fargo, and by
Macquarie.[11]

The parties clearly did not intend such a construction of
their agreement.  The Court concludes that section 13 of the
Participation Agreement does not indemnify Wells Fargo and

_____

[10]  Presumably Wells Fargo and Macquarie did not make those
payments because the Loan Participants held only non-recourse
notes.  Consequently, the Loan Participants could look only to
the Equipment and the rental income from the Equipment for
repayment and could not force Wells Fargo and Macquarie to pay
them if there was a deficiency.  (Ryan Decl. Ex. D at § 2.05;
Dale Decl. Ex. E at § 2.05.)  See also, In re Montgomery Ward,
LLC, 634 F.3d 732, 740 (3d Cir. 2011) ("A claim secured by a
nonrecourse security interest is, by definition, enforceable only
against the debtor's property.").

[11]  Wells Fargo and Macquarie assert that they are each
entitled to be indemnified for the Debtor's failure to pay rent
because section 13 gives each of them an independent right of
indemnification even if the other has asserted the same claim.
(D.I. 2313 at ¶¶ 24, 74-75; D.I. 2775 at ¶¶ 69-76.)

17

Macquarie for claims against the Debtor but only for claims
asserted against them by third parties.  Therefore, the Court
will sustain the Debtor's objection to the Wells Fargo and
Macquarie claims to the extent they seek indemnification for the
value of the Equipment that they expected to realize if the
Debtor had fully performed the Lease.

        2.   Costs related to foreclosure and bankruptcy

Wells Fargo and Macquarie also assert claims for attorneys'
fees and related costs associated with the rejection of the Lease
in the bankruptcy case.  The Debtor contends that these are not
indemnifiable under New York law.  See, e.g., Gotham Partners,
L.P. v. High River Ltd. P'ship, 906 N.Y.S.2d 205, 209 (N.Y. App.
Div. 2010) (finding that a general indemnification provision
which includes attorney's fees could "not be read broadly to
encompass an award of attorney's fees" incurred in a dispute
between the parties unless "the provision explicitly so
state[s]"); Hooper Assoc., 74 N.Y.2d at 490 (finding that general
indemnity provision, which included attorneys' fees, was not
"unmistakably clear" that it intended to indemnify a party for
attorneys' fees incurred in litigation between the parties, as
opposed to litigation involving third parties).

The Court agrees with the Debtor that the attorneys' fees
and costs incurred in connection with the bankruptcy case are not
indemnifiable under section 13 of the Participation Agreement.

18

In concluding that a general indemnification provision which
included attorney's fees was not explicit enough to cover
attorney's fees incurred in litigation between the parties, the
Court in <u>Hooper Assoc.</u> noted that

> Inasmuch as a promise by one party to a contract to
> indemnify the other for attorney's fees incurred in
> litigation between them is contrary to the well-
> understood rule that parties are responsible for their
> own attorney's fees, the court should not infer a
> party's intention to waive the benefit of the rule
> unless the intention to do so is unmistakably clear
> from the language of the promise.

74 N.Y.2d at 492.

Like the contracts in <u>Gotham Partners</u> and <u>Hooper Assoc.</u>, the
preamble of section 13 simply includes as indemnifiable,
"reasonable legal and consultant fees and expenses" which are
related to the agreements, defaults, or remedies.  (Ryan Decl.
Ex. B at § 13; Dale Decl. Ex. B at § 13.)  It does not expressly
state that the Debtor will indemnify Wells Fargo and/or Macquarie
for attorneys' fees incurred in litigation with it.  Therefore,
the Court concludes that there is no manifestation of a "clear
and unmistakable intent" to indemnify Wells Fargo or Macquarie
for attorneys' fees incurred by them in litigation with the
Debtor as opposed to litigation with third parties.  <u>See, e.g.</u>,
<u>Gotham Partners</u>, 906 N.Y.S.2d at 209; <u>Hooper Assoc.</u>, 74 N.Y.2d at
490.  Consequently, the Court will sustain the Debtor's objection
to the claims of Wells Fargo and Macquarie to the extent the
claims seek indemnification for attorneys' fees and costs

19

incurred in litigation with the Debtor.

3.   <u>Cost of purchase of Equipment at foreclosure</u>

Macquarie also seeks indemnification for the cost of purchasing the Equipment at the Indenture Trustee's foreclosure sale and other costs incidental to that purchase, including the cost of decommissioning, removing and storing the Equipment, as well as associated attorneys' fees and costs.  The Debtor contends that these claims are also not indemnifiable because they were purely voluntary expenditures by Macquarie.  Macquarie had no obligation under the parties' agreement to buy the Equipment at the foreclosure sale.  Therefore, the Debtor argues it was not an expense related to a remedy Macquarie had under the Lease.

The Court disagrees with the Debtor.  The cost incurred by Macquarie in purchasing the Equipment at foreclosure is indemnifiable.  These were actual funds expended by Macquarie as a result of the Debtor's default of the Lease.  Further, the price paid to the Indenture Trustee by Macquarie for the Equipment ($32.5 million) reduced the Indenture Trustee's claim against the Debtor under the Lease.  (Ryan Decl. Ex. C at § 16; Dale Decl. Ex. D at § 16.)

The Court concludes, however, that the other costs incurred by Macquarie (for decommissioning, removal and storage of the Equipment) are not indemnifiable.  They were not paid to the

20

Indenture Trustee and will not reduce its claim against the
Debtor.  Further, they cannot be characterized, as Macquarie
asserts, as costs related to its exercise of any remedies under
the Lease.  First, Macquarie had no remedies under the Lease
because all rights and remedies under the Lease were assigned to
the Indenture Trustee, until its claim is paid in full.  Second,
it was the sale/purchase of the Equipment at the foreclosure sale
that was the exercise of a remedy under the Lease, the costs
expended by Macquarie after it bought the Equipment were expended
by it not as a creditor of the Debtor but voluntarily as the new
owner of the Equipment to preserve its value for itself.
Therefore, the Court will overrule the Debtor's objection to
Macquarie's claim for indemnification for the price paid for the
Equipment but will sustain the objection to the claim for costs
incurred after that sale.


IV.  <u>CONCLUSION</u>

        For the foregoing reasons, the Court concludes that the
Debtor's objection to the claims of Wells Fargo and Macquarie
will be sustained in part to the extent that the claims seek
indemnification for the lost value of the Equipment resulting
from the Debtor's rejection of the Equipment Lease, for
attorneys' fees arising from litigation with the Debtor, and for
the costs expended by Macquarie after it bought the Equipment at

the foreclosure sale.  The Court will, however, overrule the
objection to the extent it relates to the claim of Macquarie for
indemnification of the cost incurred by it ($32.5 million) in
buying the Equipment at the foreclosure sale.

An appropriate Order is attached.


Dated: August 8, 2012                BY THE COURT:

                                     Mary F. Walrath
                                     United States Bankruptcy Judge